

**CALLI LAW, LLC**
One Flagler Building, Suite 1100
14 Northeast 1st Avenue
Miami, Florida 33132
T. 786.504.0911
F. 786.504.0912
www.calli-law.com

November 10, 2021

<u>**BY EMAIL**</u>

Honorable Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    <u>In re Search Warrant dated November 5, 2021</u>, 21 MAG 10685

Dear Judge Torres:

      For reasons not known to our clients—non-profit news organization Project Veritas and its founder, journalist James O'Keefe— the U.S. Attorney's Office for the Southern District of New York ("the government") has launched a federal criminal investigation regarding a diary, the contents of which were published by another news outlet more than a year ago.  That news outlet reported that the diary belonged to Ashley Biden, the daughter of then-candidate Joseph R. Biden. As explained below, Project Veritas received what two previously-unknown sources described as the original of Ashley Biden's diary. Despite having credible evidence that the diary belonged to Ashley Biden, Project Veritas and Mr. O'Keefe ultimately could not confirm the diary's authenticity to the degree they required to satisfy their journalistic ethics. For that reason, Project Veritas **never published** the diary nor ran a news story on it. Instead, Project Veritas provided the diary to local law enforcement in Florida. The extraordinary actions taken by the government, most significantly the use of search warrants to seize news gathering materials from journalists, appear to be founded on the premise that the diary **does** belong to Ashley Biden. That fact, however, does not warrant the exercise of federal criminal authority to investigate and punish journalists who merely obtained the diary and possessed it temporarily.

      Pursuant to its diary investigation, the government seized Mr. O'Keefe's cell phones in a 6:00 AM raid on his home. The cell phones contain vast amounts of information protected by the First Amendment, including materials related to on-going news investigations, whistleblower information, and donor information that implicates freedom of speech and association guarantees. The cell phones also contain a vast amount of attorney-client privileged material, both related to the representation of Mr. O'Keefe and Project Veritas in connection with the government's investigation, and attorney-client privileged materials arising out of many unrelated matters.

The government's seizure thus imperils interests of the highest order. Project Veritas and James O'Keefe move that the Court order the government not to review the contents of the seized phones and that the Court appoint a special master to review the phones' contents.[1]

## 1. Introduction

At 6:00 AM on Saturday, November 6, 2021, the Federal Bureau of Investigation ("FBI") executed a search warrant at Mr. O'Keefe's home, seizing two cell phones[2] belonging to Mr. O'Keefe, who is the founder of non-profit news outlet Project Veritas. The FBI seized the devices from Mr. O'Keefe's home pursuant to a search warrant procured by the government 19 hours earlier. The government had also procured search warrants for, and the FBI seized, cell phones and other electronic devices from two former Project Veritas journalists two days earlier. We have not found a reported case in which the Department of Justice obtained a search warrant to seize newsgathering work product and other First Amendment-protected material from a journalist.

The same day the government seized Mr. O'Keefe's cell phones, undersigned counsel requested that the government and the FBI sequester and not review the seized materials, including with any purported government taint team. **Ex. A**, 11/6/21 Letter of P. Calli to M. Steiner et al. The undersigned also requested that the government describe its efforts to comply with the law and other authority governing seizing materials from the news media: 42 U.S.C. § 2000aa, 28 C.F.R. § 50.10, and Justice Manual 9-13.400. The government's response declined the request not to access the seized devices and represented that it "has complied with all applicable regulations and policies regarding potential members of the news media." **Ex. B**, 11/7/21 Letter of R. Sobelman to P. Calli et al. Under these regulations and policies, seizing materials from the news media requires DOJ approvals at the highest levels. If the government's representation of compliance is correct, it means that senior DOJ officials approved the seizure of a prominent journalist's cell phones as part of a federal investigation into the President's daughter's diary. Such an investigation, and the use of search warrants to seize information from journalists, are both unprecedented.

Despite undersigned counsel's requests, the government sent an email to the undersigned at 6:11 PM on November 8, 2021, stating, "[W]e anticipate the forensic extraction of data from those devices to begin as early as tomorrow morning." **Ex. C**, 11/8/21 Email Exchange. The undersigned informed the government that Mr. O'Keefe and Project Veritas would seek judicial relief promptly and reiterated that the government should not access Mr. O'Keefe's cell phones given the privileged and First Amendment-protected information contained therein. The

---

[1] The government represented to the undersigned that it would "pause substantive review – but not technical extraction" of the materials contained on Mr. O'Keefe's phones, upon filing of the instant motion. The undersigned request entry of an order suspending extraction, as well as substantive review, until the Court adjudicates the instant motion.

[2] One of the cell phones seized from Mr. O'Keefe is his current work phone. The second phone is older and he stopped using it approximately two years ago. Given the time period relevant to the government's diary investigation, the older phone cannot have any information properly subject to the search warrant.

government refused. In a November 8, 2021, meet and confer phone call, the government stated that it would only stop its extraction and potential review of Mr. O'Keefe's phone after the filing of this Motion. The government would not even agree to hold off its review of Mr. O'Keefe's cell phone for one day when the undersigned advised that this Motion would be filed within one day.

## 2. Factual and Procedural Background

### A.    The Nature of the Government's Investigation.

The government is investigating the diary of Ashley Biden. In late October 2020, an unrelated news website called National File began publishing excerpts of the diary and articles about the diary's contents. *See e.g.* Tom Pappert, *DIARY: Biden's Daughter Ashley Resents Him For His Money, Control, Emotional Manipulation – Whistleblower*, NAT'L FILE, Oct. 28, 2020, *available at* https://nationalfile.com/diary-bidens-daughter-ashley-resents-him-for-his-money-control-emotional-manipulation-whistleblower/. For over a year, National File has continuously hosted the diary on its website, where it can be read by anyone with an internet connection. *See* Patrick Howley, *FULL RELEASE: Ashley Biden Diary Reveals Child Sex Trauma, Drug Abuse, Resentment for Joe – Whistleblower*, NAT'L FILE, Oct. 28, 2020, *available at* https://nationalfile.com/full-release-ashley-biden-diary-reveals-child-sex-trauma-drug-abuse-resentment-for-joe-whistleblower/. Mr. O'Keefe and Project Veritas did not publish the diary.

When National File published the diary, it claimed to have received the diary from a "whistleblower" at another news organization that had chosen not to report on the diary. *Id.* No Project Veritas employee had authority to, or was directed to, provide the diary to National File. Nor to provide it to anyone else. Project Veritas had no involvement in National File's publication of the diary and had no advance knowledge that National File intended to publish it.

Earlier in 2020, two individuals – R.K. and A.H. – contacted Project Veritas through a proxy. Prior to this contact, neither James O'Keefe nor anyone at Project Veritas knew or had even heard of R.K. and A.H. Those two individuals represented that they had material (including a diary) that Ashley Biden had abandoned at a house where she had been staying in Delray Beach, Florida. Project Veritas had **no** involvement with how those two individuals acquired the diary. All of Project Veritas's knowledge about how R.K. and A.H. came to possess the diary came from R.K. and A.H. themselves.

R.K. and A.H. through their lawyers requested payment from Project Veritas for contributing the diary for potential publication. As described by these individuals, the diary appeared to be newsworthy. R.K. and A.H.'s lawyers negotiated an arm's length agreement with two of Project Veritas's in-house lawyers, wherein R.K. and A.H. reaffirmed that they had come to possess the diary lawfully. Pursuant to that agreement, R.K. and A.H delivered the diary and other materials reportedly abandoned by Ms. Biden to Project Veritas.

