UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :

In re Search Warrant dated November 5, 2021    :        21 Misc. 813 (AT)
                           :
                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :

In re Search Warrant dated November 3, 2021    :        21 Misc. 819 (AT)
                           :
                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :

In re Search Warrant dated November 3, 2021    :        21 Misc. 825 (AT)
                           :
                           :
                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS FOR APPOINTMENT OF A SPECIAL MASTER


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Jacqueline Kelly
Robert B. Sobelman
Mitzi Steiner
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 2

APPLICABLE LAW .......................................................................................................... 4

DISCUSSION .................................................................................................................... 5

I.   A Filter Team Will Appropriately Address Any Potentially Privileged Journalistic
     Information in the Seized Materials .................................................................... 6

     A.   The Conduct Under Investigation Is Not Protected by the First Amendment ............. 6

     B.   Any Qualified Journalistic Privilege That Might Apply is Overcome with Respect to
          the Materials Responsive to the Search Warrants ...................................................... 8

     C.   A Filter Team Will Sufficiently Protect Any Potentially Privileged Journalistic
          Information Not Responsive to the Warrants ............................................................ 13

     D.   The Potential Inclusion in the Seized Materials of Donor Information Does Not
          Justify the Appointment of a Special Master ........................................................... 14

II.  A Filter Team Will Appropriately Address Any Potentially Privileged Attorney-Client
     Communications in the Seized Materials .......................................................... 16

III. The Court Should Deny Project Veritas and O'Keefe's Request For a Judicial Inquiry
     Into Recent Public Reporting ......................................................................... 20

CONCLUSION ................................................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*AFT Michigan v. Project Veritas*, 397 F. Supp. 3d 981 (E.D. Mich. 2019) ................................ 10

*Americans for Prosperity v. Bonta*, 141 S. Ct. 2373 (2021) ......................................................... 15

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ............................................................................ 1, 6, 7

*Branzburg v. Hayes*, 408 U.S. 665 (1972) .............................................................................. 9, 12

*Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011) ................................................. 8, 9, 10

*Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652 (E.D. Va. 2019) .............. 7

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991) ....................................................................... 7

*DeMassa v. Nunez*, 747 F.2d 1283 (9th Cir. 1984) ..................................................................... 13

*Democracy Partners v. Project Veritas Action Fund*, 453 F. Supp. 3d 261 (D.D.C. 2020) ......... 10

*Democracy Partners, LLC v. Project Veritas Action Fund*, No. 17 Civ. 1047 (PLF), 2021 WL 4785853 (D.D.C. Oct. 14, 2021) ................................................................................................. 10

*Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410 (S.D.N.Y. 2019) ............. 1, 6, 7

*Doane v. United States*, No. 08 Mag. 17 (HBP), 2009 WL 1619642 (S.D.N.Y. June 5, 2009) ... 19

*Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29 (2d Cir. 1999) .............................................. 8, 12

*In re Application of Madison*, 687 F. Supp. 2d 103 (E.D.N.Y. 2009) ......................................... 15

*In re Grand Jury Investigation of Hugle*, 754 F.2d 863 (9th Cir. 1985) (Kennedy, J.) ................. 4

*In re Search Warrants Executed on April 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150 (S.D.N.Y. May 28, 2021) ................................................................................................. 5, 16, 17

*In re Storage Eztel GmbH*, No. 19 Misc. 209 (CFC), 2020 WL 2915781 (D. Del. June 3, 2020) 13

*In re the Matter of Search Warrants Executed on April 9, 2018*, No. 18 Mag. 3161 (S.D.N.Y. Apr. 16, 2018) ............................................................................................................................ 17

*In re Zyprexa Injunction*, 474 F.Supp.2d 385 (E.D.N.Y. 2007) ............................................... 7, 8

*McGraw–Hill, Inc. v. Arizona (In re Petroleum Prods. Antitrust Litig.)*, 680 F.2d 5 (2d Cir. 1982) ............................................................................................................................................ 9

*New York Times Co. v. Gonzales*, 382 F. Supp. 2d 457 (S.D.N.Y. 2005) .................................... 3

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ......................................................... 6

*S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553 (6th Cir. 2007) ......................... 14

*Sennett v. United States*, 667 F.3d 531 (4th Cir. 2012) .............................................................. 14

*Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979) .................................................................... 6

*United States v. Abbell*, 914 F. Supp. 519 (S.D. Fla. 1995) ...................................................... 17

iii

*United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2021 WL 4120539 (S.D.N.Y. Sept. 9, 2021) .. 2, 4, 13

*United States v. Ceglia*, No. 12 Cr. 876 (VSB), 2015 WL 1499194 (S.D.N.Y. Mar. 30, 2015).... 5

*United States v. Grant*, No. 04 Cr. 207 (BSJ), 2004 WL 1171258 (S.D.N.Y. May 25, 2004)..... 18

*United States v. Hilts*, 757 F. App'x 56 (2d Cir. 2018) ................................................................ 4

*United States v. Kaplan*, No. 02 Cr. 883 (DAB), 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003)  18

*United States v. Kolfage*, No. 20 Cr. 412 (AT), 2020 WL 7342796 (S.D.N.Y. Dec. 14, 2020) .... 4

*United States v. Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607 (S.D.N.Y. Aug. 8, 2017)........ 5

*United States v. Piervinanzi*, 23 F.3d 670 (2d Cir. 1994) ............................................................ 3

