

**CALLI LAW, LLC**
One Flagler Building, Suite 1100
14 Northeast 1st Avenue
Miami, Florida 33132
T. 786.504.0911
F. 786.504.0912
www.calli-law.com

November 22, 2021

**VIA ECF**

Honorable Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     In re Search Warrant Dated November 5, 2021, Case No. 21-MC-00813 (AT)

Dear Judge Torres:

On or about September 3, 2020, a tipster called news outlet Project Veritas and left a voice mail. In the voice mail, the tipster indicated that a new occupant moved into a place where Ashley Biden had previously been staying and found Ms. Biden's diary and other personal items: "[T]he diary is pretty crazy. I think it's worth taking a look at." Communications with the source (the new occupant) who found Ashley Biden's abandoned diary and other abandoned items ensued. Project Veritas learned that Ashley Biden's other abandoned personal effects in the sources' possession included an overnight bag with the "B. Biden Foundation" logo and miscellaneous personal items. The source who found Ms. Biden's abandoned diary and another source brought the diary to Project Veritas in New York. The sources arranged to meet the Project Veritas journalist in Florida soon thereafter to give the journalist additional abandoned items. After extensive due diligence, Project Veritas chose not to run a news story about the diary. When Ashley Biden's lawyer would not confirm her client's ownership of the found items provided to Project Veritas, the news outlet arranged, on or about November 3, 2020, for the items to be delivered to state law enforcement in Florida, in the jurisdiction in which the source informed Project Veritas it originally found the abandoned items.

Over one year later, the government seized journalists' cell phones and other electronic devices, by the most invasive means possible, in its investigation of an alleged "theft." If a person not named Biden had misplaced her diary and overnight bag, would the FBI investigate at all, much less raid the home of one of America's most influential journalists? The case of the abandoned diary (or the case of the abandoned overnight bag) is an investigation better suited for the Hardy Boys than the DOJ and FBI.



The notion might be funny, except that the actions of the United States Attorney's Office for the Southern District of New York inflict serious violence not just on the credibility of that office, but on the First Amendment to the Constitution of the United States itself.

James O'Keefe's and Project Veritas's request to this Court is narrowly tailored: appoint a special master to review the contents of the cell phones the government seized from journalist James O'Keefe. Appointing a special master will safeguard attorney-client privileged, and First Amendment-protected materials, including confidential donor information. This request is justified by the critical interests in preserving such protections and upholding a free press. Further, the government's overreach and the irregularities of its investigation demonstrate that no government taint team could be adequately walled off under the circumstances – a government investigation of journalists and a news outlet that researched, but ultimately did not run, a news story about the President's adult daughter's diary.

## THE GOVERNMENT'S "NOT-A-JOURNALIST" ARGUMENT EMPHASIZES WHY A SPECIAL MASTER SHOULD BE APPOINTED; THE GOVERNMENT MAKES ITS HOSTILITY TO PROJECT VERITAS AND THUS A FREE PRESS, PATENT

The government's response demonstrates its hostility to Project Veritas and thus a free press, writing, "Project Veritas is not engaged in journalism within any traditional or accepted definition of that word. Its 'reporting' consists almost entirely of publicizing non-consensual, surreptitious recordings made through unlawful, unethical, and/or dishonest means." (Docket No. 29) at 13-14.[1]  To borrow the words of another federal district court judge who granted directed verdict for Project Veritas in a case challenging Project Veritas's investigative journalism: "I keep running that [60 Minutes Investigative Journalist] Mike Wallace analogy through my mind. If you made this argument about Mike Wallace, would everybody in the room laugh?" **Ex. A**, Trial Transcript Excerpt from *Teter v. Project Veritas Action Fund et al.*, Case No. 1:17-CV-256 (W.D.N.C.) (Reidinger, J.); *see also* 2019 WL 2423294 (June 7, 2019) (written order granting directed verdict in favor of Project Veritas Parties) ("the Plaintiffs' contention that [the Project

---

[1] Our citations use CM/ECF's pagination at the top of the document.

Veritas Parties] concocted a story line (Video I) and then consciously set out to create the 'evidence' (Foval's statements) to conform to that storyline is simply unsupported by Plaintiff's own evidence."). Contrary to the government's mischaracterization and reliance on an order on a motion in limine in a pending civil case, every time Project Veritas's investigative journalism has been challenged in court, Project Veritas has ultimately prevailed. *See also e.g. Wentz v. Project Veritas, James O'Keefe III, and Allison Maass*, Case No. 6:17-cv-1164-Orl-18GJK 2019 WL 1716024, (M.D. Fla. April 16, 2019) (Sharp, J.) (summary judgment for the Project Veritas Parties in surreptitious recording case).

