

**CALLI LAW, LLC**
One Flagler Building, Suite 1100
14 Northeast 1st Avenue
Miami, Florida 33132
T. 786.504.0911
F. 786.504.0912
www.calli-law.com

January 17, 2022

Honorable Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     **In re Search Warrant Dated November 5, 2021, Case No. 21-MC-00813 (AT)**

Dear Judge Torres:

The government's arguments in its letter filing reduce to "news organization Project Veritas and similarly situated journalists may only enjoy their First Amendment rights so long as they can pay for them." First Amendment protections, however, do not come with a price tag.

Not satisfied with defiling the First Amendment and attacking a news organization, its journalists, and a free press through its diary investigation, and unhappy with this Court's recognition of the important First Amendment issues implicated by the government's actions, the government now objects to the Special Master's recommendation that the government bear half of the cost of her fees and expenses. Instead, the government seeks to tax Project Veritas for the procedural safeguards necessitated by its attack. The government's position is its latest attempt to punish and restrain a news organization critical of the current administration.

The government's filing adopts tactics ranging from misrepresenting this Court's Order appointing the Special Master to even listing Mr. O'Keefe's personal income in its pleading – making it clear the government wishes to condition the right to a free press under the First Amendment upon the income of the subject journalist. Mr. O'Keefe's personal income is irrelevant to the First Amendment legal issues and, like the Department of Justice's leaks to its stenographers at the New York Times regarding the execution of the search warrants on these journalists, is intended to harass and embarrass Project Veritas and Mr. O'Keefe.

The government's effort to financially punish and restrain Project Veritas and Mr. O'Keefe for safeguarding their First Amendment rights and attorney-client privileges fail for the following reasons.

**1. The First Amendment Protects Journalist James O'Keefe and Media Company Project Veritas Against the Government's Harassment**

The government's investigation is targeted harassment of a media company critical of this administration. The First Amendment offers powerful protection against such malign efforts. *See Branzburg v. Hayes*, 408 U.S. 665, 710 (1972) (Powell, J., concurring) ("courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection"). The Constitution does "not leave our liberties to the foxes." *Ted Cruz for Senate v. Federal Election Commission*, Case No. 19-CV-908 (NJR) (APM) (TJK), 2021 WL 2269415, at *12 (D.D.C. June 3, 2021).

The government asserts that "[r]ecent prior allocations of Special Master costs in this District are consistent with the Government's request that the Petitioners bear the full cost of the Special Master in this matter." However, the government cited *no* case authority for its assertion. Instead, the government contends that Petitioners must pay for the Special Master because, after all, they applied for her appointment. This facile argument ignores the fact that Petitioners were forced to seek relief only because the government improperly executed search warrants on journalists in violation of the law and Department of Justice ("DOJ") regulations that safeguard First Amendment principles.

The appointment of a Special Master was necessary because, as this Court explained in its December 8, 2020 Order, "potential First Amendment concerns . . . may be implicated by the review of the materials seized from the Petitioners[.]" (Dkt. 48) at 3. These concerns include protecting confidential sources within the Biden Administration (including within the very DOJ which is seeking access to Project Veritas' journalists' materials), protecting confidential donors who may be critical of the administration, and safeguarding plans for news investigations and reporting.[1] The government denigrates these interests by falsely claiming they are not to be considered by the Special Master or this Court, writing that "the issues that O'Keefe and Project Veritas express interest in litigating are not and will not be before this Court or the Special Master. The Special Master's duties are limited to 'oversee[ing] the review of materials seized from Petitioners.'" (Dkt. 55) at 3. To the contrary, the Court's Order expressly provides that the Special Master will rule on Petitioners' objections ***prior*** to the release of materials to the government's investigative team on grounds including "any First Amendment concerns, journalistic privileges, and attorney-client privileges[.]" *See* (Dkt. 48) at 4. This necessarily means that the Court must entertain appeals under Rule 53(f) of the Federal Rules of Civil Procedure. Protecting these critical interests against the prying eyes of DOJ agents is key to preserving the newsgathering rights of Project Veritas and Mr. O'Keefe. The hubris of the investigative team, to assert that these journalists are barred from raising First Amendment claims, is remarkable. The First Amendment issues remain at the heart of this matter.

In this regard, courts nationwide have relied on a variety of procedural mechanisms to review First Amendment concerns related to search warrants, including Federal Rule of Criminal

---

[1] Each of these examples are separately protected aspects of the First Amendment. *See, e.g., Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021); *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

Procedure 41(g), the All Writs Act, equitable considerations, and the inherent supervisory power of the Court. *See, e.g.*, *Heller v. New York,* 413 U.S. 483 (1973); *Matter of Search of Kitty's East*, 905 F.2d 1367, 1370-71 (10th Cir. 1990); *Multi-Media Distributing Co., Inc. v. U.S.*, 836 F. Supp. 606, 615 (N.D. Ind. 1993).

Although we have not yet asked the Court to adjudicate the impropriety of the search warrants and investigation in light of *Bartnicki v. Vopper,* 532 U.S. 514, 525 (2001), the issue permeates these proceedings.  The government raided the homes of journalists and seized their journalists work product on the basis of search warrants reciting an unverified and unsupportable theory – conspiracy to transport stolen property across state lines, misprision of a felony, and the like – that *Bartnicki* conclusively bars.  *Bartnicki* established that the First Amendment protects the rights of journalists to accept even stolen or misplaced property, provided they played no role in the initial acquisition. *Id. Bartnicki* remains a complete defense for any media company that takes possession of allegedly stolen materials provided to it by sources.  *Bartnicki* also remains an effective shield against burdensome investigations and search warrants issued to journalists acting under its protective guidance.  If the government must abide by the dictates of *Bartnicki*, that holding must be given effect in this Court's proceedings.  The DOJ cannot ignore *Bartnicki*, to allow it to interfere in newsgathering operations, and to allow it to seek the imposition of burdensome cost allotments.  Otherwise, the government will eviscerate *Bartnicki* and the First Amendment.

