

**CALLI LAW, LLC**
One Flagler Building, Suite 1100
14 Northeast 1ˢᵗ Avenue
Miami, Florida 33132
T. 786.504.0911
F. 786.504.0912
www.calli-law.com

## PETITION FOR RETURN OF PROPERTY

Re:   *In re Search Warrant dated November 5, 2021*, 21 Misc. 813 (AT)
      *In re Search Warrant dated November 3, 2021*, 21 Misc. 819 (AT)
      *In re Search Warrant dated November 3, 2021*, 21 Misc. 825 (AT)

Related to:  20 Mag. 12614
             20 Mag. 12623
             21 Mag. 548
             21 Mag. 992
             21 Mag. 2537
             21 Mag. 2711
             21 Mag. 3884

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

I.      FACTUAL BACKGROUND .............................................................................. 3

     A.      Project Veritas' Lawful Receipt of the Abandoned Ashley Biden
           Diary ............................................................................................ 3

     B.      The U.S. Attorney's Office/Federal Bureau of Investigation
           Inquiry and Seizures ................................................................... 7

           1.      The PV Warrants .............................................................. 7

           2.      Protocol to Protect Privileged Materials Seized from
               Project Veritas ............................................................... 10

           3.      The Microsoft Warrants ................................................. 12

II.      SUMMARY OF ARGUMENT ....................................................................... 14

III.      LEGAL STANDARDS ................................................................................... 14

IV.      ARGUMENT .................................................................................................. 16

     A.      The Use of Search Warrants to Seize Work Product and
           Documentary Materials Belonging to Project Veritas and Its
           Journalists Violated the Privacy Protection Act ....................... 16

     B.      The Use of Search Warrants to Seize Work Product and
           Documentary Materials Belonging to Project Veritas and Its
           Journalists Violated the First Amendment ................................ 20

     C.      The Use of Search Warrants to Seize Work Product and
           Documentary Materials Belonging to Project Veritas and Its
           Journalists Violated the Reporter's Privilege. .......................... 25

     D.      The Government Violated the Fourth Amendment in Applying for
           and Executing the Search Warrants for Project Veritas'
           Newsgathering Materials. .......................................................... 29

           1.      The Warrants Were Not Supported by Probable Cause .............. 29

           2.      The Warrants Were Rendered Unreasonable by the
               Government's Failure to Disclose Material Information to
               the Magistrate Judges ..................................................... 31

           3.      The Warrants Were a Disproportionate Response to the
               Gravity of the Alleged Offense Under Investigation ................. 35

           4.      The Warrants Allowed Prohibited General Searches ................. 35

           5.      The Investigative Team Violated Procedures Established by
               the Magistrate Judge to Protect Privileged ................................ 40

## TABLE OF CONTENTS
(continued)

Page

    6.     The Government Compounded Its Fourth Amendment Violations by Sealing the Microsoft Warrants............................ 41

E.     The Court Must Conduct an Inquiry into the Information Submitted to, and Withheld From, the Magistrate Judges Who Issued the Warrants and Orders. ............................................................... 43

CONCLUSION.................................................................................................. 46

## INTRODUCTION

The government opposes Project Veritas' journalism.  Predicating its investigation of Project Veritas and its journalists on the alleged "theft" of an abandoned diary belonging to Ashley Biden, then-presidential candidate Joe Biden's 40-year-old daughter, the government has launched an attack on the free press.  The Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI") invaded the homes of Project Veritas journalists using search warrants to investigate what would be (had it actually occurred) a low-level theft under Florida law by Project Veritas' sources.  But the government is using these Mafia-busting tactics to investigate what is, under the Supreme Court precedent applicable to newsgathering, a non-crime.

The sources who lawfully provided the abandoned diary to Project Veritas always represented that it was found abandoned in a house that Ashley Biden occupied temporarily. The First Amendment protects journalists who receive materials from sources even *if* those materials were stolen. Under the guise of investigating this non-crime, the government violated federal law in an unprecedented use of search warrants to seize newsgathering work product, other documentary materials, and extensive personal data from journalists James O'Keefe, Spencer Meads and Eric Cochran ("the PV Warrants").   This is no mere technicality—of the forty-seven electronic devices seized in pre-dawn raids on the homes of Project Veritas journalists, only six have been found to contain data responsive to the PV Warrants, and that data represents a fraction of the other privileged and personal information stored in those devices.

Project Veritas recently discovered another element of the government's attack on the free press—for more than a year before prosecutors procured the PV Warrants, the government was secretly surveilling Project Veritas.  Starting just a few weeks after being contacted by Ashley Biden's attorney in the fall of 2020, prosecutors in the U.S. Attorney's Office for the Southern District of New York procured a series of six secret orders and warrants to seize from Microsoft

*any and all* email communications sent or received by eight Project Veritas journalists, including founder James O'Keefe (collectively "the Microsoft Warrants"). The government also used these warrants to seize "contacts" and "address book" information that Microsoft stores for these journalists, including confidential source and donor information.[1]

While the Microsoft Warrants covered various time periods, the government seized emails of some journalists going back to January 1, 2020—*eight months before* sources offered Project Veritas the abandoned diary. Using boilerplate applications and rote recitals, the prosecutors convinced various Magistrate Judges to seal the Microsoft Warrants for more than a year. It was only when Microsoft insisted that these matters be unsealed—after the FBI executed and publicized the PV Warrants—that the prosecutors had no alternative but to acquiesce in unsealing. The Microsoft Warrants were unsealed on March 10, 2021. We now know that the government seized nearly **two hundred thousand** Project Veritas emails and numerous other files.

This all-out assault on a news media organization should alarm all who believe in the First Amendment and the value of a free press. Project Veritas received the abandoned diary and other belongings lawfully, and its newsgathering work—the diary contained information that, if true, would be newsworthy and of public concern by any reasonable measure given that the subject of that information was then campaigning for the country's highest office—was legitimate, ethical, and careful. Most fundamentally, this newsgathering is protected by the First Amendment as interpreted by *Bartnicki v. Vopper*, 532 U.S. 514 (2001). At this juncture, the Rules of Criminal Procedure empower the Court to protect the First Amendment and curb the government's abuses.

Accordingly, Project Veritas and the aggrieved journalists move pursuant to Fed. R. Crim. P. 41(g) for the return of their property. Having unlawfully seized newsgathering material from

---

[1] Unlike legacy corporate media, Project Veritas engages in journalism pursuant to a non-profit model.

James O'Keefe, Project Veritas, and two former Project Veritas journalists, the government must return all electronic devices seized during the searches of the journalists' homes. The government must also return and destroy its copies of all data it obtained both from those devices and from Microsoft.  Four independently sufficient grounds support this relief:

    (1)     the seizures violated the express provisions of the Privacy Protection Act ("PPA");

    (2)     the seizures violated the First Amendment;

    (3)     the seizures violated the common law Reporter's Privilege; and

    (4)     the seizures violated the Fourth Amendment's prohibition against unreasonable searches and seizures

## I.     FACTUAL BACKGROUND

The following facts are derived from materials in the government's possession, including materials covertly seized from Microsoft, seized from the sources who lawfully provided the diary and personal effects to Project Veritas (before the government procured the PV Warrants), and claims made by Ashley Biden, her associates, and her attorney. The foregoing is summarized below. If the government does contest any of these facts, Project Veritas and its journalists request the opportunity to produce evidence *in camera* to prevent further intrusion upon the privileges that protect their newsgathering work.

    A.     <u>Project Veritas' Lawful Receipt of the Abandoned Ashley Biden Diary</u>

Project Veritas "is a national media organization dedicated to 'undercover investigative journalism.'" *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 817 (1st Cir. 2020). James O'Keefe is the journalist who founded Project Veritas and serves as its President.  In 2020, Spencer Meads and Eric Cochran worked for Project Veritas as investigative journalists.

In early September 2020, confidential sources contacted Project Veritas to report that they had found a diary authored by Ashley Biden, the daughter of then-presidential candidate Joe Biden.

3

According to these sources, Biden left the diary and other belongings behind when she moved out of a house in Delray Beach Florida that one of the sources subsequently occupied.  The sources described, and then sent images of, disturbing information about the author's father that would shock any parent and most voters.  The sources reported that they found additional belongings with the diary—including mail, photographs, and other property naming Ashley Biden—that would enable Project Veritas to confirm that she was its author.  The sources offered to bring the diary and belongings to Project Veritas in New York.  Approximately a week after the initial contact, two of the sources traveled to New York and gave the diary and other Ashley Biden belongings to Project Veritas.  Later in September, the sources gave additional Ashley Biden belongings to a Project Veritas journalist in Florida.

Over the course of the next month, Project Veritas journalists worked to authenticate the diary and its contents.  Project Veritas engaged a handwriting expert who expressed the opinion that the diary was authored by the same person who signed "Ashley Biden," or otherwise wrote on, other documents provided by the sources. The Project Veritas journalists began producing a video news story regarding Ashley Biden's allegations about her father.

Project Veritas undercover journalists attempted to contact Ashely Biden by reaching out to her known acquaintances.  In early October 2020, one of those acquaintances called a Project Veritas undercover journalist and conferenced into the call a person identifying herself as Ashley Biden.  Biden responded that the belongings were hers and asked that they be delivered to a friend who lived in Delray Beach.

A few days later a high-level official of the Biden presidential campaign called the journalist and left a voicemail message.  The official, who identified himself by name but not his position with the campaign, expressly stated that he was calling about a diary.

4

Project Veritas viewed these statements by Ashley Biden and the Joe Biden campaign official, in combination with the above-mentioned expert handwriting opinion and other corroborating information, as confirmation that the diary provided by the confidential sources was, in fact, authored by Ashley Biden.  The Project Veritas journalists worked to finalize the video news story about the diary, but also continued to analyze the contents of the diary.

On or about October 12, Mr. O'Keefe decided against publishing the news story. In an email to staff, Mr. O'Keefe explained that while he was confident the diary was authentic, Project Veritas had been unable to corroborate its allegations regarding Joe Biden's conduct towards his daughter when she was a child.  *See* (Docket No. 38) at 13.

