

**CALLI LAW, LLC**
One Flagler Building, Suite 1100
14 Northeast 1st Avenue
Miami, Florida 33132
T. 786.504.0911
F. 786.504.0912
www.calli-law.com

## <u>REPLY MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR RETURN OF PROPERTY</u>

Re:     *In re Search Warrant dated November 5, 2021*, 21 Misc. 813 (AT)
         *In re Search Warrant dated November 3, 2021*, 21 Misc. 819 (AT)
         *In re Search Warrant dated November 3, 2021*, 21 Misc. 825 (AT)

         Related Cases:     20 Mag. 12614
                            20 Mag. 12623
                            21 Mag. 548
                            21 Mag. 992
                            21 Mag. 2537
                            21 Mag. 2711
                            21 Mag. 3884

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................... 1

I.      Newly Discovered Evidence Makes it Even More Necessary for the
        Government to Disclose Whether Prosecutors Obtained Authorization of
        the Attorney General to Seize Newsgathering Materials from Project
        Veritas and Microsoft. .......................................................................................... 4

II.     The Government Has Conceded Issues by Refusing to Address Them. ............... 8

III.    The Applicable Law ............................................................................................ 10

IV.     The Government's Misconduct, the Fundamental Constitutional and
        Statutory Questions Implicated by That Misconduct, and the Validity of the
        Warrants Are Properly before the Court. ............................................................ 12

V.      The Resolution of Petitioners' Motion Need Not Await the Outcome of the
        Limited Privilege Review Being Conducted by the Special Master .................... 13

VI.     The Government's Claimed Need to Retain Petitioners' Property Is
        Unsupported by the Evidentiary Value and "Character" of the Materials .......... 20

VII.    The Government's Fourth Amendment Analysis Is Superficial and Lacks
        Support of Any Relevant Case Authority. .......................................................... 24

        A.      The Government's Probable Cause Arguments Are Flawed and Rely
                on Sealed Affidavits in Violation of the Fairness Doctrine. .................... 25

        B.      The Government Relies on the Wrong Fourth Amendment
                Standards to Defend the Particularity and Breadth of the Warrants. ....... 29

        C.      The FBI's Execution of the Warrants Was Unreasonable. ...................... 32

VIII.   The Government's Dismissive Treatment of Petitioners' Arguments
        Regarding Violations of the PPA and DOJ Regulations Is Not a Substantive
        Response, and Those Arguments Are Therefore Conceded. ............................... 35

IX.     The Government Has Failed to Address Petitioners' Showing that the
        Warrants Were Executed Independent of Any Grand Jury Investigation and
        Therefore Has Conceded the Point. .................................................................... 36

CONCLUSION ...................................................................................................................... 37

## INTRODUCTION

The Government's Opposition to Petitioners' Joint Motion for Return of Property ("government's brief" or "Opp.") is a paradigm of avoidance and excuse.  It is filled with string cites from inapposite cases, bereft of any analysis applicable to the issues.  The government's "strategy" is to ignore the issues and arguments that expose its mendacity and the fatal flaws of its theories and to seek delay for delay's sake.  The government's Opposition references the First Amendment once in passing, and *Bartnicki v. Vopper*, 532 U.S. 514 (2001) not at all.  But controlling law and the facts establishing Project Veritas' lawful and legitimate newsgathering do not disappear just because prosecutors close their eyes to them.  By refusing to address substantively many of the important issues raised in the aggrieved journalists' Joint Motion, (Docket No. 70), the government concedes them.

The clock is ticking on the government's Constitution-offending charade.  Project Veritas recently received troubling evidence of the circumstances under which the Federal Bureau of Investigation ("FBI") opened its investigation of Petitioners.  An FBI whistleblower has come forward and provided the official record marking the initiation of this unwarranted and abusive investigation of Project Veritas and its journalists.  As explained below (and in the report itself which is attached as Exhibit A), the government recognized from the very outset that the investigation was "sensitive" because Project Veritas is ***a member of the news media***.  This contemporaneous acknowledgment of Project Veritas' purpose to disseminate news to the public cannot be reconciled with the government's subsequent (and unsuccessful) argument that Project Veritas is not engaged in journalism.  [Dkt. No. 29] at 9.  The Report provided by the whistleblower also reveals the extent to which the FBI Case Agent misstated and exaggerated the predicate "offenses" to generate hysteria.  It worked.

The government's brief misstates the applicable law, as well as the Court's previous rulings, to avoid addressing the substantial evidence of the investigators' misconduct and the actual facts of record.  The government has chided Petitioners throughout these proceedings for not having challenged the validity of warrants executed at the residences of Project Veritas journalists ("the PV Warrants"), and the secret subpoenas, orders, and warrants that compelled production from Microsoft (and other providers) of Project Veritas' emails and other newsgathering materials ("the Microsoft Warrants"[1] and, collectively with the PV Warrants, "the Warrants").  Now that Petitioners *have* challenged the Warrants, the government's brief advances non-existent rulings in this case, and the appointment of a Special Master (which the government opposed), as reasons to avert or delay accountability.  But the question of the validity of the Warrants is now properly before this Court and must be adjudicated consistent with Fed. R. Crim. P. 41(g).  Nor is the Special Master's ongoing limited review an obstacle to Petitioner's Motion; indeed, the Special Master's review of a discrete number of privileged documents will become moot if this Court grants our requested relief.

The Fourth Amendment arguments in the government's brief lack any genuine analysis of probable cause.  Instead, the government employs the shield-and-sword tactic, arguing that its secret affidavits defeat Petitioners' factual recitals, but nevertheless demanding that those affidavits remain secret.  In this Circuit, the fairness doctrine outlaws that tactic.

---

[1] The aggrieved journalists' Petition for Return of Property referred to these as the "Microsoft Warrants" and this Reply retains that usage.  Additional providers – Google, Uber, and Apple – have now also notified the aggrieved journalists they too were secretly compelled to produce journalists' information to the government, subject to gag orders issued pursuant to 18 U.S.C. § 2705(b).  As with the Microsoft Warrants, the government did not disclose these intrusions to this Court or the undersigned.  The government likewise seized these materials in violation of the Constitution, the applicable statute, and regulations.  These materials must also be returned to Project Veritas and its journalists and deleted from any government servers where copies have been retained.

Perhaps the most offensive error in the government's brief is its calculated effort to have this Court adopt the **wrong Fourth Amendment standard** for measuring seizures of newsgathering and other materials protected by the First Amendment. The Supreme Court has long required "scrupulous exactitude" for warrants implicating the First Amendment; the alternative argued by the government, what amounts to a close-enough-for-horseshoes standard, falls well short of the mark.

Not least of the devices employed by the government to evade accountability is its perfunctory recital of "grand jury." The government's brief inserts that term as an adjective at every opportunity. But the government does not—and cannot— explain how the application for, and execution of, the Warrants were matters occurring before the grand jury, not **independent of** any grand jury investigation. Nor does the government even mention the controlling precedent cited by Petitioners that demonstrates that Fed. R. Crim. P. 6(e) provides no sanctuary.

The government has acted in bad faith, every step of the way, ignoring First Amendment precedent and the protections afforded to journalists by the DOJ's own regulations. Its Opposition is no exception. Project Veritas and its journalists committed no crime. Like their predecessors who published the Pentagon Papers, or contemporaries like *Politico*'s Josh Gerstein and Alexander Ward who published the leaked draft Supreme Court opinion overturning *Roe v. Wade*, the investigative journalists of Project Veritas engaged in protected First Amendment activity. Enough is enough: it is time for the Court to end the irreparable and continuing harm to Petitioners' constitutional rights. The Court should grant Petitioners' Motion and require the government to (1) return all physical and digital materials it illegally seized, (2) certify to the Court that the FBI and the DOJ have destroyed all copies of all seized material, and (3) certify that any other agency to which the FBI and DOJ provided the information have also destroyed their copies.

3

**I.**     **Newly Discovered Evidence Makes it Even More Necessary for the Government to Disclose Whether Prosecutors Obtained Authorization of the Attorney General to Seize Newsgathering Materials from Project Veritas and Microsoft.**

In recent days, a Federal Bureau of Investigation ("FBI") whistleblower approached Project Veritas and offered information about the government's abusive investigation of Project Veritas. *See FBI Whistleblower Leaks Doc Showing Bureau Targets "News Media" as "Sensitive Investigative Matter,"* PROJECT VERITAS, *available at* https://www.youtube.com/watch?v=HQljttPzSfM (May 11, 2022).  Among other information, the whistleblower provided a copy of an FBI record memorializing the formal commencement of the investigation.  As explained below, this information is alarming for numerous reasons, not least of which is that it directly contradicts arguments previously made by the government to this Court.

