**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Search Warrant Executed on November 5, 2021 | Case No.: 21 Misc. 813 (AT) |
| In re Search Warrant Executed on November 3, 2021 | Case No.: 21 Misc. 819 (AT) |
| In re Search Warrant Executed on November 3, 2021 | Case No.: 21 Misc. 825 (AT) |

**REPORT AND RECOMMENDATION**
**OF SPECIAL MASTER**

By Order of Appointment, dated December 8, 2021 (the "Order"), the Court appointed me as Special Master in the above captioned matters to review materials seized by the Government. The Court also set forth the process for the review: first, I review the materials for responsiveness and send responsive materials to the Government's filter team; second, the filter team reviews the materials and determines if any materials should be withheld; and third, the Petitioners review materials designated by the filter team for release to the investigative team and raise objections to me.[1]

As explained in more detail below, the first two steps in the process are complete, and we are now at the third step. I reviewed the documents for responsiveness, and the filter team reviewed the responsive documents for privilege. The filter team identified documents as potentially protected by the attorney-client privilege, and the remaining items were slated for release to the investigative team. Petitioners then reviewed the documents and raised their objections to me. For every document that was conceded by Petitioners to be responsive to the

---

[1] "Petitioners" refers to Project Veritas, James O'Keefe, Spencer Meads, and Eric Cochran.

search warrants, Petitioners objected to their release on First Amendment and related grounds.

Petitioners also objected to certain documents on responsiveness and attorney-client privilege

grounds.[2]

I respectfully recommend that the Court adopt the below rulings with respect to these

documents.

## I.    Background

On November 4 and 6, 2021, the Federal Bureau of Investigation executed search warrants

at the residences of three individuals affiliated with Project Veritas.  The warrants were authorized

by a federal magistrate judge, who found probable cause to believe that the premises and devices

contained evidence of federal crimes, including conspiracy to transport stolen property across state

lines, interstate transportation of stolen property, and possession of stolen goods.

In public filings to the Court, Petitioners, through counsel, made the following

representations:

1.  In September 2020, sources identified as R.K. and A.H. contacted Project Veritas to
    report that they found a diary authored by Ashley Biden.  Motion to Appoint Special
    Master 3, ECF No. 1 ("S.M. Mot.").  According to the sources, Biden left the diary and
    other belongings behind when she moved out of a house in Delray Beach, Florida, that
    one of the sources subsequently occupied.  Petition for Return of Property 4, ECF No.
    70 ("Property Pet.").

2.  The sources described and sent images of information from the diary and offered to
    bring the diary and other belongings to New York.  R.K. and A.H. requested payment
    from Project Veritas for the diary; their lawyers and Project Veritas' lawyers negotiated
    an agreement for the diary to be delivered to Project Veritas.  S.M. Mot. 3, ECF No. 1.
    The sources then traveled to New York and gave the diary and other materials to Project
    Veritas.  Property Pet. 4, ECF No. 70.

3.  Project Veritas worked to authenticate the diary and engaged a handwriting expert; it
    began producing a video news story.  *Id.*

4.  Project Veritas reached a Biden acquaintance who conferenced a person who identified
    herself as Biden.  Biden stated that the belongings were hers and asked that they be
    delivered to a friend in Delray Beach.  *Id.*

---

[2] Some of the claimed attorney-client documents were identified by the filter team; others were not.

5. Project Veritas believed that the diary was authored by Biden and worked to finalize the news story about the diary and continued to analyze the contents of the diary. *Id.* at 5.

6. Petitioner O'Keefe decided against publishing the story. *Id.* The email explaining his decision was printed in full in a filing with the Court. Petitioners' Letter Reply 13, ECF No. 38 ("PV Letter").

7. Another news website ran a story about Biden's brother which renewed Project Veritas' efforts to investigate the diary. Property Pet. 5, ECF No. 70.

8. Project Veritas was contacted by a lawyer for Biden. Project Veritas offered to return the property to Biden if she agreed to view it personally and confirm her ownership; Biden's lawyer refused. *Id.* at 5–6.