Project Veritas conducted due diligence to determine if the diary was authentic and investigated the potential news story. After significant deliberation, Project Veritas decided not to publish the diary and not to run any news story about it. Despite an internal belief that the diary was genuine, Mr. O'Keefe and Project Veritas could not sufficiently satisfy themselves with the

3

diary's authenticity such that publishing a news story about it would meet ethical standards of journalism.

After Project Veritas decided not to run a story on the diary, Project Veritas's General Counsel attempted to return the diary to Ms. Biden and her lawyer. Ms. Biden's lawyer, however, declined to confirm whether the diary belonged to Ms. Biden. Accordingly, in November 2020, Project Veritas arranged for the delivery of the diary and other materials provided by R.K. and A.H. to local law enforcement in Florida.

### B.    The Government's Execution of Search Warrants.

One year after Project Veritas provided the journal to local law enforcement in Florida, the FBI began raiding journalists' homes. On November 5, 2021, at approximately 6:00 AM, the FBI executed search warrants at the homes of two former Project Veritas journalists, seizing their cell phones and other electronic devices. On information and belief, at least one of the electronic devices seized from a former Project Veritas journalist likewise contains protected information belonging to Project Veritas.

Approximately two days later, the FBI executed a search warrant at the home of James O'Keefe, seizing two cell phones. The FBI pounded on Mr. O'Keefe's door and, when he voluntarily opened it, Mr. O'Keefe was met with approximately ten armed FBI agents (one of whom was holding a battering ram for the purpose of breaking Mr. O'Keefe's door) and blinding white lights. The FBI agents handcuffed Mr. O'Keefe (who was wearing only his underwear) in the hallway outside Mr. O'Keefe's apartment, where his neighbors could see.

The government's execution of a search warrant at Mr. O'Keefe's home demonstrates its lack of concern for a balance between the purported needs of its investigation and the rights of a free press. The government was aware that the undersigned represented Mr. O'Keefe and had agreed to accept service of a grand jury subpoena on behalf of Mr. O'Keefe and Project Veritas. **Ex. D**, 10/27/21 Correspondence of P. Calli to M. Steiner et al. In fact on November 4, 2021 – two days before its search of Mr. O'Keefe's home -- the undersigned **had** accepted service of a grand jury subpoena directed to Project Veritas. Instead of pursuing traditional document-collection procedures that would achieve balance the government's purported need for what it seized from Mr. O'Keefe and both the attorney-client privilege and First Amendment concerns at issue, the government chose the most hostile and intrusive approach possible.

Compounding its heavy-handed tactics, the government leaked details of its investigation to competitors of Project Veritas. On November 4, 2021, at about the same time that FBI agents finished searching the home of a former Project Veritas journalist, a New York Times reporter contacted one of the former journalists and also sent the following inquiry to Mr. O'Keefe:



When the New York Times ran a story about the November 4 searches, it included information that could have only come from the government, stating:

> The Trump administration Justice Department, then led by Attorney General William P. Barr, opened an investigation into the matter shortly after a representative of the Biden family reported to federal authorities in October 2020 that several of Ms. Biden's personal items had been stolen in a burglary, according to two people briefed on the matter.

Michael Schmidt, William K. Rashbaum, Precious Fondren, and Adam Goldman, *People Tied to Project Veritas Scrutinized in Theft of Diary from Biden's Daughter,* N.Y. TIMES, Nov. 5, 2021, *available at* https://www.nytimes.com/2021/11/05/us/politics/project-veritas-investigation-ashley-biden-diary.html. This leaked information likely was intended to preemptively deflect criticism that the DOJ was being used to target a news organization viewed by some as critical of the Biden administration over the matter of the President Biden's daughter's diary.

The government also appears to have leaked to the New York Times the news of the search warrant it executed at James O'Keefe's home. Shortly after the execution of the warrant, Mr. O'Keefe received the following message from Michael Schmidt, a New York Times reporter:



The government's leaks to the press are all the more remarkable in light of the cautionary language the USAO included with its grand jury subpoena issued to Project Veritas:

> The Government hereby requests that you voluntarily refrain from disclosing the existence of the subpoena to any third party. While you are under no obligation to comply with our request, we are requesting you not to make any disclosure in order to preserve the confidentiality of the investigation and because disclosure of the existence of this investigation might interfere with and impede the investigation.

**Ex. E**, 11/4/21 Cover Letter Accompanying Grand Jury Subpoena to Project Veritas. The government's purported concern for the confidentiality of its investigation apparently applies only to the subjects of its investigation, and falls away when it is communicating with the New York Times.

Additionally, the search warrant itself contains no limitations on the government's ability to access privileged material, whistleblower material, confidential source information, donor information, or material about unrelated news investigations. Indeed, the warrant states that while "[l]aw enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within categories identified above in this Attachment . . . . **law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices** or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant." **Ex. F**. (emphasis added).

### C. The Protected Contents of the Seized Cell Phones.

Mr. O'Keefe's current work cell phone that the government seized contains attorney-client privileged communications and attorney work product relating to the undersigned's representation of Mr. O'Keefe and Project Veritas in connection with the investigation for which the government executed a search warrant at Mr. O'Keefe's home. That cell phone also contains privileged communications with Project Veritas's in-house lawyers concerning internal discussion of Project Veritas's interaction with A.H. and R.K., internal discussion of Project Veritas's negotiations with counsel for A.H. and R.K., internal discussion of Project Veritas's communications with Ms. Biden's lawyer, and Project Veritas's due diligence regarding the diary.

The vast majority of attorney-client privileged and First Amendment-protected materials on Mr. O'Keefe's phones are wholly unrelated to the government's diary investigation. For example, Mr. O'Keefe's current work cell phone includes, privileged materials related to Project Veritas's pending defamation suit against the New York Times. *See Project Veritas v. New York*

*Times Co.,* Case No. 63921 /2020, 2021 WL 2395290, *10-11 (N.Y. Sup. March 18, 2021) (Wood, J.) (order denying New York Times' Motion to Dismiss). The New York Times is the same media company to which the government leaked details of its investigation. The fact that the government has already leaked information about its investigation to Project Veritas's litigation adversary is a concrete reason to believe that no government taint team could be adequately walled off to ensure that Mr. O'Keefe and Project Veritas's privileges are respected.