*United States v. Sattar*, No. 02 Cr. 395 (JGK), 2003 WL 22137012 (S.D.N.Y. Sept. 15, 2003). 19

*United States v. Stewart*, No. 02 Cr. 395 (JGK), 2002 WL 1300059 (S.D.N.Y. June 11, 2002) .. 4, 5, 18

*United States v. Treacy*, 639 F.3d 32 (2d Cir. 2011) .................................................................... 9

*United States v. Williams*, 504 U.S. 36 (1992) ............................................................................ 4

*United States v. Winters*, No. 06 Cr. 64 (SWK), 2006 WL 2789864 (S.D.N.Y. Sept. 27, 2006)... 5

## **Statutes**

42 U.S.C. § 2000aa *et seq.* ........................................................................................................ 14

## **Rules**

28 C.F.R. § 50.10 ........................................................................................................................ 2

## PRELIMINARY STATEMENT

The Supreme Court's First Amendment jurisprudence draws a clear and critical distinction "between stealing documents and disclosing documents that someone else had stolen previously." *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 431 (S.D.N.Y. 2019) (citing, *inter alia*, *Bartnicki v. Vopper*, 532 U.S. 514 (2001)).



(*See, e.g.*, S.M. Mot. 3).[1] Accordingly, their claim to First Amendment protection for the conduct under investigation is meritless. (*See* Part I.A-B, *infra*).

In any event, there is only one issue before the Court at present: whether to appoint a special master to review evidence obtained pursuant to judicially authorized search warrants. The Movants have not justified such extraordinary relief. The use of a "filter team" to review privileged material is a well-accepted practice that is "respectful of, rather than injurious to, the protection of privilege." *United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2021 WL 4120539, at *4

---

[1] "S.M. Mot." refers to the letter motion filed by Project Veritas and O'Keefe on November 10, 2021 (Dkt. No. 1, 21 Misc. 813); "Cochran Mot." refers to the letter motion filed by Cochran on November 17, 2021 (Dkt. No. 6, 21 Misc. 819); "Meads Mot." refers to the letter motion filed by Meads on November 18, 2021 (Dkt. No. 7, 21 Misc. 825); and "P.R. Mot." refers to Project Veritas and O'Keefe's letter dated November 15, 2021 (Dkt. No. 13, 21 Misc. 813).

(S.D.N.Y. Sept. 9, 2021).  The Movants have offered no persuasive explanation why that practice would not be sufficient here to protect any qualified journalistic privilege or First Amendment privilege that might exist (*see* Part I.C-D, *infra*), or to protect any attorney-client or work product privilege (*see* Part II, *infra*).  Finally, Project Veritas and O'Keefe's ancillary claim that the Court should launch a judicial investigation into alleged leaks regarding the investigation is based on rank speculation, lacks legal foundation, and should be denied.  (*See* Part III, *infra*).

## FACTUAL BACKGROUND

On November 4, 2021, the Federal Bureau of Investigation ("FBI") executed search warrants at Meads's and Cochran's residences for certain electronic devices.  (*See* Cochran Mot. Ex. A; Meads Mot. Ex. A.)  On November 6, 2021, the FBI executed a similar search warrant at O'Keefe's residence for cellphones.  (*See* S.M. Mot. Ex. F.)  The warrants were supported by detailed affidavits, and authorized by a federal magistrate judge, who found probable cause to believe that the subject premises and the devices therein contained evidence of federal crimes, including conspiracy to transport stolen property across state lines and interstate transportation of stolen property.  (*E.g.*, S.M. Mot. Ex. F at 1.)[2]

---

[2] Project Veritas, O'Keefe, and Meads rely on the Justice Manual ("JM") and 28 C.F.R. § 50.10 for the argument that the search warrants at issue should not have been executed.  (*See* S.M. Mot. 8-9; Meads Mot. 7-8.)  Here, as the Government previously informed O'Keefe and Project Veritas (*see* S.M. Mot. Ex. B at 2), the Government complied with all applicable regulations and policies regarding potential members of the news media in the course of this investigation, including with respect to the search warrants at issue.  In any event, it is well settled that 28 C.F.R. § 50.10 "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person."  28 C.F.R. § 50.10(j); *see also New York Times Co. v. Gonzales*, 382 F. Supp. 2d 457, 484 (S.D.N.Y. 2005) (28 C.F.R. § 50.10 "confer[s]

The judicially authorized search warrants at issue were obtained by the Government as part of an ongoing grand jury investigation (the "Investigation") into the theft and interstate transportation of certain property stolen from an individual (the "Victim").  As the Investigation is ongoing and no criminal charges have yet been filed, the underlying factual details remain non-public.

However, O'Keefe and Project Veritas's motion for a special master contains a number of unsworn assertions regarding the Investigation and the underlying facts, for which no evidence is provided, and which are either false or misleading and are directly contradicted by the evidence described in the sworn affidavits that were submitted to the federal magistrate judge in support of the search warrants.  Because the Investigation is ongoing and non-public, the Government is constrained in this forum from correcting these many falsehoods and inaccuracies, which are not material to the issue before the Court, that is, whether a special master should be appointed.