Investigative journalism once enjoyed a significant place in the American consciousness – from pioneering journalist Nellie Bly's use of an alias and a cover story to induce a lobbyist to reveal the dirty underbelly of political dealing in the late 19th Century, to investigative journalist Ken Silverstein's use of an undercover role to expose Washington D.C. lobbying firms that were prepared to launder the reputation of an authoritarian regime. *See e.g.* Ken Silverstein, *Washington Lobbyists for Hire and the US as the Avatar of Human Rights: An Undercover Report*, THE ASIA-PACIFIC JOURNAL (July 12, 2007) *available at* https://apjjf.org/-Ken-Silverstein/2461/article.pdf. Unfortunately, large corporate legacy media outlets dependent on their advertisers have largely abandoned the practice of investigative journalism.  The pressure to maximize profits and the consolidation of local news stations under corporate ownership has likewise driven broadcast media to abandon the hidden camera investigative reporting that journalists like the aforementioned Mike Wallace once popularized. Corporate media's abandonment of investigative reporting does not make any less silly the government's claim that "Project Veritas is not engaged in journalism within any traditional or accepted definition of the term." (Docket No. 29) at 13-14. Journalism is "the collection and editing of news for presentation through the media[.]" *journalism*, MERRIAM-WEBSTER, https://www.merriamwebster.com/dictionary/journalism. Black's Law Dictionary includes a definition of "watchdog journalism," which is "[i]nvestigative journalism that seeks to uncover facts and expose abuses of power, esp. by the government, to the public." *watchdog journalism*, BLACK'S LAW DICTIONARY (11th ed. 2019). Before the government denigrates Project Veritas's journalism, it should crack open a dictionary instead of click on internet blogs. *Compare* (Docket No. 29) at n.7. (citing, *e.g.,* entertainment blog "The Wrap" and something called "the click.news.").

Reacting to the government's execution of the search warrant at Mr. O'Keefe's home, Pulitzer Prize-winning journalist Glenn Greenwald[2] wrote:

> The reason this is such a grave press freedom attack is two-fold. First, as indicated, any attempt to anoint oneself the arbiter of who is and is not a "real journalist" for purposes of First Amendment protection is inherently tyrannical. Which institutions are sufficiently trustworthy and competent to decree who is a *real journalist* meriting First Amendment protection and who falls outside as something else?

---

[2] Glenn Greenwald is an expert investigative journalist in his own right and an authoritative voice in the field. Among other achievements, his reporting on the Brazilian 'Lava Jato' prosecution exposed prosecutorial and judicial misconduct, ultimately contributing to the vindication of wrongfully imprisoned former Brazilian President Luiz Inácio Lula Da Silva.

But there is a much more significant problem with this framework: namely, the question of who is and is not a real journalist is completely irrelevant to the First Amendment. None of the rights in the Constitution, including press freedom, was intended to apply only to a small, cloistered, credentialed, privileged group of citizens. The exact opposite was true: the only reason they are valuable as rights is because they enjoy universal application, protecting *all citizens* . . . . What was protected by the First Amendment was not a small, privileged caste bearing the special label "journalists," but rather the *activity* of a free press.

Glenn Greenwald, *Kyle Rittenhouse, Project Veritas, and the Inability to Think in Terms of Principles* (Nov. 16, 2021), *available at* https://greenwald.substack.com/p/kyle-rittenhouse-project-veritas. For this reason, organizations such as the ACLU ("We urge the court to appoint a special master to ensure that law enforcement officers review only those materials that were lawfully seized and that are directly relevant to a legitimate criminal investigation.") and the Committee to Protect Journalists ("While we do not endorse some of the tactics Project Veritas employs, the FBI's recent raids on the organization's founder and his associates represent a concerning overreach by law enforcement") have denounced the government's conduct. *ACLU Comment on FBI Raid of Project Veritas Founder*, ACLU (Nov. 14, 2021) *available at* https://www.aclu.org/press-releases/aclu-comment-fbi-raid-project-veritas-founder; *CPJ Concerned over FBI Raid on Home of Project Veritas Founder James O'Keefe*, Committee to Protect Journalists (Nov. 15, 2021) *available at* https://cpj.org/2021/11/cpj-concerned-over-fbi-raid-on-home-of-project-veritas-founder-james-okeefe/. Many others in the news media have also criticized the government's raids. In fact, a Washington Post reporter who wrote an article that the government cites[3] had this to say about the government's attack on the First Amendment:

Such activities do enjoy protection under federal law. The Privacy Protection Act . . . passed into law in response to the landmark case *Zurcher v. Stanford Daily*, in which the Supreme Court ruled that it was constitutional for police to search a newspaper's materials in a hunt for evidence of criminal wrongdoing. The law sought to correct this outrage, prohibiting searches and seizures of "any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication." Note the law's agnosticism regarding whether the target may or may not qualify as a "journalist." It applies to any person — whether O'Keefe or Bob Woodward — who's out to disseminate information.