Project Veritas and Mr. O'Keefe will present their First Amendment arguments once a completed record is assembled through the Special Master process.  They also plan to present valid First Amendment and other privileges during the pendency of the Special Master process as permitted by this Court's December 8, 2020 Order.

## 2. Imposing Special Master Costs Against Journalists Working to Protect First Amendment Interests is Unconstitutional

The government argues that an upstart journalism organization with a current annual budget that recently hovers around $22 million is better suited to fund Special Master proceedings than a goliath arm of the U.S. government featuring a long-standing bloated budget, currently at $31.1 billion.[2]  The government's demand that a press entity bear considerable financial burdens to defend against the government's unconstitutional attack on a free press is corrosive to the First Amendment.  The exercise of First Amendment rights is a guaranteed right, not a luxury subject to taxation at the government's whim.  Imposing daunting costs during the pendency of an investigation meant to *resolve* important First Amendment questions inflicts its own kind of abridgement.  When exorbitant costs may be levied against the media simply for acting in accord with settled First Amendment precedent, the process becomes the punishment.

The Supreme Court has been clear about the importance of guarding against government attempts to impose financial penalties against the press:

---

[2]   *See* Department of Justice, Summary 2021 Budget, available at: https://www.justice.gov/doj/page/file/1246841/download (last visited Jan. 16, 2022).

> When the State singles out the press, though, the political constraints that prevent a legislature from passing crippling taxes of general applicability are weakened, and the threat of burdensome taxes becomes acute. That threat can operate as effectively as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government.

*Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 585 (1983); *see also Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936) ("suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern"). After *Grosjean* and *Minneapolis Star*, indirect means of punishing speech still exist, like imposing burdensome costs upon journalists when they seek to vindicate their First Amendment rights. But the power to effectuate a differential tax against the press is the power to silence it. *Minneapolis Star*, 460 U.S. at 585.

The Supreme Court has recognized that the costs of defending against even a protracted *civil* lawsuit can chill important First Amendment rights. *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (if a suit entails "long and expensive litigation," then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails). These are settled First Amendment norms, not exceptions.

For Project Veritas, an upstart journalism organization, each dollar spent on Special Master fees and expenses is a dollar not spent publishing news stories or investigating leads. Just as courts have taken care to streamline and reduce costs and attendant burdens in lesser circumstances such as civil litigation, campaign finance, or union cases, courts overseeing criminal investigations into the press initiated by the very government investigated by the press should be equally, if not more so, protective of the rights of the free press. *Branzburg*, 408 U.S. at 710 (Powell, J., concurring). "[A] magistrate asked to issue a warrant for the search of press offices can and should take cognizance of the independent values protected by the First Amendment." *Zurcher v. Stanford Daily*, 436 U.S. 547, 569-570 (1978) (Powell, J., concurring).

The term "free press" does not come with an asterisk and a disclaimer. The government, restrained by law from directly curtailing a free press, may not do so indirectly by attrition of resources necessary to expose and defeat an improper criminal investigation of the press for having investigated the government within the well-established confines of the law. Otherwise, the First Amendment would no longer prevent the government from shutting down any news agency who investigated it by merely declaring a false and unsupportable conspiracy theory that the journalist in question "participated" in the leaking of information to the journalist, or became an "accessory after the fact" by corroborating that which was leaked to the journalist, or that the leaked information "crossed state lines." The costs of fighting such bad-faith investigations would be too much for a freelance journalist, or an upstart news agency, to bear. Through such unchecked tactics, the government would control the press, rather than be held accountable by it.

As another United Stated District Court explained in rejecting a challenge to Project Veritas's journalism by another disgruntled subject of its news reporting, "[I]f citizens and the media are

handcuffed by a fear of liability, that's detrimental to political discourse, it is detrimental to society as a whole, and it is detrimental, really, to our fundamental freedom." *Teter v. Project Veritas Action Fund et al.,* Case No. 1:17-CV-256 (W.D.N.C.) (Reidinger, J.) – May 21, 2019 Trial Transcript.

The Court should reject the government's objection to the Special Master's Recommendation and enter an ***interim***[3] Order pursuant to Fed. R. Civ. P. 53(g)(3), allocating the cost of the Special Master's compensation and expenses in equal halves to the government and the Petitioners.

Respectfully submitted,

CALLI LAW, LLC

/s/

By: _____

Paul A. Calli
Charles P. Short

Harlan Protass
PROTASS LAW PLLC
260 Madison Avenue
22nd Floor
New York, NY 10016
T. 212-455-0335
F. 646-607-0760
hprotass@protasslaw.com

14 NE 1st Avenue
Suite 1100
Miami, FL 33132
T. 786-504-0911
F. 786-504-0912
pcalli@calli-law.com
cshort@calli-law.com

*Admitted Pro Hac Vice*

Benjamin Barr
BARR & KLEIN PLLC
444 N. Michigan Avenue
Suite 1200
Chicago, IL 60611
T. 202-595-4671
ben@barrklein.com

Stephen R. Klein
BARR & KLEIN PLLC
1629 K. Street, NW
Suite 300
Washington, DC 20006
T. 202-804-6676
steve@barrklein.com

*Admitted Pro Hac Vice*

*Admitted Pro Hac Vice*

*Counsel for James O'Keefe, Project Veritas and Project Veritas Action Fund*

cc:     All Counsel of Record (via ECF)

---

[3] James O'Keefe and Project Veritas reserve the right to seek a full allocation of the Special Master's compensation and expenses to the government, after a full briefing at a later date.