Subsequent events, however, caused Project Veritas to turn back to the potential news story. On October 14, 2020, the news website Revolver ran a detailed story on Hunter Biden's laptop and materials contained therein, including information that echoed certain allegations made in Ashley Biden's diary. *See Revolver Exclusive: Inside Source Alleges Underage Photos Found On Hunter's Laptop Were of a Member of The Biden Family*, Revolver (Oct. 14, 2020) *available at* https://www.revolver.news/2020/10/hunter-laptop-rudy-giuliani-underage-biden-family-member/.  Given these developments and the interest in the diary expressed by the Biden campaign, Project Veritas decided to contact campaign officials directly and ask to interview Joe Biden about allegations in the diary.

Project Veritas made this request in a letter authored by its in-house counsel and delivered to the Biden campaign on October 16, 2020.  The campaign did not respond, but Project Veritas was soon contacted by a lawyer representing Ashley Biden.  Project Veritas offered to return the property to Biden if she agreed to view it personally and confirm her ownership; Biden's lawyer

refused to confirm ownership of the abandoned items and vowed to send the matter to the United States Attorney's Office for the Southern District of New York.

While Project Veritas was corresponding with Ashley Biden's lawyer, it continued its investigation to corroborate the content of the diary.  Later in October, Project Veritas learned that another news organization had received a copy of what was described as Ashley Biden's diary and that other news organization was concerned its version was not authentic.  Mr. O'Keefe concluded that this new information injected uncertainty into the assessment of the diary's content, and he informed his staff (for a second time) that Project Veritas would not publish its news story about the diary.

Shortly after Project Veritas' decision not to publish, a news blog named National File—which is not affiliated with Project Veritas—began publishing excerpts from the diary. *See Patrick Howley, EXCLUSIVE SOURCE: Biden Daughter's Diary Details 'Not Appropriate' Showers with Joe as Child, National File* (Oct. 24, 2020) *available at* https://nationalfile.com/exclusive-source-biden-daughters-diary-details-not-appropriate-showers-with-joe-as-child/.

National File published the full diary on October 26, 2020 and it remains on the internet to this day. *See FULL RELEASE: Ashley Biden Diary Reveals Child Sex Trauma, Drug Abuse, Resentment for Joe – Whistleblower, NATIONAL FILE (Oct. 26, 2020) available at* https://nationalfile.com/full-release-ashley-biden-diary-reveals-child-sex-trauma-drug-abuse-resentment-for-joe-whistleblower/. National File attributed its source for the diary as a leak from a whistleblower at another media organization that chose not to publish the diary or report its contents.  Project Veritas has no affiliation or other connection with National File and any leak of its unpublished news story, if that occurred, was not caused or authorized by Project Veritas.

In early November 2020, Project Veritas arranged for the delivery of the diary and other abandoned belongings to the Delray Beach, FL police department.

B.   The U.S. Attorney's Office/Federal Bureau of Investigation Inquiry and Seizures

1.   *The PV Warrants*

Nearly a year after Project Veritas decided not to publish its news story and delivered the diary and belongings to local law enforcement, Project Veritas learned that the FBI had confronted two of its confidential sources for the news story.  In late October 2021, the FBI seized electronic devices from these sources and attempted to interview them.  Within a week, undersigned counsel delivered correspondence to the U.S. Attorney's Office documenting his efforts to communicate with the responsible prosecutors and offering to provide information on behalf of Project Veritas.  *See* October 27, 2021 Letter from Paul Calli, Esq. to the USAO (Exhibit A).  On November 1, 2021, Mr. Calli verbally conveyed detailed information to the prosecutors describing the circumstances of Project Veritas' lawful receipt of the Ashley Biden diary, making clear that Project Veritas was not involved in any theft of property and that all of Project Veritas's information on how the confidential sources found the property came from the sources themselves.

The proffer provided by counsel for Project Veritas would have caused any reasonable prosecutor to reciprocate by pursuing "negotiations with the affected member of the news media," as required by DOJ Regulations, to obtain from Project Veritas additional information about its acquisition of the diary.  *See* 28 C.F.R § 50.10(a)(3).  At the very least, any reasonable prosecutor would have paused pending plans to seize information from Project Veritas and/or its journalists while the government reviewed the contents of the electronic devices acquired from the confidential sources.  But here, the prosecutors did neither.

On November 3, 2021, the prosecutors from the Southern District of New York, accompanied by local FBI agents, submitted applications to Magistrate Judge Cave for warrants to seize electronic devices from former Project Veritas journalists Spencer Meads and Eric Cochran.[2]  The warrants were issued and included an admonishment to the executing agents to "collect evidence in a manner reasonably designed to protect any attorney-client **or other applicable privilege**."  *See* Warrants (Exhibit B and C, respectively) at 5 and 4.  The Magistrate Judge further directed the agents "[w]hen appropriate . . . [to] use a designated 'filter team,' separate and apart from the investigative team, in order to address potential privileges."  *Id.*

The warrants were executed at the residence of Mr. Cochran and Mr. Meads, respectively, in the early morning hours of November 4, 2021. Both were initially handcuffed by the agents who spent several hours photographing and searching the premises.  The FBI seized twenty-eight (28) devices from Cochran.  *See* December 17, 2021 Letter from AUSA Sobelman to Special Master Barbara Jones (Exhibit D) at 2-3.  In addition, the agents took at least sixteen photographs of the contents of one of Mr. Cochran's devices (a mobile telephone) and made three recordings of audio files on that device, before the security settings caused the device to lock.  *Id.* at 2 n.2.[3]  The government knew that the images and recordings were created when Mr. Cochran was working as a Project Veritas journalist. Notwithstanding Magistrate Cave's directives that "[r]eview of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client **or other applicable privilege** (to the extent not waived)" and "[w]hen appropriate, the procedures shall

---

[2] By this time, Acting U.S. Attorney Audrey Strauss, whose office had obtained the covert Microsoft Warrants, had departed. The Office was led by the then-recently appointed United States Attorney, Damion Williams.

[3] The FBI agents likely took many more photographs, and possibly other recordings, but we know about only 16 of them that the Special Master deemed responsive.

include use of a designated 'filter team,' separate and apart from the investigative team, in order to address potential *privileges*," (Exhibit B) at 5, these photographs and recordings were immediately available to the investigative team. The investigative team continued to view them until counsel for Mr. Cochran moved for the appointment of a Special Master on November 12. (Exhibit D) at 2 n.2.

The FBI seized seventeen (17) devices from Mr. Meads. *Id.* at 3-4. The agents even seized a laptop belonging to one of Mr. Meads' roommates. *Id.*

The following day, November 5, one or more of the local prosecutors, accompanied by local FBI agents, again applied to Magistrate Judge Cave for a warrant, this time to seize electronic devices from Project Veritas' founder and President James O'Keefe. It is not known what information the agents acquired (or remained in deliberate ignorance of) when executing the warrants for Mr. Meads and Mr. Cochran the preceding day that could justify the issuance of a warrant for the property of a third Project Veritas journalist.[4] The warrant for Mr. O'Keefe's home was issued by Magistrate Judge Cave and she included the same admonishments and directive that appeared in the Meads and Cochran warrants regarding procedures to protect privileges. (Exhibit E) at 4.

The FBI executed the warrant at Mr. O'Keefe's home in the early morning hours of November 6. Mr. O'Keefe was handcuffed and required to stand in the public hallway of the apartment building dressed in his underwear. The FBI seized two cell phones from Mr. O'Keefe's apartment. *See* (Exhibit D) at 1. In addition, the agents took at least fifteen photographs of the contents of one of the devices (a mobile telephone) before the security settings caused the device

---

[4] Significantly, *no* evidence of any wrongdoing by Project Veritas has been found in the images, recordings and other items photographed or extracted by the FBI from the 45 devices seized from Mr. Meads and Mr. Cochran.

to lock.  *Id.* at 1 n.1.   Knowing that the contents of the device were created by Mr. O'Keefe in his capacity as the senior Project Veritas journalist, and notwithstanding Magistrate Cave's directives that that "[r]eview of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client *or other applicable privilege* (to the extent not waived)" and "[w]hen appropriate, the procedures shall include use of a designated 'filter team,' separate and apart from the investigative team, in order to address potential *privileges*," (Exhibit E) at 4, these photographs were immediately available to the investigative team. The investigative team continued to view them until counsel for Mr. O'Keefe moved for the appointment of a Special Master on November 10.  (Exhibit D) at 1 n.1.

### 2.        *Protocol to Protect Privileged Materials Seized from Project Veritas*

Upon application of Project Veritas and its journalists, and over the objection of the government, this Court issued an order appointing the Honorable Barbara Jones as Special Master in this matter to (1) review the contents of the devices seized from the Project Veritas journalists to determine what material is responsive to the warrants; (2) provide any such responsive material to the DOJ filter team; and (3) rule on objections the Project Veritas journalists raise in regard to the DOJ filter team's proposed release of materials to the investigative team.  *See* December 8, 2021 Order (Docket No. 12).

The FBI Computer Analysis Response Team (CART) analyzed the electronic devices seized from the Project Veritas journalists by the investigative team.  The most recent report on the CART unit's work organized those devices into three categories.  *First*, the CART decided that 15 of the devices contained data within the temporal limits of the PV Warrants (August 1, 2020 – execution date) and submitted that data to the Special Master.  *See* February 6, 2022 Letter

from AUSA Sobelman to Special Master Barbara Jones (Exhibit F).  ***Second***, the CART determined that 15 of the seized devices contained ***no*** data within the temporal limits of the PV Warrants.  *Id.*  ***Third***, 17 of the seized devices are non-functional or otherwise cannot be accessed. *Id.*

The Special Master reviewed the data submitted by the CART unit and determined that another 10 devices seized by the FBI contained "no responsive materials."  *See* March 7, 2022 Special Master Report (Docket No. 61) at 1-2.  The Special Master located material that she found to be responsive to the PV Warrants on ***only*** 6 of the devices seized by the FBI, specifically one-hundred fifty-five photographs/images, recordings, and other items.  *Id.* at 2.  Those items were contained on devices belonging to Mr. O'Keefe (15), Mr. Meads (66) and Mr. Cochran (74).