Known within the FBI as a "splash report," the record documents the opening of a criminal investigation of Project Veritas on October 29, 2020. **Ex. A.**[2]  That is the ***very same date*** Ashley Biden's lawyer sent an email to Project Veritas' Chief Legal Officer threatening to send the matter of Project Veritas possession of Ms. Biden's diary "to SDNY."[3]  Among the fields in the splash report format that must be completed by the FBI Case Agent is whether the inquiry is a "SIM (Sensitive Investigative Matter)."  In this Report, that field reads: "News Media."  According to the whistleblower, designation of a criminal investigation as a SIM requires approval of FBI supervisory officials and the FBI Division Legal Counsel.  The whistleblower also explained that

---

[2] Project Veritas redacted the names of the agents assigned to the investigation.  Upon request, Project Veritas will provide an unredacted copy to the Court.

[3] As explained in Petitioners' Motion, Project Veritas wrote to the Biden for President Campaign on October 16, 2020 asking to interview Joe Biden about the diary.  Mot. at 5.  Mr. Ede was soon contacted by Ashley Biden's attorney, Roberta Kaplan, who refused to allow her client to view the diary for authentication purposes and, at the same time contended that the diary was "stolen."  *Id.* at 5-6.  Ms. Kaplan's increasingly aggressive letters and emails culminated in her October 29 threat to take the matter to the United States Attorney's Office for the Southern District of New York.

once a criminal investigation is designated as a SIM, except for the bare-bones splash report only agents and personnel assigned to the investigation can access related records and information. Even certain fields in a SIM splash report, for example the title and summary of the investigation, are blocked as "restricted."

It is evident from this Report that the government recognized on Day #1 that Project Veritas is a member of the "News Media."  This knowledge cannot be reconciled with the position the government took when opposing the appointment of a Special Master—that Project Veritas was not eligible to assert any journalistic privileges because "Project Veritas is not engaged in journalism within any traditional or accepted definition of that word."  [Dkt. No. 29] at 9; *see also id.* at 10 n.7 (citing dozens of social media and legacy media "authorities" in support of the argument that Project Veritas engages in "political spying" and "is not a journalist").  That the prosecutors proceeded as they did in the face of the FBI's acknowledgement that Project Veritas is part of the "News Media" is appalling.

The Report's "SIM" designation of "News Media" exposes the prosecutors' deceit. Fortunately, the First Amendment does not yield to the whims of prosecutors who dislike journalists or their audiences, and Project Veritas' journalism continued unabated.  A non-exhaustive list of news stories published by Project Veritas and James O'Keefe since the government's pre-dawn raids includes: a CBS whistleblower who exposed internal training directing CBS journalists to "stop thinking in terms of objective journalism,"[4] a CNN technical director's admissions about the conflict of interest as a result of anchor Chris Cuomo and his brother (the former governor of New York),[5] reporting that exposed a CNN producer who is a

---

[4] https://www.youtube.com/watch?v=x4yJYMIpoy8 (Nov. 16, 2021).
[5] https://www.youtube.com/watch?v=JQoyyHPbRf0 (Dec. 1, 2021).

pedophile,[6] DARPA documents regarding funding of gain-of-function research,[7] government negligence in COVID-19 vaccine administration programs,[8] a United Healthcare nurse who blew the whistle on miscoding of COVID-19 cases,[9] a whistleblower who exposed racism and other toxic workplace issues at ESPN,[10] an FDA executive officer's candid statements regarding COVID-19 policy,[11] a New York Times reporter's analysis of the media "overreaction" in its coverage of January 6th, [12] and Twitter's hostility to free speech principles in the wake that it might be purchased by Elon Musk.[13]

The splash report also reveals the lengths to which the FBI Case Agent went to incite hysterical interest in this investigation. For example, the FBI agent who provided the splash report to Project Veritas stated that the first line of the report, which reads "56-D," indicates that the FBI categorized the matter as a "federal election crime," a description that defies belief. Next, the splash report categorizes the investigation as "Threat Level - 1." According to the whistleblower and DOJ's own definition, Threat Level 1 is reserved for the most serious offenses such as terrorism and other national security matters. The splash report format also calls for the Case Agent to "tag" the suspected conduct to be investigated so that the evidence can be tracked and analyzed by the relevant components within the FBI. It tags the following:

- Violence_Harm
- Extortion
- Coercion
- Acts_Liberty

---

[6] https://www.youtube.com/watch?v=XgAoSgKj010 (Dec. 15, 2021).
[7] https://www.youtube.com/watch?v=_zgoENmeddA (Jan. 10, 2022).
[8] https://www.youtube.com/watch?v=1zkUeEypVxE (Jan. 27, 2022).
[9] https://www.youtube.com/watch?v=hx2FFPhbNlY (Feb. 2, 2022).
[10] https://www.youtube.com/watch?v=ds_770evuig (Feb. 8, 2022).
[11] https://www.youtube.com/watch?v=6nSXHrmOy8o (Feb. 15, 2022).
[12] https://www.youtube.com/watch?v=1izwiGzDTCc&t=17s (March 8, 2022).
[13] https://www.youtube.com/watch?v=TexDrY6AlAw (May 16, 2022); *see also* https://www.youtube.com/watch?v=oVZU4aSl2ag (May 17, 2022).

- Activity

The case agent chose tags that were inflammatory and opaque. He did so based on nothing more than a story sold by Ashley Biden's lawyers. The government bought a pig in a poke.

As explained in Petitioner's Motion, the applicable DOJ regulations provide that a federal prosecutor or FBI agent "must obtain the authorization of the Attorney General to apply for a warrant to search the premises, property, communications records, or business records of a member of the news media." 28 C.F.R § 50.10(d)(1). The government's brief continues to rely on the mantra that government regulations "create [no] right or benefit," Opp. at 23, to excuse its refusal to address whether and how the prosecutors obtained the Attorney General's approval for the Warrants. The government has previously assured the Court that it "complied with all applicable regulations and policies regarding potential members of the news media in the course of this investigation, including with respect to the search warrants at issue" when obtaining the PV Warrants [Dkt. No. 29] at 2 n.2. But this cannot be accurate. As explained in Petitioner's Motion, the DOJ Regulations ***prohibit*** the use of search warrants to seize ***newsgathering*** materials. Mot. at 15, 18-19. Not even the Attorney General could have approved the PV Warrants consistent with the limitations of the DOJ's own regulations.

It is evident that the government was not candid with the Court when arguing that Project Veritas "is not a journalist." It has become increasingly more probable that the prosecutors chose not to seek the requisite approval from the Attorney General on the same discredited rationale—Project Veritas is "not a journalist," so the DOJ regulations do not apply. The splash report supplied by the FBI whistleblower raises other troubling questions about the impetus of and motive for the investigation, and the extent to which the Case Agent "hyped" the predicate by

mischaracterizing or exaggerating the alleged conduct through the use of inflated threat tags in the splash report.  The government should be required to account for its manipulation and deceit.

## II.     The Government Has Conceded Issues by Refusing to Address Them.

It is well-settled that arguments not addressed in a party's opposition brief are conceded. *See, e.g., In re Jumei Int'l Holding Ltd. Sec. Litig.*, Case No. 14-CV-9826, 2017 WL 96176, *5 n.4 (S.D.N.Y. Jan. 10, 2017) (Pauley, J.) ; *Blessinger v. City of N.Y.*, Case No. 17-CV-47, 2017 WL 3841873, *3 (S.D.N.Y. Sept. 1, 2017) (Pauley, J.) ; *LBF Travel, Inc., v. Fareportal, Inc.*, No. 13-CV-9143, 2014 WL 5671853, *16 (Gorenstein, J.) ("because LBF has not disputed defendants' arguments on this issue, we deem its claims on this point to be abandoned"); *In re UBS AG Sec. Litig.*, No. 07-CV-11225, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (Sullivan, J.) (considering an argument not addressed in an opposition brief waived); *McNeil-PPC, Inc. v. Perrigo Co.*, Case No. 05-CV-1321, 2007 WL 81918, at *12 n.4 (S.D.N.Y. Jan. 12, 2007) (Pauley, J.) (same); *First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392-33 & n.116 (S.D.N.Y. 2002) (Kaplan, J.) (same).