9. Project Veritas learned that another news organization had received a copy of the diary and the other news organization was concerned it was not authentic. Mr. O'Keefe again decided not to publish the story. *Id.* at 6.

10. Shortly thereafter, a blog published the diary; it attributed its source as a "whistleblower at another media organization that chose not to publish the diary." *Id.*

11. In early November 2020, Project Veritas arranged for the delivery of the diary and other belongings to the Delray Beach, FL police department. *Id.* at 7.

The Government, for its part, has been more circumspect in its public statements to the Court regarding the relevant factual background and its investigation. It characterized Project Veritas' assertions as "either false or misleading and . . . directly contradicted by the evidence described in the sworn affidavits that were submitted to the federal magistrate judge in support of the search warrants." Government's Memorandum of Law in Opposition to Motions for Appointment of a Special Master 3, ECF No. 29.

On August 25, 2022, Robert Kurlander and Aimee Harris pled guilty to one count of conspiracy to commit interstate transportation of stolen property in violation of 18 U.S.C. § 371. *See U.S. v. Harris, et al.*, No. 22-cr-457 (S.D.N.Y. Aug. 25, 2022). At her plea, Harris stated the following:

> In September 2020, I found property, including a journal, belonging
> to another person in a place where I was living. Knowing that I did
> not have a right to take the property, I agreed with another person
> and did cause a journal to be transported from Florida to New York
> City. The value of the journal was more than $5,000. I know this
> because I did not directly receive the money for the journal; the
> organization that purchased it sent two payments of $10,000 each
> for my benefit to lawyers that were representing me in a child
> custody matter. I sincerely apologize for my actions and know that
> what I did was wrong [and] illegal.

Tr. of Plea Proceeding 20, *U.S. v. Harris, et al.*, No. 22-cr-457 (S.D.N.Y. Aug. 25, 2022), ECF

No. 12. Harris also stated that she knew the journal was going to be transported across state lines

and that she traveled with a person who transported the stolen property across state lines. *Id.* at

20–21. She confirmed that she did not have a right to the journal. *Id.* at 20.

At Kurlander's plea, he stated:

> In and around September 2020, I agreed with others to assist and
> facilitate the transportation of property that did not belong to us. . . .
> I learned that these items were stolen from a residence in Florida
> and knew that they would be transported across state lines, from
> Florida to New York City. . . . Although I did not personally find
> and/or steal these items from the residence, I learned that they were
> wrongfully obtained. I know and understand what I was doing was
> wrong and unlawful, and I apologize.

Tr. of Plea Proceeding 21–22, *U.S. v. Harris, et al.*, No. 22-cr-457 (S.D.N.Y. Aug. 25, 2022), ECF

No. 14. Kurlander also confirmed that the value of the items was over $5,000. *Id.* at 22. According

to the Government's press release after Kurlander's plea, Kurlander has agreed to cooperate with

the Government.

## II.    <u>Special Master Review Process</u>

In accordance with the Court's Order, I reviewed documents on every device that contained

accessible content. I determined that 1,021 documents were responsive to the search warrants. I

provided those determinations to the filter team, who then reviewed the documents for any

applicable privileges.  The filter team identified 17 documents as potentially protected by the attorney-client privilege; it did not find that any other privileges protected the documents.

With respect to the documents that I identified as responsive, Petitioners primarily object on the bases of: (1) First Amendment and related grounds; (2) responsiveness grounds; and (3) attorney-client privilege.  Because the First Amendment and related objections impact nearly every document subject to release, I invited briefing on the applicable standard.  I also invited briefing on the crime fraud exception to the attorney-client privilege with respect to a small set of documents.  Below, I set forth the legal principles applicable to these objections and individual rulings on the documents.

## III.      Ruling on First Amendment and Related Objections

Petitioners object to the release of documents on the grounds that they are protected by the First Amendment, Federal Common Law Reporter's Privilege, Privacy Protection Act, and 28 C.F.R. § 50.10 and the Justice Manual 9-13.400.  In their briefing, they propose a six-factor framework that incorporates these legal concepts.  The Government counters that the materials are not protected under the qualified evidentiary privilege for information gathered in a journalistic investigation and even if these documents were protected, Petitioners have waived their right to assert privilege due to their extensive comments to the Court and to the public.