The attorney-client privileged and work product material on the cell phones relate to both litigation and non-litigation matters, including both currently pending matters and historic matters. The following is a preliminary list of lawyers with whom there are privileged communications on Mr. O'Keefe's phones. It illustrates the huge amount of privileged material the government has seized:

- Paul Calli and Charles Short of Calli Law, LLC
- Benjamin Barr and Stephen Klein of Barr & Klein PLLC
- Elizabeth Locke and Andy Phillips of Clare Locke LLP
- Justin Kelton and Robert Spolzino of Abrams Fensterman LLP
- Stefan Passantino and Elizabeth Prendergast of Michael Best & Friedrich LLP
- Paul Mersino of Butzel Long
- Michael Montecalvo and Jamie Dean of Womble Bond Dickinson
- Harmeet Dhillon and Ron Coleman of Dhillon Law Group
- Kerry Verdi and Ben Ogletree of Verdi & Ogletree PLLC
- Jason Zimmerman and Brock Magruder of GrayRobinson
- G. David Rubin and Elizabeth Sanguinetti of Litchfield Cavo, LLP
- Jeremy Rosen of Horvitz and Levy, LLP
- Gregory Zimmer, Jill Vogel, Jason Torchinsky, Shawn Sheehy, Steve Roberts, Erin Burroughs, and Darby Grant of Holtzman Vogel, PLLC
- Laurence Levy and Dan Filor of Greenberg Traurig, LLP
- Bradley Benbrook of Benbrook Law Group
- Alan Lyons, William Fried and Samuel Bazian of Herrick Feinstein, LLP
- Daniel Kelley of McCarter and English, LLP
- Donal Blaney and Keeley Parry of Griffin Law
- Linda Kerns of the Law Offices of Linda A. Kerns
- David Houck and Matthew Richardson, QC of Henderson Chambers
- Douglas Chalmers Jr. of Chalmers and Adams LLC
- Jered Ede, John Sullivan, Zachary Kramer, and Julia Witt, General Counsel to Project Veritas

In addition to attorney-client privileged materials, both phones also contain newsgathering materials which are critical to the exercise of a free press and protected by the First Amendment. These include materials related to news investigations (present and past), communications with whistleblowers and other confidential sources, communications with donors (crucial information protected by the First Amendment guarantee of freedom of association) and internal discussion of investigative and editorial policies and practices. This is confidential and protected information newsgathering information wholly unconnected to the government's diary investigation.

### 3. The Privacy Protection Act, 28 C.F.R. § 50.10, and Justice Manual 9-13.400.

As detailed above, the government represented that it "has complied with all applicable regulations and policies regarding potential members of the news media." **Ex. B,** 11/7/21 Letter of R. Sobelman to P. Calli et al. This statement, if true, is extraordinary. It would mean that, pursuant to the relevant rules and regulations governing DOJ efforts to obtain information from journalists, the Attorney General of the United States approved a search warrant to seize privileged communications, and newsgathering materials belonging to a prominent journalist – all over the matter of a diary already in the public domain, that Project Veritas did not publish, and which it ultimately provided to state law enforcement in Florida.

28 C.F.R. § 50.10, which is reiterated and reinforced by Section 9-13.400 of the Justice Manual, provides the rules and regulations governing the DOJ's use of process, orders, or warrants to obtain information from members of the news media. And those rules and regulations do not permit the government's actions here. **Even if** a member of the news media is the subject or target of the government's investigation, the regulations require the government to explore alternative means for gathering the information it seeks and require the government to consider certain factors that it evidently did not consider here. 28 C.F.R. § 50.10(d)(3) governs applications for warrants to search the premises, property, communications records, or business records of members of the news media. In determining whether to authorize such an application, the Attorney General must consider, among other factors, whether prosecutors have

> pursued negotiations with the affected member of the news media unless the Attorney General determines that, for compelling reasons, such negotiations would pose a clear and substantial threat to the integrity of the investigation, risk grave harm to national security, or present an imminent risk of death or serious bodily harm.

28 C.F.R. § 50.10(c)(5)(iv)(A); *see also* 28 C.F.R. § 50.10(c)(5)(vi) ("Requests should be treated with care to avoid interference with newsgathering activities and to avoid claims of harassment"). The government failed to pursue such negotiations here, and the exceptions for investigative integrity, national security, and the risk of death or serious bodily harm obviously are not present. The government has been aware of the relevant events for more than a year, the government issued a grand jury subpoena to Project Veritas just 24 hours before applying for a search warrant to seize cell phones from Mr. O'Keefe's home, and the subject matter of the investigation do not implicate national security or safety concerns.

Ironically, President Biden himself has called law enforcement demands for press records "simply wrong."[3] In a similar vein, the Attorney General stated that the only way to make reporters' shield laws "permanently durable is through legislation, and I will personally support working with Congress to develop legislation that would make protections for obtaining the press'

---

[3] Matt Zapotosky & Anne Gearan, *Biden says he won't allow Justice Dept. to seize journalists' phone, email records*, WASH. POST, May 21, 2021, *available at* https://www.washingtonpost.com/national-security/biden-journalists-justice-department/2021/05/21/fb606c4a-ba72-11eb-a5fe-bb49dc89a248_story.html

records part of the legislation." *See* Josh Gerstein, *Garland Backs Legislation to End Subpoenas for Reporters' Records*, POLITICO (June 25, 2021) available at https://www.politico.com/news/2021/06/25/garland-reporters-records-subpoenas-496291. And on July 19, 2021, the Attorney General issued a memorandum directing that DOJ not use compulsory legal process to obtain information from members of the press acting within the scope of newsgathering activities.[4] The principles that informed this guidance are no less applicable where the newsgathering activities focus on the President's daughter.

In addition to the regulations and DOJ's guidance on implementing them, the Privacy Protection Act ("PPA") generally prohibits the search and seizure of "work product materials" possessed by a person or entity in connection with "a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication." 42 U.S.C. § 2000aa(a). Likewise, the PPA regulates the search and seizure of non-work product materials, again generally prohibiting the search and seizure of "documentary materials, other than work product materials, possessed by a person in connection with a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate commerce." 42 U.S.C. § 2000aa(b).

Although both the regulations and guidance contain a so-called "suspect exception," it is restricted by the requirement that "a government officer or employee may not search for or seize such materials under the provisions of this paragraph if the offense to which the materials relate consists of the receipt, possession, communication, or withholding of such materials or the information contained therein." 42 U.S.C. § 2000aa(a)(1), (b)(1). None of the exceptions-to-the-exception apply.

If, in fact, the highest levels of the DOJ were involved with approving the government's application for a warrant to search Mr. O'Keefe's home and seize his cell phones, such approval is an overreach at its highest levels of government, thereby providing further support for the notion that no government taint or filter team could fairly or adequately self-police the government's review of the information found on Mr. O'Keefe's cell phones and that the appointment of a Special Master is the most prudent means for conducting such a review.

### 4. This Court Should Appoint a Special Master to Conduct a Review of the Cell Phones that the Government Seized from Mr. O'Keefe.

The government has seized journalists' cell phones, electronic devices and media which contain newsgathering and privileged information, including information about Project Veritas's litigation against the New York Times, the competitor to which the government has leaked details of its investigation. And apparently, this invasive conduct has been authorized at the highest levels of DOJ. The government cannot be relied upon to review the First Amendment-protected and privileged materials that it seized. The appointment of a special master to review the seized materials is necessary to protect core First Amendment interests and attorney-client privileged information. Moreover, the appointment of a special master is necessary to avoid the appearance

---

[4] *See* Attorney General Memorandum for the Deputy Attorney General, The Associate Attorney General, Heads of Department Components, United States Attorneys, Federal Prosecutors, July 19, 2021, *available at* https://www.justice.gov/ag/page/file/1413001/download.

of impropriety, particularly given that the government's investigation involves the President's daughter's diary.