For purposes of this submission, the only statement that directly bears on the discussion below is O'Keefe and Project Veritas's repeated claim that they had "no involvement" in how the victim's property was "acquired."  (S.M. Mot. 3.) ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

no substantive rights or protections such as may be privately enforced"), *vacated and remanded on other grounds*, 459 F.3d 160 (2d Cir. 2006).  Similarly, the JM "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal."  JM § 1-1.100; *see also United States v. Piervinanzi*, 23 F.3d 670, 682 (2d Cir. 1994) (JM "guidelines . . . provide no substantive rights to criminal defendants").  Furthermore, Project Veritas and O'Keefe cite to their purported interest in "traditional document-collection" pursuant to the subpoena that the Government has served upon Project Veritas, which bears a return date of November 24, 2021. (S.M. Mot. 4.) However, Project Veritas has declined to confirm that it intends to comply with the subpoena and has sought an extension of the return date.  (*See* Dkt. No. 27, 21 Misc. 813.)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ To the extent the Court has specific factual questions, the Government is prepared to provide additional information to the Court on an *ex parte* basis, including the affidavits that form the basis for the search warrants.[3]

## APPLICABLE LAW

Courts have a "limited supervisory authority over a grand jury proceeding." *United States v. Hilts*, 757 F. App'x 56, 59 (2d Cir. 2018) (citing *United States v. Williams*, 504 U.S. 36, 47 (1992)). That authority extends to the protection of privileges recognized by the Constitution, Congress, and the common law. *See Williams*, 504 U.S. at 48; *Gravel v. United States*, 408 U.S. 606, 612-15 (1972); *In re Grand Jury Investigation of Hugle*, 754 F.2d 863, 864-65 (9th Cir. 1985) (Kennedy, J.).

When a search involves materials potentially protected by a privilege, such as the attorney-client privilege, the review may be conducted by a government "filter team," a magistrate judge, or a special master. *See generally United States v. Stewart*, No. 02 Cr. 395 (JGK), 2002 WL 1300059, at *4-6 (S.D.N.Y. June 11, 2002) (discussing the potential options for review of search warrant materials). The use of a government "filter team" is "respectful of, rather than injurious to, the protection of privilege," *Avenatti*, 2021 WL 4120539, at *4, and accordingly is "common

---

[3] In order to protect the Government's ongoing grand jury investigation and the privacy interests of the Movants, the Government has redacted certain non-public information in the publicly filed version of this brief. *See United States v. Amodeo*, 71 F.3d 1044, 1050-51 (2d Cir. 1995); *United States v. Kolfage*, No. 20 Cr. 412 (AT), 2020 WL 7342796, at *12 (S.D.N.Y. Dec. 14, 2020) (denying motion to unseal affidavit because the "information, if disclosed, could hamper the investigation" and "disclosure would implicate the privacy interests of uncharged individuals and entities").

procedure" in this District, *see, e.g.*, *United States v. Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607, at *7 (S.D.N.Y. Aug. 8, 2017) (noting government use of filter review team as evidence of good faith); *United States v. Ceglia*, No. 12 Cr. 876 (VSB), 2015 WL 1499194, at *1 (S.D.N.Y. Mar. 30, 2015); *United States v. Winters*, No. 06 Cr. 64 (SWK), 2006 WL 2789864 (S.D.N.Y. Sept. 27, 2006) (proposed use of "'wall Assistant' adequately protects the defendant's asserted privilege").

The appointment of a special master to review materials is appropriate only in exceptional circumstances.  Such circumstances may exist where the search involves, for instance, the files of a criminal defense attorney with cases adverse to the United States Attorney's Office, "thus rais[ing] Sixth Amendment concerns that would not otherwise be present," *Stewart*, 2002 WL 1300059, at *5, or where the attorney represents the President of the United States such that any search may implicate not only the attorney-client privilege but also the executive privilege, *see In re Search Warrants Executed on April 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021).

## DISCUSSION

The Movants raise a number of arguments and legal issues in their submissions.  The Court need not address or decide any of them except for the sole question before the Court: whether the circumstances presented constitute an exceptional situation in which a special master must be appointed in lieu of the filter team procedure that is used in virtually every investigation requiring any type of privilege review in this District.  In short, the answer is no—as explained below, there is nothing about the circumstances presented that render this matter so exceptional that the normal procedures are inadequate.

I.      **A Filter Team Will Appropriately Address Any Potentially Privileged Journalistic Information in the Seized Materials**

   A.      **The Conduct Under Investigation Is Not Protected by the First Amendment**

As an initial matter, the Movants are not entitled to First Amendment protection in connection with the conduct under investigation.  That is, there is no First Amendment protection for the theft and interstate transport of stolen property, and as such no related privilege attaches to materials responsive to the search warrants.

As noted, the Supreme Court's First Amendment jurisprudence draws a clear and critical distinction "between stealing documents and disclosing documents that someone else had stolen previously."  *Democratic Nat'l Comm.*, 392 F. Supp. 3d at 431; *see generally id.* at 430-35 (canvassing relevant case law).  In *Bartnicki*, for example, a radio commentator published a recording that he had legally obtained but which he knew or had reason to know had been illegally intercepted by a third party.  532 U.S. at 517, 535.  The defendants in that civil case were protected by the First Amendment, but that protection rested on three factual assumptions: (1) they "played no part in the illegal interception" and learned about it only after it had occurred; (2) "their access to the information on the tapes was obtained lawfully, even though the information itself was intercepted unlawfully by someone else"; and (3) "the subject matter of the [recorded] conversation was a matter of public concern."  *Id.* at 525.  These first two factual predicates reflect long-standing Supreme Court precedent drawing a distinction between active involvement in criminal conduct and passive receipt of stolen property or information.  *See, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (upholding press's right to publish information of public concern obtained from documents stolen by a third party); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 99 (1979) (state officials may not constitutionally punish publication of "lawfully obtained" truthful information absent need to further state interest of the highest order).  The

6

motion filed by Project Veritas and O'Keefe, and the cases cited therein, similarly recognize this distinction.  (*See* S.M. Mot. 10 (citing *Bartnicki* for the proposition that First Amendment protection attaches "provided that the publisher was not involved in the unlawful activity")).  Put simply, even members of the news media "may not with impunity break and enter an office or dwelling to gather news." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991).