Erik Wemple, *Opinion: Did the Justice Department overreach in raiding James O'Keefe's home?* WASH. POST (Nov. 16, 2021), *available at* https://www.washingtonpost.com/opinions/2021/11/16/project-veritas-freedom-speech-james-okeefe-justice-overreach/. One need not wonder why the

---

[3] *See* Washington Post article cited in (Docket No. 29) at 14 n.8. This article is based on a sealed exhibit in pending federal civil litigation. Project Veritas's adversary selectively and misleadingly quoted from the sealed exhibit in a public pre-trial filing, failing to redact the isolated language it quoted from the sealed exhibit. The journalist wrote an article based on the false impression Project Veritas's adversary had given in their unredacted filing. The Court struck and sealed the adversary's unredacted filing. Shame on the government for amplifying misleading claims about a sealed exhibit. If the government shows such a lack of respect for judicially sealed material, how can it be  trusted to conduct its own taint team review?

4

government did not include this article by the same author in its lengthy footnote. *Compare* (Docket No. 29) at 14 n.8.

A point-by-point refutation of the government's misleading "not-a-journalist" citations is unnecessary and beyond the scope of this reply, but one demands a specific response. The government cited a blog post by the "Election Integrity Partnership" critical of Project Veritas. (Docket No. 29) at 14 n.7. The blog post is false, and Project Veritas has sued EIP's component entities for defamation. *Project Veritas v. Stanford and Univ. Wash.*, Case No. 2:21-cv-1326 (W.D. Wash.). EIP sent an advance copy of its defamatory blog post to the New York Times, which in turn wrote a defamatory article regurgitating the false claims – a coordinated misinformation campaign between EIP and the New York Times. Project Veritas has also sued the New York Times[4] for defamation, and earlier this year defeated its motion to dismiss. *Project Veritas v. The New York Times Co.*, 2021 WL 2395290, 2021 N.Y. Slip Op. 31908(U), (N.Y. Supp. March 18, 2021).

*Democratic Nat'l Committee v. Russian Fed'n*, 392 F. Supp. 3d 410 (S.D.N.Y. 2019), rejected the notion that disfavored journalists could be denied First Amendment protections. *Id.* at 435 (rejecting DNC argument that "this case does not threaten freedom of the press because WikiLeaks did not engage in normal journalistic practices"). In any event, the Department of Justice has established a procedure for prosecutors to follow when there is any question about the status of a person or entity as a journalist. DOJ Manual § 9-13.400A.1.1.[5] The government's response is silent on whether the prosecutors here followed those procedures, instead representing only generally that the government fully complied with all regulations and policies involving the news media. (Docket No. 29) at 6 n.2. The Court, and Project Veritas, are left to wonder whether the DOJ Policy and Statutory Enforcement Unit determined that Project Veritas is not a member of the news media, or if the prosecutors simply clicked around the internet to find blogs and politically motivated competitor news outlets upon which to base its position concerning Project Veritas.

The notional reason the government criticizes Project Veritas's journalism is an argument that a qualified reporter's privilege might not apply, even though the seized devices are filled with First Amendment newsgathering both related and completely unrelated to the government's diary (or overnight bag) investigation. This puts the cart before the horse, given that the narrow issue is the appointment of a special master to review the seized cell phones and sort through the privilege issues and non-responsive materials with input from the parties. And it is an argument that emphasizes why a special master is required – the government has pre-judged Project Veritas on the basis of hostile news articles and blog posts, ignored other news outlets that recognize the fact of Project Veritas's journalism, and ignored the cases where Project Veritas's journalism has been

---

[4] As discussed in James O'Keefe and Project Veritas's Motion to Require the Government to Disclose Leaks, the government's leaks about this investigation to another member of the news media is even more egregious because that newspaper is Project Veritas's adversary in pending civil litigation.

[5] "When there is a question regarding whether an individual or entity is a member of the news media, members of the Department must consult with the [Policy and Statutory Enforcement Unit] before employing the use of a covered law enforcement tool. Members of the Department must also consult with the [Policy and Statutory Enforcement Unit] regarding whether the conduct at issue of the affected member of the news media constitutes or relates to 'newsgathering activities.'"

validated when challenged in court. The government's denial of Project Veritas's journalism demonstrates its rank hostility. Given how it has pre-judged Project Veritas in this way, it makes no sense to entrust the government to safely oversee Project Veritas's privileges during the review process. It appears from the government's own arguments, that the government would spend more time finding reasons to ignore such protections (as it now asks the Court to do) than honoring them.  A taint team is insufficient; a special master should be appointed.