Pursuant to the protocol established by the Court, the Special Master delivered the items she determined to be responsive to the DOJ filter team, including journalists' notes; photographs of information received from confidential sources; text messages and recorded calls from persons with information; records of journalists' newsgathering activities; and journalists' editorial communications regarding whether the Biden diary story should be published.  Remarkably, the DOJ filter team contends that ***none*** of these items are deserving of protection under the First Amendment or the Reporter's Privilege.  Project Veritas, Mr. O'Keefe, Mr. Meads and Mr. Cochran have submitted to the Special Master objections to the DOJ filter team's determinations, demonstrating these items comprise work product and other documentary material created in the course of newsgathering and are protected from disclosure by the First Amendment and/or the Reporter's Privilege.  The aggrieved journalists have also demonstrated that several items deemed

responsive to the PV Warrants by the Special Master, in fact, are not responsive.  The Special Master has taken these objections under advisement.[5]

### 3. *The Microsoft Warrants*

On March 11, 2022, Project Veritas was notified by its electronic communications service provider, Microsoft, that for over a year the government has been secretly seizing and reviewing Project Veritas email and other enterprise information.  Microsoft was finally able to notify Project Veritas of this surveillance because, as explained below, its attorneys resisted the government's renewal of non-disclosure orders and notified the prosecutors that Microsoft intended to institute litigation seeking leave to disclose these matters.

Undersigned counsel has now received copies of the following orders and warrants by which the government secretly seized voluminous Project Veritas data:

- <u>20 Mag. 12614</u>:  Served November 24, 2020, this subpoena seeks subscriber information for the account [Human Resource Manager at] projectveritas.com, without time limitation. The accompanying secrecy order prohibited Microsoft from disclosing the existence of the subpoena for one year; the order was extended 180 days.  (Signed by Magistrate Judge Wang)

- <u>20 Mag. 12623</u>:  Served November 24, 2020, this order issued under 18 U.S.C. § 2703(d) requires Microsoft to produce information associated with the same account, again without time limitation.  The order included a one-year secrecy provision that was later extended an additional year.  (Signed by Magistrate Judge Gorenstein)

- <u>21 Mag. 548</u>:  Served January 15, 2021, this search warrant demanded email content and other information associated with the same account specified in 20 Mag. 12614 and 20 Mag. 12623 (but with the domain name misspelled as "[Human Resources manager at] projectvertias.com"), [Eric Cochran at] projectveritas.com, and [Spencer Meads at] projectveritas.com, for the period January 1, 2020 to present.  The warrant contained a one-year secrecy provision, later extended an additional year.  (Magistrate Judge signature somewhat indistinct but appears to be Magistrate Judge Wang)

---

[5] Notably, the Special Master has not completed her review of the data extracted from the mobile device seized from Mr. O'Keefe.  Nevertheless, the investigative team urged the Special Master to "pause" her review of Mr. O'Keefe's device while she considers the objections submitted by Project Veritas and its journalists.

- <u>21 Mag. 992</u>:  Served January 26, 2021, this search warrant demanded email content and other information associated with [Additional Investigative Journalist at] projectveritas.com, for the period January 1, 2020 to present.  It contained a one-year secrecy provision, later extended an additional year.  (Signed by Magistrate Judge Freeman)

- <u>21 Mag. 2537</u>:  Served March 5, 2021, this search warrant demanded email content and other information associated with [Three Additional Investigative Journalists] for the period September 1 – December 1, 2020.  It contained a one-year secrecy provision. (Signed by Magistrate Judge Lehrburger)

- <u>21 Mag. 2711</u>:  Served March 10, 2021, this order, issued under 18 U.S.C. § 2703(d), required Microsoft to produce information associated with [An Additional Investigative Journalist at] projectveritas.com, for the period September 1 – December 1, 2020.  It included a one-year secrecy provision.  (Signed by Magistrate Judge Moses)

- <u>21 Mag. 3884</u>:  Served April 9, 2021, this search warrant demanded email content and other information associated with [James O'Keefe at] projectveritas.com, for the period September 1 – December 1, 2020.  It contained a one-year secrecy provision.  (Signed by Magistrate Judge Aaron)

Significantly, these search warrants required the production of ***any and all*** emails, including content, within the prescribed time periods.  As noted above, we have recently learned from Microsoft that the government seized nearly ***two hundred thousand*** Project Veritas emails and numerous other files.  The warrants also required disclosure of all address and contact information.[6]

At the time Microsoft was served with the January 2022 extensions of the non-disclosure order, its attorneys had become aware of the execution of the PV Warrants and this Court's December 8, 2021 Order appointing Special Master Jones to protect "any First Amendment concerns, journalistic privileges, and attorney-client privileges."  (Docket No. 48) at 4.  The government's actions to continue sealing the Microsoft Warrants raised significant concerns, however, given that the data seized from Microsoft very well could include documents protected

---

[6] At the time the prosecutors obtained these warrants, the U.S. Attorney's Office was led by Acting U.S. Attorney Audrey Strauss.

by those same privileges.   Stated another way, at the very time that this Court has put in place a procedure to prevent disclosure of privileged material to the government investigative team, it appeared that the investigative team *already possessed* privileged materials and may not have informed this Court of that when opposing the appointment of a special master.

Microsoft, through its attorneys, advised that it would move to vacate the extensions of the non-disclosure orders and notify the Court of its concerns.  The government relented and moved to lift any pending non-disclosure orders for the Microsoft Warrant, which motion was granted March 10, 2022.  *See* 22 Mag. 2364 (Magistrate Judge Netburn).

Project Veritas has moved to compel the government to provide further information about its secret seizures of Project Veritas materials from providers, including Microsoft.  (Docket No. 64).  The full extent of the government's invasion of the newsgathering activities of Project Veritas journalists remains unknown.

## II.   SUMMARY OF ARGUMENT

The seizure of newsgathering materials from Project Veritas and its journalists was unlawful, and those materials must be returned pursuant to Fed. R. Crim. P. 41(g) for four, independently sufficient reasons: (1) the seizures violated the express provisions of the Privacy Protection Act; (2) the seizures violated the First Amendment; (3) the seizures violated the common law Reporter's Privilege; and (4) the seizures violated the Fourth Amendment.

## III.   LEGAL STANDARDS

Federal Rule of Criminal Procedure 41(g) provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return…in the district where the property was seized."  Upon the filing of a Rule 41(g) motion "[t]he court must receive evidence on any factual issue necessary to decide the motion."

*Id.* "[W]here no criminal proceedings against the movant are pending or have transpired, a motion for the return of property is treated as [a] civil equitable proceeding." *Mora v. United States*, 955 F.2d 156, 158 (2d Cir. 1992). "Equitable considerations might justify an order requiring the government to return or destroy all copies of records that it has seized." Fed. R. Crim. P. 41 (advisory committee notes (1989 amendments)).

The Privacy Protection Act, 42 U.S.C. § 2000aa *et seq.* ("the PPA") makes it unlawful, notwithstanding any other law, for a government employee "in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product [or other documentary] materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication." 42 U.S.C. § 2000aa.a. The only exception to this prohibition is where there is "probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate [but not where] the offense to which the materials relate consists of the receipt, possession, communication, or withholding of such materials or the information contained therein." *Id.* at § 2000aa.a.1.

The DOJ itself has construed this "suspect" exception to the PPA to be applicable only where "the member of the news media is a subject or target of a criminal investigation for conduct ***not*** based on, or within the scope of, newsgathering activities." § 50.10(d)(4) (emphasis added).

The First Amendment forbids government action that "abridge[es] the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon

probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

## IV.   ARGUMENT

### A.   The Use of Search Warrants to Seize Work Product and Documentary Materials Belonging to Project Veritas and Its Journalists Violated the Privacy Protection Act

Project Veritas, Mr. O'Keefe, Mr. Meads and Mr. Cochran are all protected by the PPA inasmuch as the singular purpose of Project Veritas' business is to "disseminate to the public a newspaper, book, broadcast, or other similar form of public communication."  42 U.S.C. § 2000aa.a.  The materials seized from Mr. O'Keefe, Mr. Meads and Mr. Cochran comprise work product materials and/or documentary materials protected by the PPA.  And there can be no legitimate dispute that these materials were created or acquired in the course of newsgathering activities.

In opposing the appointment of a special master, the government relegated to a footnote its conclusory assertion that it is relying on the "suspect" exception to the PPA to justify the seizures. Gov't Opp. to Appointment of Special Master (Docket No. 29) at 14 n.10.  In the government's view, this exception is triggered because

> There is probable cause to believe that Project Veritas, O'Keefe, Cochran, and Meads were ***actively involved*** in the unlawful conduct under investigation – the interstate transportation of stolen property, as well as the theft of certain of the property itself.

*Id.* at 7 (emphasis added).  The government has never suggested in any of its various pleadings opposing the appointment of a Special Master and other relief sought by Project Veritas that any of its journalists actually ***stole*** the Biden diary or other belongings initially received from confidential sources.  Any such suggestion would be frivolous: the sources offered these items to Project Veritas and delivered the property to New York.  Instead, the government's coy description of its supposed probable cause, and the secondary theories of liability cited in the warrants, suggest

that the government's investigation theory was (or, at least, is now) that after receiving the Biden diary and other belongings from the sources Project Veritas requested and obtained additional Biden property.[7]  Such a "solicitation," in the view of the prosecutors, is a crime.

But there is no "active involvement" exception to the PPA, and the government cited no decision applying such a theory to uphold seizures from a member of the news media.  The "suspect" exception is triggered only where there is probable cause to believe that a journalist is ***actually committing*** (or has committed) a criminal offense.  *See* 42 U.S.C. § 2000aa.a.1.  What is more, the PPA expressly excludes from this exception a journalist's "receipt, possession, communication, or withholding of [stolen] materials or the information."  *Id.*  Therefore, in the absence of probable cause to believe that a Project Veritas journalist committed a breaking and entering to steal the Biden diary—and the government has not claimed (nor could it) that it has any evidence of such conduct—there is no basis in the text of the PPA for issuance of the PV Warrants.  Put differently, there is no accurate and complete set of facts the government could have provided to the Magistrate Judge that would make the seizures lawful under the PPA.

Congress directed the DOJ to promulgate regulations to provide for the protection of privacy interests, including the First Amendment principles underlying the PPA, when prosecutors seek to obtain documentary materials in criminal investigations.  *See* 42 U.S.C. § 2000aa-11.  Those regulations governing DOJ use of subpoenas and search warrants to obtain documents and other information from members of the news media are codified at 28 C.F.R § 50.10 ("the DOJ Regulations").  The government has previously assured the Court that when obtaining the PV

---

[7] See PV Warrants (Exhibits B, C, and E) citing § 371 (conspiracy to possess and transport stolen goods); § 2 (aiding and abetting); § 3 (accessory after the fact); and § 4 (misprision of felony).  The PV Warrants also cite § 2314 (interstate transportation of stolen property) and § 2315 (possession of stolen property), but as explained below those offenses are so plainly foreclosed by the PPA and *Bartnicki* that citation to them raises serious questions about the government's motives.