By failing to address the following arguments made in Petitioners' Motion, the government has conceded them:

- There is no legitimate federal law enforcement interest in investigating the loss, or even the alleged theft, of a diary and personal belongings of an adult woman with minimal financial value, *see* Mot. at 24, 27-28;

- The government violated the PPA by using search warrants to seize work product and other documentary materials possessed by Project Veritas, an organization reasonably believed to have a purpose to disseminate news to the public, *see Id.* at 16-19;

- The DOJ has interpreted the PPA "suspect exception" to permit the use of warrants only to seize **non**-newsgathering materials, *see Id.* at 19;

- The government's use of the Warrants to seize work product and documentary materials from Project Veritas journalists and Microsoft violated the First Amendment, *see Id.* at 20-25;

- The government's use of the Warrants to seize work product and documentary materials from Project Veritas journalists and Microsoft violated the Reporter's Privilege, *see Id.* at 25-29;

- *Bartnicki* held that the government may not penalize a journalist for receipt and publication of allegedly stolen material in the absence of proof that the journalist actually participated in the theft, *see Id.* at 20-21;

- The cases in this Court and elsewhere construe *Bartnicki* to preclude the very theories of secondary liability—conspiracy, accessory, aiding and abetting, accessory after the fact, and transporting stolen material—on which all of the Warrants were based, *see Id.* at 22-23;

- The Warrants were obtained and executed independent of any grand jury investigation, *see Id.* at 43-46;

- No filtering procedures to protect First Amendment interests were conducted before the government investigative team obtained access to the Microsoft Warrant materials, *see Id.* at 36 n.14.[14]

One of the issues conceded by the government deserves particular attention. Both the substance and tone of the government's brief display its utter disregard for the protections the Constitution affords newsgathering and other free speech activities. The government's lengthy brief virtually ignores the First Amendment, mentioning it only in passing once. Opp. at 20. What is more, the government contends that members of the news media are entitled to no more judicial scrutiny of search warrants and other legal process targeting newsgathering than are the drug

---

[14] At the same time the government refuses to address the facts, it argues that Petitioners have not supplied "evidence" to support their factual assertions. Opp. at 3 n.3. As explained in Petitioner's Motion, however, the facts cited by Petitioners are derived from materials in the government's possession, and Petitioners are willing to produce the supporting evidence *in camera* to prevent further intrusion upon the privileges that protect their newsgathering work. Mot. at 3. It is difficult to reconcile the government's contention here that Petitioners have not said enough about the facts, with the government's argument to the Special Master that Project Veritas has said too much in public pleadings, thereby waiving privileges. *See* April 13, 2022 Government's Memorandum of Law in Response to Petitioners' Briefs Dated April 1, 2022 ("April 13 Gov't Memo") at 6.

dealers, child-porn purveyors, Ponzi-scheme operators, and other common criminals who sought to suppress seized contraband, proceeds destined for forfeiture, or instrumentalities of crime in the dozens of cases the government cited.

We address those cases below, demonstrating that they are distinguishable and, in many instances, do not support the propositions for which they are cited. More fundamentally, however, the government's exclusive reliance on cases that do not involve the media and newsgathering reveals either that the government can find no decisions construing the First Amendment to allow secret warrants for journalists' emails and raids at their homes, or that it is the view of the responsible prosecutors and agents the First Amendment, the Supreme Court decisions interpreting it, and constraining legislation like the PPA are inconvenient obstacles that must be circumvented.

## III.    The Applicable Law.

The government's recital of "applicable" case decisions is lengthy (two full pages), but ultimately misleading. Opp. at 4-5. Nearly all of these cases concerned property that was to be forfeited, contraband, cash proceeds of criminal activity, lost or destroyed, or for which the claimant had not adequately established a possessory interest. Several of the decisions, however, completely undercut the dismissive tone of the government's opposition here. In *Mora v. United States*, 955 F.2d 156, 158 (2d Cir. 1992), the Second Circuit recognized that "Rule 41 . . .  itself provides that '[t]he court shall receive evidence on any issue of fact necessary to the decision of the motion;'" *see also id.* ("Research has revealed no authority for the proposition that a district judge must rely on a representation made by the government"). Similarly, *United States v. Chambers,* 192 F.3d 374, 377 (3d Cir. 1999) held that the district court erred in failing to conduct an evidentiary hearing on "disputed issue[s] of fact necessary to the resolution of the motion."[15]

---

[15] Other circuit courts have ruled that an evidentiary hearing is appropriate to test representations and arguments made by the government in opposition to a Rule 41(g) motion. *See, e.g., United*

Only one of the Rule 41(g) cases relied upon by the government addressed First Amendment issues, and that decision actually contradicts the government's position here.  As mentioned above, the government's brief is virtually silent regarding the First Amendment interests at stake in this case, claiming cavalierly that this is an issue for another forum and another day (if ever).  Opp. at 1, 20.  *In the Matter of Search of Kitty's East*, 905 F.2d 1367 (10th Cir. 1990), however, recognized that "the special protections of the First Amendment" justify prompt judicial intervention.  *Id.* at 1371.  In affirming the trial court's decision to conduct a Rule 41(g) evidentiary hearing to examine the validity of the warrant authorizing seizure of materials protected as commercial speech, the Tenth Circuit reasoned:

> It is axiomatic that the timing of speech is often crucial to its impact and that prior restraints are presumptively unconstitutional.  The promise of review of a prior restraint at some indefinite, future time does not meet constitutional requirements.

*Id.* (internal quotations and citations omitted); *see also Heller v. New York*, 413 U.S. 483, 492 (1973) (after seizure pursuant to warrant, prompt judicial determination following an adversarial proceeding necessary to preserve First Amendment rights).

The government's recitation of the "applicable law" contains ***not one case*** upholding the seizure and retention of newsgathering materials protected by the First Amendment, much less any decision denying Rule 41(g) relief on the solitary ground that the seizure was made by warrant.  It is true, as the government observes, that "reasonableness under all the circumstances must be the test when a person seeks to obtain the return of property".  Opp. at 4 (citing Rule 41(g) Advisory

---

*States v. Hess*, 982 F.2d 181 (6th Cir. 1992) ("There are no findings of fact or conclusions of law regarding either the [claimant's] right to the records or the reasonableness of the government's retention of the records").

Committee Note).  But the government's retention of seized property can never be deemed reasonable where the seizure unreasonably infringed upon First Amendment interests.

## IV. The Government's Misconduct, the Fundamental Constitutional and Statutory Questions Implicated by That Misconduct, and the Validity of the Warrants Are Properly before the Court.

The government plainly lacks confidence in its ability to defend the actions of the prosecutors and agents in their investigation of news media company Project Veritas.  There is no better evidence of the government's apprehension than its argument that the Court has already ruled on the validity of the Warrants and determined that the government's conduct may not be challenged.  Opp. at 10 ("The Court should decline the Movants' latest invitation to reconsider its prior rulings").  This argument distorts the record and ignores the plain text of Fed. R. Crim. P. 41(g).

The government contends that although the issue was never briefed, the Court's observation at the outset of these proceedings that Petitioners had not yet changed the validity of the PV Warrants amounted to a "ruling" that is "manifestly correct because duly authorized legal process is not subject to challenge by the Movants in this pre-indictment phase of the investigation." Opp. at 10.  This argument rests on a thin reed—the Court's observation in its December 8, 2021 Order appointing a Special Master that "[t]he Court shall not consider arguments related to the validity of the search warrants because that issue is not before the Court." [Dkt. No. 48] at 2.  At that time, however, Project Veritas and its journalists had not yet challenged the validity of the Warrants.  Indeed, they did not learn of the existence of the Microsoft Warrants until more than three months later.  To be sure, Project Veritas' Motion to Appoint a Special Master did not seek the return of its documents or suppression of evidence.  [Dkt. No. 1].  Nor did the government's brief opposing the appointment of a Special Master, [Dkt. No. 29], argue that warrants are not subject to challenge in this pre-indictment phase of the investigation.  Indeed, the

government acknowledged that "there is only one issue before the Court at present: whether to appoint a special master to review evidence obtained pursuant to judicially authorized search warrants." *Id.* at 1.  Clearly the Court was not asked by the parties in November 2021 to address the validity of the warrants or to rule that no preindictment challenge is permissible.

Now, however, the validity of the Warrants **has** been placed in issue by Petitioners' Rule 41(g) Motion.  The government's contention that the Motion is a nullity because there is no indictment and the government has not deigned to inform the Court and Project Veritas that no charges will issue, is not supported by a single case cited in the government's brief.  Indeed, the text of Rule 41(g) is clear that when an aggrieved party seeks relief from "an unlawful search and seizure of property or by the deprivation of property" the Court must take evidence and rule on the motion.  *Id.* ("The court *must* receive evidence on any factual issue necessary to decide the motion") (emphasis added).

## V.   The Resolution of Petitioners' Motion Need Not Await the Outcome of the Limited Privilege Review Being Conducted by the Special Master.