### A.      Standard of Review for Journalistic Privilege Challenges

The Second Circuit has "long recognized a qualified evidentiary privilege for information gathered in a journalistic investigation."  *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011).  This privilege "is intended to protect the public's interest in being informed by a vigorous, aggressive, and independent press by limiting the circumstances in which litigants may obtain access to press files through court-ordered discovery."  *Id.* at 306–07 (internal quotation marks and citation omitted).  This privilege, however, is not absolute.  *See id.* at 307.  It may yield to

other important interests.  *See New York Times v. Gonzales*, 459 F.3d 160, 169 (2d Cir. 2006) ("in particular circumstances 'compelling public interests' might require that the privilege be overcome").  The contours of this privilege and when it is overcome depend on whether the information sought to be protected is confidential or nonconfidential.[3]

The protection accorded by the privilege, "although not absolute, is at its highest when the information sought to be protected was acquired by the journalist through a promise of confidentiality."  *Chevron*, 629 F.3d at 307.  This is because "[f]orcing the press to breach a promise of confidentiality threatens its ability in the future to perform its public function by impairing its ability to acquire information for publication."  *Id.*  To overcome the privilege, there must be a "clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of a claim, and not obtainable from other available sources."  *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982); *see also N.Y. Times*, 459 F.3d at 169–170.

Nonconfidential materials are also protected by the qualified privilege, but "where the protection of confidential sources is not involved, the nature of the press interest protected by the privilege is narrower."  *Gonzales v. Nat'l Broadcasting Co., Inc.*, 194 F.3d 29, 36 (2d Cir. 1999). When the protection of confidentiality is "not at stake, the privilege should be more easily overcome" and "the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought."  *Id.*  For nonconfidential materials, the privilege is overcome upon a showing that "the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources."  *Id.*

---

[3] It is the burden of the person who claims the privilege to show entitlement to it.  *See Chevron*, 629 F.3d at 309.  In the context of this review, the Government does not dispute the Petitioners' entitlement to invoke the journalist's privilege.  Once the privilege is invoked, it is the burden of the party seeking disclosure to demonstrate that the privilege has been overcome.  *See Gonzales v. Nat'l Broadcasting Co., Inc.*, 194 F.3d 29, 36 (2d Cir. 1999).

\*       \*       \*

In light of the foregoing, Petitioners' ambitious six-part framework is unnecessary.  The Second Circuit has established the parameters of the qualified evidentiary privilege for journalists, and I must apply the Second Circuit's standard here.  Nonetheless, I write briefly on several elements of Petitioners' proposed standard in order to explain why Petitioners have not established any reason to modify the Second Circuit standard.

First, Petitioners' heavy reliance on *Bartnicki v. Vopper*, 532 U.S. 514 (2001), is misplaced. *Bartnicki* addressed the narrow question of whether civil liability may be imposed on a publisher who obtained information in a lawful manner but from a source who obtained it unlawfully, a question that the Supreme Court answered in the negative.  *See id.* at 528, 533–35.  Here, the question is whether the Government may receive documents responsive to valid search warrants. *Bartnicki* does not speak to this issue, nor does it provide general principles applicable to my review.

Petitioners repeatedly argue that they are like the publisher in *Bartnicki* and that their actions fall "within *Bartnicki*'s protection."  James O'Keefe and Project Veritas's Brief on First Amendment and Journalistic Privileges 19, Apr. 1, 2022 ("PV Br.").  Petitioners argue that *Bartnicki* renders the crimes under investigation here—including interstate transportation of stolen property and possession of stolen goods—"non-crimes."[4]  *Id*.  But *Bartnicki* addresses liability for *publication* of unlawfully obtained information (there, by a source) and does not "protect" unlawful acquisition of information.  It does not suggest that people are free to commit unlawful acts simply because they are journalists.  In fact, *Bartnicki* explicitly left open the question whether