**A.      The Government's Seizures Imperil Protected First Amendment Rights, Including Those Related to Both Freedom of the Press and Freedom of Association.**

Members of the news media like Mr. O'Keefe and Project Veritas depend on an atmosphere of confidence and trust. If the government may, pursuant to a search warrant, fully examine a reporter's electronic devices – which include information and communications with government critics, watchdogs, and whistleblowers – then the truth-seeking function of the press will wither. The First Amendment guarantees a free press because of the role it plays as a "vital source of public information." *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936). Put differently, "[t]he press [is] protected so that it [can] bare the secrets of government and inform the people." *New York Times Co. v. U.S.*, 403 U.S. 713, 717 (1971) (Black, J., concurring). The press' function to act as a vital source of information is threatened whenever the government impairs or seeks to impair its ability to gather news. In the present matter, the early morning raid and seizure of reporter's property that holds confidential information about donors, government inside sources, and new leads is in jeopardy, as is the First Amendment itself.

The first principles are critical to the Court's evaluation of this request for appointment of a special master. In *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the Supreme Court extended First Amendment protections to entities and persons publishing truthful information obtained from a source regarding matters of public concern **even if** a source unlawfully obtained the information, provided that the publisher itself was not involved in the unlawful activity. *Id.* at 517-18. This principle is consistent with the principle that "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979). With the government's seizure of protected newsgathering property here – in the form of a reporter's cellular phones – that same protection offered by *Bartnicki* should be honored.

Following *Bartnicki*, this Court and two federal courts of appeals have faithfully followed its protections. Recently, the Fourth Circuit did this in *Allen v. Beirich*, Case No. 19-2419, 2021 WL 2911736 (4th Cir. July 12, 2021) (Blake, J.). There, the Southern Poverty Law Center ("SPLC") published two stories about Allen linking him to a white supremacist organization. The SPLC obtained this information by paying $5,000 to a former accountant of the white supremacist group who obtained and held the information illegally. *Id.* at *2. Because the SPLC did not cause or induce the accountant to engage in illegal acts, its subsequent payment for the receipt of newsworthy information did not establish liability on its part. *Id.* at *5. This reasoning is in accord with *Jean v. Massachusetts State Police*, 492 F.3d 24, 31 (1st Cir. 2007), in which the U.S. Court of Appeals for the First Circuit found that, even though the publisher was in "active collaboration" with information thieves, the publisher still maintained the First Amendment protections set forth in *Bartnicki*. *Id.* at 31.

Similarly, this Court extended *Bartnicki*'s protection in *Democratic National Committee v. Russian Federation*, 392 F.Supp.3d 410 (S.D.N.Y. 2019). In that case, WikiLeaks solicited stolen documents from the Russian Federation and this Court held, consistent with *Bartnicki*, that so long

as WikiLeaks requested already stolen information, it was protected First Amendment conduct. *Id.* at 435-36. Poignantly, this Court reasoned that even allowing WikiLeaks to be charged as an after-the-fact coconspirator would simply "eviscerate *Bartnicki*" and would render "any journalist who published an article based on stolen information a coconspirator in theft." *Id.* at 435. This the First Amendment does not permit. Yet, it is precisely the theory the government appears to pursue here – a theory foreclosed per *Bartnicki* and *Russian Federation*. With this impermissible predicate, the government has executed a search that imperils privileged and First Amendment protected material.

The seized cell phones also include whistleblower and source information. Few whistleblowers will come forward to journalists if they know their identities are being scoured by the very government they wish to share information about. *See, e.g.*, *Mills v. State of Alabama*, 384 U.S. 214, 219 (1966) (the "press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve"); *Dillon v. Suffolk County Dept. of Health Services*, 917 F.Supp.2d 196, 212-13 (E.D.N.Y. 2013) (county doctor speaking out about administration of a jail medical program constituted protected speech about a matter of public concern under the First Amendment). Similarly, journalists who are on the cutting edge of important stories and insider disclosures find their work entirely stymied (perhaps entirely) when the government possesses the power to inspect the plans of whistleblowers critical of government power. Appointing a special master will help protect the rights of whistleblowers and Project Veritas in their reporting critical of public officials and government policies.

Because the seized materials also include Project Veritas donor information, the First Amendment's guarantee of freedom of association is also threatened, and must likewise be preserved through the use of a special master. Just this last term, the Supreme Court reaffirmed the importance of the right of association held between donors and the organizations they support in *Americans for Prosperity Foundation v. Bonta*, 141 S.Ct. 2373 (2021). Piercing the right of anonymous, private association does damage to the right of association. *Id.* at 2382. The Supreme Court so found because "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and "the vital relationship between freedom to associate and privacy in one's associations. . . ." *Id.* (internal quotations omitted). Government intrusions into donor-organization relationships causes donors to reduce their support or stop giving entirely.

When the government uses questionable tactics to investigate the press, it is important that courts respond to protect fundamental First Amendment rights. A too intrusive process creates a chilling effect on the press and individuals may "well forgo the pursuit of their just claims. The judicial system will thus have made the utilization of its remedies so onerous that the people will be reluctant or unwilling to use it, resulting in frustration of a right as valuable as that of the speech itself." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 38 n.22 (1984) (internal quotations omitted).

Allowing the prying eyes of government prosecutors to themselves alone review First Amendment protected information – like newsworthy, confidential information lawfully obtained by reporters – would send a chill to journalists nationwide. *See, e.g.*, *Branzburg v. Hayes*, 408 U.S.

665, 707-08 (1972) ("news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment"); *Dombrowski v. Pfister*, 380 U.S. 479, 485-86 (1965) (judicial processes can exact a "substantial loss or impairment of freedoms of expression").

Perhaps most monumentally, this matter involves journalists investigating and deciding whether to publish a story about the daughter of a presidential candidate – now, the President of the United States. This is a newsworthy topic at the very heart of the First Amendment – a term this Court has instructed the government to interpret liberally. *Rogers v. Grimaldi*, 695 F.Supp. 112, 117 (S.D.N.Y. 1988) (internal citations omitted). Whatever interest the government has in investigating the diary, it "would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Bartnicki*, 532 U.S. at 529-30. Appointing a special master would demonstrate here that First Amendment press rights will be taken seriously, even when the press has the courage to investigate the family of the current President.

### B.     The Attorney-Client Privilege is a Paramount and Well-Established Concern.

"We readily acknowledge the importance of the attorney-client privilege, which 'is one of the oldest recognized privileges for confidential communications.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009) (quoting *Swidler & Berlin v. U.S.*, 524 U.S. 399, 403 (1998)). "By assuring confidentiality, the privilege encourages clients to make 'full and frank' disclosures to their attorneys, who are then better able to provide candid advice and effective representation." *Id.* (quoting *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981)). These well-established principles serve "broader public interests in the observance of law and administration of justice." *Id.* (cleaned up). "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn*, 449 U.S. at 389. "The lawyer–client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Id.* (internal quotation marks omitted) (quoting *Trammel v. U.S.*, 445 U.S. 40, 51 (1980)). Thus, "[t]he importance and sanctity of the attorney-client privilege is well established." *In re Grand Jury Subpoenas*, 144 F.3d 653, 659-60 (10th Cir. 1998) (citing *Upjohn*, 449 U.S. at 389).

### C.     Authority for Appointment of a Special Master to Review the Seized Materials for Privilege and Materials Protected by the First Amendment.