███████████████████████████████████

█████████████████████████████ █ ████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████  They are therefore not entitled to First Amendment protection with regard to the conduct at issue.  *See, e.g.*, *Bartnicki*, 532 U.S. at 525; *Democratic Nat'l Comm.*, 392 F. Supp. 3d at 431; *Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652, 657 (E.D. Va. 2019) (rejecting First Amendment argument to dismiss civil complaint by respondent where respondent was alleged to have conspired with the parties who illegally obtained the information at issue); *In re Zyprexa Injunction*, 474 F.Supp.2d 385, 396 (E.D.N.Y. 2007) (discussing Pentagon Papers case and concluding that, in contrast, the reporter in

---

[4] Notably, the Movants do not claim to have published information from the stolen property at issue and the subject offenses under investigation do not include the publication of any such information.

question was "deeply involved in the effort to illegally obtain" documents).[5]

Because no First Amendment protection attaches to the conduct at issue, the Movants are not entitled to claim an attendant privilege as to materials responsive to the warrants, which only pertain to evidence of the crimes under investigation.

### B.   Any Qualified Journalistic Privilege That Might Apply is Overcome with Respect to the Materials Responsive to the Search Warrants

Even if the Movants could establish that a qualified journalistic privilege applied to the information responsive to the search warrants—though they cannot—it is readily overcome by the showing made in support of the search warrants.

The Second Circuit has recognized a qualified evidentiary privilege for information that is gathered in a "journalistic investigation." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011) (citing cases). It is the burden of the person or entity claiming privilege to show entitlement to it. *Id.* at 309. Where the privilege is established, information from confidential sources or materials may only be obtained upon a showing that the information is: "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29, 33 (2d Cir. 1999) (quoting *McGraw–Hill, Inc. v. Arizona (In re Petroleum Prods. Antitrust Litig.)*, 680 F.2d 5, 7 (2d Cir. 1982)). The privilege may apply to both confidential and non-confidential materials. *Id.* at 33,

---

[5] In *Zyprexa*, the district court cited to *The New York Times*'s apparent recognition of the distinction between passively accepting stolen information and affirmatively inducing the illegal activity. 474 F. Supp. 2d at 396 (citing *The New York Times, Ethical Journalism: A Handbook of Values and Practices for the News and Editorial Departments*, 9 (Sept. 2004): "Staff members must obey the law in pursuit of news. They may not break into buildings, homes, apartments, or offices. They may not purloin data, documents or other property, including such electronic property as databases and e-mail or voice mail messages. They may not tap telephones, invade computer files or otherwise eavesdrop electronically on news sources. In short, they may not commit illegal acts of any sort.")).

35.  However, where confidential sources are not involved, the protected interest is narrower and the privilege is more easily overcome.  *Id.* at 35-36.  In those circumstances, the privilege is overcome where "the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources."  *Id.* at 36.

The *Gonzales* test applies equally to compelled disclosure in criminal cases.[6]  *See United States v. Treacy*, 639 F.3d 32, 43 (2d Cir. 2011).  As the *Gonzales* test recognizes, the protection accorded by the privilege is not absolute.  *See Chevron Corp.*, 629 F.3d at 307 (citing *Branzburg v. Hayes*, 408 U.S. 665, 690–91 (1972)).  It may yield, for example, to law enforcement interests in certain circumstances.  *See Branzburg*, 408 U.S. at 690-91 (finding "no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial").

As an initial matter, there is considerable doubt whether the practices of Project Veritas or its employees generally could be entitled to the protection of a qualified journalistic privilege. Project Veritas is not engaged in journalism within any traditional or accepted definition of that word.   Its "reporting" consists almost entirely of publicizing non-consensual, surreptitious

---

[6] The Government is unaware of any case in which this test has been applied to materials obtained by a search warrant, for which a showing of probable cause has been made, but it assumes *arguendo* that the test would apply to such materials for the purposes of this submission and the Movants have offered no alternative standard.

recordings made though unlawful, unethical, and or/dishonest means.[7]   And publicly disclosed

Project Veritas communications[8] suggest that Project Veritas may not be able to establish that it

exercises sufficient independence over whether and when to publish the content it creates in order

to be eligible for the protection of the privilege.  *See Chevron Corp.*, 629 F.3d at 308 ("Those who