## THE GOVERNMENT'S RESPONSE DEMONSTRATES ITS OVERREACH IN SEIZING A JOURNALIST'S CELL PHONES

The government's response harkens back to the old phrase, when you don't have the facts, argue the law. When you don't have the law, argue the facts. When you have neither, just argue. Here, the government has neither law nor facts on its side. Accordingly, its response resembles a David Blaine magic show of deception – 'Look over there, not over here!' Much like a magic show, the government's response lacks substance.

The government's carefully parsed words in its response ("the theft of certain of the property itself") suggests that it has possibly now shifted its focus from a diary investigation to the other items found abandoned in the residence with the diary – items that contributed to Project Veritas's strong belief that Ashley Biden wrote the diary. For example, when the sources contacted Project Veritas, Source 2 sent photographs showing that other abandoned property, like the diary itself, was already in Source 2's possession. Importantly, the possible shift in the government's theory does not change the analysis under First Amendment case law. The sources already had the property in their possession when they contacted Project Veritas. The sources represented to Project Veritas that they had lawfully come into possession of all of the abandoned property. The government does not dispute that *Bartnicki v. Vopper*, 532 U.S. 514 (2001) is the controlling precedent on this issue and *Bartnicki* holds that First Amendment protection attaches "provided that the publisher was not involved in the unlawful activity." *See e.g.* (Docket No. 29) at 5, 10-11. Evidence – including photographic evidence – demonstrates that the sources already possessed the property at the time they came to Project Veritas. Regardless of any government falsehood, the hard evidence demonstrates that Project Veritas could not have played a role in how the items had been acquired by the sources.

The arguments rejected by the court in *Democratic Nat'l Comm., Democratic Nat'l Comm.* 392 F. Supp. 3d 410, mirror the "active involvement" theory of liability advanced by the government here. *See* (Docket No. 29) at 8, 11 (asserting that Project Veritas was "actively involved" in "the interstate transportation of stolen property" and theft of "**certain** of the property") (emphasis added); *id.* at 16 (referring to "communications" with those who obtained the diary and other property); Search Warrant, Ex. F to Motion (citing violations of conspiracy, aiding and abetting, accessory after the fact and misprision of felony).The attempted use of such "accomplice" theories to circumvent First Amendment protections has been rejected not only in the civil context, as explained above, but also where authorities sought to hold a publisher criminally liable for the wrongdoing of the primary actor.

Thus in *Democratic Nat'l Comm.* the court dismissed the claims against  WikiLeaks and Julian Assange (collectively "WikiLeaks")—non-traditional journalists by any measure— recognizing that they were entitled to First Amendment protections despite artful pleading by the

DNC reminiscent of the "active involvement" exception to the First Amendment that the government advances here.[6] The DNC alleged that WikiLeaks was not entitled to First Amendment protection because it "solicited the documents from the [alleged thief] knowing that they were stolen and coordinated with the [thief]…to disseminate the documents." 392 F. Supp. 3d at 434; *see also id*. at 433-34 ("WikiLeaks participated in the theft of the DNC documents [and] in a criminal conspiracy to steal the DNC's information" and/or was "an after-the-fact coconspirator for the theft"). The *Democratic Nat'l Comm.* court held that it was "constitutionally insignificant" that WikiLeaks knew the documents were stolen and solicited them. *Id.* at 434-35. The court also rejected the DNC's "after-the-fact coconspirator" theory of liability, reasoning that this argument "would render any journalist who publishes an article based on stolen information a coconspirator in the theft." *Id.*

In *Jean v. Massachusetts State Police*, 492 F.3d 24 (1st Cir. 2007), the government challenged the posting of a video that was recorded in violation of the Massachusetts electronic interception statute. The plaintiff Jean, a political activist, obtained a copy of the recording and posted it on her website. The police threatened to file felony charges and directed that she cease and desist posting the video. The plaintiff obtained an injunction and on appeal the government argued that Jean's posting of the video was not entitled to First Amendment protections because she "assisted, conspired, or served as an accessory to [the recorder's] violation [and] Jean's active collaboration with [the recorder] that made his unlawful dissemination possible in the first instance." *Id.* at 31. The First Circuit, relying on *Bartnicki v. Vopper*, 532 U.S. 514 (2001) upheld the injunction, rejecting the government's argument that Jean, unlike the publisher in *Bartnicki* (Yocum), was a culpable participant in the underlying violation:

> the fact that Yocum received the tape 'passively' and Jean received the tape 'actively' is a distinction without a difference: both made the decision to proceed with their disclosures knowing that the tape was illegally intercepted, yet the Supreme Court held in *Bartnicki* that such a knowing disclosure is protected by the First Amendment.