Warrants its prosecutors "complied with all applicable regulations and policies regarding potential members of the news media in the course of this investigation, including with respect to the search warrants at issue."  Gov't Opp. to Appointment of Special Master (Docket No. 29) at 2 n.2.  This assurance, however, was untrue.  As explained below, the DOJ regulations ***prohibit*** reliance on the PPA suspect exception to seize newsgathering materials.

Importantly, the DOJ regulations recognize that even ***subpoenas*** to obtain information from members of the news media are "extraordinary measures, not standard investigatory practices."  28 C.F.R § 50.10(a)(3).  As such, subpoenas may be used only with

> authorization by the Attorney General, or by another senior official . . . when the information sought is essential to a successful investigation, prosecution, or litigation; after all reasonable alternative attempts have been made to obtain the information from alternative sources; and after negotiations with the affected member of the news media.

*Id.*  These requirements for pursuit of alternative sources of information and negotiations with the affected media member, however, are relaxed where the Attorney General determines that the "suspect" exception to the PPA is applicable.  *See* § 50.10(c)(4)(i).  In that circumstance the Attorney General could approve issuance of a subpoena to a member of the news media even where the "investigation relat[es] to an offense committed in the course of, or arising out of, newsgathering activities."  *Id.*[8]

---

[8] Just a few months before the agents/prosecutors applied for the PV Warrants, the Attorney General announced that the DOJ "will no longer use compulsory legal process for the purpose of obtaining information from or records of members of the news media acting within the scope of newsgathering activities."  *See* July 19, 2021 Attorney General Memorandum, *avail. at* https://www.justice.gov/ag/page/file/1413001/download at 1. This new policy was prompted by a recognition that DOJ's internal procedural protections heretofore may have insufficiently weighed "the important national interest in protecting journalists from compelled disclosure of information revealing their sources, sources they need to apprise the American people of the workings of their government." *Id.*

The DOJ Regulations, however, establish markedly more stringent limitations on the use of ***search warrants*** to seize information from a member of the news media.  The Attorney General or his designee is authorized to approve application for a news media search warrant pursuant to the "suspect exception" of the PPA only "when the member of the news media is a subject or target of a criminal investigation for conduct ***not*** based on, or within the scope of, newsgathering activities." § 50.10(d)(4) (emphasis added).  Therefore, this DOJ regulation ***prohibits*** the use of warrants to seize newsgathering materials, and neither the Attorney General nor his designee could have approved the applications for the PV Warrants.[9]

In cases where prosecutors have broken DOJ's own rules, the government is quick to argue that a DOJ regulation "does not create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States." *See, e.g.*, Gov't Opp. to Appointment of Special Master (Docket No. 29) at 2 n.1.  But these regulations were enacted at the direction of Congress to ensure that its prohibition on the use of search warrants to seize newsgathering materials was understood and respected by prosecutors.  The DOJ's own interpretation of the PPA "suspect" exception—that it is available as a basis for using search warrants only to obtain ***non***-newsgathering information—would certainly have informed the Magistrate Judge's decision whether or not to issue the PV Warrants.  Likewise, § 50.10(d)(4) should lead this Court to construe the PPA "suspect" exception no more expansively than the DOJ does and to conclude that the PV Warrants were unlawful.

---

[9] It would seem implausible that the Attorney General or any other official at "Main Justice," being fully apprised of the circumstances nevertheless approved the search warrant applications in disregard of the PPA, the DOJ regulations, and the Attorney General's recent pronouncement severely limiting the use of search warrant permitted under the regulations.  In the highly unlikely event that this occurred, however, this occurrence would have been material to the Magistrate Judge's assessment of probable cause inasmuch as it would have revealed a political motive to use the warrants to punish newsgathering perceived as unfavorable to the President and his family.

B.     The Use of Search Warrants to Seize Work Product and Documentary Materials
Belonging to Project Veritas and Its Journalists Violated the First Amendment.

The Microsoft Warrants enabled the government to rummage through the Project Veritas

virtual newsroom, at the government's leisure, for more than a year and continuing to the present

time.  *See, e.g.*, Mel Bunce et al., "*Our Newsroom in the Cloud:" Slack, Virtual Newsrooms, and

Journalistic Practice*, 20 News Media & Soc'y 3381 (Dec. 31, 2017), *available* at

https://bit.ly/34lHrhV.  Through this secret and persistent surveillance, the government seized the

identities of confidential sources, documents and information received from those sources, story

leads and outlines, draft and final news videos, donor information, and much more.  These seizures

were not limited to sensitive information pertaining to the Biden diary news story; the government

seized "all" such data for an entire year stored in the email accounts of certain Project Veritas

journalists.  These covert seizures were in blatant violation of the First Amendment.  Likewise, the

seizures from journalists' homes enabled by the PV Warrants were, by design, conducted under

the glare of the public spotlight, but were no less in disregard of First Amendment rights.

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) forecloses the theory apparently underpinning

the government's investigation of Project Veritas—that its journalists encouraged sources to obtain

and provide property that the government contends was "stolen."  In *Bartnicki*, the Court held that

the government may not constitutionally punish a journalist's receipt of information from a source

who obtained it unlawfully where the recipient's purpose is to disseminate that information to the

public.  The plaintiff in *Bartnicki* invoked Title III of the Omnibus Crime Control and Safe Streets

Act of 1968, which prescribes criminal penalties and civil damages for the intentional disclosure

of the contents of an electronic communication when the defendant "know[s] or ha[s] reason to

know that the information was obtained" through an illegal interception.  18 U. S. C. § 2511(1)(c).

Vopper, a radio commentator, played on his public affairs talk show a recording of a surreptitiously

intercepted cell phone conversation to which Bartnicki was a party.  *Bartnicki*, 532 U.S. at 519.
Bartnicki filed an action for damages against Vopper and other media representatives who
published the recording, and the defendants raised various defenses including that disclosure was
protected by the First Amendment.  *Id.* at 520.  The government intervened on appeal in support
of the enforcement of the statute's sanctions.

The ruling in *Bartnicki* is clear and controlling here.  The Court held that a member of the
media is not liable for receiving or publishing newsworthy information that was obtained
unlawfully by a source.  *Id.* at 533-34 ("[t]he enforcement of [a federal criminal statute] implicates
the core purposes of the First Amendment it imposes sanctions on the publication of truthful
information of public concern").  Remarkably, the prosecutors here applied for the PV Warrants
on the basis of alleged offenses—conspiracy to possess stolen goods (§ 371), and possession of
stolen goods (§ 2315)—that *Bartnick*i ***expressly*** held were not offenses.  *See (*Exhibits B, C, and
E) at 1.[10]  The government's reliance on the federal statute prohibiting interstate transportation of
stolen property (§ 2314) is likewise foreclosed by *Bartnicki*.  The plaintiff there argued that the
"delivery" of the unlawful recording was conduct that could be sanctioned without impinging upon
protected speech, but the Court was unpersuaded:

> It is true that the delivery of a tape recording might be regarded as conduct but
> given that the purpose of such a delivery is to provide the recipient with the text of
> recorded statements, it is like the delivery of a handbill or pamphlet, and as such, it
> is the kind of 'speech' that the First Amendment protects.

*Bartnicki*, 532 U.S. at 527.[11]

---

[10] This is another indication that these prosecutors did not obtain the approval of the Attorney General to
seek the PV Warrants.  We are confident that the Attorney General and his staff are familiar with *Bartnicki*.

[11] The Solicitor General supported these unsuccessful arguments, emphasizing the deterrent effect of the
statute.  *Id.* at 529-30 and n.13.

*Bartnicki* limits liability to circumstances where the journalist actually "participate[d] in the theft." *Democratic Nat'l Committee v. Russian Fed'n*, 392 F. Supp. 3d 410, 434-36 (S.D.N.Y. 2019). For this reason, the government's "active involvement" theory fares no better under First Amendment scrutiny than it does under the PPA statutory analysis. *See supra* at 16-17. That phrase appears nowhere in *Bartnicki*, and the government has not cited (nor have we located) a decision limiting its holding to deny First Amendment protection to a member of the news media on that ground.  To the contrary, decisions of this Court and others have construed *Bartnicki* to preclude nearly identical theories of liability regarding journalists who received stolen information.  This Court in *Democratic Nat'l Committee* rejected the claim that Wikileaks and others who disseminated information hacked from DNC computers were liable under conspiracy, accessory-after-the-fact, or aiding and abetting theories for "soliciting" stolen information and "encouraging" the hacker to disseminate it.  Judge Koeltl declined the plaintiffs' invitation to infer a conspiracy from the fact that some defendants met with associates of the hacker, observing that it is a "common journalistic practice. . . to 'meet[] with information thieves' or 'solicit[] stolen information.'"  *Id.* at 435.  And Judge Koeltl interpreted *Bartnicki*'s threshold for liability—whether a party played a part in an illegal interception—to mean actually "participate in the theft." *Id.*; *see also id.* at 436 (defendants "could have published the documents themselves without liability because they did not participate in the theft and the documents are of public concern"). Judge Koeltl adopted the First Circuit's analysis of *Bartnicki* in *Jean v. Mass. State Police*, 492 F.3d 24 (1st Cir. 2007).  Local police threatened to prosecute Jean, a political activist who maintained a website displaying information critical of law enforcement, for publishing an illegally recorded video of an arrest and search.  *Id.* at 25-26.  Jean sought an injunction citing her First Amendment rights.  The district court entered an injunction, and on appeal the government argued

that *Bartnicki* was distinguishable on the ground that Jean "assisted, conspired, [] served as an accessory to", "aid[ed] and abet[ed]," and was in "active collaboration" with the individual who made the illegal recording.  *Id.* at 31, 33.  The First Circuit rejected the government's efforts to distinguish *Bartnicki*, reasoning that "the fact that [the defendant in *Bartnicki*] received the tape 'passively' and Jean received the tape 'actively' is a distinction without a difference."  *Id.* at 32.