Equally baseless is the government's argument that the ongoing Special Master privilege review of a discrete category of documents insulates examination of the government's misconduct pursuant to Rule 41(g).  Throughout these proceedings, the government has deployed the argument that the "validity of the warrants is not in issue" to shroud the actions of the prosecutors and FBI agents in secrecy and avoid being held to account.  *See, e.g.*, [Dkt No. 65] at 2.  Indeed, the government has argued to the Special Master that "the validity of the Government's search warrants, the investigative steps taken during its Investigation, the strength of the evidence gathered to date [are] not before the Special Master."  April 13 Gov't Memo at 21.  And yet the government now argues that this Court should not consider the government's statutory and constitutional violations until after the Special Master makes her privilege determinations,

uninformed (if the government gets its way) by any consideration of the government's misconduct. *See* Opp. at 1.  Like the street-corner dealer with three shells and a pea, the government seeks to conceal its misconduct, hoping that shuffling and fast-talk will prevent or delay discovery.

The government's cynical efforts to prevent or delay judicial scrutiny of its misconduct should not be countenanced.  First, its claim that "the same arguments are pending before the Special Master," Opp. at 20, cannot be reconciled with its position that the Special Master may not consider "the validity of the Government's search warrants [or] the investigative steps taken during its Investigation."  April 13 Gov't memo at 21.  Second, having chided Petitioners on numerous occasions for not having challenged the validity of the warrants, the government cannot now be excused from defending the Warrants and the associated misconduct of the prosecutors and agents.

The Special Master protocol was established, over the government's objection, to protect "the potential First Amendment concerns that may be implicated by the review of the materials seized from Petitioners."  December 8, 2021 Order [Dkt. No. 48] at 3.  This prophylactic relief was necessary because investigators were preparing to review materials seized pursuant to the PV Warrants.  At that time Petitioners were unaware of the full range of the government's misconduct. For example, only later did Petitioners learn that FBI agents on the investigative team, in violation of the admonition in the PV Warrants that filter personnel should be used to protect privileges, accessed electronic devices during the searches of Project Veritas journalists and promptly circulated to prosecutors images of newsgathering communications.  *See* December 17, 2021 Sobelman Letter to Special Master, Mot., Ex. D at nn. 1&2.  Nor did Petitioners become aware until late March 2022 of the government's surreptitious use of warrants to seize hundreds of thousands of Project Veritas emails from its internet service provider.  *See* Mot. at 12-14 (detailing Microsoft Warrants seizures).  And, as explained below, only in the last few weeks did Project

Veritas learn that seventy-five (75) percent of the emails and records seized from Microsoft pre-date the time that Project Veritas was first contacted about the Ashley Biden diary by confidential sources.  The fact that these invasions were not known at the time the aggrieved journalists moved to appoint a special master is a consequence of the government's choice to proceed in secret instead of engaging in dialogue with the news media as 28 C.F.R. § 50.10 requires.  The government might well have disclosed during the Special Master litigation that it **already** had penetrated the privileges to be protected by the protocol approved by the Court through the investigators' review of  hundreds of thousands of emails and other records seized from Microsoft, Apple, Google, and Uber.  Instead, the government continued its clandestine violation of Project Veritas' privileges, even successfully extending the 18 U.S.C. § 2705(b) gag orders to providers after this Court appointed the Special Master.  The Special Master is currently considering arguments that three hundred twenty-four (324) images, photographs, internal and external communications, and video and audio recordings seized via the PV Warrants are protected by the First Amendment and Reporter's Privilege.  These items represent a fraction of the data seized by the government and, even as to these items, the government is endeavoring to prevent the Special Master from determining that the items were unlawfully seized in the first place.  Petitioner's Motion is hardly "an improper 'end-run' around the Special Master," Opp. at 20, inasmuch as the Motion challenges the validity of *all* the Warrants obtained by the government and its retention of *any* data seized from the Project Veritas journalists or Microsoft.  The urgency of that relief deserves priority over the Special Master's review of a limited body of materials.  *See, e.g.*, *Elrod v. Burns*, 427 U.S.

347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").[16]

### VI. The Warrants Do Not Justify the Government's Retention of Project Veritas Newsgathering Information and Other Property Because the Warrants Were Unlawfully Obtained and Executed and Allowed Prohibited General Searches.

The government manipulated the legal system by providing false facts to the magistrate judges, omitting material facts, and failing to apprise those magistrates of relevant law and regulations.  Having presented these defective applications to the magistrates, and a theory of liability that under *Bartnicki* and its progeny is a non-crime, the government now seeks to erect the inevitably defective probable cause findings as a shield.  The disingenuity of the government's argument is manifest.

The government's tautology does not even find support in its caselaw.  The government's brief argues that "the issuance of valid warrants alone justifies denial of the [Rule 41(g)] motion Opp. at 6, but this premise is directly contradicted by one of the cases  the government cites.  *See United States v. $16,072.00 in U.S. Currency*, 374 F. Supp. 3d 205, 209 (N.D.N.Y. 2019) ("[t]he government is not permitted to seize private property and then simply retain that property without any demonstration that the property is somehow necessary to an investigation *even if* seizure of the property was executed pursuant to a valid search warrant." ) (emphasis added).  And the two decisions principally relied upon by the government for this proposition do not come close to supporting it.

---

[16] Should this Court grant the relief requested by Petitioners the issues being examined by the Special Master will be moot.

According to the government, the factual circumstances in *In re Search Warrants Executed on Apr. 28, 2021*, 21 Misc. 425 (JPO), 2021 WL 2188150, at *3 (S.D.N.Y. May 28, 2021) are "indistinguishable from those presented here."  Opp. at 22; *see also id.* at 21 ("circumstances were materially the same").  As we previously pointed out, [Dkt. No. 65] at 3, this false equivalence does not survive even a cursory review of Judge Oetken's opinion, and his reasoning actually supports granting the relief requested here.

Judge Oetken was addressing the government's application to appoint a special master to review an attorney's files, and the content of a second attorney's mobile telephone, seized pursuant to search warrants.  Most fundamentally, that case is distinguishable because the government—unlike the prosecutors here—was taking steps to ***promote*** the protection of valid privileges, not to ***evade*** protections and violate privilege.  Judge Oetken denied as premature the request of the attorneys for the return or suppression of email seized pursuant to the Stored Communications Act, 18 U.S.C. §§ 2701 et seq. "SCA") but, importantly, that denial was based on a critical fact not present here. Judge Oetken relied on "the Government['s] represent[ation] that it has utilized a 'filter team' — a separate group of attorneys and agents who were not part of the investigative team — to review materials for privilege."  2021 WL 2188150, at *2; *see also id.*  ("This Court finds that the filter team process adequately safeguards the attorney-client privilege and the constitutional rights of the search subjects and their clients").  In contrast, while attorney-client privilege concerns remain, the primary issue here is the government's use of warrants that violate the First Amendment and Reporter's Privilege to obtain journalists' communications.  By its failure to address the issue, the government has conceded that there was no First Amendment filter team of the Microsoft Warrant materials.  Indeed, the prosecutors represent to this Court that they

17

"reviewed" the Project Veritas email content seized from Microsoft and all of it "contain[s] material responsive to the search warrants."  Opp. at 8.

The positions taken by the government in the Special Master proceeding demonstrates that any purported filter team review of the materials seized from Microsoft and other providers was an ineffective veneer.  The filter team has not conceded that a single document seized pursuant to the PV Warrants is attorney-client privileged – not even communications where undersigned counsel for Project Veritas discussed facts and legal strategy with James O'Keefe and Chief Legal Officer Jered Ede.  The filter team's record on First Amendment issues is even more suspect.  What is more, as noted previously, *see* [Dkt. No. 69] at 2, we now know that the government filter team reviewing the PV Warrants materials has stated that the First Amendment and Reporter's Privilege protect ***none*** of: (1) the journalists' notes; (2) photographs of information received from, and text messages with, sources; (3) recordings of calls with sources; (4) records of journalists' newsgathering activities; and (5) journalists' editorial communications regarding whether the Biden diary story should be published.  Given this evidence of callous disregard for the First Amendment, the Court would need to suspend disbelief to find that the government filter team was more vigilant when its review of the Microsoft Warrants materials was not subject to Special Master oversight.

Unlike the aggrieved parties in *In re Search Warrants Executed on Apr. 28, 2021* who could not "establish[] irreparable harm from the Government's retention of the property in light of the [filter team] safeguards . . . to protect attorney-client privilege"), 2021 WL 2188150 at *3, Petitioners ***have*** established irreparable harm from the government's seizure and retention of their newsgathering materials for which there is no adequate remedy at law.  *See, e.g.*, *Elrod,*, 427 U.S.

at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes *irreparable* injury") (emphasis added).[17]

The other decision relied upon by the government, *United States v. Xiaojie Shun*, No. 16 Cr. 75 (RJA) (MJR), 2019 WL 4396237, at *15 (W.D.N.Y. Apr. 10, 2019) could not be further afield. The indicted defendant there filed a motion under Rule 41(g) arguing that electronic review of voluminous business records seized via warrants was "very difficult" and sought return of the originals. *Id.* at *14. The magistrate judge summarily denied relief, directing the government "to allow defense counsel continued access to review, photograph and copy the material." *Id.* at * 15.