---

[4] To the extent Petitioners assert "no credible claim that Project Veritas reporters stole the diary or anything else," PV Br. 19, the crimes listed in the search warrant include conspiracy to transport stolen property across state lines, interstate transportation of stolen property, and possession of stolen goods.

the government may punish not only a publisher's "unlawful acquisition" of information but "the ensuing publication as well."  532 U.S. at 528 (addressing only punishment of publication of materials obtained by a publisher lawfully but by a source unlawfully).  *Bartnicki* certainly does not foreclose a government investigation of unlawful acts in acquiring material or excuse unlawful conduct by a journalist.  *See also Branzburg v. Hayes*, 408 U.S. 665, 691 (1972) ("It would be frivolous to assert . . . that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws.").[5]  Nor does *Bartnicki*'s holding restrict the evidence that the Government may receive under the standards set forth above.

Second, Petitioners suggest that I should apply strict scrutiny here because of alleged bad faith by the Government.  PV Br. 11–12, 18.  Petitioners' argument is rooted in Justice Powell's concurrence in *Branzburg*, in which he stated: "[i]f a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy."  408 U.S. at 710.  But Petitioners fail to cite the language that follows, in which Justice Powell wrote that reporters may move to quash a subpoena if the information sought has "only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationship without a legitimate need of law enforcement."  *Id.*  Here, the *Petroleum Products*/*Gonzales* standard ensures that the materials turned over to the Government are far from "remote and tenuous."  Moreover, the materials were seized pursuant to judicially authorized warrants, which demonstrates that the Government has established probable cause that the offenses under investigation were committed and that the seized devices contained

---

[5] Even if *Bartnicki* was applicable to this review, that decision was made based on a factual record that clearly established the publisher had nothing to do with the wrongdoing and received the materials in a lawful manner. Petitioners' roles are currently under investigation.

evidence of that criminal conduct. I see no basis, either under the law or on these facts, to apply a stricter standard than the one set forth above.[6]

Third, and in a similar vein, I will not apply a heightened standard of scrutiny to the warrants because of Fourth Amendment concerns. The Petitioners posit that "the intersection of the First and the Fourth Amendments here require an exacting inquiry and a heightened burden of proof." PV Br. 22. Petitioners argue that the Government should be compelled to demonstrate compliance with the scope of the search warrants and DOJ regulations before they can receive documents. This invocation of the Fourth Amendment is premature. *See In re Search Warrants Executed on Apr. 28, 2021*, No. 21-MC-425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021) ("any pre-indictment suppression motion would be premature at this juncture"). My role is to adjudicate privilege, not to pass on the propriety of the warrants, and there is no legal basis for incorporating a Fourth Amendment analysis into the privilege review.!

Finally, I note that the concerns animating the qualified journalist's privilege are not concerns here. Very often, courts worry about reporters being targeted by abusive grand jury subpoenas, *e.g., Branzburg*, 408 U.S. at 709–10, or reporters becoming an "investigative arm of the judicial system, the government, or private parties." *Gonzales*, 194 F.3d at 35. Here, the materials were seized pursuant to a search warrant, which required judicial approval. And the Government is not only seeking these materials to investigate Petitioners' sources; the Government is investigating the conduct of the Petitioners as well.[7] This is not a situation where the

---

[6] There is no basis to declare a First Amendment interest that affords additional protection here. The Second Circuit has repeatedly declined to "wade into these constitutional waters" absent a convincing reason, *U.S. v. Treacy*, 639 F.3d 32, 43 (2d Cir. 2011), and such a reason has yet to be found. Given the judicially authorized search warrants, the government's interest in investigating criminal conduct, and the strict procedure for avoiding intrusion into non-responsive materials, no such reason exists here.

[7] Petitioners argue that they were mere recipients of information that, if stolen, would have been "petty theft under Florida law at worst." PV Br. 21. They argue they were engaging in ordinary newsgathering and are being targeted for their potential reporting on the daughter of the current president. Of course, those very facts are the subject of the Government's investigation.

Government is deputizing Petitioners to do its investigative work for it; the Government is investigating Petitioners.  Under these circumstances, there is no reason to depart from the Second Circuit's standard and apply any additional scrutiny or balancing measures.