Mr. O'Keefe and Project Veritas can summarize the law no better than the government did in the matter, *In re Search Warrant dated April 21, 2021*, 21 Mag. 4335, *In re Search Warrant dated April 28, 2021*, 21 Mag. 4591, regarding the conduct of a government filter review of privileged materials seized from Rudolph Giuliani (the "Giuliani Case"). In moving for appointment of a special master to conduct the type of review that Mr. O'Keefe and Project Veritas seek in this case, the government itself acknowledged:

Courts have a "limited supervisory authority over a grand jury proceeding." *United States v. Hilts*, 757 F. App'x 56, 59 (2d Cir. 2018) (citing *United States v. Williams*, 504 U.S. 36, 47 (1992)). That authority extends to the protection of privileges recognized by the Constitution, Congress, and the common law. *See Williams*, 504 U.S. at 48; *Gravel v. United States*, 408 U.S. 606 (1972); *In re Grand Jury Investigation of Hugle*, 754 F.2d 863, 864-65 (9th Cir. 1985) (Kennedy, J.). That supervisory authority exists prior to an individual being charged with a crime. *See In re Grand Jury Investigation of Hugle*, 754 F.2d at 865 ("a court is not required to defer relief [on a privilege issue] until after issuance of the indictment"); *In re Wiltron Assocs. Ltd.*, 49 F.R.D. 170, 172 (S.D.N.Y. 1970) (declining to grant relief under Rule 41 and recognizing jurisdiction was based on the court's "general supervisory power").

21 Mag. 4335, Case No. 1:21-mc-00425-JPO (Dkt. 16 at 2).

While in this district, the government might make use of a "filter team" to try and protect privilege, that approach is not always appropriate. Under certain circumstances, a special master is necessary and more appropriate choice for conducting such a review. Courts in this district have frequently dealt with the issue in the context of searches of lawyer's electronic devices. It is equally appropriate here, where not only a significant amount of privileged material is imperiled, but First Amendment protected material is likewise at risk. Where sensitive issues of First Amendment privilege have arisen, courts have endorsed the appointment of special masters as an appropriate remedy. *See, e.g.*, *In re Storag Etzel GmbH*, Case No. 19-MC-209-CFC, 2020 WL 2915781, *1 (D. Del. June 3, 2020) (Connolly, J.) (special master appointed because of his expertise in First Amendment matters); *DeMassa v. Nunez*, 747 F.2d 1283 (9th Cir. 1984) (authorizing use of special master to search a computer containing privileged material); *U.S. v. Duke Energy Corp.*, 2012 WL 1565228 at *2-*3 (M.D.N.C. Apr. 30, 2012) (appointing special master to determine if items were privileged or protected under the First Amendment); Here, the use of a special master will protect the highly sensitive information gathered by journalists from government prosecutors while allowing non-privileged and responsive items to be accessed. *See, e.g.*, *In re application of Madison*, 687 F.Supp.2d 103, 118-119 (E.D.N.Y. 2009) (petitioners must make showing of First Amendment or privilege protection to invoke a special master).

Courts may appoint special masters based on a motion, after a criminal case has been charged, or pursuant to a return of property motion or a temporary restraining order. *See In re the Matter of Search Warrants Executed on April 9, 2018*, No. 18 MJ 3161 (S.D.N.Y. Apr. 16, 2018) (denying the motion of former President Trump's lawyer, Michael Cohen, for a temporary restraining order, but appointing a special master); *In re Search Warrants Executed on April 28, 2021*, 21-MC-425 (JPO), 2021 WL 2188150, at **1, 4 (S.D.N.Y. May 28, 2021), appeal withdrawn (June 30, 2021) (granting Government's motion to appoint special receiver in Giuliani case to "avoid unnecessary intrusion on attorney-client communications" and as "the appointment of a special master is warranted here to ensure the perception of fairness."); *see also In re Horowitz*, 482 F.2d 72, 80 (2d Cir. 1973) (limiting production of attorney-client and accountant-client privileged documents in response to grand jury subpoena and directing that trial court "is free to utilize a magistrate or appoint a special master" to oversee compliance with rulings on privilege); *U.S. v. Abbell*, 914 F. Supp. 519 (S.D. Fla.1995) (after seizing law firm documents through a search

warrant, the government employed a taint team to determine privilege; however, court appointed a special master to review the documents, with costs charged to the government; cited in *United States v. Stewart*, Case No. 02-CR-395-JGK, 2002 WL 1300059 (S.D.N.Y. June 11, 2002) (Koeltl, J.); *DeMassa v. Nunez*, 747 F.2d 1283, 1285 (9th Cir. 1984) (relating procedure for execution of search warrant involving special master at site of law offices during execution of warrant).

Even with unequivocal Supreme Court precedent in *Bartnicki*, *supra,* precluding criminal liability for Project Veritas or Mr. O'Keefe, the government has aggressively investigated them. The attendant conclusion from *Bartnicki*, *Russian Federation*, and *Beirich* is that government is free to investigate wrongdoers – actual thieves, for example – but must use an especially light hand when dealing with journalists who accept material from sources. Because the First Amendment firmly protects against criminal liability for news organizations such as Project Veritas who accept material from third parties, care must be taken to protect its newsgathering rights here. Appointing a special master will provide this protection.

Additionally, the use of a special master is particularly appropriate given the nature of the government's apparent leaks during its investigation. As noted earlier the government leaked details of its grand jury investigation to the press, including to competitors of Project Veritas. Before or immediately after the agents departed from one of the homes searched on November 4, 2021, a New York Times writer contacted one of the persons on whom a warrant was executed, requesting to speak. Given a leak occurred at or before the issuance of the search warrants, it is naive to believe the free press should trust that the government will protect its privileged information in this matter. Appointing a special master is an appropriate prophylactic method to protect against leaks. Notably, during independent counsel Kenneth Starr's investigation of Bill Clinton, Judge Norma Holloway Johnson appointed a special master to examine and limit the flood of leaks from that probe. *See* William Glaberson*, Pssst, Says Prosecutor to Reporter; I'm All Ears, Is the Reply*, N.Y. TIMES, June 24, 1998, at A22. Appointing a special master now will reduce the risk of future leaks and reduces attendant First Amendment injuries.

In *United States v. Stewart*, 2002 WL 1300059, at *4, the government conceded that "that the Court has the authority and discretion to decide whether to appoint a Special Master to conduct an initial review of the seized materials for privilege and responsiveness or whether to allow the government's privilege team to conduct this review." *Id*. at *4. Part of the government's concession in *Stewart* was based on the special master procedures found in the United States Attorney's Manual. *Id.* at *6. Just as *Stewart* was "exceptional," so, too, is this case. Not only do the seized materials contain attorney-client privileged communications, but also news gathering materials that have nothing do to with the purpose of the search warrant.

Consistent with a court's supervisory authority, however, the Court may also appoint a special master where, as here, there is no pending criminal case against the subjects of the search. *See In re the Matter of Search Warrants Executed on April 9, 2018*, No. 18 MJ 3161 (S.D.N.Y. Apr. 27, 2018) (Dkt. 30) (appointing a special master pursuant to Federal Rule of Civil Procedure 53(a)(1)(C) and the court's "inherent equitable powers and authority"); *Benjamin v. Fraser*, 343 F.3d 35, 46 (2d Cir. 2003) (noting that section 3626(g)(8) "implicitly incorporates the long recognized principle that Article III courts may appoint agents to engage in a variety of activities essential to the performance of judicial responsibilities." (citations omitted)).