---

[7] *See, e.g.*, *Democracy Partners, LLC v. Project Veritas Action Fund*, No. 17 Civ. 1047 (PLF), 2021 WL 4785853, at *8 (D.D.C. Oct. 14. 2021) (concluding that "O'Keefe's statements in AMERICAN PRAVDA," a book he authored, "provide a sufficient good faith basis for plaintiffs to characterize defendants' conduct in the events that gave rise to this case as a 'political spying operation'" and "[t]he Court also agrees that 'political spying' is a fair characterization of the undisputed facts in this case."); *Democracy Partners v. Project Veritas Action Fund*, 453 F. Supp. 3d 261, 271 (D.D.C. 2020) (undisputed facts establishing Project Veritas employee obtained an internship at a consulting firm on false pretenses and using a false identity); *AFT Michigan v. Project Veritas*, 397 F. Supp. 3d 981, 985-86 (E.D. Mich. 2019) (Project Veritas did "little to refute" allegation that Project Veritas "implanted" one of its employees at a union's organization and then used "a hidden camera [in a private office] to covertly record a private conversation . . . during which they discussed the resolution of a matter related to teacher discipline with the goal of teaching [the Project Veritas employee] how staff members provide assistance in those matters."), *appeal denied*, 2019 WL 46667711 (6th Cir. 2019) (denying Project Veritas's interlocutory appeal); s*ee also, e.g.*, Tim Kenneally & Daniel Frankel, *James O'Keefe, NPR-Slayer: What Kind of Journalist is This?*, The Wrap, Mar. 9, 2011, https://www.thewrap.com/who-exactly-video-sting-artist-james-okeefe-25369/ (Marty Kaplan, the director of the Norman Lear Center at USC's Annenberg School of Communication: "What [O'Keefe] does isn't journalism. It's agitpop, politi-punking, entrapment-entertainment.  There is no responsible definition of journalism that includes what he does or how he does it."); Isabella Garcia-Camargo, *et al*., *Project Veritas #BallotHarvesting Amplification*, Election Integrity Partnership, Sept. 29, 2020, https://www.eipartnership.net/rapid-response/project-veritas-ballotharvesting    (Stanford University and University of Washington researchers concluding that Project Veritas video alleging voter fraud was what "a domestic, coordinated elite disinformation campaign looks like in the United States"); Matthew Sockol, *Essay: Is Provocateur James O'Keefe a Journalist?*, Oct. 6, 2020, https://theclick.news/is-james-okeefe-a-journalist/ ("While I don't base journalistic integrity off an individual's political stance, O'Keefe is not a journalist because the Pew Center's Four Core Principles do not apply to him.  He is not a journalist because his work is rooted in an agenda instead of the truth."); Alexander Nazaryan, *James O'Keefe: Meet the Man Who Makes the Fake News*, Newsweek, Jan. 17, 2018, https://www.newsweek.com/2018/02/02/james-okeefe-project-veritas-american-pravda-fake-news-781964.html ("O'Keefe is exceptionally good at what he does, though what he does cannot be called, by any reasonable measure, journalism.")

[8] *See* Erik Wemple, *Email Suggests Project Veritas Seeks Donors' 'Input'*, Wash. Post, Nov. 10, 2021, https://www.washingtonpost.com/opinions/2021/11/10/email-suggests-project-veritas-seeks-donors-input/ (describing email from O'Keefe stating that donors to Project Veritas should be "ask[ed] for their input" "as to when Project Veritas should post certain of its" content).

do not retain independence as to what they will publish but are subservient to the objectives of others who have a stake in what will be published have either a weaker privilege or none at all."). For the privilege to attach, although a person need not be a credentialed reporter for an established media entity, the person must have acted in the role of "the independent press," and with the purpose of disseminating to the public at the time the "gathering of information commences." *Id.* at 307. By contrast, "[a]n undertaking to publish matter in order to promote the interests of another, regardless of justification, does not serve the same public interest" and, consequently, is not exempt from the obligation to produce information relevant to a legal dispute. *Id.* at 308. In order for the privilege to potentially attach, the Movants have the burden to establish that it applies to their conduct, *id.* at 309, which they cannot do by merely repeating *ad nauseam* that they are or previously were "journalists."

In any event, the question is not whether Movants might retain a qualified journalistic privilege for *some* of their activities. Here, the Government's investigation is limited to a narrow course of conduct and the particular offenses listed in the search warrants, and therefore its scope does not include all of the Movants' activities. And even assuming the privilege might attach to the information at issue here, the proper test to overcome such a privilege is that prescribed by *Gonzales* for non-confidential materials. Here, as the Movants appear to concede, the Government does not seek the identity of confidential sources or any materials they have provided. Indeed, the Government has already established the identity of the individuals whom Project Veritas has characterized as its "sources" through the evidence gathered in its investigation and the Movants do not appear concerned with shielding their identities. (*See, e.g.*, S.M. Mot. 1, 3.) In addition, the seized materials are all electronic devices that were in the possession of O'Keefe, Meads, and Cochran, and do not include any of the Victim's stolen property. Accordingly, to overcome any

11

potentially applicable privilege to obtain the materials responsive to the warrants, the Government need only show that "the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 36.

By authorizing the search warrants, a federal magistrate judge already determined that probable cause exists that the offenses under investigation were committed and that the seized devices contain evidence of those crimes. That showing more than satisfies the first part of the *Gonzales* test. And as set forth in great detail in the affidavits submitted in support of the warrants,



establishes that the responsive materials contained in the Movants' devices are not reasonably obtainable from other sources.

.[9]

In sum, any qualified journalistic privilege that might attach to the information responsive to the search warrants is readily overcome by the showing made in support of the search warrants.