492 F.3d at 32.

The government's claim that Project Veritas falls on the "wrong side" of the rule in *Bartnicki* is untethered to anything specific; it is simply a free-floating, evidence-less accusation. The government's response contains no fact whatsoever that supports its accusations against Project Veritas; accusations which it believes justify seizing a journalist's cell phones. It instead points to its sealed search warrant affidavits. It has refused to share those with the undersigned. It has opposed the Reporter's Committee for Freedom of the Press' efforts to unseal them. *See* (Nov. 15, 2021 Letter Motion). It does not want its purported grounds scrutinized anything other than *ex parte*, and it certainly does not want the other parties who know the facts (and can therefore respond to specific points) to have access to the underlying affidavits. But these are constitutional minimums for any proceeding here to be in compliance with *Bartnicki*. If the government can simply declare a journalist a "thief" – without evidence accessible to the defense or an opportunity

---

[6] The motion to dismiss filed by Wikileaks and Assange was supported by amici Knight First Amendment Institute at Columbia University, the Reporters Committee for Freedom of the Press, and the American Civil Liberties Union. *Id.* at 426.

to examine it, without a prior adversarial hearing or, unthinkably, without a timely remedy – then *Bartnicki* is eviscerated.

In keeping with its practice of obfuscation, the only specific "fact" the government includes in its response is fake: "the Movants used encrypted applications to communicate with one another about the commission of the offenses under investigation, in an apparent effort to avoid law enforcement scrutiny." (11/19/21 Unredacted Gov't. Resp.) at 12. The government redacted this sentence for the public version of its filing, but redaction is entirely unnecessary. What the government's sinister sounding phrase refers to is the fact that Project Veritas journalists used the popular messaging app Telegram to communicate. This is an entirely ordinary means of communication. Telegram is readily available to download for free on Apple's app store. At the time of this writing, Telegram is the sixth-most downloaded app in the social networking category:



There is nothing strange or sinister – and certainly nothing suggestive of probable cause – in the use of a free, standard messaging app used by the likes of BBC[7], Bloomberg News[8], The New York Times[9], and the Washington Post[10].   Responsible lawyers use the Telegram app to communicate with their clients. Responsible journalists use the Telegram app to communicate with

---

[7] t.me/bbcworldofl.

[8] t.me/bloomberg.

[9]  t.me/nytimes.

[10] t.me/washingtonpost.

their sources and colleagues. The undersigned is aware of judges who use it to communicate with their law clerks, and FBI agents who use it to communicate. The government's distortion of an ordinary fact demonstrates its desperation by painting as nefarious that which is mundane and normal. And besides, as the government's overreach here demonstrates, keeping one's communications encrypted so the government cannot immediately access them is a good idea – especially if you are a journalist perceived as critical of the current administration.

As our own investigation continues, we have learned that the government has deliberately avoided learning information that disproves its false theory that Project Veritas was somehow involved in a "theft." The undersigned have interviewed the individuals who steered the sources who found the abandoned diary and other abandoned personal items, to Project Veritas (including the tipster who left the voice mail for Project Veritas on or about September 3, 2020). Astonishingly, the government has not interviewed these individuals, despite knowing their identities and listing them by name in the documents. From an investigative standpoint, the government's choice not to interview them is inexplicable. The only possible explanation is that the government wishes to remain willfully blind or deliberately ignorant and avoid obtaining evidence inconsistent with its false theory that Project Veritas was involved in the theft of the diary and other materials. The sources told those individuals, just as they told Project Veritas, that the diary and other items were abandoned by Ashley Biden in a place where she had been staying while undergoing rehabilitation treatment.

The government asserts, "[T]he Government's investigation is limited to a narrow course of conduct and the particular offenses listed in the search warrants, and therefore its scope does not include all of the Movants' activities." (Docket No. 29) at 15. The proffered narrowness of the government's diary or overnight bag investigation starkly contrasts with the immense amount of First Amendment-protected and attorney-client privileged information contained on the cell phones it seized in its dawn raid on Mr. O'Keefe's home, the vast majority of which simply has nothing to do with the government's extreme actions.