This Court need not look far to determine how equitable considerations relevant to deciding a Rule 41(g) motion should apply. There is a great body of First Amendment jurisprudence that regularly favors the issuance of equitable relief in favor of those who seek to exercise their rights to free speech and association.  It is a matter of black letter law that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  And the chilling effect on protected First Amendment activities constitutes irreparable injury and generally supports the issuance of injunctive relief. *Ostrowski v. Local 1-2, Utility Workers of America, AFL-CIO*, 530 F. Supp. 208, 215 (S.D.N.Y. 1980) (citing *Chicago Area Military Project v. City of Chicago*, 508 F.2d 921, 926 (7th Cir. 1975)).

 The mere threat of prosecution for speech that the government deems "objectionable" violates the First Amendment.  *See, e.g., Bantam Books v. Sullivan*, 372 U.S. 58, 71-72 (1963). Relief is regularly afforded where one demonstrates "an objectively justified fear of real consequences" *before* they actually occur. *Initiative & Referendum Institute v. Walker*, 450 F.3d 1082, 1088 (10th Cir.2006) (internal quotations omitted). Here, the First Amendment injury has already occurred—the seizure of Project Veritas's records because the government deems its newsgathering about the Biden family objectionable.

The First Amendment also protects the right to political privacy and association with like-minded supporters, sources and other journalists. Those rights been violated here by the compelled

disclosure of text messages among Project Veritas board members and advisors about whether or not to publish, discussions with other news organizations about stories, internal communications among Project Veritas journalists, photographs of source material, communications with external sources, and internal journalist drafts and notes.

The seizure of newsgathering materials and consequent threat to prosecute journalists is precisely the sort of punitive action that discourages the exercise of constitutionally protected rights. *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966). Few journalists would risk investigating the most powerfully connected individuals in the United States government if their First Amendment freedoms could be brushed aside so easily. This chilling effect is compounded by the fact that the government's investigation here was triggered by, and is seeking to punish, the ***content of speech***. There can be no serious dispute that the DOJ and FBI have brought their collective forces to bear upon Project Veritas and its journalists because of their newsgathering work about the Ashley Biden diary. The notion that there is a compelling federal law enforcement interest in ***how*** the dairy was acquired and whether its acquisition violated Florida's petty theft statute is nonsense. It is the fact that Project Veritas acquired the diary and prepared to report about its contents to the potential detriment of then-candidate Joe Biden that has animated the interest of the government. Enforcement action motivated by a "disagreement with the message" violates the First Amendment. *Police Dep't of Chicago v. Mosle,* 408 U.S. 92, 95 (1972) ("But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content"); *see also Doe v. Ashcroft*, 334 F. Supp. 2d 471, 507-08 (S.D.N.Y. 2004), *vacated on other grounds sub nom. Doe v. Gonzales*, 449 F.3d 415, 418 (2d Cir. 2006) (FBI national security letters restricting disclosure of law enforcement activity are content-based and subject to strict scrutiny).

In sum, the newsgathering materials seized from Project Veritas are unquestionably entitled to protection under the First Amendment.  It is clear from *Bartnicki* and cases interpreting it that a journalist cannot be held liable for the receipt, transportation, or possession of stolen property, or even for "actively" encouraging a thief.  It follows that the government procured the Microsoft Warrants and the PV Warrants on the basis of applications presenting probable cause to believe that a ***non-crime*** had occurred.  The consequent seizures, therefore, were unlawful, and all of the devices and information extracted from them must be returned to Project Veritas and its journalists.

C.     The Use of Search Warrants to Seize Work Product and Documentary Materials <u>Belonging to Project Veritas and Its Journalists Violated the Reporter's Privilege.</u>

That the PPA and First Amendment protect newsgathering information from government seizure is not the end of the story.  In the years after *Branzburg v. Hayes*, 408 U.S. 665 (1972) declined to reach the question of whether a qualified common law privilege also protects newsgathering, at least ten Circuit Courts of Appeal have answered that question in the affirmative. *See* Introduction to the Reporter's Privilege Compendium, *available at* https://www.rcfp.org/introduction-to-the-reporters-privilege-compendium (last updated Nov. 5, 2021) (gathering cases).  Many of these decisions rely on Federal Rule of Evidence 501, which authorizes federal courts to develop privileges "in the light of reason and experience." *Id.*; s*ee also Trammel v. United States*, 445 U.S. 40, 47 (1980) ("[Rule 501] acknowledges the authority of the federal courts to continue the evolutionary development of testimonial privileges.').

In this Circuit, "the reporter's qualified privilege extends to both civil and criminal cases." *United States v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983).  *Burke* recognized that:

What is required is a case-by-case evaluation and balancing of the legitimate competing interests of the newsman's claim to First Amendment protection from

> forced disclosure of his confidential sources, as against the defendant's claim to a
> fair trial which is guaranteed by the Sixth Amendment.

*Id.*  There is no principled reason for a different test when it is the government seeking to force

disclosure of the newsman's materials.  Indeed, Sixth Amendment fair trial rights are fundamental.

*See, e.g.*, *Barber v. Page*, 390 U.S. 719, 721 (1968) (noting "essential and fundamental

requirement for [a] fair trial which is this country's constitutional goal"). There is no comparable

constitutional guarantee for the government's right to seize or otherwise gather evidence

independent of a grand jury investigation.[12]

"[T]o protect the important interests of reporters and the public in preserving the

confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific

showing that the information is: highly material and relevant, necessary or critical to the

maintenance of the claim, and not obtainable from other available sources."  *Burke*, 700 F.2d at

76-77.  The government ***could not*** have satisfied that standard in the applications for the Microsoft

Warrants or the PV Warrants.  First, as the Court can see from *in camera* examination of the

photographs, images, and recordings seized by the FBI, these materials show only that Project

Veritas gathered information to prepare a news story about the Biden diary.  None of the materials

from the seized items designated as relevant by the Special Master indicate that Project Veritas

journalists s participated in its theft.  The seized items, therefore, could not be considered "highly

material [or] critical to the maintenance of the claim" by any reasonable measure.  *Burke*, 700 F.2d

at 77.

Second, the government could not have presented truthful and complete information to the

Magistrate Judges sufficient to show that the information was not obtainable from other available

---

[12] As explained below, the U.S. Attorney's Office and FBI procured the Microsoft Warrants and PV
Warrants independent of any grand jury investigation.

sources.  As explained above, at the time the government applied for the PV Warrants, it had already seized a computer and mobile telephone from the confidential sources who, after acquiring the Biden diary, lawfully offered it to Project Veritas.  *See supra* at 7.   On information and belief, the government did not reveal to the Magistrate Judge that the information sought via the PV Warrants was available from these alternative sources.

In his concurring opinion in *In Re Grand Jury, Judith Miller*, 438 F.3d. 1141, 1178 (D.C. Cir. 2006), Judge Tatel chronicled the development of the Reporter's Privilege and described the essence of the requisite balancing test in a simple question: does "the public interest in punishing the wrongdoers…outweigh[] any burden on newsgathering?"   That balancing weighs overwhelmingly in favor of Project Veritas and its journalists.  The public's interest in punishing an alleged theft of personal belongings (primarily papers) left behind in a residence, and in which the owner thereafter demonstrated no interest, is minimal.  Indeed, Biden never filed a burglary or theft report with the local police.  As far as we are aware, the interest taken in this matter by the U.S. Attorney's Office and the FBI arose only after Project Veritas' request to the Biden Campaign for comment on the diary led Ashley Biden's lawyer to solicit the assistance of the prosecutors. *See supra* at 6.   That is a partisan political interest, not a compelling law enforcement need.

The import of the matters under investigation here cannot be seriously compared to investigations of the leak of a covert CIA agent's identity, *see In re Grand Jury, Judith Miller*, 438 F.3d. at 1173; the leak of government plans to seize assets of terrorist organizations, *see New York Times Co. v. Gonzales*, 459 F.3d 160, 163 (2d Cir. 2006); or even to the unlawful use and sale of drugs.  *See Branzburg v. Hayes*, 408 U.S. 665 (1972).

On the other side of the scale lies the First Amendment's express protection for "freedom . . . of the press" which forecloses any debate about that institution's "important role in the

discussion of public affairs." *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966).   "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Brown v. Hartlage*, 456 U.S. 45, 52 (1982).   The press, "which includes not only newspapers, books, and magazines, but also humble leaflets and circulars…play[s] an important role in the discussion of public affairs." *Mills*, 384 U.S. at 219.   "Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change…muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id.*

The DOJ itself has recognized that these critical free press interests outweigh the government's investigative needs even for the most serious of crimes, and even where only non-content information is being sought by investigators.   In the only instance that we are aware of where the DOJ obtained § 2703(d) orders to compel a service provider to produce non-content email information for journalists, the DOJ: (1) authorized the service provider (Google) to provide pre-disclosure notice to the news organization (The New York Times), allowing for a judicial challenge to the orders; and (2) ultimately withdrew the orders even though the offense under investigation was the leak of classified information.   M. Schmidt and A. Goldman, *Project Veritas Says Justice Dept. Secretly Seized Its Emails*, N.Y. TIMES (March 22, 2022), *available at* https://www.nytimes.com/2022/03/22/us/politics/project-veritas-emails.html.   This transparent and measured approach in an investigation involving the reporting of leaked classified information, is strikingly different than the clandestine and wide-ranging campaign by the prosecutors here to pursue journalists who received an allegedly stolen personal diary but never published it.

The DOJ Regulations establish federal policy, reinforcing the legislative mandate of the PPA, to protect "news media from forms of compulsory process, whether civil or criminal, which might impair the news gathering function." 28 C.F.R. § 50.10.  As noted, that policy prohibits the very action taken by the prosecutors and agents here—the use of warrants to seize newsgathering materials from a member of the media.  In these circumstances, the balancing of interests required by the Reporter's Privilege tilts entirely in favor of Project Veritas and its journalists.

> D.     The Government Violated the Fourth Amendment in Applying for and Executing the Search Warrants for Project Veritas' Newsgathering Materials.

For the reasons identified above, neither the Microsoft Warrants nor the PV Warrants were supported by probable cause.  The warrants also were rendered unreasonable when the prosecutors withheld material information from the magistrate judges who issued these warrants, including that the warrants were prohibited by the DOJ's own regulations. The searches were also unreasonable because the warrants were a disproportionate response to the gravity of the offense under investigation.  And the execution of the Microsoft Warrants and the PV Warrants also violated the Fourth Amendment in numerous respects.