The government relegates to a footnote the argument that materials seized under the authority of the Stored Communications Act ("SCA"), such as the Microsoft Warrant materials, are somehow immune from recovery under Rule 41(g). Opp. at 7 n.5. But as we explained in an earlier pleading, [Dkt. No. 66], the government mis-cites *In re the Matter of the Application of the U.S. for a Search Warrant,* 665 F. Supp. 2d 1210 (D. Or. 2009). That case addressed only the notice provisions of Rule 41(f)(1)(C), not return of property. *See* 665 F. Supp. 2d at 1224 ("the Fourth Amendment notice requirement is satisfied when a valid warrant is obtained and served on the holder of the property to be seized, the ISP"). Indeed, the owners of the emails were not even parties to the case. *Id.* Equally misleading is the government's citation to *In re Search of Yahoo, Inc.*, No. 07 Misc. 3194 (MB), 2007 WL 1539971, at *6 (D. Ariz. May 21, 2007) for the same proposition. *Id.* That decision merely addressed the singular question of whether a magistrate

---

[17] The government also cites *In re Search Warrants Executed on Apr. 28, 2021* for the remarkable proposition that a Rule 41(g) motion must be denied where the government's review of electronic data seized by warrants "is now largely complete." Opp. at 8. But a the-harm-is-already-done rationale finds no support in Judge Oetken's opinion. Rather, the Court merely observed that a review of the subject materials for attorney-client communications (the only privilege at issue there) had already been performed by a filter team. 2021 WL 2188150 at *2.

judge has authority under the SCA and Rule 41 to issue a warrant to be executed outside the judicial

district; there was simply no Rule 41(g) relief at issue in that case.

## VI.    The Government's Claimed Need to Retain Petitioners' Property Is Unsupported by the Evidentiary Value and "Character" of the Materials

The government also insists that its retention of the property seized from the Project Veritas

journalists and its providers is "reasonable" because the government's "investigation remains

ongoing and the return of the property sought would *impair* the . . . investigation" due to "the

character of these items and materials."  Opp. at 8 (emphasis added).  This argument reduces to

the proposition that the Court may not provide relief from the government's statutory and

constitutional violations so long as the government says it "needs" the fruits of those violations to

continue trenching upon the Petitioners' rights.  What is more, the government's representations

about the evidentiary value of the seized materials are patently inaccurate and based on flawed

legal reasoning.

Most fundamentally, the government's generalized "need" argument does not come close

to satisfying the standard for disclosure of confidential reporter's information: a clear and specific

showing that documents at issue are (1) "highly material and relevant"; (2) "necessary or critical

to the maintenance of the claim"; and (3) "not obtainable from other available sources."  *See In re*

*Petroleum Prod. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir.1982).  Indeed, such non-particularized

claims of need do not even satisfy the less-demanding standard for disclosure of non-confidential

reporter's materials.  *See, e.g.*, *In re McCray, Richardson, Santana, Wise and Salaam Litig.*, 991

F. Supp. 2d 464, 470 (S.D.N.Y. 2013) ("Defendants point to no particular interview or outtake that

would provide the evidence they seek.  Instead, Defendants only make general claims that the

outtakes are likely to contain relevant material").

The government's need arguments are also factually flawed.  With respect to the documents seized from the Project Veritas journalists, the DOJ investigative team supposedly has no knowledge of the contents, so the government's claim that these materials have "anticipated . . . evidentiary value" cannot possibly be credited.  The mere circumstance that the documents may fall within the scope of a fatally broad search warrant does not imbue those documents with evidentiary value.  The PV Warrants authorized the wholesale seizure from Meads, Cochran and O'Keefe of "any and all cellphones, tablets, computers, and electronic storage media within the Subject Premises," and the retention of, *inter alia*, "evidence sufficient to establish the user(s) of the Subject Devices at time relevant."  *See* Mot. at Exhibits A-C.  In other words, ***any*** email or other document that evidenced the use of any given device by the Project Veritas journalists is technically "responsive" to the PV Warrants.  So, for example, one of the documents designated "responsive" is a September 27, 2020 invitation to a 27th birthday party for Mr. Cochran.  Even the most active prosecutorial imagination would be hard pressed to conjure up the evidentiary value of Mr. Cochran's birthday.

Petitioners urge the Court to review *in camera* the approximately three hundred (300) images and recordings that the Special Master has found preliminarily to be responsive to the PV Warrants.  The review can be completed in a very short time, as nearly all of the images are snapshots of texts, or brief recordings.  We believe the Court will readily conclude that ***none*** of the images provide direct or circumstantial evidence that Project Veritas journalists actually participated in the alleged theft of the Ashley Biden diary and other belongings.  Indeed, the images do not even provide evidence that the diary and belongings were stolen ***by anyone***.  For these reasons, the government's argument that return of the PV Warrant materials will "impair" its investigation clearly fails.

As questionable as the government's "impairment" argument is regarding the PV Warrants materials, the representation that the investigation will be impaired by return of the Microsoft Warrants materials is, in a word, preposterous.  When Petitioners filed their Rule 41(g) motion, they had just recently learned of the secret execution of the Microsoft Warrants.  At that time Petitioners could only estimate that the government had seized "nearly two hundred thousand Project Veritas emails and numerous other files."  Mot. at 2.  Petitioners have now obtained and analyzed copies of the seized materials received from Microsoft.  We can now advise the Court that *84% of the seized documents fall outside the relevant time period*, and *75% pre-date the initial contact by the confidential source*s who offered the Ashley Biden diary to Project Veritas.

Specifically, (1) the government seized a total of 199,816 unique (i.e., non-duplicate) documents from Microsoft; (2) 149,901 of those items are dated prior to September 3, 2020, the date (as the government well knows) Project Veritas was first approached by a confidential source about the Ashley Biden diary; and (3) 18,392 of the seized items post-date November 8, 2020, the date (as the government well knows) Project Veritas caused the Biden diary and other belongings to be delivered to the Delray Police Department. Affidavit, **Ex. B** hereto. It is reckless in the extreme for the government to represent that returning to Petitioners the 84% of the documents seized from Microsoft that are obviously beyond any relevant time parameters will "impair" the government's investigation.   There should be consequences for this kind of prosecutorial impertinence.

Obviously, the government cannot be taken at its word about the supposed evidentiary value of the documents seized from Microsoft.  Nor is it appropriate in the context of a Rule 41(g) motion to accept the government's representations.  *See Mora*, 955 F.2d at 158 ("no authority for the proposition that a district judge must rely on a representation, made by the government . . . .

Instead, in making a determination a trial court must rely on the evidence before it").  To make feasible an *in camera* inspection of the Microsoft Warrant documents (which number nearly 200,000), we respectfully request that the Court direct the government to submit the "wheat"— any documents showing actual participation of Petitioners in a purported theft of the Ashley Biden diary or other property.  We are confident that the government will be unable to produce any such documents, as none exist; *in camera* examination of the remaining "chaff" is unnecessary.

The government's oblique reference to the "character" of the seized materials, Opp. at 8, actually makes Petitioners' point.  It is the newsgathering "character" of the materials seized from the Project Veritas journalists and their providers that distinguishes this property from any of the non-privileged personal effects at issue in the cases cited by the government.  *See* Opp. at 8-9.  In some of those cases the property was the subject of a criminal or civil forfeiture claim.  *See $16,072.00 in U.S. Currency*, 374 F. Supp. 3d 205; *Acosta v. United States*, Case No. 12-MISC-793 (ARR), 2013 WL 2444172 (E.D.N.Y. June 5, 2013); *United States v. Huggins*, Case No. 13-CR-155 (SHS) (SN), 2013 WL 1728269 (S.D.N.Y. Mar. 22, 2013).[18]  Other cases involved pending indictments where the property at issue was alleged to be contraband, proceeds of criminal activity, or other direct evidence of the charged offense to be presented at trial.  *See United States v. King*, Case No. 21-CR-255 (NSR), 2022 WL 875383 (S.D.N.Y. Mar. 24, 2022); *United States*

---

[18] In *Huggins* the Court also found that the claimant had failed to establish either an ownership or possessory interest in the subject property, diamonds seized from a safety deposit box owned by an individual indicted for operating a Ponzi scheme.  The diamonds were the subject of a forfeiture count in the indictment.  2013 WL 1728269 at *2.  It is mystifying that the government believes that this decision deserves to be prominently featured in its brief.  *See* Opp. at 10.  To the extent that the government thought *Huggins* was a platform for making the "Chicken Little" argument that return of the documents to Project Veritas "potentially could lead to the loss of evidence," Opp. at 10, that argument conflicts with Rule 41(g).  *See id.* ("the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings").