      **B.**     **Confidential, Nonconfidential, and Documents Not Subject to the Privilege**

When evaluating individual documents in this review, the applicable privilege standard depends on whether the documents are confidential, nonconfidential, or not subject to the privilege at all.  In most of the cases analyzing the privilege, there is only one type of information sought— phone records in *N.Y. Times*, for example—and the applicable standard is clear.  Here, the search warrants authorize the seizure of documents that fall into different categories.  For that reason, I note the types of materials that courts have found to be confidential, non-confidential, and not subject to the privilege.

Confidential materials include information "acquired by the journalist through a promise of confidentiality," *Chevron*, 629 F.3d at 307, and documents that may reveal the identity of confidential sources.  *See N.Y. Times*, 459 F.3d at 168.  Nonconfidential materials are those "where the protection of confidential sources is not involved" and "confidentiality is not at stake." *Gonzales*, 194 F.3d at 36.  The following materials have been deemed nonconfidential: unedited and unaired video footage, or "outtakes," *see id.*, reporters' notes and film outtakes, *see U.S. v. Cuthbertson*, 630 F.2d 139 (1980), journalist resource materials that were provided without an expectation of privacy, *see Shoen v. Shoen*, 5 F.3d 1289 (9th Cir. 1993), and dates and methods journalists learned certain information.  *See Goldberg v. Amgen, Inc.*, 123 F. Supp. 3d 9 (D.D.C. 2015).

Finally, not every document in a reporter's possession is material subject to the qualified journalist's privilege.  The information must be "gathered in a journalistic investigation" for the privilege to apply.  *Chevron*, 629 F.3d at 306.

C.      Waiver

       1.      "At Issue" Waiver

The Government argues that Petitioners waived their right to assert the journalist privilege

due to their extensive representations regarding their sources, investigation, and publishing

decisions, both in and out of court.   The Government's waiver argument is premised on the

"fairness doctrine" which "prevent[s] prejudice to a party and distortion of the judicial process that

may be caused by the privilege-holder's selective disclosure during litigation of otherwise

privileged information."  *Schiller v. City of New York*, 245 F.R.D. 112, 120 (S.D.N.Y. 2007).  The

Government argues that Petitioners' motion for the return of property made "strategic . . . partial

disclosures" in order to "persuade the Court, the Special Master, and apparently the public that

because they were following 'common journalistic practices,' their actions were subject to a First

Amendment 'safe-harbor'[.]"   Government's Memorandum of Law in Response to Petitioners'

Briefs Dated April 1, 2022, at 8, Apr. 13, 2022 ("Gov. Br.").  In sum, the Government argues that

by putting these events "at issue," and making partial disclosures, Petitioners waived any privilege

over the documents underlying these events.

       In response, the Petitioners first argue: (1) the Government's position would call for the

waiver of the privilege after the publication of any story; and (2) the Government's position would

render the recitation of facts in a legal complaint a waiver of "any attorney-client or work product

privilege for communications or analysis involving such facts."   James O'Keefe's and Project

Veritas's Reply Brief on First Amendment and Journalistic Privileges 9, Apr. 20, 2022 ("PV Reply

Br.").   Petitioners' first argument is a straw man; the Government does not argue, nor does any

court suggest, that the publication of a news story operates to waive the qualified journalist's

privilege.  Petitioners' second argument is similarly overstated.  The Government's position does

not stand for the proposition that reciting non-privileged facts in a complaint or other legal filing

serves as a waiver of attorney-client communications about those facts.  It does, however, correctly stand for the proposition that if those facts reveal privileged content, or put "at issue" a privileged communication, the privilege may be waived.  *See generally Electro Sci. Indus. v. Gen. Scanning, Inc.*, 175 F.R.D. 539, 543 (N.D. Cal. 1997) ("Waiver analysis focuses on the disclosure of the content of specific *communications* between counsel and client—and a pleading would not effect a waiver unless the pleading disclosed specific lawyer-client communications, even if the substance of the pleading tracked what a lawyer had confidentially advised the client.").