In addition to this Court's inherent supervisory authority, this Court may draw upon Rule 53 of the Federal Rules of Civil Procedure for its authority to appoint a special master to aid the Court in dealing with the government's seizure of attorney-client privileged communications. *U.S. v. Black*, No. 16-20032-JAR, 2016 WL 6967120 **3-4 (D. Kan. Nov. 29, 2016) (Robinson, J.). In *Black*, the government obtained privileged audio and video recordings of communications between inmates and their attorneys. *Id*. at *1. The government had also obtained digital images of the information on prison law library computers, which contained more privileged materials. *Id*. at *5, n.33. The court held an emergency hearing following the defendants' motion for return of information under Rule 41(g), Federal Rules of Criminal Procedure. The government may be held responsible for costs of a special master. *See id*.; *Trout v. Ball*, 705 F.Supp. 705, 707 (D.D.C. 1989) (appointing special master and assessing costs against government in 13-plus year, scorched-earth defense against a meritorious class action against the Navy for sexual discrimination).

## 5. Requested Relief

Given the sensitive nature of the issues herein, the government should agree to a similar approach here as it did in the Giuliani Case. Mr. O'Keefe and Project Veritas are perceived antagonists of the President and his *administration; a prominent journalist with a considerable, devoted following. He and his sources benefit from the journalist privilege. On balance, to ensure the perception of fairness and to avoid the unnecessary intrusion on the free press and journalist privilege, it is necessary for this Court to appoint a special master. The special master can expeditiously filter the warrant materials for potentially privileged documents, and the review can be informed by Mr. O'Keefe and Project Veritas's parallel review of the same materials – just as in the Giuliani Case.

Mr. O'Keefe and Project Veritas request that the Court adopt the procedures adopted by Judge Wood for the appointment of a special master in *In re the Matter of Search Warrants Executed on April 9, 2018*, Case No. 18 MJ 3161 (S.D.N.Y. Apr. 16, 2018), specifically:

- Direct the parties to confer and submit proposed candidates for a special master and, if they cannot reach agreement on a list of candidates, submit their own candidates.
- Appoint a special master from the list of candidates proposed by the parties or another suitable candidate identified by the Court.
- Require the special master to submit a declaration regarding any bases for potential disqualification.
- Issue an order identifying the duties, reporting and judicial review requirements, and other provisions relating to the appointment of a special master.
- Require the parties and special master to complete the review of the seized materials on an expedited schedule set forth by the Court.

Mr. O'Keefe and Project Veritas also request that the Court order the government to immediately seal the seized materials and affirm in writing that they have refrained from reviewing, copying, accessing, or extracting the materials.

## 6. Conclusion

Accordingly, Mr. O'Keefe and Project Veritas request that this Court enter an Order appointing a Special Master to review the contents of the cell phones the government seized from Mr. O'Keefe's home on November 6, 2021.

By:    /s/ Paul A. Calli
           Paul A. Calli
           Florida Bar No. 994121
           Chas Short
           Florida Bar No. 70633
           CALLI LAW, LLC
           14 NE 1st Ave, Suite 1100
           Miami, FL 33132
           Telephone: (786) 504-0911
           Facsimile (786) 504-0912
           PCalli@Calli-Law.com
           CShort@Calli-Law.com

           *Pro Hac Vice Motion to Be Filed Forthwith*

By:    s/ Harlan Protass
           Harlan Protass
           PROTASS LAW PLLC
           260 Madison Avenue, 22nd Floor
           New York, NY 10016
           Telephone: 212-455-0335
           hprotass@protasslaw.com

/s/ Benjamin T. Barr
Benjamin Barr
BARR & KLEIN PLLC
444 N. Michigan Avenue Ste. 1200
Chicago, IL 60611
Telephone: (202) 595-4671
Ben@barrklein.com

/s/ Stephen R. Klein
Stephen R. Klein
Bar No. 177056
BARR & KLEIN PLLC
1629 K St. N.W., Ste. 300
Washington, DC 20006
Telephone: (202) 804-6676
steve@barrklein.com

*Pro Hac Vice Motion to Be Filed Forthwith*

# EXHIBIT A



CALLI LAW, LLC
One Flagler Building, Suite 1100
14 Northeast 1ˢᵗ Avenue
Miami, Florida 33132
T. 786.504.0911
F. 786.504.0912
www.calli-law.com

November 6, 2021

Mitzi Steiner                                     **Via PDF email: Mitzi.Steiner@usdoj.gov**
Assistant United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Robert Sobelman                                                        **Via PDF email:**
Assistant United States Attorney                           **Robert.Sobelman@usdoj.gov**
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Jacqueline Kelly                                                       **Via PDF email:**
Assistant United States Attorney                           **Jacqueline.Kelly@usdoj.gov**
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

        **Re:    Seizure of James O'Keefe's Cell Phone**

Dear Ms. Steiner, Mr. Sobelman and Ms. Kelly:

        I am writing on behalf of Project Veritas, and James O'Keefe, both of whom I represent.

        By this letter, I request that the government sequester and not access Mr. O'Keefe's cell phone, which it seized this morning.  Mr. O'Keefe's cell phone contains attorney-client privileged communications and attorney work product related to this investigation. It also contains attorney-client privileged materials and attorney work product for numerous matters unrelated to the government's inquiry. For example, it contains privileged materials related to Project Veritas's defamation suit against the New York Times. The cell phone contains other materials that are protected by the attorney-client and work product privileges belonging or relating to Mr. O'Keefe individually, Project Veritas, and/or the Project Veritas Action Fund.

        In addition to the above-described privileged materials, Mr. O'Keefe's cell phone contains other material protected by the First Amendment that the government must not access, including donor information for Project Veritas and Project Veritas Action Fund, information related to on-

going news investigations unrelated to the government's inquiry, and whistleblower information. The privileged and First Amendment information (hereinafter "Protected Information") may not lawfully be accessed by your office, the FBI, or any so-called "taint team" that the government has assembled, or may plan to assemble, for the purpose of reviewing the seized electronic devices.

The government's seizure of Mr. O'Keefe's cell phone violates The Privacy Protection Act ("PPA"), 42 U.S.C. 2000aa. The PPA generally prohibits the search and seizure of "work product materials" possessed by a person or entity in connection with "a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication." 42 U.S.C. 2000aa(a). There is no exception applicable on the present facts.

Likewise, the PPA's prohibition on the search and seizure of non-work product materials is applicable. The general rule for non-work product materials under the PPA is that "documentary materials, other than work product materials, possessed by a person in connection with a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in our affecting interstate commerce" are prohibited from search and seizure in connection with a criminal investigation. 42 U.S.C. 2000aa(b). There is no exception applicable on the present facts.

The seizure also violated 28 C.F.R. 50.10 and the Justice Manual's guidance on that regulation. 28 C.F.R. 50.10 states that the government's use of subpoenas and search warrants "to seek information from, or records of, non-consenting members of the news media [are] extraordinary measures, not standard investigative practices." 28 C.F.R. 50.10(a)(3). The government must obtain high level approvals before seeking a search warrant on a member of the news media like Mr. O'Keefe, and the member of the news media should be given "reasonable and timely notice" of the high level determination. 28 C.F.R. 50.10(e)(2)(i). The exceptions are not applicable. Moreover, you are aware I was willing to accept service of a grand jury subpoena on behalf of Mr. O'Keefe (as I did for Project Veritas) and rather than pursue less First Amendment intrusive means, the government chose to execute a search warrant. This contravenes the policy preferences articulated in both 28 C.F.R. 50.10(a)(3) and the corresponding guidance in Justice Manual 9-13.400.