---

[9] Even under the more stringent test for confidential materials (which are not at issue here), *see Gonzales*, 194 F.3d at 33, the qualified privilege—to the extent one exists with respect to the Movants—is overcome with respect to any responsive materials within the seized materials. The demonstration of probable cause in the applications for those warrants also satisfies any requirement that the Movants' devices contain information responsive to the warrants that is "highly material and relevant" to the Government's ongoing grand jury investigation. Accordingly, the compelling law enforcement interests in the instant case, as contemplated in *Branzburg*, 408 U.S. at 690-91, are significant and the materials responsive to the warrants are "necessary" and "critical" to the Government's investigation of the alleged offenses. And for the reasons set forth above, such material is not obtainable from other available sources.

**C.**    **A Filter Team Will Sufficiently Protect Any Potentially Privileged Journalistic Information Not Responsive to the Warrants**

As set forth above, there is considerable doubt that any of the activities of Project Veritas and its employees would be subject to a qualified journalistic privilege.  But even assuming that the seized materials contain information not responsive to the warrants to which the qualified journalistic privilege may apply, a filter team, working in consultation with counsel for the Movants, is well-situated to protect any such information from disclosure to the investigative team, using similar protocols to those employed to protect the attorney-client privilege.

As noted, the use of a filter team is common practice in this District and has been recognized as protective of privileges.  *See Avenatti*, 2021 WL 4120539, at *4; *see also* pp. 15-19 *infra* and pp. 4-5 *supra*.  While the issue most commonly arises in the context of claims of attorney-client privilege, the Movants have made no attempt to explain why the use of a filter team would be any less sufficient in the context of a qualified journalistic privilege.  The Movants rely upon three cases in support of their request for a special master to conduct a review for materials to which the qualified journalistic privilege may apply in lieu of a filter team (S.M. Mot. 13), but all are plainly inapposite.  Two of those are cases in which special masters were used in connection with the assertion of the attorney-client privilege or other privileges.  *See DeMassa v. Nunez*, 747 F.2d 1283, 1285 (9th Cir. 1984); *United States v. Duke Energy Corp.*, No. 00 Civ. 1262 (WO), 2012 WL 1565228, at *2 (M.D.N.C. Apr. 30, 2012).  In the third, the court appointed a special master in a civil case to analyze whether "the parties' sealing of certain filings in this matter 'compl[ied] with Supreme Court and Third Circuit law."  *In re Storage Eztel GmbH*, No. 19 Misc. 209 (CFC), 2020 WL 2915781, at *1 (D. Del. June 3, 2020).  None of the cases cited by Movants involve the use of a special master to review materials obtained pursuant to a search warrant or the application of the qualified journalistic privilege, and none of them support the

13

proposition that a filter team cannot appropriately address any potential application of such a privilege.  Indeed, the United States Attorney's Office for the Southern District of New York ("USAO-SDNY") has conducted filter reviews in more than 300 investigations and cases in the past three years alone, some of which involved filtering materials potentially subject to the qualified journalistic privilege.

Thus, to the extent there is any non-responsive material on the seized devices that is subject to a qualified journalistic privilege, a filter team can adequately protect that privilege.[10]

### D.    The Potential Inclusion in the Seized Materials of Donor Information Does Not Justify the Appointment of a Special Master

O'Keefe, Project Veritas, and Meads further claim that a special master is required because the seized materials "include Project Veritas donor information."  (S.M. Mot. 11; *see also* Meads Mot. 9-10.)   Assuming that this is accurate, the inclusion of such information in the seized materials in no way justifies the appointment of a special master.  This is evident from the sole legal authority the Movants cite on this point, *Americans for Prosperity v. Bonta*, 141 S. Ct. 2373 (2021).  (S.M. Mot. 11; Meads Mot. 10.)  There, a state regulation requiring mandatory disclosure

---

[10] Project Veritas, O'Keefe, and Meads also attempt to invoke the Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa *et seq*.  (S.M. Mot. 9; Meads Mot. 8.)  The PPA provides no basis for the appointment of a special master or for any relief as part of a criminal case.  Rather, it sets forth a private right of action for damages where the Government unlawfully searches for or seizes documents or work product materials intended for public dissemination in or affecting interstate or foreign commerce.  *See* 42 U.S.C. §§ 2000aa(a) and (b), 2000aa-6.  In any event, the PPA has no bearing on the search warrants at issue here because the relevant provisions contain a "suspect exception," under which the PPA does not apply where law enforcement has "probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate." 42 U.S.C. § 2000aa(a)(1); *see, e.g. Am. News & Info. Servs., Inc. v. Gore*, 778 F. App'x 429, 431 (9th Cir. 2019); *S.H.A.R.K. v. Metro Parks Serving Summit Cty.,* 499 F.3d 553, 567 (6th Cir. 2007); *Sennett v. United States*, 667 F.3d 531, 535-36 (4th Cir. 2012).  As set forth herein, the evidence gathered to date, including the facts set forth in the sealed affidavits submitted in support of the Government's applications for the search warrants at issue, ████████████████████████████████████

of a list of the names and addresses for major donors for every charitable organization was found to violate the right to free association.  The circumstances presented here could not be more different: *Bonta* concerned a compelled disclosure regime that required all covered organizations to disclose donor information without any particularized showing of need.  *See Bonta*, 141 S. Ct. at 2386.  Here, by contrast, the search warrants were issued upon a showing of probable cause to believe that specific devices contained evidence of specific criminal conduct.  That the seizure of the devices may result in the incidental collection of donor information does not render the warrants unconstitutional or require the appointment of a special master.  If that were so, a special master would be called for in a multitude of investigations and cases that involve data seized from non-profit entities or individuals affiliated therewith.  The case law does not contemplate or necessitate such a result.