A meaningful First Amendment injury occurred at the point FBI raid teams seized Mr. O'Keefe's digital notes containing news sources within the Biden administration, plans for upcoming news investigations, and donors to Project Veritas not aligned with the current administration. That damage is only amplified by allowing the government to search those materials without use of a special master. Without access to, or adversarial hearings about, materials suggesting journalists acted outside of *Bartnicki*—a truly exceptional claim—the government is free to run roughshod over its express protections.

The failings of the government's investigation, and the infirmity of its underlying legal theory in light of *Bartnicki* and its progeny, demonstrate its overreach in seizing Mr. O'Keefe's cell phones. Having embarked upon such an invasive approach over a diary (or maybe, an overnight bag) belonging to the President's adult daughter, the government can hardly be relied upon to respect privileges and First Amendment considerations through the use of a filter team. That is the fox asking to be allowed to guard the hen house.

## THE GOVERNMENT MISLEADS THE COURT AS TO THE IMPORT OF THE
## PRIVACY PROTECTION ACT AND RELATED REGULATIONS

The government argues that its own policy on seizing materials from members of the news media, 28 CFR § 50.10(d), and the Privacy Protection Act, 42 U.S.C. § 2000aa et seq., (the "PPA") are irrelevant to the issues before the Court. (Docket No. 29) at 6 n.2, 14 n.10. Remarkably, the government relegates its discussion of the PPA to a footnote, even though the statute prohibits the very action taken by the government here.

The government insists that a finding of probable cause that Project Veritas was "actively involved" in obtaining the allegedly stolen diary overrides otherwise applicable First Amendment protections. The government seeks to justify its search as appropriate based on the "suspect exception" to the Privacy Protection Act. But the government misleads the Court and omits a critical portion of the statute. The government writes:

> the PPA has no bearing on the search warrants at issue here because the relevant provisions contain a "suspect exception," under which the PPA does not apply where law enforcement has "probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate." 42 U.S.C. § 2000aa(a)(1).

(Docket No. 29) at 18 n.10. What the government failed to disclose to the Court is that the "suspect exception" does not apply if the suspect offense involves the receipt, possession, communication, or withholding of materials to be used in disseminating a newspaper, book, broadcast, or similar form of public communication. This statutory language appears immediately after the language establishing the "suspect exception:"

> *Provided, however,* that a government officer or employee **may not** search for or seize such materials under the provisions of this paragraph **if the offense to which the materials relate consists of the receipt, possession, communication, or withholding of such materials** or the information contained therein . . . .

42 U.S.C. § 2000aa(a)(1) (italics original) (bold emphasis added).[11] This investigation relates to newsworthy information and materials that Project Veritas obtained in connection with researching a news story that it considered publishing but ultimately chose not to. The search warrant executed at James O'Keefe's home was based on a theory for which the Privacy Protection Act expressly forbids the issuance of search warrants – the receipt and possession of allegedly stolen property for use in a news story. *See* (Docket No. 10) at Ex. F (search warrant's recitation of 18 U.S.C. §§ 371 (conspiracy to transport stolen property across state lines and conspiracy to possess stolen goods), 2314 (interstate transportation of stolen property), 2315 (possession of stolen goods), 2 (aiding and abetting), 3 (accessory after the fact), and 4 (misprision of a felony)). Presumably, the

---

[11] This proviso itself has exceptions, none of which the government alleges here. The exceptions deal with national defense information, classified information, information related to sexual exploitation of children (*id.*) or if there is reason to believe that the immediate seizure of such materials is necessary to prevent the death of, or serious bodily injury to, a human being. (42 U.S.C. § 2000aa(a)(2)). None of these could possibly apply.

government likewise misled the Honorable Sarah Cave who signed the search warrant, by failing to inform her that the exceptions on which the government relied for obtaining search warrants to seize materials from members of the news media do not apply to journalists performing newsgathering functions. This apparent concealment from Magistrate Judge Cave further undermines the government's continued reliance on the magistrate judge's finding of probable cause. The government should never have been authorized to apply for this search warrant.

As the *Democratic Nat'l Comm.* court recognized in rejecting nearly identical accomplice arguments advanced by the DNC, "it is a common journalistic practice…to meet[] with information thieves or solicit[] stolen information." 392 F. Supp. 3d at 435. The government's strained arguments against First Amendment protections for obtaining news materials that may have been stolen are no more persuasive when employed to avoid the PPA prohibition against the use of search warrants to seize materials from members of the news media.  The government contends that because the only remedy afforded by the PPA is one for civil damages the violation of the statute ought not be considered in determining whether a special master should be appointed to review the seized materials. (Docket No. 29) at 18 n.10.  But this contention misses the point —if the prosecutors violated a statute, and the DOJ failed to adhere to its own policies, what assurances can the Court and Project Veritas have that other prosecutors within the DOJ selected for the "filter team" will serve in a manner that protects First Amendment and attorney-client privilege interests?