> ### 1.     The Warrants Were Not Supported by Probable Cause

When government officials apply for a search warrant they are required to "provide the magistrate with a substantial basis for determining the existence of probable cause.  *Illinois v. Gates*, 462 U.S. 213, 239 (1983).  Here, as explained above, the prosecutors and agents are investigating a non-crime based on complaints received from Ashley Biden's lawyer and, quite possibly, the Joe Biden campaign.  Simply put, it is not a crime for a journalist to receive, possess, transport, or solicit property stolen by another party.  *See supra* at 20-25.  The government's crutch—that Project Veritas was "actively involved" in obtaining the Ashley Biden diary and

belongings—is a thin reed that collapses under the weight of authority from this and other courts. *Id.*

From the very beginning the prosecutors knew (or certainly should have known) that there was no crime committed by Project Veritas. The complaint lodged by Ashley Biden's lawyer with then Acting U.S. Attorney Audrey Strauss in or about early November 2020 in no way provided "specific and articulable facts" showing reasonable grounds to believe that Project Veritas had committed a criminal offense, let alone facts amounting to probable cause.   The Project Veritas correspondence with Biden's attorney, which presumably she supplied to the prosecutors, indicated that Project Veritas had acquired the Biden diary and property lawfully.  Likewise, Biden and her associates almost certainly recorded the telephone conversations they had with the undercover Project Veritas journalist.  The prosecutors listening to those recordings would have learned significant facts casting doubt on the proposition that the Biden diary was stolen, including that Biden was uncertain where and when she had lost track of her diary and that she did not then claim it had been stolen.

It is doubtful that, prior to submitting their first application for a § 2703(d) order just weeks after being contacted by Ashley Biden's lawyer, the prosecutors and agents spoke to any witness (other than Biden) who had direct contact with, or observed the actions of, the Project Veritas journalists.  As mentioned above, the FBI did not contact the Project Veritas confidential sources until late October 2021, nearly a year after the government procured the first § 2703(d) order on November 24, 2020.  That initial § 2703(d) application could only have been based on speculation and generalities.  And to the extent that the four applications for Microsoft Warrants submitted in January-April 2021 were based on data and emails derived from earlier orders/warrants, the applications were inaccurate or misleading.  As noted above, the electronic communications that

the government has seized, either directly from the Project Veritas journalists or the confidential sources, consistently evidence that the sources already had possession of Biden's diary and other property ***before*** contacting Project Veritas.

> **2.      The Warrants Were Rendered Unreasonable by the Government's Failure to Disclose Material Information to the Magistrate Judges**

A magistrate judge can perform a proper assessment of probable cause only if "the applicant agency fully and accurately provides information in its possession that is material to whether probable cause exists [and] the government [has] a heightened duty of candor . . . in *ex parte* proceedings." *In re Accuracy Concerns Regarding FBI Matters Submitted to FISC*, 411 F.Supp.3d 333, 335-36 (U.S. Foreign Intel. Surveillance Ct., Dec. 17, 2019) (internal quotations omitted).   "[O]mitting . . . highly relevant information [about a search of electronic data] is inconsistent with the government's duty of candor in presenting a warrant application. A lack of candor in this or any other aspect of the warrant application must bear heavily against the government in the calculus of any subsequent motion to return or suppress the seized data." *United States v. Comprehensive Drug Testing*, Inc., 621 F.3d 1162, 1178 (9th Cir. 2010) (Kozinski, C.J., concurring).   The affiant may not "selectively include[] information bolstering probable cause, while omitting information that d[oes] not."  *United States v. Perkins*, 850 F.3d 1109, 1117 (9th Cir. 2017).

The applications for the Microsoft Warrants and the PV Warrants were deficient in (at least) the following respects.  ***First***, and most fundamentally, there is substantial reason to believe that the prosecutors misled the Magistrate Judges by claiming that Project Veritas was not a news organization entitled to the protections of the PPA and First Amendment.  After all, the government unsuccessfully made those very same arguments to this Court.  *See* (Docket No. 29) at 9-10.

*Second*, the government was not candid with the Magistrate Judges regarding the prohibitions of the PPA.  To be sure, courts are "presumed to know the law and apply it in making their decisions." *Walden v. Arizona*, 497 U.S. 639, 653 (1990).  But the fact that the Magistrate Judges may have been generally familiar with the PPA did not relieve the government of its duty to be candid in describing the conduct of Project Veritas journalists.  For example, had the government revealed that Project Veritas acquired the Biden diary and belongings in the course of newsgathering, the Magistrate Judges would have realized that the PPA precluded the seizures.

Conversely, if the warrant application stated that Project Veritas and its journalists were "actively involved" in the theft of the Biden diary or other property—just as the government has represented to this Court, *see* (Docket No. 29) at 7—such a conclusory and misleading characterization would have infected the probable cause determination. As explained above, there is no "active involvement" exception to the PPA, and any statement to the contrary would have misled the Magistrate Judges.  Had the Magistrate Judges been accurately and fully informed, they would have realized that the PPA and First Amendment made unlawful the issuance of the warrants in the circumstances.

*Third*, the agents and prosecutors likely misrepresented to the Magistrate Judges that they had obtained the necessary approvals under the DOJ Regulations and/or failed to advise them that these regulations *expressly prohibited* the use of search warrants based on newsgathering conduct. As explained above, the government cannot excuse omissions of this kind by invoking the disclaimer that DOJ regulations grant no rights to the public.  "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Morton v. Ruiz,* 415 U.S. 199, 235 (1974). The notion that DOJ can enact regulations to extoll its virtue, but that

prosecutors are then free to ignore those regulations without consequence, is especially offensive in the context of a probable cause determination where those prosecutors must be candid with the court.

The importance courts attach to these DOJ Regulations in determining whether to approve warrants is illustrated by the November 9, 2021 Order issued by Chief Judge Howell of the District Court for the District of Columbia.[13]  This Order circulated to district and magistrate judges the Attorney General's July 19, 2021 Memorandum announcing that, with very narrow exceptions, applications for search warrants (and other compulsory process) to obtain information from members of the news media were **prohibited**.  The Order also directed that "any government application for a warrant…seeking information from or records of an individual or entity who is, or who purports to be, a member of the news media…shall include a statement confirming that…the submitting attorney is familiar with…the applicable requirements set forth in [DOJ Regulations], the Justice Manual, and the July 19, 2021 DOJ Memorandum." Implicit in a prosecutor's representation of familiarity with a regulation is that she has complied with it.

Surely the Magistrate Judges here, when presented with the applications for the Microsoft Warrants and PV Warrants, would have expected no less than the disclosures required by this Order.  It stands to reason that they would have wanted to know that the applicants **had not** obtained the requisite approval of the Attorney General or his designee to apply for the PV Warrants because DOJ policy precluded it.

**Fourth**, having seized electronic devices from Project' Veritas confidential sources prior to applying for the PV Warrants, the government knowingly withheld from the Magistrate Judge, or was reckless in failing to disclose to her, the material contents of those devices, including:

---

[13]   *Available   at*   https://www.dcd.uscourts.gov/sites/dcd/files/Revised%20Executive%20Order%2021-67.pdf

1. communications showing that the sources who offered the Biden diary and belongings to Project Veritas in September 2020 possessed that property before approaching Project Veritas;

2. communications showing that the sources provided these materials to Project Veritas, and its journalists did not remove the items from any residence or other location; and

3. a Contributor Agreement between Project Veritas and the sources, negotiated by legal counsel, which confirmed: (a) the representations of the sources that they had obtained the Biden diary and other belongings lawfully; and (b) Project Veritas acquired these items from the sources in the course, and for the purpose, of newsgathering.

Had the government disclosed this information to Magistrate Judge Cave, she would have been able to determine that there was no basis for believing that Project Veritas or its journalists participated in the alleged theft of Biden's property, much less grounds rising to the level of probable cause. Stated another way, the Magistrate Judge would have realized that the agents and prosecutors were investigating Project Veritas and its journalists for a ***non-crime***.

***Fifth***, on information and belief the government did not inform the Magistrate Judge when applying for the PV Warrants that, less than a week before, counsel for Project Veritas delivered a letter to the prosecutors advising that counsel was authorized to provide information voluntarily regarding the subject of the investigation and, alternatively, to accept any subpoena for Project Veritas records. *See* (Exhibit A). If Magistrate Judge Cave were familiar with the PPA, almost certainly she would have considered this offer of cooperation by Project Veritas to be material to her determination that the proposed seizures were consistent with the statute as well as the implementing DOJ regulations. *See* 42 U.S.C. § 2000aa-11a.2 (directing that DOJ impose "requirement that the least intrusive method or means of obtaining such materials be used"); 28 C.F.R § 50.10(a)(3) (requiring "all reasonable alternative attempts [to] have been made to obtain the information from alternative sources; and after negotiations with the affected member of the news media have been pursued").

Each of these misrepresentations or omissions constitutes an independently sufficient ground for finding that the government failed to "provide the magistrate with a substantial basis for determining the existence of probable cause." *Gates*, 462 U.S. at 239.  Not only was there no probable cause for the Microsoft Warrants and PV Warrants, but also the conduct of the government, especially when viewed in its totality, interfered with the Magistrate Judges' performance of their duties.

### 3. The Warrants Were a Disproportionate Response to the Gravity of the Alleged Offense Under Investigation

The Fourth Amendment establishes a requirement that "all searches and seizures must be reasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011).  Reasonableness has many dimensions, and one is "proportionality between the gravity of the offense and the intrusiveness of the search." *United States v. Lyles*, 910 F.3d 787, 795–96 (4th Cir. 2018).   That was absent here. Even accepting, *arguendo*, the government's characterization of the conduct under investigation, the alleged non-violet theft of personal papers is a relatively minor offense.  *Cf. Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984) (the "underlying offense . . . [was] relatively minor").  But in fact, as explained above, the prosecutors are investigating Project Veritas and its journalists for what is, under, *Bartnicki*, a non-crime. By no reasonable measure can the wholesale seizure of newsgathering materials, attorney-client privileged communications, and irrelevant personal information be considered a proportional response to an alleged low-grade larceny, much less to a non-crime.

### 4. The Warrants Allowed Prohibited General Searches

"The chief evil that prompted the framing and adoption of the Fourth Amendment was the indiscriminate searches and seizures conducted by the British under the authority of general warrants." *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (internal quotations omitted).

This practice is foreclosed by the requirement that an affidavit supporting a search warrant indicate "that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  There must "be a nexus . . . between the item to be seized and criminal behavior."  *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967); *accord United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (requiring that affidavits must set forth "sufficient facts demonstrating why the police officer expects to find evidence in the [place to be searched] rather than in some other place") (citation omitted).