*v. Williams*, 181 F. Supp. 2d 267, 301 (S.D.N.Y. 2001); *Podlog v. United States*, Case No. S2 92-CR-374 (JFK), 1996 WL 403029 (S.D.N.Y. July 18, 1996).  Indeed, in one case, the government represented that it was prepared to return the property at the conclusion of the post-trial appeal.  *See Kee v. United States*, Case No. 01-CV-1657 (DLC), 2001 WL 897175, at *1 (S.D.N.Y. Aug. 9, 2001).  ***None*** of the cases cited by the government concerned hundreds of thousands of documents, much less newsgathering materials protected by the First Amendment and Reporter's Privilege.  In short, the government's authority simply does not support its position that vague claims of "need" and an ongoing investigation justify retention of seized materials that are the subject of a Rule 41(g) motion.

## VII.    The Government's Fourth Amendment Analysis Is Superficial and Lacks Support of Any Relevant Case Authority.

The government dedicates most of its brief to arguing, at a very high level of generality, that the Warrants were supported by probable cause, sufficiently particular and narrow, reasonably executed and, in all events, are insulated from challenge so long as no charges are filed.  Opp. at 10-20.  Predictably, the cases cited in support of these arguments uniformly concern the execution of warrants to seize evidence of drug offenses, possession of child porn, armed robbery, murder, and the like.  And the decisions cited for the premise that Petitioners' Motion is "premature" concerned pre-indictment motions to suppress, not motions for return of property.[19]  For these and the numerous additional reasons discussed below, the government's Fourth Amendment arguments fail.

---

[19] *See* Opp. at 10 (*citing* 2021 WL 2188150 at *3) and *Doane v. United States,* Case No. 08-MAG-17 (HBP), 2009 WL 1619642, at *9 (S.D.N.Y. June 5, 2009).

A.     The Government's Probable Cause Arguments Are Flawed and
       <u>Rely on Sealed Affidavits in Violation of the Fairness Doctrine.</u>

The government insists that the probable cause threshold is "relatively low."  Opp. at 11.

Yet even the cases the government cites highlight the irreducible minimum requirement that there

be probable cause to believe "evidence of a *crime* will be found in a particular place."  *United*

*States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (emphasis added).  The government's brief ignores

altogether the fundamental flaw in the government's applications and resulting probable cause

determinations, addressed at length in Petitioners' Motion, that the prosecutors and agents obtained

warrants to search for what they knew, or with the exercise of diligence should have known, was

a ***non-crime***.  Mot. at 20-25; *see also id.* at 25 ("It follows that the government procured the

Microsoft Warrants and the PV Warrants on the basis of applications presenting probable cause to

believe that a ***non-crime*** had occurred").

The government claims it is constrained from discussing the existence *vel non* of probable

cause "in light of the non-public information contained in the affidavits submitted in support of

the search warrants at issue."  Opp. at 12.  But this demurrer is simply a dodge.  The government

refers to the content of the affidavits as "non-public" but conspicuously does not argue that the

contents are Rule 6(e) material, nor could it.  *See infra* at 28-29.  In any event there is nothing to

prevent the government from discussing the information it obtained from the computers and cell

phones seized from Project Veritas' confidential sources less than two weeks before the PV

Warrants were obtained—which by no measure can be deemed Rule 6(e) material—and whether

the government advised Magistrate Judge Cave of the exculpatory character of that information.

The government wants it both ways.  It attacks the detailed recitation of facts in Petitioner's

Motion as "equal parts rhetoric, speculation, and inaccurate factual assertions," Opp. at 1, but then

points to its "non-public" affidavits rather than openly disputing or contradicting any particular

fact.  *See also id.* at 3 n.3 ("Petitioners' facts are "false or inaccurate" as shown by the sealed affidavits); *id.* at 6 (Petitioners' facts are "incomplete, and inaccurate").[20]  The government also argues that Petitioners "must show the affidavit[s] contained false statements or omissions," Opp. at 13, at the same time it insists that there has been "no change in circumstances" that justifies the Court's revisiting its decision not to allow defense counsel access to the sealed affidavits.  Opp. at 12 n.8.

These are quintessential examples of the prohibited shield-and-sword tactic that triggers application of the fairness doctrine.  *See, e.g. In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) ("a party cannot. . . affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party").  Now that the government has invoked its sealed affidavits to denigrate Project Veritas' factual assertions, and relies on the sealed affidavits and related probable cause determinations to attempt to meet the reasonableness test of Rule 41(g), the fairness doctrine requires that the affidavits be unsealed.[21]

Finally, there are substantial reasons to question the accuracy and completeness of the information supplied to the various magistrate judges by the FBI affiant(s), *see* Mot. at 26-35, concerns that are only enhanced by the government's evasive opposition brief.  For example, with respect to the Microsoft Warrants (the first of which was sought just weeks after the government was approached by Ashley Biden's counsel), the government could not have made "a clear and

---

[20] This is but the latest chapter in the lengthy history of the government using its sealed affidavits as a sword.  *See* [Dkt. No. 29] at 3 ("Petitioners' facts are "either false or misleading and are directly contradicted by the evidence described in the sworn affidavits"); [Dkt. No. 65] at 4 (Petitioners' factual allegations are "baseless" as shown in the sealed affidavits); April 13, 2022 Gov't Memo at 17 ("evidence described in [sealed] affidavits [shows] substantial evidence demonstrating probable cause").

[21] As the recent filing by the American Civil Liberties Union points out, see [Dkt. No. 75], there have been considerable changes in circumstances since December 2021 when Magistrate Judge Cave denied the request to unseal the PV Warrants affidavits.

specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *United States v. Burke*, 700 F.2d 70, 76-77 (2d Cir. 1983).  Having interviewed Ashley Biden, the FBI knew that she had possession or control of her diary and belongings until mid-2020 when she moved out of a temporary Florida residence and left these belongings behind.  The FBI also knew that Biden ***never filed a police report*** claiming that her belongings were stolen.  And the FBI knew that Project Veritas (through an undercover journalist) did not contact Biden until October 2020.  So it is highly doubtful, to say the least, that when applying for the Microsoft Warrants the FBI could have shown by a ***fair probability*** that (1) the Biden belongings were stolen, not abandoned; (2) Project Veritas had actually participated in any alleged theft; or even (3) how or when Project Veritas acquired possession of the Biden diary.  Put another way, instead of making the required "clear and specific showing" that a crime was committed, who committed it, and that "highly material and relevant [evidence], necessary or critical to the maintenance of the claim, and not obtainable from other available sources" was located in the files of Project Veritas, *Burke*, 700 F2d at 76-77, the government procured the Microsoft Warrants in the hope of discovering any of this occurred.

There is no better evidence of the government's plan to rummage through Project Veritas files than that the Microsoft Warrants allowed for the seizure of 149,901 Project Veritas documents pre-dating the time that it first learned of the existence of the Ashley Biden diary.  The government continues to defend the probable cause determination that evidence of a crime could be found in Project Veritas emails sent or received during the period January-August 2020.  Opp. at 14-15

(probable cause was "well-supported by the facts articulated in the affidavits submitted in support of those warrants").  But that, of course, is impossible.[22]

As for the PV Warrants, the FBI knew or should have known from its examination of the Microsoft Warrant materials, and the computers and cellphones seized from Project Veritas' confidential sources, when and how it acquired the Biden diary.  Either the government: (1) knew and did not inform Magistrate Judge Cave that Project Veritas did not actually participate in the theft of the Ashley Biden diary and belongings; (2) misled the Magistrate Judge by advancing theories of secondary criminal liability rejected in *Bartnicki* and cases applying it, (3) failed to reveal that the DOJ's own regulations forbid the seizure of newsgathering materials;  (4) persuaded the Magistrate Judge, as it unsuccessfully argued in opposing the appointment of a Special Master, [Dkt. No. 29] at 9, that "Project Veritas is not engaged in journalism;" or (5) all of the above.

These facts and many others regarding the government's conduct outlined by Petitioners, Mot. at 26-35, militate for an adversarial hearing during which the government must, in the sunlight under informed judicial scrutiny as opposed to lurking in the shadows, address these concerns regarding the veracity of the information it provided to Judge Cave when seeking her probable cause determinations.

---

[22] Equally dubious is the government's claim that it may retain these obviously irrelevant emails because it has "determined [they] contain material responsive to the warrants." Opp. at 8.  The government deems a document "responsive" without regard to content solely because it falls within the (overly broad) date range in the warrant.  That position is unsupported by any of the government's cases and runs afoul of the more exacting standards established by the Supreme Court for warrants to seize materials potentially protected by the First Amendment.  *See infra* at 29-30.