This is a unique procedural posture for an "at issue" waiver argument.  The Government is correct that Petitioners have made several public disclosures to the Court about the very same content that they seek to protect in the review process.  But in a typical "at issue" case, the party seeking the purportedly waived information needs the underlying documents to test the disputed privilege-related claim or defense of the other party.  Here, the Government primarily seeks these documents to investigate criminal activity, though it is possible that some of the documents could be used to rebut arguments made in Petitioners' filings with the Court.

The Government raises a serious waiver argument.  Petitioners' highly specific disclosures are incongruous with the privilege.  I will consider the waiver arguments with respect to each category of documents at issue here.  But as discussed below, if the documents are not protected by the journalist's privilege, I will not reach the waiver issue.

2.     Third Party Disclosure

A related and more basic question is whether privileged content has been disclosed to third parties.  *See, e.g., In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987) ("Matters actually disclosed in public lose their privileged status because they obviously are no longer confidential.  The cat is let out of the bag, so to speak."); *Curto v. Medical World Commc'ns, Inc.*, 783 F. Supp. 2d 373, 378 (E.D.N.Y. 2011) ("It is well-settled that voluntary disclosure of privileged communications to

a third party results in waiver of the attorney-client privilege.") (internal quotation marks omitted). Petitioners appear to agree that Second Circuit case law holds that "when privileged *content* is disclosed in whole or in part, such disclosure waives the privilege."  PV Reply Br. 9 (emphasis in original).  Though publication of a story would not operate as a disclosure, the revelation of other privileged information in court or in public would.  Petitioners suggest that their disclosures came from a variety of sources and that they did not "identify the source of the recited facts except where derived from records available from public or government sources," *id.*, but this is belied by the filings in this case.[8]  Petitioners' independent recitation of otherwise privileged information that only they or their sources would know is incompatible with a claim of privilege.  As with the "at issue" waiver above, I will assess third party waiver on a category-by-category basis, and I may not need to reach the issue.

> **D.  Decisions on Documents[9]**

> >  1.  Communications with Sources and Communications that Identify Sources.

In a typical case, communications between reporters and confidential sources (and reporters' communications that name sources) would be considered confidential materials, and the standard for evaluating their disclosure would be the most exacting.  In this case, however, the identity of the sources is known to the Government, and Kurlander is cooperating with the Government.  The Government has obtained the sources' electronic devices.  Property Pet. 7, ECF No. 70.  Indeed, when Petitioners argue that the Government has not met the *Petroleum Products* test, they argue that the materials are already available to the Government because the Government

---

[8] To the extent Petitioners themselves made public statements about the facts of the case that they now claim are the basis for these representations to the Court, that would have no effect on the waiver analysis.

[9] I am mindful that in a typical special master review process, there may be concern about discussing types of documents under review, even if the content of the documents is not disclosed.  Here, there is no such concern as Petitioners have admitted that these kinds of communications exist in their filings and public statements, and Harris and Kurlander have admitted their conduct at their guilty pleas.

is in possession of the sources' electronic devices.  Petitioners also verified the sources' identities in their filings by including their initials and personal identifying information, as well as the general content of their communications.

The Government argues that in this atypical case, these materials are nonconfidential, and I agree.  Though the Second Circuit has not addressed a similar factual scenario, other courts have offered useful guidance.  In *U.S. v. Criden*, the Third Circuit explained that though it need not reach the issue, "we will venture the view that [the party seeking disclosure] probably should be required to prove less to obtain the reporter's version of a conversation already voluntarily disclosed by the self-confessed source than to obtain the identity of the source itself."  633 F.2d 346, 358 (3d Cir. 1980).  At least one court in the Third Circuit has followed that guidance.  *See In re Grand Jury Empaneled Feb. 5, 1999*, 99 F. Supp. 2d 496, 499 (D.N.J. 2000) ("[T]he government is required to prove less to obtain the information where, as here, the reporter's version of the conversation was already voluntarily disclosed by the self-confessed source.").