I also request that the government sequester and not access devices seized from Spencer Meade and Eric Cochran earlier this week.  Both individuals are former employees of Project Veritas, and the devices seized from them may contain some of the same attorney-client, work product and First Amendment information described above that is the protected property of Project Veritas.

So that we may take appropriate action, please provide forthwith:

1.      A copy of the warrants by which electronic devices were seized from Mr. O'Keefe, Mr. Meade and Mr. Cochran;

2.      A copy of the search warrant affidavits for the foregoing; and

3.      A description of the government's efforts to comply with the requirement of 28 CFR 50.10 and J.M. 9-13.400, including but not limited to:

a.     Whether the government obtained approval from senior DOJ officials prior to applying for the search warrants,

b.     If not, why it did not,

c.     Whether this matter was submitted to DOJ's News Media Review Committee,

d.     And if not, why not.

It is imperative that you acknowledge this request immediately and provide written assurances that the government will sequester and not access the seized electronic devices.  Should you decline this request, or fail to respond within twenty-four (24) hours, we will seek immediate judicial intervention.


Sincerely,

*Paul A. Call*

Paul A. Calli
Chas Short

# EXHIBIT B



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 7, 2021

**BY EMAIL**

Paul A. Calli, Esq.
Calli Law, LLC
One Flagler Building, Suite 1100
14 Northeast 1st Avenue
Miami, Florida 33132
pcalli@calli-law.com

Re:     *In the Matter of the Search of the Premises Known and Described as*
         *151 Fenimore Road, Apartment 62A, Mamaroneck, New York* **(21 Mag. 10685)**

Dear Mr. Calli:

The Government writes in response to your letter dated November 6, 2021, sent on behalf of your clients James E. O'Keefe, III, and Project Veritas, concerning a search warrant executed on that same date at the residence of Mr. O'Keefe.  The Government provides the following responses as a courtesy, as it is under no obligation to do so.

First, you request that the Government provide you with a copy of the warrant executed at Mr. O'Keefe's residence.  The Government understands that a copy was provided to Mr. O'Keefe at the time of the search.  Nevertheless, as a courtesy, please find another copy attached hereto. The Government declines, however, to provide you with a copy of the affidavit submitted to the Court in support of its application for the warrant.  Your clients are "not entitled to a preview of the Government's evidence in an ongoing investigation before [they have] been charged with a crime."  *In re Search Warrants Executed on Apr. 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150, at *3 (S.D.N.Y. May 28, 2021) (denying motion to unseal affidavits submitted in support of warrants because there is "no authority" "for the proposition that the Fourth Amendment (or any other constitutional or statutory provision) gives a person who has not been charged a right to review a search warrant affidavit during an ongoing investigation").

Second, with regard to potentially privileged materials on the devices seized from Mr. O'Keefe, the warrant contains a provision, with which the Government will comply, that will safeguard any potentially privileged materials, including through the use of a filter process as necessary.  As you may know, "[t]he use of a filter team is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney-client communications."  *In re Search Warrants Executed on April 28, 2021*, 2021 WL 2188150, at *2 (citing *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at *8 (S.D.N.Y. Oct. 9, 2020), and *United States v. Ceglia*, No. 12 Cr. 876 (VSB), 2015 WL 1499194, at *1 (S.D.N.Y. Mar. 30, 2015)); *see*

*also United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2021 WL 4120539, at *4-5 (S.D.N.Y. Sept. 9, 2021) (approving of filter team procedure based on identical provision in search warrant issued for an attorney's electronic devices); *United States v. Winters*, No. 06 Cr. 54 (SWK), 2006 WL 2789864, at *2 (S.D.N.Y. Sept. 27, 2006) (proposed use of "'wall Assistant' adequately protects the defendant's asserted privilege").  In undertaking the filter process, the Government would welcome any information your clients wish to provide that may assist the filter team, such as a list of attorneys who have represented your clients.

Similarly, without agreeing that any other privilege or the Privacy Protection Act is applicable to the contents of Mr. O'Keefe's devices, the Government would welcome any information your clients wish to provide that would assist the filter team in identifying the applicable privilege or protection and the materials to which it might theoretically apply.

Third, as to your assertions regarding the Government's compliance with various federal regulations and Justice Manual provisions, the Government hereby confirms that it has complied with all applicable regulations and policies regarding potential members of the news media in the course of this investigation, including with respect to the search warrant at issue.

Finally, you make multiple requests concerning devices, which you state belonged to individuals whom you do not represent, that the Government may have recovered in the course of executing other search warrants at locations that are unrelated to your clients.  The Government respectfully declines to engage in correspondence with you or your clients about any such matters.

We are available to confer further regarding any of the foregoing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: *Robert B. Sobelman*

Jacqueline Kelly
Mitzi Steiner
Robert B. Sobelman
Assistant United States Attorneys
(212) 637-2456/2284/2616

Attachment

# EXHIBIT C

**Chandra Bussone**

| | |
|---|---|
| **From:** | Paul Calli |
| **Sent:** | Monday, November 8, 2021 6:52 PM |
| **To:** | Sobelman, Robert (USANYS) |
| **Cc:** | Chandra Bussone; Steiner, Mitzi (USANYS); Kelly, Jacqueline (USANYS) 2; Charles Short; Harlan Protass |
| **Subject:** | Re: James O'Keefe |

Rob,

I have included Harlan Protass, additional counsel to James O'Keefe and Project Veritas, on this email.

As detailed in my November 6, 2021 letter you, I reiterate my request that the government sequester and not access Mr. O'Keefe's cell phone which contains, among other things, attorney client privileged information, material protected by the First Amendment, and confidential donor information .

You emailed me at 6:11 pm on 11/8/21 and informed that the government will begin its extraction of privileged, legally protected, and confidential information as early as the morning of 11/9/21.

This is to notify you that Mr. O'Keefe and Project Veritas will be seeking judicial intervention by or before 6 pm tomorrow, 11/9/21.  The government should not access the seized devices until the issue is resolved by the Court.

I request a meet and confer call tomorrow afternoon.

The Department of Justice's use of a search warrant to seize a reporter's notes and work product violates decades of established Supreme Court precedent.

You are aware that we are filing a motion requesting the appointment of a special master to oversee the entire process of the extraction of data and appropriate review of that data from Mr. O'Keefe's cell phone.  Under those circumstances, why is the Department of Justice rushing to extract the data and refusing to even allow one day for judicial review?

Sincerely,

Paul Calli

Paul A. Calli, Esq.
Calli Law, LLC
One Flagler Building
14 Northeast 1st Avenue, Suite 1100
Miami, FL 33132
786-504-0911 O
786-504-0912 F

305-401-8994 C
PCalli@Calli-law.com
www.calli-law.com

Sent from my iPhone

On Nov 8, 2021, at 6:11 PM, Sobelman, Robert (USANYS) <Robert.Sobelman@usdoj.gov> wrote:

Paul,

In light of your request for us to "sequester" your client's devices, please be advised that we anticipate the forensic extraction of data from those devices to begin as early as tomorrow morning.