Moreover, no Project Veritas donor information will be seized from the devices to be reviewed unless such information is responsive to the items to be seized as identified in the search warrants.  Accordingly, the potential inclusion of such information in the seized materials does not weigh in favor of the appointment of a special master.  *See, e.g.*, *In re Application of Madison*, 687 F. Supp. 2d 103, 118-19 (E.D.N.Y. 2009) (denying motion for special master where petitioners claimed seized devices contained "membership list" of political organization because "the government sought, and the [w]arrants authorized, the seizure of assorted documents and records constituting evidence of the commission of [specific enumerated] crimes").

## II.    A Filter Team Will Appropriately Address Any Potentially Privileged Attorney-Client Communications in the Seized Materials

O'Keefe, Project Veritas, and Cochran also claim that the seized materials contain communications or documents that are subject to the attorney-client privilege and/or work product protection.[11]  (S.M. Mot. 6-7; Cochran Mot. 3.)  Assuming this assertion is correct, a filter team will appropriately address any such materials and therefore the appointment of a special master is unnecessary.

As noted, the use of a designated filter team, like the one to be used here, "is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney-client communications."  *In re Search Warrants Executed on April 28, 2021*, 2021 WL 2188150, at *2 (collecting cases); *see also* pp. 4-5, 13 *supra*.  Indeed, the USAO-SDNY currently has numerous pending cases in which it is employing the use of a filter team to screen for potentially privileged material, including multiple cases in which the materials being reviewed were seized from an attorney or law firm.  This common procedure is sufficient for this case.

O'Keefe and Project Veritas's inclusion in their motion of a list of attorneys who have represented them demonstrates that the process of filtering attorney-client communications will not be difficult.  (*See* S.M. Mot. 7.)  Indeed, the Government invited such a list in its letter to O'Keefe and Project Veritas's counsel (S.M. Mot. Ex. B at 2), so that the Government may provide that information to the filter team to screen out such communications.  It is not unusual in this District for materials obtained via search warrant to include potentially privileged attorney-client communications both related and unrelated to the subject matter of the Government's

---

[11] Meads concedes that "it is not believed that any of the devices seized from [him] contain any attorney-client privileged communications."  (Meads Mot. 6.)

investigation.  The Movants offer nothing to distinguish this case from the many others in which similar procedures are followed to appropriately handle potentially privileged materials.

The few cases in which special masters have been appointed to handle claims of attorney-client privilege are easily distinguishable, as they all involved searches of materials seized from attorneys and law firms.  First, the Movants point to the cases in which search warrants were executed on electronic devices belonging to Michael Cohen and Rudolph Giuliani.  *See In re Search Warrants Executed on April 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150 (S.D.N.Y. May 28, 2021); *In re the Matter of Search Warrants Executed on April 9, 2018*, No. 18 Mag. 3161 (S.D.N.Y. Apr. 16, 2018) (Dkt. No. 38).  (S.M. Mot. 13-14; Cochran Mot. 3.) Unlike O'Keefe, Cochran, and Meads, Cohen and Giuliani were both attorneys.  Their unique roles as personal attorneys for a sitting (during the Cohen matter) and former (during the Giuliani matter) president of the United States led the courts in those cases to appoint special masters not because they were deemed necessary to protect the attorney-client privilege, but merely to "ensure the 'perception of fairness'" in light of their unique roles.[12]  *In re Search Warrants Executed on April 28, 2021*, 2021 WL 2188150, at *4.  Indeed, those courts "recognized the appropriateness of the use of a filter team" and found that "the filter team process adequately safeguards the attorney-client privilege and the constitutional rights of the search subjects and their clients."  *Id.* at *2 (citing *In re the Matter of Search Warrants Executed on April 9, 2018*, No. 18 Mag. 3161 (S.D.N.Y. Apr. 16, 2018) (Dkt. No. 38 at 8; Dkt. No. 104 at 88)).  Put simply, no analogy can be drawn between the circumstances presented by Cohen and Giuliani matters, on one hand, and this

---

[12] Similarly, *United States v. Abbell*, 914 F. Supp. 519, 521 (S.D. Fla. 1995), an order which contains virtually no legal discussion or analysis, involved the appointment of a special master where "exceptional" privilege issues arose from the seizure of files from multiple law firms' offices.  (*See* S.M. Mot. 13-14.)

case, on the other.

Second, O'Keefe and Project Veritas rely on *United States v. Stewart*, No. 02 Cr. 395 (JGK), 2002 WL 1300059 (S.D.N.Y. June 11, 2002).  (S.M. Mot. 14.)  This case is fundamentally different from *Stewart*.  Stewart was a criminal defense attorney who represented numerous defendants being prosecuted by the USAO-SDNY.  She shared an office with other criminal defense attorneys who similarly represented numerous defendants being prosecuted by the USAO-SDNY.  When agents executed a search warrant on her office, they seized files not just from her own office, but also hard drives and networking hardware from common areas of the office that had been used by other attorneys.  *Id*. at *3.  This fact raised significant Sixth Amendment concerns for numerous defendants in pending criminal cases, as multiple courts have recognized in distinguishing *Stewart*.  *See, e.g.*, *United States v. Grant*, No. 04 Cr. 207 (BSJ), 2004 WL 1171258, at *3 (S.D.N.Y. May 25, 2004) ("[U]nlike the situation in *Stewart*, there are no Sixth Amendment concerns in this case.  The seized documents were not in the files of a criminal defense lawyer, and relate to civil, not criminal, litigation that predates the indictment in this case."); *United States v. Kaplan*, No. 02 Cr. 883 (DAB), 2003 WL 22880914, at *11 (S.D.N.Y. Dec. 5, 2003) ("*Stewart* is of little aid to the Defendant here, since in this case Defendant is a civil litigation attorney, the seized files are materials pertaining to civil cases, and the Sixth Amendment concerns implicated in *Stewart* are clearly not present here.").