## THE GOVERNMENT'S ATTEMPT TO DISTINGUISH OTHER SPECIAL MASTER CASES FAILS

There is no government taint team sufficiently trustworthy to conduct the review of Mr. O'Keefe's cell phones. This is an investigation into the President's adult daughter's diary (or, as discussed above, possibly an investigation into her overnight bag). If the government's representations that it has complied with the Privacy Protection Act, regulations involving using search warrants to seize materials from members of the news media, and corresponding sections of the Justice Manual are to be believed, that means the government has obtained approvals from the highest levels of the Department of Justice, including the Attorney General himself.

The benefit of a filter team is theoretically that prosecutors with no personal stake in a matter are more inclined to cautiously and fairly evaluate issues of privilege than a prosecutor who has a direct stake in winning a particular case. There is no filter team that does not work for this President, whose daughter's personal effects are the subject of this investigation. There is no filter team that does not work for this Attorney General, who authorized a search of a journalist's home.

The government has now represented multiple times that it fully complied with all the regulations governing what it must do to obtain approval to execute a search warrant to seize materials from the news media. (Docket No. 29) at 6 n.2. These regulations and the guidance in the Justice Manual require approval from the most senior officials at DOJ. *See* discussion in James O'Keefe and Project Veritas's Mot. (Docket No. 10) at 8-9. The Attorney General himself has directed, "The Department of Justice will no longer use compulsory legal process for the purpose of obtaining information from or records of members of the news media acting within the scope of newsgathering activities . . . ." *See* Attorney General Memorandum for the Deputy Attorney

General, The Associate Attorney General, Heads of Department Components, United States Attorneys, Federal Prosecutors, July 19, 2021, *available at* https://www.justice.gov/ag/ page/file/1413001/download. But this directive does not apply where the President's daughter's diary or overnight bag is concerned.

Thus: there is no taint team that can be free of the institutional pressure of working in the Department of Justice that has authorized the government's seizures at the highest levels; no federal prosecutor who can be free of knowing the government's inquiry revolves around the executive's daughter's personal effects, including her diary, entries of which are profoundly embarrassing to the chief executive.

Not content with denigrating Project Veritas' right to the protections granted by the First Amendment, the government suggests that First Amendment rights are somehow less worthy of protection than the interests served by the attorney-client privilege. Specifically, the government claims that the caselaw cited by Project Veritas for appointment of a special master are "plainly inapposite" because those cases involved the seizure of attorney-client communications and work product, not mere journalist materials. (Docket No. 29) at 17-18. This argument is wrong, both as a matter of policy and common sense. Whereas the common law recognizes protection for attorney-client communications and attorney work product, Congress enacted the PPA to protect news gathering material from government seizure and compelled production. The suggestion that the appointment of a special master to review seized materials is warranted only when common law privilege issues are at stake is nonsensical. Moreover, here the government has seized materials protected by both the First Amendment and the attorney client privilege/work product doctrine. The government's attempt to distinguish the authorities cited by Project Veritas elevates form over substance.

For example, the government's efforts to distinguish the Michael Cohen and Rudolph Giuliani cases fail. The central concern in those cases (like other special master review cases) were "avoid unnecessary intrusion on attorney-client communications" and as "ensur[ing] the perception of fairness." *In re Search Warrants Executed on April 28, 2021*, 21-MC-425 (JPO), 2021 WL 2188150, at **1, 4 (S.D.N.Y. May 28, 2021), appeal withdrawn (June 30, 2021). These are common concerns in cases where special masters are appointed, but in sharp focus given the connection to the President of the United States. The government argues that this makes the instant investigation unlike the circumstances that required a special master in Cohen and Giuliani. (Docket No. 29) at 21. That's not a *difference*. This investigation *likewise* involves the President. And not just because the investigation revolves around the President's adult daughter's abandoned personal items, but because the subject diary raises unsavory matters that reflect poorly on the President himself. The use of a taint team to evaluate issues of attorney-client privilege and First Amendment protections as to a journalist this administration regards as an antagonist jeopardizes the "perception of fairness."

Neither is it of consequence that Cohen and Giuliani were lawyers, and James O'Keefe is a journalist. Mr. O'Keefe is the founder and President of Project Veritas and is intimately and directly involved in its legal matters. We have preliminarily identified a list of 42 lawyers at 20 law firms (plus Project Veritas's in-house general counsel) with whom Mr. O'Keefe has privileged communications that are contained on the seized cell phones. Attorney-client privileged material

is no less privileged when it is seized from the client than when it is seized from the lawyer, and the sanctity of the attorney-client relationship demands the same level of respect.