The Microsoft Warrants are textbook examples of prohibited general warrants. The first such warrant dated January 14, 2021 (21 Mag. 548) demanded production of, *inter alia*, "all [email] content and other information within the Provider's possession, custody, or control associated with the accounts [of 3 Project Veritas journalists]" reaching back to ***January 1, 2020***. *See* (Document No. 64-1) at p. 12 of .pdf. Of course, there could be no probable cause to believe Project Veritas committed a crime associated with the Biden diary in the ***eight months*** before its journalists acquired that diary in September 2020.  Nor could there be probable cause to believe that ***each and every*** email sent or received during a one-year period "contain[s] evidence, fruits, and instrumentalities of crime."  *Id*. at p. 10 of .pdf.  These general warrants enabled the government to obtain, and later peruse at their leisure, communications that the Project Veritas journalists had with confidential sources, other journalists, legal counsel, family members, and friends.[14]

---

[14] The government has recently claimed that it "employed" a filter team to review the Project Veritas data seized from Microsoft. *See* (Docket No. 68) at 1.  But the government declines to say whether this team "filtered" for both attorney-client and journalistic privileges. *Id.*  There is substantial cause to believe that no review was conducted to filter newsgathering materials: (1) the prosecutors are of the view that Project Veritas is not engaged in journalism; and (2) the U.S. Attorney's Office Filter Team does not appear to have a First Amendment element in its filter mechanism. *See* (Docket No. 69) at 2.

The stunning reach of the Microsoft Warrants is not limited to the email content.   The warrants also commanded the production of "[a]ll address book, contact list, or similar information associated with the Subject Accounts."   *See e.g. id.*, *passim*.   Thus, for each of the eight Project Veritas journalists named in the Microsoft Warrants the government obtained the names and contact information for every source, donor, or other confidential associate.   And, although the time period for compelled production of O'Keefe's email content was limited to a four-month period, the directive to produce his contact and address information was not.   *See id.* at p. 32 of .pdf.   This breach of confidentiality is especially harmful to Project Veritas as its investigative journalism relies heavily on whistleblowers, including those within the federal government.

The PV Warrants also ran afoul of the prohibition against general warrants in authorizing the agents to seize "any and all cellphones, tablets, computers, and electronic storage media" from Meads and Cochran, *see* (Exhibits B and C), and "any and all cellphones" from Mr. O'Keefe." *See* (Exhibit E).   This "any and all" language gave the FBI agents license to seize data regardless of the temporal limitation expressed elsewhere in the warrants.   *See* (Exhibits B, C and E) at 3 (August 1, 2020 – Present).   As explained above, the FBI CART unit subsequently determined that nearly one-third of the forty-seven devices seized by the agents contained no information within the prescribed time period, and the Special Master found that an additional ten devices seized by the FBI contained no responsive data. *See supra* at 10-11.

The government has admitted the FBI has the technical capability to determine, without viewing the contents of a device, when it was last accessed and thereby to rule out that the device contains information within the warrant period. *See* (Exhibit D) at 5.   The FBI agents executing the PV Warrants almost certainly were accompanied by a member of the CART unit who could have used this technology on site instead of seizing all devices.   *Cf. United States v. Comprehensive*

*Drug Testing, Inc.*, 621 F.3d 1162, 1171 (9th Cir. 2010) ("it was wholly unnecessary for the case agent to view any data for which the government did not already have probable cause because there was an agent at the scene who was specially trained in computer forensics").

The FBI agents conducting the search also could have employed on-site less intrusive techniques—for example, attempting to power up each device—to determine whether a device was even readable.  Of the 47 devices seized by the FBI, 10 were non-functional or otherwise not readable.  *See* (Exhibit F) at 2-4.  Moreover, "advancements in technology enable the Government to create a mirror image of an individual's hard drive, which can be searched as if it were the actual hard drive but without interfering with the individual's use of his home, computer, or files."  *United States v. Gains,* 755 F.3d 125, 135 (2d Cir. 2014); *vacated on other grounds*, 824 F.3d 199 (2016).  There is no discernable reason why the FBI could not have made images of the computers, laptops, and storage devices that it seized and left the hardware in the possession of its owners.

The FBI's seizure of electronic devices from Mr. Meads and Mr. Cochran was particularly indiscriminate, executed without any apparent effort to determine whether the devices were used when the journalists worked for Project Veritas, or even that the devices were operable.   In particular, of the 17 devices seized from Mr. Meads, only 2 were determined by the FBI and Special Master to contain information responsive to the PV Warrants.  *See* Special Master Report at 2 (Item Nos. 1B57, 1B58).  Of the 28 devices seized from Cochran, only 3 were determined by the FBI and Special Master to contain information responsive to the PV Warrants. *See* Special Master Report (Document No. 61) at 1-2 (Item Nos. 1B42, 1B41, 1B40). This indiscriminate seizure of every electronic device in the premises, when only ten percent of the devices contained responsive data, is precisely the kind of general search that the Fourth Amendment forbids.

If there could have been any reasonable dispute that the FBI conducted prohibited general searches in executing the PV Warrants, any doubt has been eliminated by the government's conduct after the FBI CART unit processed the seized devices. As detailed above, the FBI is holding at least 41 devices seized from Mr. O'Keefe, Mr. Meads and Mr. Cochran that either indisputably contain no information responsive to the PV Warrants, cannot be accessed by the CART unit, or have been determined to be inoperable.  And yet the government has taken no action to return these devices to the Project Veritas journalists.

When the government discovers that it has seized information outside the scope of a search warrant, the non-responsive information must be returned.  *See, e.g.*, *Andresen v. Maryland*, 427 U.S. 463, 482 n. 11 (1976) ("to the extent such papers were not within the scope of the warrants or were otherwise improperly seized, the State was correct in returning them voluntarily and the trial judge was correct in suppressing others"); *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) ("when items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items. . .").  The retention of seized documents for which the government has not established probable cause converts the seizure into an unlawful general warrant.  *See CDT*, 621 F.3d at 1176 (noting "serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant").   In all events, Project Veritas and its journalists should not have to remain deprived indefinitely by the unlawful search and seizure of their privileged work product, other documentary materials, and personal information that both the FBI CART unit, and the Special Master have determined fall outside the scope of the PV Warrants. This Petition demands the return of those devices and all data extracted or copied therefrom.  *See United States v. Ganias*, 824 F.3d 199, 219 (2d Cir. 2016) ("Rule 41(g) permits a defendant or any 'person aggrieved' by

either an unlawful or lawful deprivation of property . . . to move for its return") (internal quotations and citations omitted).

"The general warrant specified only an offense . . . and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched." *Steagald v. United States*, 451 U.S. 204, 220 (1981). "Opposition to such searches was in fact one of the driving forces behind the Revolution itself." *Riley v. California*, 573 U.S. 373, 403 (2014). That the federal government would continue to use such writs nearly two hundred fifty years later is alarming; that the writs were being used by the government to punish a news organization for gathering unfavorable information about the President is intolerable.

**5.      *The Investigative Team Violated Procedures Established by the Magistrate Judge to Protect Privileged***

The investigative team knowingly disregarded the Magistrate Judge's directives regarding the protection of privileged information. Each of the PV Warrants contains the instruction that the collection of evidence be performed "in a manner reasonably designed to protect any attorney-client or other applicable privilege [including] the use of a designated 'filter team' separate and apart from the investigative team." *See* (Exhibits B, C, and E) at 5.    And yet, it appears that no filter agents were employed on-site to execute the PV Warrants even though the investigation team knew that (1) Mr. O'Keefe, Mr. Meads and Mr. Cochran were journalists; (2) electronic devices seized from the Project Veritas sources two weeks earlier contained evidence that these journalists were engaged in newsgathering when receiving and investigating the information provided by the sources; and (3) the proffer received by the prosecutors from Project Veritas's counsel just three days before the PV Warrants were executed provided unmistakable notice that Project Veritas and its journalists were asserting First Amendment and other journalistic privileges.

What is more, the members of the investigative team executing the PV Warrants took photographs of, or otherwise copied, images, recordings and videos stored in mobile devices seized from Mr. O'Keefe (15) and Mr. Cochran (19) "prior to th[e] device locking pursuant to [their] security settings." *See* (Exhibit D) at 1-22 & nn.1-2.  The agents then circulated those materials to other agents and prosecutors on the investigative team.  The government has acknowledged that the investigative team viewed this material until Project Veritas and its journalists filed their respective motions for appointment of a Special Master.  *See* (Exhibit D) at 1-2 & nn. 2-3.  The prosecutors continued to view this evidence even after receipt of a written demand from counsel for Project Veritas that the government cease extraction of the data.  *See* (Exhibit D) and (Exhibit G).

It is readily apparent that the investigative team reserved to itself decision-making authority on First Amendment and other privilege questions.  They ignored the filter team and other protective procedures established by the Magistrate Judge (and required by the DOJ regulations). Not only has the investigative team been tainted by this exposure to privileged materials, but also their deliberate disregard of warrant requirements and DOJ rules cast further doubt on the reliability of their representations to the Magistrate Judge and this Court.

### 6.    *The Government Compounded Its Fourth Amendment Violations by Sealing the Microsoft Warrants*

The government compounded its Fourth Amendment violations by causing the Microsoft Warrants to be sealed, thus preventing Project Veritas from challenging the grounds for, and scope of, these seizures.  The government procured these sealing orders through mere recitals of the text of 18 U.S.C. § 2705(b), which allows for non-disclosure orders when there is "reason to believe that notification of the existence of the [warrant] will result in…destruction of or tampering with evidence…or otherwise seriously jeopardizing an investigation."    Section 2705(b), however,

establishes a *will*, not a may, threshold for non-disclosure orders.  *Id.*  Project Veritas certainly wanted to protect its confidential sources from harassment (both official and political).  But nothing in its communications with Biden's lawyer or the Joe Biden campaign could have justified a representation to a magistrate judge of reason to believe Project Veritas journalists "will" interfere with the investigation if notified of its existence.