B.      The Government Relies on the Wrong Fourth Amendment Standards
        to Defend the Particularity and Breadth of the Warrants.

The government's recital of the law supposedly governing the particularity requirement of the Fourth Amendment, and the related prohibition against overly broad searches, highlights the flaws and shortcomings in the Warrants.  According to the government's description of the case law, it is just fine if a warrant contains "some ambiguity," is "broad," contains only an "illustrative" list or "examples" of items to be seized, permits seizure of "all emails from an account" or "all electronic devices," and for significant categories of documents is "not date-limited" (which, the government says, "is standard practice in this District").  Opp. at 13-16.  These seem like questionable standards for evaluating adherence to the Fourth Amendment even in the run-of-mill drug, porn, violent-crime and fraud cases represented by the government's decisional authority. But these close-enough-for-horseshoes criteria are certainly not the appropriate measure for searches of materials that may be protected by the First Amendment.

The Supreme Court has clearly and forcefully commanded that

> [w[here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with *scrupulous exactitude*.  A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material.  Hence, in *Stanford v. Texas* [379 U.S. 476 (1965)], the Court invalidated a warrant authorizing the search of a private home for all books, records, and other materials relating to the Communist Party, on the ground that whether or not the warrant would have been sufficient in other contexts, it authorized the searchers to rummage among and make judgments about books and papers and was the functional equivalent of a general warrant, one of the principal targets of the Fourth Amendment. Where presumptively protected materials are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field . . . . [C]ourts [must] apply the warrant requirements with *particular exactitude* when First Amendment interests would be endangered by the search.

29

*Zurcher v. Stanford Daily,* 436 U.S. 547, 564-65 (1978) (emphasis added); *see also id.* at 566 ("Nor if the requirements of specificity and reasonableness are properly applied, policed, and observed, will there be any occasion or opportunity for officers to rummage at large in newspaper files or to intrude into or to deter normal editorial and publication decisions").

    *Zurcher* followed other Supreme Court cases recognizing that the Constitution imposes exacting requirements for search warrants used to seize materials arguably protected by the First Amendment, far more demanding than for seizure of contraband or ordinary instrumentalities of crime.  *See, e.g., Marcus v. Search Warrant*, 367 U.S. 717, 731 (1961) ("use of these warrants implicates questions whether the procedures leading to their issuance and surrounding their execution were adequate to avoid suppression of constitutionally protected publications"); *Quantity of Books v. Kansas*, 378 U.S. 205 (1964) ("It is no answer to say that obscene books are contraband, and that, consequently, the standards governing searches and seizures of allegedly obscene books should not differ from those applied with respect to narcotics, gambling paraphernalia and other contraband"); *Roaden v. Kentucky*, 413 U.S. 496, 504 (1973) (seizure of material arguably protected by the First Amendment "is plainly a form of prior restraint [and] calls for a higher hurdle in the evaluation of reasonableness").

    The government's brief fails to acknowledge this controlling precedent and even boasts that much less "exactitude" is required by magistrate judges in this District.  Opp. at 13-16.  That is apparently true inasmuch as the text of the PV Warrants, *see* Mot. at Exs. B, C, E, and the Microsoft Warrants, [Dkt. No. 64] at Ex. A, lacks any exactitude at all, much less the "scrupulous exactitude" required by *Zurcher*.  Instead, as the government admits, the Warrants allowed the seizure of the electronic equivalent of "all, books, records, and other materials," Opp. at 15-16 ("each and every email"), the very kind of search invalidated in *Stanford v. Texas*.  The government

likewise admits that the FBI agents were free to rummage at large in the electronic equivalent of newspaper files, unconstrained by time limitation or search terms, because "it has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has been issued." Opp. at 15.  Indeed, time limitations are meaningless to the government as evidenced by its remarkable claim that it was appropriate to seize email from Microsoft going back *8 months* before Project Veritas even learned of the existence of the Ashley Biden diary. Opp. at 15 (arguing that "the Second Circuit has never addressed when, if at all, time frames are a constitutional requirement in business record search warrants").[23]

The failure of the government (and several magistrate judges) to adhere to the more exacting Fourth Amendment requirements applicable to search warrants for First Amendment-protected materials—a deficiency that is patent on the face of the Warrants— requires an adversarial hearing at which the government must explain what specific information was supplied to the magistrate judges as to both probable cause and the particular evidence to be seized.  *See* Rule 41(g) ("The court must receive evidence on any factual issue necessary to decide the motion").  An adversarial hearing is especially appropriate given the substantial questions that exist regarding the accuracy and completeness of the information provided by the affiant(s) to procure the Warrants.  *See supra* at 26-27.

---

[23] This statement is yet one more example of the government misstating the applicable law. The case cited to support this remarkable time-limits-do-not-matter argument, *United States v. Cohan*, 628 F. Supp. 2d 355, 367 (E.D.N.Y. 2009), involved a motion to suppress and the application of the good faith exception to the exclusionary rule recognized in *United States v. Leon*, 468 U.S. 897 (1984).  But judicially-imposed restrictions on the scope of the exclusionary rule—itself a judicially-created remedy—are not applicable to orders for return of property which derive their authority from the Federal Rules of Criminal Procedure and their enabling legislation.  Indeed, caselaw cited by the government recognizes that the *Leon* good faith exception is not applicable to Rule 41(g) motions.  *See, e.g., In the Matter of Search of Kitty's East*, 905 F.2d 1367, 1372 (10th Cir. 1990).

C.    The FBI's Execution of the Warrants Was Unreasonable.

We have shown above, and in Petitioner's Motion, that the Warrants were unsupported by probable cause, insufficiently particular, and otherwise failed to meet the Supreme Court's "scrupulous exactitude" standard for warrants directed at materials protected by the First Amendment.  The execution of these unlawful warrants was also unreasonable.

Regarding the Microsoft Warrant materials, the government does not even pretend to have employed procedures to protect First Amendment interests in reviewing the nearly two hundred (200) thousand emails and items seized.  Indeed, as noted above, the government claims that **all** these materials have been "reviewed by the Government and . . . determined to contain material responsive to the search warrants."  Opp. at 8.  Either the Microsoft Warrants are fatally overbroad and allowed a prohibited general search, or this representation is false.  Either circumstance provides a solid basis for an adversarial hearing at the very least, if not a summary order that the seized materials be returned to Project Veritas.

Regarding the PV Warrants, the government's brief does not deny the premises, advanced in Petitioner's Motion, that the FBI had the capability via CART technicians or otherwise to determine at the time of warrant execution whether a given electronic device was operable, if it was last accessed during the warrant period, and could be imaged onsite.  Mot. at 37-38.  Instead, the government asserts that it was reasonable for the FBI to seize every single electronic device from three residences because the PV Warrants allowed them to do so.  Opp. at 18.   This is not correct.  The PV Warrants authorized the agents to take possession of and review all devices found within the premises.  *See, e.g.* Mot., Ex. B.  But nowhere do the PV Warrants authorize the government to take devices offsite that are ***capable of*** being reviewed onsite.

This is not a hyper-technical or academic point.  As demonstrated in Petitioner's Motion, of the forty-seven (47) devices seized by the FBI, responsive materials were found on only six (6).

Mot. at 11.  The CART unit found that fifteen (15) of the seized devices are non-functional or otherwise could not be accessed. *See* May 4, 2022, Sobelman Letter to Special Master (**Ex. C**, hereto) at 4.  And the CART unit was able to rule out sixteen (16) of the other devices as containing no data within the temporal limits of the PV Warrants.  *Id.*

The government seeks to plant its flag on "reasonableness" ground by averring that it "returned the devices that have been determined by the FBI not to contain any data within the time period of the search warrants or by the Special Master not to contain any data responsive to the search warrants."  Opp. at 2.  Once again, the government tells only part of the story.  ***First***, it was not until mid-April, weeks after Petitioners' Motion was filed, that the government returned thirteen (13) devices seized from Meads and twenty-three (23) devices seized from Cochran.  This was more than two months after the FBI determined that many of these devices were inoperable or contained no responsive data, *see* Mot. at Ex. F, and more than a month after the Special Master reported that there was no responsive data on ten (10) more of the devices.  [Dkt. No. 61] at 2.  ***Second***, in the absence of a sworn declaration to the contrary, there is substantial reason to believe that the FBI CART unit has retained copies of ***all*** data extracted from the operable devices seized from the Project Veritas journalists, including data determined to be non-responsive, that was downloaded to the CART on archive drive, storage area network, or other server.  *See* Opp. at 9 (acknowledging that the prosecutors "direct[ed] the FBI to forensically image the devices").