Under these circumstances, the *Gonzales* test for nonconfidential materials applies, and it is easily met here.  These materials are relevant to the crimes under investigation, and they are not reasonably available from other sources.   Petitioners advance the argument that their communications with the sources are available from Harris and Kurlander and therefore, this aspect of the test is not met with respect to those documents.  Though Harris and Kurlander may have provided their communications with Petitioners to the Government, it is unclear whether they provided all of the communications at issue here.  To the extent they provided some of these communications, it would be strange to withhold all of the communications because some might be duplicative of those already in the Government's possession.  Moreover, the documents here

contain metadata associated with Petitioners' devices that may be important to the Government's investigation.

I note that even under the more exacting standard of *Petroleum Products*, the journalist's privilege would be overcome.  These documents are the most relevant to the essential elements of the crimes under investigation, necessary to the Government's investigation, and not reasonably available from other sources.

Because I find that the documents are not protected by the qualified journalist's privilege, I do not reach the waiver issue with respect to these documents.

        2.     <u>Internal Project Veritas Documents about the Biden Property and Potential Story</u>

The next category of documents broadly includes internal Project Veritas documents about the Biden materials and the potential story.  These documents do not implicate confidential sources.  Some of these documents reflect analysis of the Biden materials and others are more ministerial.  Because these documents do not implicate confidential sources, the *Gonzales* test for nonconfidential materials applies, and it is satisfied here.  These materials are relevant to the crimes under investigation, and they are not reasonably available from other sources.

        3.     <u>External Communications During Investigation of Potential Story</u>

The next category of documents includes communications with third parties during the investigation into the Biden materials and the potential story.  Again, these materials do not implicate confidential sources. *See Gonzales*, 194 F.3d at 36 ("[B]ecause the outtakes were not materials obtained by [news organization] in confidence, the *Petroleum Products* test is not applicable.").  The *Gonzales* test is satisfied with respect to these materials.

4.      <u>Communications Regarding the Decision Not to Publish</u>

This category of documents includes documents relating to the decision not to publish the Biden story.  As an initial matter, these documents do not appear to be within the ambit of the qualified journalist's privilege.  *See generally Guzman v. News Corp.*, 877 F. Supp. 2d 74 (S.D.N.Y. 2012) (editors' discussions regarding publication of cartoon and decision to redact photo not protected by an "editorial privilege," and news organization failed to show that the journalist's privilege is broad enough to include the editorial process).  Even if they are, however, these materials are nonconfidential, and the *Gonzales* test is met with respect to these documents.[10]

5.      <u>Communications Regarding Blog's Publication of Biden's Diary</u>

This category of documents relates to the publication of Biden's diary on a blog called "National File."  These documents are not "information gathered in a journalistic investigation." *Chevron*, 629 F.3d at 306.  Rather, they are documents related to a rival's publication of the story and the identity of the blog's "whistleblower."  Property Pet. 6, ECF No. 70.  These documents are not subject to the qualified journalist's privilege.

6.      <u>Communications Regarding the Deposit of the Biden Property with Law
Enforcement</u>

This category of documents relates to Project Veritas' deposit of the Biden materials with law enforcement in Delray Beach, Florida.  Again, these documents are not "information gathered in a journalistic investigation."  *Chevron*, 629 F.3d at 306.  Rather they are documents related to disposal of the Biden materials, after Project Veritas decided not to publish the story and after the National File published its story.  These documents are not subject to the qualified journalist's privilege.

---

[10] Though I need not reach the Government's waiver argument in light of these findings, any protection over these documents would be waived by the Petitioners' decision to print in full Petitioner O'Keefe's statement regarding the decision not to publish.  PV Letter 13, ECF No. 38.

7.    Communications that Post-Date the Deposit of Biden Property

This category of documents encompasses all documents that are responsive to the search warrant, but post-date Project Veritas' work on the potential story, the decision not to publish, and the deposit of the Biden materials with law enforcement.  They are not information gathered in a journalistic investigation and are not subject to the qualified journalist's privilege.

8.    Miscellaneous Administrative Documents

Finally, documents that are ministerial administrative documents are not information gathered in a journalistic investigation and are not subject to the qualified journalist's privilege.