Thanks,

Rob

On Nov 7, 2021, at 2:16 PM, Sobelman, Robert (USANYS) <RSobelman@usa.doj.gov> wrote:

# EXHIBIT D

 CALLI LAW

CALLI LAW, LLC
One Flagler Building, Suite 1100
14 Northeast 1st Avenue
Miami, Florida 33132
T. 786.504.0911
F. 786.504.0912
www.calli-law.com

October 27, 2021

**Via Federal Express**

Daniel Gitner
Criminal Division Chief
United States Attorney's Office
Southern District of New York
One St. Andrews Plaza
New York, NY 10007

Re:   **James O'Keefe and Project Veritas**

Dear Mr. Gitner:

This Firm represents James O'Keefe and Project Veritas. Mr. O'Keefe is a journalist and Project Veritas is a non-profit media and journalism organization.

I believe that your office is conducting an investigation regarding a matter about which Project Veritas has material and helpful information. I believe the Assistant United States Attorney handling the investigation is Mitzi Steiner. Yesterday my call to your office was put through to Ms. Steiner's office at my request, and Ms. Steiner answered. I identified myself, my clients, and requested an opportunity to speak regarding the investigation. Ms. Steiner asked me how I obtained her name, whether I obtained any other information, stated that she could not speak with me and thanked me for my call before hanging up.

Based on the foregoing I hope that your office has not formed misapprehensions about my clients.

My clients have authorized me to provide an attorney proffer. When or if your office is interested in communicating regarding the investigation, please contact me. In the interim, I am authorized to accept any letter or subpoena from the Department of Justice by email, on behalf of my clients. Reference is hereby made, however, to 28 C.F.R § 50.10 and Justice Manual 9-13.400.

Sincerely,

Paul A. Calli

Chas Short

CC:      Mitzi Steiner, Assistant United States Attorney, Via Federal Express
         Laura Grossfield Birger, Criminal Division Chief, Via Federal Express

# EXHIBIT E



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

_____

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 4, 2021

Project Veritas
c/o Paul A. Calli, Esq.
Calli Law, LLC
One Flagler Building, Suite 1100
14 Northeast 1st Avenue
Miami, Florida 33132
pcalli@calli-law.com

      Re:    Grand Jury Subpoena

Dear Mr. Calli,

    Please be advised that the accompanying grand jury subpoena has been issued in connection with an official criminal investigation of a suspected felony being conducted by a federal grand jury.  The Government hereby requests that you voluntarily refrain from disclosing the existence of the subpoena to any third party.  While you are under no obligation to comply with our request, we are requesting you not to make any disclosure in order to preserve the confidentiality of the investigation and because disclosure of the existence of this investigation might interfere with and impede the investigation.

    Thank you for your cooperation in this matter.

              Very truly yours,

              DAMIAN WILLIAMS
              United States Attorney

By:

              Mitzi Steiner
              Assistant United States Attorney
              (212) 637-2284

# EXHIBIT F

AO 93C  (08/18) SDNY Rev.  Warrant by Telephone or Other Reliable Electronic Means      ☐ Original              ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>the Premises Known and Described as ▮▮▮▮▮▮ | )<br>)<br>)<br>)<br>)<br>) |

# **21 MAG 10685**

Case No.

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Southern_____ District of _____New York_____ *(identify the person or describe the property to be searched and give its location)*:

the Premises Known and Described as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮as described in Attachment A-1

The search and seizure are related to violation(s) of *(insert statutory citations)*:

18 U.S.C. §§ 371 (conspiracy to transport stolen property across state lines and conspiracy to possess stolen goods), 2314 (interstate transportation of stolen property), 2315 (possession of stolen goods), 2 (aiding and abetting), 3 (accessory after the fact), and 4 (misprision of felony)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment A-1

**YOU ARE COMMANDED** to execute this warrant on or before      November 19, 2021      *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ .
                                                                                                    *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*      ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      11/5/2021  11:18am                                  *Judge's signature*

City and state:   New York, New York                                  Hon. Sarah L. Cave, U.S. Magistrate Judge
                                                                                                    *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| Certification |
|---|

   I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

           _____
                *Executing officer's signature*

           _____
                *Printed name and title*

**ATTACHMENT A-1**

## I.   Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein:

An apartment known as unit



## II.   Items to Be Seized

### A.   Subject Devices

Law enforcement agents are authorized to seize any and all cellphones within the Subject Premises, including, but not limited to, the cellphone that is or was assigned to the call number ████████████ (collectively, the "Subject Devices").

### B.   Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Devices are the following evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371 (conspiracy to transport stolen property across state lines and conspiracy to possess stolen goods), 2314 (interstate transportation of stolen property), 2315 (possession of stolen goods), 2 (aiding and abetting), 3 (accessory after the fact), and 4 (misprision of felony) (collectively, the "Subject Offenses") for the time period August 1, 2020, up to and including the date on which the Subject Devices are seized, consisting of:

a.      Evidence sufficient to establish the user(s) of the Subject Devices at times relevant to the Subject Offenses, such as user-inputted data, access logs, device information, photographs, communications with other individuals or entities that reveal the true identity of the user(s) such as their name, address, telephone number, email address, payment information, and other personally identifiable information.

b.      Evidence of communications regarding or in furtherance of the Subject Offenses, such as communications with or relating to Ashley Biden (and representatives thereof) and/or Ashley Biden's family, friends, or associates with respect to her stolen property.

c.      Evidence of the location of Ashley Biden's property and the location of the user of the Subject Accounts at times relevant to the Subject Offenses, such as communications that reference particular geographic locations or refer to the property being located in a particular place.

d.      Evidence of the identity, locations, knowledge, and participation in the Subject Offenses of potential co-conspirators, such as communications with other individuals—including, but not limited to, ████████████████████████████████████████████ about obtaining, transporting, transferring, disseminating, or otherwise disposing of Ashley Biden's stolen property, including but not limited to communications reflecting the knowledge of co-conspirators that the property obtained from Ashley Biden had been stolen, and communications that contain personally identifiable information of co-conspirators and references to co-conspirators' places of residence or locations at particular points in time.

e.      Evidence regarding the value of any of Ashley Biden's stolen property, such as communications about the resale or market value of any of the items stolen from her, or any plans to sell or market the same.

f.      Evidence of steps taken in preparation for or in furtherance of the Subject Offenses, such as surveillance of Ashley Biden or property associated with her, and drafts of communications

2019.11.19

to Ashley Biden, President Biden, and Ashley Biden's associates regarding her stolen property and communications among co-conspirators discussing what to do with her property.

g.      Evidence reflecting the location of other evidence with respect to the Subject Offenses, such as communications reflecting registration of online accounts potentially containing relevant evidence of the scheme.

### C.  Unlocking Devices with Biometric Features

During the execution of the warrant, law enforcement personnel are authorized to obtain from James E. O'Keefe, III the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any electronic device(s), including to (1) press or swipe the fingers (including thumbs) of O'Keefe to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of O'Keefe to activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of O'Keefe to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

### D.  Review of ESI

Following seizure of any device(s) and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein that was sent, received, posted, created, or otherwise accessed, established, modified, or deleted between the time period August 1, 2020 and the present for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

2019.11.19

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified above in this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

\* \* \*

Review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege (to the extent not waived). When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

4

2019.11.19