*Stewart* was exceptional because the search swept-up files for multiple criminal defendants with cases pending before the USAO-SDNY, which was the office investigating Stewart herself.  There was thus no way for the USAO-SDNY to effectively establish a filter team, because the filter attorneys may well have had cases involving the clients (whose names were unknown to the USAO-SDNY) of the other attorneys in Stewart's law suite.  Thus, the filter attorneys might have

18

inadvertently been exposed to the privileged files of the very defendants they were prosecuting. 2002 WL 1300059, at *7.  No such concern exists here, where O'Keefe, Cochran, and Meads are not lawyers at all, much less criminal defense attorneys with a pending criminal case in this Court.[13]

This case is thus a far cry from the rare cases in which a special master has been employed with respect to attorney-client materials.  Accordingly, there is no basis in this case to deviate from the common, well-accepted practice of using a filter team to protect any materials that may be subject to the attorney-client privilege.[14]

---

[13] Appointment of a special master would also run the risk of creating significant delay in an ongoing criminal investigation, as even the author of *Stewart* recognized.  In the related case of *United States v. Sattar*, the defendants asked Judge Koeltl to appoint another special master for a different privilege review.  Judge Koeltl denied the request, noting that the appointment of a special master would cause "undue delay," and lamenting that the special master in *Stewart* was appointed in June 2002 but had yet, as of September 15, 2003—15 months later—to prepare a report. No. 02 Cr. 395 (JGK), 2003 WL 22137012, at *22 (S.D.N.Y. Sept. 15, 2003). Such a delay in this case would unacceptably prolong and impede the ongoing criminal investigation.

[14] Meads also seeks, without any citation to any legal authority, what would amount to the pre-indictment suppression of the materials seized from his residence.  (Meads Mot. 11.)  As there is no factual or legal basis for such a request, it should be denied.  *See, e.g.*, *In re Search Warrants Executed on April 28, 2021*, 2021 WL 2188150, at *2 ("any pre-indictment suppression motion would be premature"); *Doane v. United States*, No. 08 Mag. 17 (HBP), 2009 WL 1619642, at *9 (S.D.N.Y. June 5, 2009) (petitioner's motion to suppress was not "ripe for adjudication" because "[n]o criminal charges have been brought").  Meads further requests, also without citation to any legal authority, that the Government not be permitted to extract or review the contents of certain devices he claims contain only data predating the temporal limitation of the search warrant. (Meads Mot. 2, 11.)  This request is baseless.  The search warrants explicitly authorized law enforcement agents to seize the electronic devices at issue, as it is not apparent from the face of an electronic device when it was used.  But as the Government explained to Meads's counsel prior to the filing of the motion, to the extent that, once the devices are extracted, the metadata supports Meads's assertion that one or more of the devices do not contain data within the temporal limitation of the search warrant, that device will be promptly returned and its contents will not be reviewed.

19

III.     **The Court Should Deny Project Veritas and O'Keefe's Request For a Judicial Inquiry Into Recent Public Reporting**

Ostensibly in support of their motion for a special master, O'Keefe and Project Veritas have requested that the Court engage in a legally baseless and improper inquiry into the source of certain public reporting.  (P.R. Mot. 1.)  O'Keefe and Project Veritas's motion engages in pure speculation, with absolutely no evidence, that someone associated with the Government somehow obtained and then provided to members of the news media an internal Project Veritas memorandum that appears to have no connection to the Government's ongoing grand jury investigation.  O'Keefe and Project Veritas's motion contains no citations to legal authority or any explanation as to the legal basis for their request.  There is no basis for the Court to indulge O'Keefe and Project Veritas's speculation or accept their invitation to initiate a judicial inquiry into how some document, which has no apparent relation to the Government's investigation, was provided to members of the news media.

O'Keefe and Project Veritas also suggest that certain public reporting about the existence of the investigation and search warrants being executed somehow necessitates the appointment of a special master.  (S.M. Mot. 7.)  As O'Keefe and Project Veritas well know, however, the Government approached multiple individuals as part of the investigation prior to the execution of the search warrants.  In addition, neighbors within the apartment buildings of all three residences upon which the search warrants were executed heard and observed law enforcement agents carrying out their duties.  That public reporting of overt steps taken in the investigation does not in any way undermine confidence in a USAO-SDNY filter team's ability to abide by the strict confidentiality obligations imposed upon it, as the USAO-SDNY's filter teams have done in countless other investigations.

20

## CONCLUSION

For the reasons set forth above, the motions should be denied.

Dated:  New York, New York
        November 19, 2021

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney


                    By:     /s/
                            Jacqueline Kelly
                            Robert B. Sobelman
                            Mitzi Steiner
                            Assistant United States Attorneys
                            Tel.: (212) 637-2456/2616/2284

21