The government's seizure of newsgathering materials from a journalist's home also raises critical First Amendment concerns. In our motion for Appointment of a special master, we noted that "we have not found a reported case in which the Department of Justice obtained a search warrant to seize newsgathering work product and other First Amendment-protected material from a journalist." (Docket No. 10) at 2. Neither has the government. Conspicuously absent from its response is citation to any case upholding the execution of a search warrant to seize documents from a news gathering organization. These exceptional circumstances merit appointing a special master.

## **CONCLUSION**

Although there was compelling evidence of the diary's authenticity, James O'Keefe and Project Veritas's newsroom staff ultimately found that the evidence of authenticity did not rise to a level sufficient to satisfy their journalistic ethical standards for news publishing. This remains fully consistent with their internal belief that the diary was genuine – the sordid nature of the diary's contents required that a high threshold be satisfied prior to running a story on it. As James O'Keefe summarized the editorial concerns in an October 12, 2020, email:

Team,

I've thought carefully on whether to release this so-called 'Sting Ray' story which involve entries in a personal diary to a very public figure.

My thinking and analysis in short is this:

To release means the action is *less wrong* than the necessary wrongs that would follow if the information were not utilized and published. But in this case *even more harm* would be done to the person in question and Project Veritas if we were to release this piece. We have no doubt the document is real, but [i]t is impossible to corroborate the allegation further. The subsequent reactions would be characterized as a cheap shot.

Whereas the great novelist Ernest Hemingway said[,] "[W]hat is moral is what you feel good after and what is immoral is what you feel bad after," the great novelist Thomas B. Morgan paraphrased thus[:] "Morally defensible journalism is rarely what you feel good about afterward; it is only that which makes you feel better than you would otherwise.["]

Using the Hemingway analysis, this very private entry related to a public figure's family is not worth it, and it's indefensible to publish what we currently have.

I'm not worried about things we look into allegations but not publishing. Our actions so far are entirely defensible.

13

We are launching Colorado and CT tapes this week, which are unquestionably stronger and will make waves much bigger.

**Ex. B**. If James O'Keefe is a "political spy," as his politically motivated detractors (such as those in corporate competitors like the New York Times) falsely allege, he could have simply published a salacious news story regarding Ashley Biden's diary. But he did not. James O'Keefe's and Project Veritas's fidelity to their journalistic ethics include high editorial standards. To the extent they harbored any doubt that the diary was authored by Ashley Biden, the United States Attorney's Office for the Southern District of New York and the FBI have removed all doubt. Nothing could be better confirmation of the diary's authenticity and the claims therein than the government's use of federal law enforcement to invade the homes of journalists who did not even run a story on the diary, but only considered doing so, and then turned all material provided to it by sources over to law enforcement.

For the foregoing reasons, James O'Keefe and Project Veritas request that the Court appoint a special master to oversee the review of Mr. O'Keefe's seized cell phones. Specifically, the Court should:

- Direct the parties to confer and submit proposed candidates for a special master and, if they cannot reach agreement on a list of candidates, submit their own candidates;

- Appoint a special master from the list of candidates proposed by the parties or another suitable candidate identified by the Court;

- Require the special master to submit a declaration regarding any bases for potential disqualification;

- Issue an Order identifying the duties, reporting and judicial review requirements, and other provisions relating to the appointment of a special master; and

- Require the parties to provide the special master with all necessary information such that the Special Master can complete the review of the seized materials on an expedited schedule set by the Court.

Respectfully submitted,

CALLI LAW, LLC

By: _____
/s/
Paul A. Calli
Charles P. Short
14 NE 1st Avenue
Suite 1100
Miami, FL 33132
T. 786-504-0911

14

F. 786-504-0912
pcalli@calli-law.com
cshort@calli-law.com

*Admitted Pro Hac Vice*

Harlan Protass
PROTASS LAW PLLC
260 Madison Avenue
22nd Floor
New York, NY 10016
T. 212-455-0335
F. 646-607-0760
hprotass@protasslaw.com

*Counsel for James O'Keefe,*
*Project Veritas and Project*
*Veritas Action Fund*

Benjamin Bar                         Stephen R. Klein
BARR & KLEIN PLLC                    BARR & KLEIN
444 N. Michigan Avenue               1629 K Street, NW
Suite 1200                           Suite 300
Chicago, IL 60611                    Washington, DC 20006
T. 202-595-4671                      T. 202-804-6676
ben@barrklein.com                    steve@barrklein.com

*Admitted Pro Hac Vice*              *Admitted Pro Hac Vice*


cc:      All Counsel of Record (via ECF)