The prosecutors' recitals of "jeopardy" were no more credible when made in the first § 2705(b) application filed in November 2020, than when repeated verbatim fourteen months later in the government's application for renewal of non-disclosure orders.  *See* 21 Mag. 992 (January 13, 2022).  By January 2022 the FBI had very publicly executed and publicized the PV warrants, and the Court had appointed a Special Master to protect the privileged materials seized during those searches. And yet the prosecutors were still representing to magistrate judges that disclosing the seizure of Project Veritas records would jeopardize the investigation.  *Id.*

*     *     *

In sum, in procuring and executing the PV Warrants, the investigative team: violated the PPA; rights guaranteed to Project Veritas and its journalists by the First Amendment, common law Reporter's Privilege, and the Fourth Amendment; the applicable DOJ Regulations; and the requirements established by the Magistrate Judge.  As a result, Project Veritas and its journalists are aggrieved by the unlawful search and seizure of privileged work product and other documentary materials, as well as by the deprivation of that property.  Accordingly, all of the seized devices must be returned to Mr. O'Keefe, Mr. Meads and Mr. Cochran, respectively.  Fed. R. Crim. P. 41(g).  Furthermore, all data extracted, downloaded, imaged, or otherwise copied from those devices by the FBI must be returned or destroyed.  *Id.* advisory committee notes (1989 amendments).

E.    The Court Must Conduct an Inquiry into the Information Submitted to, and Withheld From, the Magistrate Judges Who Issued the Warrants and Orders.

Rule 41(g) requires that the Court "receive evidence on any factual issue necessary to decide the motion."  The Court must therefore conduct an inquiry that requires the government to come forward with the information that it submitted to the Magistrate Judges, and to answer whether it withheld the material information identified above.

Project Veritas previously requested that the PV Warrant applications be unsealed (Docket No. 33), and the Court denied the request on the ground that disclosure was not necessary for Project Veritas and its journalists to respond to the government's arguments opposing the appointment of a Special Master.  (Docket No. 42).  These applications now *are* "necessary to decide th[is] motion," Fed. R. Crim. P. 41(g), and should be made available to counsel.

The government cannot properly withhold the applications by invoking Fed. R. Crim. P. 6(e) because this investigation has been conducted by the FBI and U.S. Attorney's Office *independent of* any grand jury inquiry.  Indeed, as explained below, it is doubtful that any grand jury has actually been convened to investigate Project Veritas and its journalists.  The Microsoft Warrants were obtained promptly after Ashley Biden's attorney enlisted the aid of the U.S. Attorney's Office in November 2020.  The PV Warrants were obtained for Mr. Meads' and Mr. Cochran's homes were obtained almost exactly a year later.  But absent a showing that the facts in the warrant applications were gathered through the grand jury process, the contents are not "matter(s) occurring before the grand jury."  Fed. R. Crim. P. 6(e)(2)(B).

There is cause to believe that there has never been an actual grand jury investigation of Project Veritas.  On November 4, the day the PV Warrants were executed at Mr. Meads' and Mr. Cochran's homes, the prosecutors emailed to counsel for Project Veritas a document purporting to

be a grand jury subpoena (Exhibit H).  The document, which appears to be an electronically generated form, does not refer to any particular grand jury then-empaneled by the Chief Judge of this Court.  Rather, the document purports to command attendance before "the GRAND JURY" at 40 Foley Square, Room 220, on November 24, 2021.  But when a representative of Project Veritas appeared with counsel at that location, on the designated date and time, to lodge Project Veritas' objections to the compelled production of privileged materials, ***there was no grand jury sitting***. *See* November 26, 2021 Paul Calli, Esq. Letter to AUSA Mitzi Steiner (Exhibit I).

The grand jury may not be used as "a pawn in a technical game," and the Constitution and federal law tolerate no such result. *See U.S. Dist. Ct. for S. Dist. Of W. Virginia*, 238 F.2d 713, 722 (4th Cir. 1957) *(quoting United States v. Johnson*, 319 U.S. 503, 512 (1943) (Frankfurter, J.)).  The government argues when it is convenient for it to do so that the execution of search warrants by the FBI are "independent of" proceedings before the grand jury," *see, e.g.*, *United States v. Eastern Air Lines, Inc.*, 923 F.2d 241 (2d Cir. 1991), but then solemnly intones the words "grand jury" to shroud in secrecy actions undertaken by the prosecutors and FBI agents for their own purposes. In *Eastern Air*, the government represented to the court, in support of the position that a search warrant affidavit should be unsealed, that its contents were "based on the government's investigations independent of the investigations by the grand jury and that the affidavit did not reflect matters that had occurred before the grand jury." *Id* at 244. The Second Circuit reasoned that "this finding is supported by the government's representation that the 13 confidential informants cited in the affidavit made their statements to the investigators voluntarily, have not testified before the grand jury, and have not received grand jury subpoenas." *Id.*

There is reason to believe that is exactly the circumstance here—the prosecutors and FBI agents who applied for the Microsoft orders and warrants merely conveyed to the magistrate judges

information obtained from "informants," such as Ashley Biden's lawyer, and that information had not been, and never was, submitted to a grand jury. Absent a showing to the Court that the information in the warrant applications, and the Project Veritas materials seized as a result, were matters occurring before the grand jury, the prosecutors may not shroud its investigation in secrecy by invoking the need to protect "the proper functioning of our grand jury system." (Docket No. 65) at 3.

In one of its recent filings, the government attempted to add support to these insinuations by reciting that "[s]ince the inception of *the Government's investigation*, it has been assigned to a duly empaneled grand jury sitting in the Southern District of New York. Gov't Sur-Reply (Docket No. 68) at 2 (emphasis added). This is a telling admission that all along this has been, and is, an investigation by the U.S. Attorney's Office and the FBI. That there may have been a record entry made somewhere "assigning" the investigation being conducted by prosecutors and agents to a grand jury, again, begs the actual question. A grand jury did not seize, or cause the seizure, of Project Veritas emails from Microsoft—the prosecutors and agents did. A grand jury did not seize, or cause the seizure, of privileged and personal property from the Project Veritas journalists—the prosecutors and agents did. There was an "assigned" grand jury for the government investigation at issue in *Eastern Air Lines* that actually returned charges, but that assignment did not render the search warrant executed in that investigation by the FBI a "matter occurring before the grand jury." 923 F.2d at 244 ("the government's investigations [was] independent of the investigations by the grand jury").

The occasional use by the government of forms like the one sent to counsel for Project Veritas to compel the production of documents does not alter the fact that nothing is actually "occurring before the grand jury." Fed. R. Crim P. 6(e)(2)(B). It would elevate form over

substance to allow the government to shroud their work in secrecy by solemnly intoning the words "grand jury."  Nor should the government be allowed to attempt to justify its conduct through *ex parte* submissions.  *See, e.g.*, *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987) ("[i]t is . . .  the firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte*, in camera submissions").

There is nothing secret about the government's diary investigation.  Numerous news articles have been published recounting the work of the investigators, including articles that appeared nearly contemporaneously with the FBI execution of the PV Warrants.  *See e.g.*, Josh Gerstein, *FBI Raid on Project Veritas Founder's Home Speaks Questions About Press Freedom*, POLITICO (Nov, 13, 2021) *available at* https://www.politico.com/news/2021/11/13/raid-veritas-okeefe-biden-press-521307.  The privacy interests of Project Veritas, its journalists and sources have already been compromised by these very public government seizure tactics.  It would be a cynical ploy for the government to cite privacy as a ground for denying Project Veritas access to the facts underlying these seizures as is necessary for resolution of this Petition.

## CONCLUSION

Media Company Project Veritas was approached by sources who lawfully provided Ashley Biden's diary and personal effects, representing that this property had been abandoned. Project Veritas investigated a news story about the diary, and what Ashley Biden alleged about her father, who was campaigning to be the President of the United States. Project Veritas conducted its investigative reporting with diligence, integrity, and within the bounds of the law.

In sharp contrast, the government has unlawfully seized voluminous newsgathering information protected by the First Amendment and Reporter's Privilege.  But the government has produced nothing, nor can it, to support its specious claim that Project Veritas and its journalists

participated in the theft of property or otherwise committed a crime.  The government knows the truth: Project Veritas engaged in journalism protected by the First Amendment.  But it is a form of journalism of which the government disapproves, especially where the subject of the newsgathering is the President.  But disapproval of Project Veritas' reporting is no justification for secret email surveillance of newsgathering communications, or pre-dawn raids of journalists' homes.  These actions are expressly prohibited by the PPA (as well as the DOJ regulations and policy implementing it), the First Amendment, and common law Reporter's Privilege.

Whether these prosecutors have operated without appropriate supervision, or the highest levels of the Biden administration's DOJ are complicit in this investigation into Ashley Biden's abandoned diary, it is time for the Court to curb the government's lawless behavior. The Court should grant this Motion and require the government to immediately return all seized materials to the aggrieved journalists.

Respectfully submitted,

CALLI LAW, LLC

/s/

By: _____
         Paul A. Calli
         Charles P. Short
14 NE 1st Avenue
Suite 1100
Miami, FL 33132
T. 786-504-0911
F. 786-504-0912
pcalli@calli-law.com
cshort@calli-law.com

*Admitted Pro Hac Vice*

Harlan Protass
PROTASS LAW PLLC
260 Madison Avenue
22nd Floor

New York, NY 10016
T. 212-455-0335
F. 646-607-0760
hprotass@protasslaw.com

*Counsel for James O'Keefe,*
*Project Veritas and Project*
*Veritas Action Fund*

Benjamin Bar
BARR & KLEIN PLLC
444 N. Michigan Avenue
Suite 1200
Chicago, IL 60611
T. 202-595-4671
ben@barrklein.com

*Admitted Pro Hac Vice*

Stephen R. Klein
BARR & KLEIN PLLC
1629 K Street, NW
Suite 300
Washington, DC 20006
T. 202-804-6676
steve@barrklein.com

*Admitted Pro Hac Vice*

Adam Hoffinger
GREENBERG TRAURIG LLP
2101 L Street N.W., Suite 1000
Washington, DC 20037
T. 202-331-3173
hoffingera@gtlaw.com

*Counsel for Eric Cochran*

Brian E. Dickerson
THE DICKERSON LAW GROUP, P.A.
6846 Trail Boulevard
Naples, FL 34108
T. 202-570-0248
bdickerson@dickerson-law.com

*Pro hac vice admission pending*

Eric Franz
THE LAW OFFICES OF ERIC FRANZ, PLLC
220 Old Country Road
Mineola, NY 11501
T. 212-355-2200
eric@efranzlaw.com

*Counsel for Spencer Meads*

cc:     All Counsel of Record (via ECF)