The government crows about returning thirty-six (36) seized devices, but this is simply theater.  Its brief is silent about whether the data from any of those devices has been retained, all of which was non-responsive and unrelated to the government's abandoned diary investigation. The government's brief at the very least implies that all imaged data has been retained.  Opp. at 18 (citing Rule 41(f)(1)(B) provision allowing the seizing officer, at the time he/she is preparing the

inventory, to retain a copy of any ESI that was received). But that provision does not (and could not) authorize the government to retain documents or information determined to be non-responsive, especially when a Rule 41(g) motion has been filed. *See, e.g., Andresen v. Maryland*, 427 U.S. 463, 482 n. 11 (1976) ("to the extent such papers were not within the scope of the warrants or were otherwise improperly seized, the State was correct in returning them voluntarily"); *United States v. Ganias*, 824 F.3d 199, 218-19 (2d Cir. 2016) (Rule 41(g) is the appropriate mechanism for aggrieved party to obtain return of forensically imaged data that is non-responsive to a warrant); *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1179 (9th Cir. 2010) (*en banc*) (Kozinski, J., concurring) ("[o]nce the data has been segregated . . . any remaining copies should be destroyed or . . .  returned"); *United States v. Tamura*, 694 F.2d 591, 596-97 (9th Cir. 1982) ("[w]e likewise doubt whether the Government's refusal to return the seized documents not described in the warrant was proper").[24]

Finally, the government struggles to rationalize the conduct of FBI agents during the execution of the PV Warrants who took thirty-one (31) photographs and made three (3) recordings of information on the cellphones of O'Keefe and Meads, then forwarded those items to the prosecutors and other members of the investigative team. Mot. at 8-10. The government half-heartedly notes that the PV Warrants did not contain a "dictate" prohibiting screenshots. Opp. at 20. But the government's brief does not even attempt to justify the immediate circulation of this potentially privileged information to the investigative team, notwithstanding the admonition in the

---

[24] The government seems to suggest that Rule 41(g) permits it to retain a copy of property that must be returned to an aggrieved party. Opp. at 17 n.9. But neither the Rule's text nor the First Amendment permit such a result. Rather, any non-responsive or other unlawfully seized property, including all duplicates or images, must be returned to Project Veritas. To the extent that the government has any potential investigatory interest in the property, Rule 41(g) provides a mechanism to protect that interest. *Id.* (the Court "may impose reasonable conditions to protect access to the property and its use in later proceedings").

PV Warrants that procedures be employed "to protect any attorney client *or other applicable privilege*. See Mot. at Ex. E.  The conduct of the FBI agents, and the prosecutors' refusal to acknowledge its implications, evidence a total lack of regard for First Amendment interests.

**VIII.  The Government's Dismissive Treatment of Petitioners' Arguments Regarding Violations of the PPA and DOJ Regulations Is Not a Substantive Response, and Those Arguments Are Therefore Conceded.**

The government's argument that PPA violations may not be litigated, Opp. at 22, misreads the statute and ignores the commands of Rule 41(g).  Although the PPA provides that a violation of the ***guidelines*** to be promulgated by the Attorney General may not be asserted as grounds for "the suppression or exclusion of evidence," *see* 42 U.S.C. § 2000aa-12, the statute does not similarly preclude litigation based on violations of the ***PPA itself***.  Petitioners' Motion demonstrated that the government's execution of the Warrants violated the PPA. *See* Mot. at 16-19.  The DOJ's own interpretation of the PPA "suspect" exception is aligned with Petitioners' position.  *See* 28 C.F.R. § 50.10(d)(4) (the Attorney General is authorized to approve application for a news media search warrant pursuant to the "suspect exception" of the PPA only "when the member of the news media is a subject or target of a criminal investigation for conduct not based on, or within the scope of, newsgathering activities." (emphasis added).  The government has declined to address those arguments, and therefore has conceded them. *See supra* at 8-9.

In addition to the government's decision to ignore these arguments, additional facts have been revealed further demonstrating that the government did not obtain the requisite approvals. As discussed *supra*, the FBI opened this investigation the same day Ashley Biden's lawyer threatened to send the matter "to SDNY."  The first of its secret subpoenas to journalists' providers issued only 24 days later – not enough time to obtain approval from the highest reaches of DOJ.

In short, we fully understand why the government's brief avoids any substantive discussion of the PPA and the DOJ regulations.  But those choices have consequences.  The violations are conceded.

### IX.   The Government Has Failed to Address Petitioners' Showing that the Warrants Were Executed Independent of Any Grand Jury Investigation and Therefore Has Conceded the Point.

Petitioners' Motion set forth substantial grounds for concluding that there has never been an actual grand jury investigation of Project Veritas.  Mot. at 43-46.  Citing *United States v. Eastern Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir. 1991), Petitioners demonstrated that the Warrants were "based on the government's investigations independent of [any] investigations by the grand jury and . . . did not reflect matters that had occurred before the grand jury."

The government's brief takes a "the-less-said-about-that-matter-the-better" approach to this consequential issue.  While inserting the words "grand jury" before "investigation" throughout its brief, the government attempts to deflect the issue by derisively observing that it has "previously corrected [Petitioners'] baseless assertion that this matter is not, or at some point was not, a valid grand jury investigation."  Gov't Opp. at 7 ("citing" Letter, Dkt. No. 68).  But as pointed out in Petitioners' Motion, *id.* at 45, this "correction" merely recited that "[s]ince the inception of the Government's investigation, it has been *assigned* to a duly empaneled grand jury sitting in the Southern District of New York." (*quoting* Dkt. No. 68 at 2) (emphasis added).  The government has not even attempted to address substantively Petitioners' argument that the Warrants were obtained and executed independent of an "assigned" grand jury:

> That there may have been a record entry made somewhere "assigning" the investigation being conducted by prosecutors and agents to a grand jury, again, begs the actual question.  A grand jury did not seize, or cause the seizure, of Project Veritas emails from Microsoft—the prosecutors and agents did.  A grand jury did not seize, or cause the seizure, of privileged and personal property from the Project Veritas journalists—the prosecutors and agents did.  There was an "assigned" grand jury for the government investigation at issue in *Eastern Air Lines* that actually

> returned charges, but that assignment did not render the search warrant executed in that investigation by the FBI a "matter occurring before the grand jury."  923 F.2d at 244 ("the government's investigations [was] independent of the investigations by the grand jury").

Mot. at 45.  Even more remarkable is the absence of any mention in the government's brief of the controlling *Eastern Airlines* decision.  This briefing lacuna unquestionably warrants application of the black-letter rule that arguments not addressed are conceded.

## CONCLUSION

This is a landmark case of government overreach, made even more egregious by its direct assault on the First Amendment.  It is beyond any serious dispute that this investigation is viewpoint-based and was sparked by complaints from the Biden family.  Right out of the gate, the prosecutors sought to denigrate Project Veritas' reporting as "political spying," misrepresenting to this Court that "Project Veritas is not engaged in journalism."  Yet an FBI whistleblower has come forward to reveal that the DOJ's own records described the investigation as "sensitive" ***exactly because*** Project Veritas is a member of the "news media."

Fortunately, line prosecutors and FBI case agents do not get to decide who is entitled to free speech rights and other protections guaranteed by the First Amendment. Petitioners' Motion demonstrates that the government's seizures violated both the First and Fourth Amendment, as well as the PPA and related DOJ regulations, and that all of the seized materials (including images and copies) should be returned to Project Veritas.  The government cannot be permitted to confiscate newsgathering materials and to maintain secret files on American journalists.  Unless interdicted, the government's unlawful seizures will be a steppingstone to eroding the First Amendment and undermining a free press. The Court should grant the Petition.

Respectfully submitted,

CALLI LAW, LLC

/s/

By: _____

Paul A. Calli
Charles P. Short
14 NE 1st Avenue
Suite 1100
Miami, FL 33132
T. 786-504-0911
F. 786-504-0912
pcalli@calli-law.com
cshort@calli-law.com

*Admitted Pro Hac Vice*

Harlan Protass
PROTASS LAW PLLC
260 Madison Avenue
22nd Floor
New York, NY 10016
T. 212-455-0335
F. 646-607-0760
hprotass@protasslaw.com

Benjamin Bar
BARR & KLEIN PLLC
444 N. Michigan Avenue
Suite 1200
Chicago, IL 60611
T. 202-595-4671
ben@barrklein.com

*Admitted Pro Hac Vice*

Stephen R. Klein
BARR & KLEIN PLLC
1629 K Street, NW
Suite 300
Washington, DC 20006
T. 202-804-6676
steve@barrklein.com

*Admitted Pro Hac Vice*

*Counsel for James O'Keefe,*
*Project Veritas and Project*
*Veritas Action Fund*

cc:     All Counsel of Record (via ECF)