IV.    **Ruling on Attorney-Client Privilege Objections**

There is a small number of documents over which Petitioners claim attorney-client privilege.  During my review, I made two evaluations with respect to these documents: was the document itself in fact attorney-client privileged, and if so, was the privilege vitiated by the crime fraud exception to the attorney-client privilege.  I invited the parties to make submissions on crime fraud with respect to 14 documents.

A.    **Attorney-Client Privilege**

The attorney-client privilege protects "confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance."  *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007).  The privilege is construed narrowly "because it renders relevant information undiscoverable; [it is applied] only where necessary to achieve its purpose." *Id.*  As the party invoking the privilege, Petitioners bear the burden of establishing its applicability.  *See id.*  Therefore, Petitioners must show "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Id.* at 419.

For several documents in the review, the third element—made for the purpose of obtaining or providing legal advice—was not shown.  The question was "whether the communication was generated for the purpose of obtaining or providing legal advice as opposed to business advice." *Id*.  In the documents where attorney-client privilege was not found, the communications were business communications (here, the business of journalism) that merely included a lawyer, or they were business communications where the lawyer was acting in a journalistic role, not an attorney role.  These documents are indicated on the attached chart as "not privileged; does not contain legal advice."

### B.       Crime Fraud Exception to the Attorney-Client Privilege

Communications that otherwise would be protected by the attorney-client privilege (or the work product privilege) are not protected "if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct."  *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984).  The party invoking the exception, here the government, "bears the burden of proving facts that show probable cause to believe that a crime or fraud has been committed and that the communication in issue was in furtherance of that conduct."  *A.I.A. Holdings, S.A. v Lehman Brothers, Inc.*, No. 97-CV-4978 (LMM) (HBP), 1999 WL 61442, at *4 (S.D.N.Y. Feb. 3, 1999).  The communications "may be in furtherance of a crime or fraud even if the attorney is unaware of the client's ill intent."  *U.S. v. Ceglia*, No. 12-CR-876 (VSB), 2015 Wl 1499194, at *3 (S.D.N.Y. Mar. 30, 2015).

Based on the materials submitted to me, including the search warrant affidavits, the government's correspondence to me, and the guilty pleas of Harris and Kurlander, I find that the government has satisfied its burden of proving facts that show probable cause to believe that crimes

or frauds have been committed.[11]   The Petitioners again posit that *Bartnicki* affords a protection that renders the alleged conduct non-criminal.  That reasoning fails for the same reasons set forth above.

With respect to the 14 documents that I evaluated for the crime fraud exception, the government has, with respect to 10 documents, satisfied its burden of showing that the communications in issue were in furtherance of the crimes or fraud.  As to the remaining documents, I found two are privileged or partially privileged, and two are not privileged because they are not for the purpose of obtaining or providing legal advice.[12]   In making these determinations, I am mindful that the "burden is not satisfied by a showing that the material in question might provide evidence of a crime or fraud.  Rather the communication itself must have been in furtherance of a fraud or crime and must have been intended to facilitate the fraud or crime."  *In re Omnicom Grp. Inc. Sec. Litig.*, 233 F.R.D. 400, 404–05 (S.D.N.Y. 2006) (internal quotation marks and citation omitted).

## V.    <u>Ruling on Responsiveness Objections</u>

I identified 61 documents during the first round of my review that Petitioners argued were not responsive and I agreed.  Those documents appear on the below list as "Not Responsive."

---

[11] Those crimes are conspiracy to transport stolen property across state lines and conspiracy to possess stolen goods, interstate transportation of stolen property, possession of stolen goods, aiding and abetting, accessory after the fact, and misprision of a felony.

[12] One additional document not provided to the parties for supplemental briefing, 1B45_18084, is also subject to the crime-fraud exception and is similar in subject matter to the documents for which I sought supplemental briefing.

## VI.    <u>Conclusion</u>

I respectfully submit this Report and Recommendation for the Court's consideration.  I set forth my decisions on individual documents in the lists appended to this Report and Recommendation.  I have reached my decision on these documents based on the principles noted above.

Dated: New York, New York
      March 21, 2023

                            **HON. BARBARA S. JONES (Ret.)**

DM-#8264864