**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Search Warrant Dated November 5, 2021 | Case No.: 21 Misc. 813 (AT) |
| In re Search Warrant Dated November 3, 2021 | Case No.: 21 Misc. 819 (AT) |
| In re Search Warrant Dated November 3, 2021 | Case No.: 21 Misc. 825 (AT) |

**PETITIONERS' OBJECTIONS TO REPORT AND RECOMMENDATIONS OF SPECIAL MASTER—PUBLIC PORTION**

BARR & KLEIN PLLC
Benjamin Barr (admitted *pro hac vice*)
444 N. Michigan Ave., Ste. 1200
Chicago, IL 60611
202-595-4671
ben@barrklein.com

Stephen R. Klein (admitted *pro hac vice*)
1629 K Street NW Ste. 300
Washington, D.C. 2006
202-804-6676
steve@barrklein.com

*Counsel for Project Veritas and*
  *James O'Keefe*

GRAVES GARRETT LLC
Edward D. Greim
Todd P. Graves (admitted *pro hac vice*)
Graves Garrett, L.L.C.
1100 Main Street St. 2700
Kansas City, MO 64105
(816) 256-4144
edgreim@gravesgarrett.com

SCHAERR | JAFFE LLP
Erik S. Jaffe
1717 K Street NW, St. 900
Washington, DC 20006
(202) 787-1060
ejaffe@schaerr-jaffe.com

*Counsel for Project Veritas*

Jeffrey H. Lichtman
Law Offices of Jeffrey Lichtman
11 E. 44th St., Suite 5011
New York, New York 10017
212-581-1001
jl@jeffreylichtman.com

Marc A. Fernich
Law Office of Marc Fernich
800 Third Avenue, Suite 18
New York, New York 10022
212-446-2346
maf@fernichlaw.com


*Counsel for James O'Keefe*


THE DICKERSON LAW GROUP, P.A.
Brian E. Dickerson
6846 Trail Boulevard
Naples, FL 34108
202-570-0248
bdickerson@dickerson-law.com

Eric Franz
The Law Offices of Eric Franz, PLLC
One Old Country Road, Suite 347
Carle Place, New York 11514
212-355-2200
eric@efranzlaw.com

*Counsel for Spencer Meads*

GREENBERG TRAURIG LLP
Adam S. Hoffinger
Steven Harrison
2101 L Street N.W., Suite 1000
Washington, D.C., 20037
202-331-3173
hofferinga@gtlaw.com

*Counsel for Eric Cochran*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................... 1

FACTUAL BACKGROUND ...................................................................... 4

    A.  Project Veritas' Receipt of Newsworthy Information from Confidential
        Sources. ................................................................................ 4

    B.  The Government's Investigation and Seizures. ............................. 6

        1.  *The Microsoft Warrants* ......................................................... 6

        2.  *The Warrants to Seize Materials from Journalists' Residences.* .......... 7

        3.  *Protocol to Protect Privileged Materials Seized from Project Veritas.* ..... 9

ARGUMENT ............................................................................................. 10

    I.    The Report Erred in Concluding That There Is "No Basis to Declare
        a First Amendment Interest" in the Protection of Project Veritas'
        Newsgathering. ...................................................................... 10

        A.  First Principles ................................................................... 10

        B.  *Bartnicki* Requires Strict Relevancy Determinations. .................. 14

            1.  *Compelled Disclosure of High-Value First Amendment*
               *Information Should Have Triggered Strict Scrutiny* ................... 15

            2.  *The Report's Arguments for Distinguishing* Bartnicki *Are*
               *Unavailing.* ...................................................................... 17

        C.  Even If *Bartnicki* Were Not Controlling, the Report Errs In Failing
           to Conduct a First Amendment Analysis. .................................. 20

    II.   The Report Misapplied Journalistic Privilege ................................. 23

        A.  The Common Law Journalistic Privilege Protects Project Veritas
           and its Journalists. ............................................................... 24

        B.  The Report's Constricted Understanding of "Confidential" Materials
           and Newsgathering Would Eviscerate the Journalistic Privilege ....... 26

            1.  *Sources and Communications Are "Confidential" if they Were*
               *Gathered Under an Understanding of Confidentiality* ................ 26

2. *The Report Errantly Creates a New Exception to the Common Law Rule* ..............................................................................27

3. *Materials that discuss information obtained from confidential sources should also be treated as confidential.* ..............................30

C. The Report Errantly Applies the Tests Applicable to Nonconfidential and Confidential Documents ..............................................32

    1. *Likely Relevance to a Significant Issue or Critical to the Case* .......33

      a. The Report fails to discuss or identify "likely relevance" or specific issues. ..............................................................33

      b. It was error to rely on the search warrants as a proxy for meeting the common law "relevance" standard when the warrants were unlawful under the Privacy Protection Act. ..........................35

      c. Relying on secret warrants as an advance adjudication of the journalistic privilege is fundamentally unfair and defeats the purpose of the privilege. ..............................................37

    2. *Not Reasonably Obtainable, or Unobtainable* ...........................38

D. The Government's Waiver Argument is Misplaced .........................39

E. Conclusion ..................................................................41

III. The Special Master Erred in Applying the Crime-Fraud Exception. ........41

A. The Report Contains No Analysis of the Necessary Elements of the Crime-Fraud Exception to the Attorney-Client Privilege. ..............42

    1. *The Finding That a Crime was Committed by Someone at Some Unspecified Time Is Insufficient.* ......................................43

    2. *The Report Effectively Ignores the "In Furtherance" Element.* .......45

B. The Government Has Not Met Its Burden of Proving Either Element of the Crime-Fraud Exception to the Attorney-Client Privilege. ..............................................................47

    1. *The Government Has Not Proven a Post-Advice Crime/Fraud* .......47

    2. *The Government Has Not Satisfied the "In Furtherance" Element.* 51

IV.   The Special Master Erred in Resolving Certain of Petitioners'
      Attorney-Client Privilege Objections.................................................54

CONCLUSION.................................................................................................57

## INTRODUCTION

Project Veritas and its journalists (the Petitioners) are being targeted by a multiyear criminal investigation—a massive deployment of federal resources that includes surveillance of their journalism through the secret seizure of thousands of internal emails, raids on their homes, and seizure of their personal devices—because they dared to gather news about the future President of the United States through his daughter's diary. According to the Government, Petitioners' newsgathering—receipt and possession of newsworthy material—is a serious crime.

This Court appointed the Special Master after Petitioners argued that such search warrants likely violated federal law (the Privacy Protection Act, 42 U.S.C. §2000aa), and that at the very least, implicated Petitioners' First Amendment rights under *Bartnicki v. Vopper*, 532 U.S. 514 (2001), and a constellation of other authority, as well as Petitioners' journalistic and attorney-client privileges. Now, a year later, the Special Master concludes that her appointment was largely unnecessary. Her Report agrees with the Government that its searches provide "no basis" to so much as consider the First Amendment. Similarly, the policies undergirding the strong common law journalistic privilege, built by the Second Circuit and district courts in this worldwide hub of journalism, are "not concerns." Nor are most of Petitioners' contacts with counsel found deserving of protection. Hurdling all three objections in just 15 pages of analysis, the Report would release nearly all of the more than 1,000 documents comprising Petitioners' newsgathering materials and attorney-client communications. As shown below, the Report is deeply flawed. It is simply unreliable as a guide to the materials, as an explicator of the facts, or as an interpreter of the law.

First, the Report fundamentally errs by treating the issuance of untested warrants as virtually dispositive of the First Amendment and all other objections. It refuses to consider that the seizures might be subject to First Amendment scrutiny because Petitioners' newsgathering is protected activity under *Bartnicki*, related authority, and their progeny. *Bartnicki* holds that the

1

transmittal of newsworthy information (there, tapes of illegally-recorded phone calls) is itself speech (*id*. at 527) and that even where journalists know their source illegally obtained the information, the journalists cannot be punished where they themselves did not participate in that crime. *Id*. at 535.

*Bartnicki* cannot be ignored where the Government's factual allegations already implicate it. In prosecuting individuals alleged to be Petitioners' sources, the Government acknowledged that those sources had complete possession and control of the Biden diary and materials ***before*** contacting Project Veritas. Notwithstanding this admission and the clear holding of *Bartnicki* to the contrary, the Government contends—and the Report appears to agree— that Project Veritas' newsgathering receipt and possession of the "stolen" materials in in the course of newsgathering is ***itself*** the crime against which such massive resources have been committed. Rather than grappling with how the First Amendment applies to an investigation of such newsgathering "crimes," the Report simply presumes that probable cause findings for warrants were fully informed and considered applicable law. But as shown below, this would mean that the First Amendment provides no protection precisely where the risk of injury is greatest, when the Government decides that newsgathering about a powerful political figure (who happens to lead the Executive Branch) is a crime. As the Special Master implicitly found, her review—and even a filter team—is unnecessary if a magistrate-issued warrant conclusively disposes of citizens' First Amendment rights.

This core error—reliance on *ex parte* warrants and undisclosed supporting materials to defeat Petitioners' constitutional rights and privileges—repeats itself across all objections.[1]

---

[1] Petitioners' Sealed Objections to Report and Recommendations ("Petitioners' Sealed Objection"), filed contemporaneously herewith, addresses the privileged content of these communications, document-by-document.

- With respect to the Journalistic Privilege:

  o the Report errantly and with little discussion finds that this investigation presents no concern regarding a free and vigorous press, confidential sources, or newsgathering;

  o the Report misclassifies hundreds of documents as "non-confidential," either because the Government has prosecuted the confidential sources, or on the flawed logic that Project Veritas' internal discussion of information received from the sources for editorial decision-making, somehow transforms confidential information into non-confidential information; and

  o the Report misapplies the controlling tests for confidential and nonconfidential materials, failing to explain how materials are either "critical" to the Government's case or at least "likely relevant" to a specific issue, and failing to explain how the Government's cooperating sources cannot provide the same information.

- With respect to the attorney-client privilege:

  o the Special Master raised the crime-fraud exception *sua sponte*, but even after receiving briefing addressing the issue document-by-document, the Report applied the exception *en grosse* without identifying the predicate ongoing or future crime/fraud supposedly intended by Project Veritas' journalists or explaining how each communication was itself in furtherance of the crime; and

  o the Report classifies numerous communications as the "business of journalism" rather than to obtain or give legal advice, when in fact employees are clearly asking for counsel's legal guidance.

The Report and its supporting spreadsheet disclose little about how and why the Special Master applied its principles to specific documents. Yet it should be unnecessary for this Court to correct each individual mistake. Because the Report's gravest error is a fundamental misreading of the law, this Court can and should apply the protections outlined in the remainder of these Objections to decide that the seized documents should not be released to the Government.

3

## FACTUAL BACKGROUND[2]

A.     **Project Veritas' Receipt of Newsworthy Information
       from Confidential Sources.**

Project Veritas "is a national media organization dedicated to 'undercover investigative journalism.'" *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 817 (1st Cir. 2020). James O'Keefe founded Project Veritas and, until February 2023, served as its President. In 2020, Spencer Meads and Eric Cochran worked for Project Veritas as investigative journalists.

In early September 2020, confidential sources contacted Project Veritas to report that they had a diary authored by Ashley Biden, the daughter of presidential candidate Joe Biden. According to the sources, Biden left the diary and other items behind when she vacated a house in Florida in June 2020 that one of the sources now occupied. The sources sent images of entries in the diary suggesting that the author had been sexually abused by her father. The sources also reported that they had documents and other materials left behind by Biden that would enable Project Veritas to confirm she was the author of the diary. Approximately a week after the initial contact, two of the sources traveled to New York and gave the diary and other items to Project Veritas. Later in September, the sources gave additional materials left behind by Ashley Biden to a Project Veritas journalist in Florida.

The government has alleged that one of these sources had complete possession and control of the Biden property in or about June 2020 and that both sources made various attempts to sell the property to others before approaching Project Veritas. *See* Criminal Information, No. 1:22-cr-00457-LTS, Doc. No. 2 ("Criminal Information") at ¶¶ 1, 4, 6-7.

---

[2] The following facts are derived from government pleadings, materials in the government's possession (including materials seized from Microsoft and Project Veritas sources) and witnesses that have provided information to the government, including Ashley Biden, her attorney, and associates.

Over the course of the next month, Project Veritas worked to authenticate the diary and its contents and began producing a news story regarding Biden's allegations about her father. Project Veritas undercover journalists attempted to contact Biden by reaching out to her known acquaintances. In early October 2020, a Biden acquaintance called a Project Veritas undercover journalist and conferenced in a person identifying herself as Ashley Biden who stated that the diary and other items were hers and should be delivered to a friend. Shortly thereafter the Project Veritas undercover journalist received a call from the Biden campaign inquiring about the diary.

Project Veritas viewed these events, along with forensic and other corroborating information, as confirmation that the diary was authored by Ashley Biden. On or about October 12, however, O'Keefe decided against publishing the news story due to concerns that the content of the diary could not be corroborated. Project Veritas turned back to the potential news story when the website Revolver ran a story on Hunter Biden's laptop and information on it that echoed certain allegations made in Ashley Biden's diary. *See Revolver Exclusive: Inside Source Alleges Underage Photos Found On Hunter's Laptop Were of a Member of The Biden Family*, Revolver (Oct. 14, 2020) *available at* https://www.revolver.news/2020/10/hunter-laptop-rudy-giuliani-underage-biden-family-member/. Given these developments and the interest in the diary expressed by the Biden campaign, Project Veritas decided to contact campaign officials and ask to interview Joe Biden about allegations in the diary.

Project Veritas made this request in a letter delivered to the Biden campaign on October 16, 2020. The campaign did not respond, but Project Veritas was soon contacted by a lawyer representing Ashley Biden. At or about the same time, Project Veritas learned that another news organization had obtained what was described as Ashley Biden's diary, injecting uncertainty into the question of the diary's authenticity. O'Keefe again decided against publishing a news story

about the diary. Within a few days, the news blog National File— which is not affiliated with Project Veritas—began publishing excerpts from the diary. *See Patrick Howley, EXCLUSIVE SOURCE: Biden Daughter's Diary Details 'Not Appropriate' Showers with Joe as Child, National File* (Oct. 24, 2020) *available at* https://nationalfile.com/exclusive-source-biden-daughters-diary-details-not-appropriate-showers-with-joe-as-child/.

In view of these developments Project Veritas offered to return the property to Biden if she agreed to personally confirm her ownership. Biden's lawyer, however, refused to confirm ownership of the diary and other items and vowed to send the matter to the United States Attorney's Office for the Southern District of New York. In early November 2020, Project Veritas arranged for the delivery of the diary and belongings to a police department in Florida.

### B.   The Government's Investigation and Seizures.

#### 1.   The Microsoft Warrants

Beginning in November 2020 and continuing for over a year, the government surreptitiously monitored communications of Project Veritas journalists by executing a series of search warrants issued to Microsoft, Project Veritas' email service provider, to seize nearly two hundred thousand (200,000) emails, address and contact files, and other enterprise information of O'Keefe, Meads, Cochran, and other Project Veritas journalists. The government seized email communications of Meads and Cochran extending back to January 2020, *eight months before* the sources approached Project Veritas to offer the Biden diary and related materials. The warrants were not limited to communications about the Biden diary story but rather called for the seizure of *all* emails in the prescribed periods. As a result, the government obtained access to the Project Veritas journalists' sensitive communications with countless confidential sources.

Project Veritas was unaware of this government intrusion until March 2022. At that time Microsoft successfully opposed the government's application to extend the sealing orders for

another year by pointing out that the government's investigation of Project Veritas had been widely publicized. And three months earlier this Court had appointed a Special Master to establish a process to protect "First Amendment concerns, journalistic privileges and attorney-client privileges." *See* December 8, 2021 Order (Docket No. 12) ("December 8 Order"). After the Microsoft warrants were unsealed by Magistrate Judge Netburn, Project Veritas sought clarification to confirm that the unsealing order encompassed warrants and other compulsory process issued to Apple, Google and Uber of which Project Veritas had recently become aware. *See* Case No. 22 MAG 2364 (SN), May 4, 2022 Calli Law Letter.

These materials seized by the government from third-parties are outside the scope of the protocol established in the December 8 Order. The materials, however, are relevant to the critical issue of whether the government has carried its burden of showing need to access the source communications and other journalistic work product seized from Project Veritas.

**2.      *The Warrants to Seize Materials from Journalists' Residences*.**

Nearly a year after Project Veritas decided not to publish its news story and delivered the diary and other Biden materials to local law enforcement, Project Veritas learned that the FBI seized electronic devices from the sources for the story. Within a week, counsel for Project Veritas delivered correspondence to the U.S. Attorney's Office offering to provide information on behalf of Project Veritas. *See* October 27, 2021 Letter from Paul Calli, Esq. (Exhibit A). Over the next few days counsel conveyed detailed information to the responsible prosecutors describing the circumstances of Project Veritas' lawful receipt of the Biden diary.

The proffer provided by Project Veritas' counsel would have caused any reasonable prosecutor to pursue "negotiations with the affected member of the news media," as required by DOJ Regulations, to obtain from Project Veritas additional information about its acquisition of the diary. *See* 28 C.F.R § 50.10(a)(3). At the very least, the prosecutors could have paused any pending

plans to seize information from Project Veritas and/or its journalists while the government reviewed the contents of the electronic devices obtained from the Project Veritas sources to confirm the facts proffered by counsel. Here, the prosecutors did neither.

On November 3, 2021, the government submitted applications for warrants to seize electronic devices from Meads and Cochran. The warrants included an admonishment to the executing agents to "collect evidence in a manner reasonably designed to protect any attorney-client *or other applicable privilege*." *See* Warrants (Exhibits B and C) at 4. The Magistrate Judge further directed the agents "[w]hen appropriate . . . [to] use a designated 'filter team,' separate and apart from the investigative team, in order to address potential privileges." *Id.*

The warrants were executed at the residences of Cochran and Meads on November 4, 2021. The FBI seized twenty-eight (28) devices from Cochran. *See* December 17, 2021 Letter from AUSA Sobelman to Special Master Barbara Jones (Exhibit D) at 2-3. In addition, the agents took at least sixteen (16) photographs of the contents of one of his mobile phones and made three (3) recordings of audio files on that device before the security settings caused the device to lock. *Id.* at 2 n.2. Notwithstanding the directive in the Warrants that a filter team be used to protect privileges, these photographs and recordings were immediately available to the full investigative team who continued to view them until counsel for Cochran moved for the appointment of a Special Master. *Id.* The FBI seized seventeen (17) devices from Meads. *Id.* at 4. The agents even seized a laptop belonging to one of Meads' roommates. *Id.*

The following day the government applied for a warrant to seize electronic devices from James O'Keefe. The nineteen (19) photographs and recordings taken from Cochran's devices the preceding day for viewing by the investigation team contained *no* evidence of wrongdoing by Project Veritas and could not justify the issuance of a warrant to seize property of a *third* Project

Veritas journalist. The warrant for O'Keefe's home contained the same admonishments and directive that appeared in the Meads and Cochran warrants regarding procedures to protect privileges. *See* Warrant (Exhibit E) at 4.

The FBI executed the warrant at O'Keefe's home on November 6, seized two mobile phones, and took fifteen (15) photographs of the contents of one device before it locked. *See* Exhibit D at 1 n.1.  Notwithstanding the directive in the warrant that a filter team be used to protect privilege, these photographs were immediately available to the investigative team who continued to view them until O'Keefe's counsel moved for the appointment of a Special Master. *Id*.

3. ***Protocol to Protect Privileged Materials Seized from Project Veritas.***

Upon application of Project Veritas and its journalists this Court appointed the Honorable Barbara Jones as Special Master to (1) review the contents of the seized devices to determine what material is responsive to the warrants; (2) provide any such responsive material to the DOJ filter team; and (3) rule on objections the Project Veritas journalists raise in regard to the DOJ filter team's proposed release of materials to the investigative team. *See* December 8 Order.

The Special Master reviewed the data submitted by the FBI and located material responsive to the Warrants on just six (6) of the forty-seven (47) seized devices. *See* March 7, 2022 Report (Docket No. 61) at 1-2. The materials included journalists' notes; photographs of information received from sources; texts and recorded calls; other records of newsgathering activities; and editorial communications about whether the Biden diary story should be published. The Special Master delivered that material to the DOJ filter team which found ***none*** of these items deserving of protection under the First Amendment or the Journalistic Privilege. Petitioners submitted to the Special Master detailed objections to the DOJ filter team's determinations, demonstrating the items comprise work product and other documentary material created in the course of newsgathering, and that many of the items are not even responsive to the Warrants. Both the government

investigation team, and its filter team, also submitted briefs to the Special Master disputing that Project Veritas' journalistic materials are entitled to protection.

On March 21, 2023, nearly a year after briefing of the main issues, the Special Master issued a Report and Recommendations ("Report"), consisting of a 20-page discussion and a 65-page spreadsheet describing each document in the potential production. *See* Doc. 118. The Report was amended over the next several days, and on March 25 the parties received the Special Master's proposed redactions to certain documents. As discussed in greater detail below, the Report is flawed in numerous respects. Among other errors, the Report: (1) misinterpreted the holding in *Bartnicki*, and wrongly found "no basis" for considering First Amendment concerns; (2) misapplied the law on the Journalistic Privilege and failed to hold the government to its burdens; (3) determined, without providing required reasoning and contrary to the standards enunciated in the cases cited in the Report, that the crime-fraud exception overrides Project Veritas' attorney-client privilege for certain documents; and (4) mischaracterized numerous communications between Project Veritas and legal counsel as "business" when the content clearly reflects requests for legal guidance, the reporting of relevant factual information, and solicitation by counsel of additional information needed to inform the legal analysis.

## ARGUMENT

**I.  The Report Erred in Concluding That There Is "No Basis to Declare a First Amendment Interest" in the Protection of Project Veritas' Newsgathering.**

### A.  <u>First Principles</u>

The right to investigate and criticize those in power is central to the First Amendment and the foundation of constitutional democracy. *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936). Because of this, every segment of law touching upon fragile First Amendment freedoms must embody respect for the protection of these rights. *NAACP v. Button*, 371 U.S. 415, 433 (1963).

This necessarily requires incorporating substantive First Amendment doctrinal protections into criminal investigations of the free press.

*Bartnicki* establishes the modern bedrock principle that journalists and others can publish illegally acquired information provided: (1) they played no part in the illegal acquisition; (2) they obtained access to the information lawfully; and (3) the information relates to a matter of public concern. 532 U.S. at 525. For *Bartnicki* to have effect, any aspect of a criminal investigation that touches on implicated First Amendment freedoms must be reviewed with a sensitivity toward their protection. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (this is "but a special instance of the larger principle that freedoms of expression must be ringed about with adequate bulwarks"). This is especially so in the area of investigative journalism, where reporters often meet with "information thieves" as a "common journalistic practice[]." *Democratic National Committee v. Russian Federation*, 392 F.Supp.3d 410, 435 (S.D.N.Y. 2019).

Rather than analyzing with sensitivity the First Amendment concerns, the Report entirely dismisses them. The Report treats reliance on *Bartnicki* as "misplaced" and writes off the First Amendment generally, noting that there is absolutely "no basis to declare a First Amendment interest that affords additional protection here" because the Second Circuit has hesitated to "wade into these constitutional waters." Report at  9 n.6. (*citing U.S. v. Treacy*, 649 F.3d 32, 43 (2d Cir. 2011). In fact, even in circumstances where the government is given great leeway, the Second Circuit has determined that it ***must*** evaluate under a strict scrutiny standard the abridgment of First Amendment rights during government searches even where the searches are considered "routine" under the Fourth Amendment. *See, e.g.*, *Tabbaa v. Chertoff*, 509 F.3d 89, 102 n.4 (2d Cir. 2007) (recognizing that "the First Amendment requires a different analysis, applying different legal standards, than distinguishing what is and is not routine in the Fourth Amendment border

context"); *Guan v. Mayorkas*, 530 F.Supp.3d 237, 264 (E.D.N.Y. 2021) ("That the Government conducts a search, thereby implicating Fourth Amendment rights, does not mean that the same search may not also implicate First Amendment rights; it goes without saying that a single government action may violate multiple constitutional rights.").

The Supreme Court's Fourth Amendment precedent long ago counseled that where press liberties confront compulsory legal process, First Amendment concerns should be examined to properly protect First Amendment interests. Justice Powell's concurrence in *Branzburg v. Hayes* instructs that "no harassment of newsmen will be tolerated." 408 U.S. 665, 709-10 (1972) (Powell, J., concurring).[3] It promises that newsmen facing First Amendment intrusions will "not [be] without remedy." *Id.* at 710. Similarly, *Zurcher v. Daily Stanford* notes that materials sought to be seized that are protected by the First Amendment must meet the Fourth Amendment's requirements with "scrupulous exactitude." 436 U.S. 547, 564 (1978). Justice Powell's concurrence further informs that this means that magistrates faced with search warrants for the press should also "take cognizance of the *independent values* protected by the First Amendment." *Id.* at 570 (Powell, J., concurring) (emphasis added). These "independent values" must include liberty interests spelled out in First Amendment jurisprudence. And that includes new articulations of those interests in the 45 years since *Zurcher*.[4]

---

[3] To be clear, the Petitioners expressly preserve: (i) all of their Fourth Amendment-based arguments for suppressing the disputed materials; and (ii) all First Amendment and other arguments that could not be fully and fairly litigated at this stage, where the applications supporting the Government's *ex parte* requests for warrants remain unavailable to Petitioners because the Government successfully opposed Petitioners' requests to unseal them.

[4] Of course, this also implicates First Amendment values existing at the time *Zurcher* was released, such as the requirement that the Warrant Clause should be read more strictly when invoked against "books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments." *Stanford v. Texas*, 379 U.S. 476, 485-86 (1965).

Other Fourth Amendment precedent has recognized the need for more First Amendment-protective procedures where criminal investigations burden speech. One cure for criminal investigations that can chill protected First Amendment conduct is the use of burden-shifting procedures that protect those interests. Henry P. Monaghan, *First Amendment 'Due Process'*, 83 Har. L. Rev. 518 (1970) (quoting *Speiser v. Randall*, 357 U.S. 513, 520 (1958)). After all, the "history of American freedom is, in no small sense, the history of procedure." *Malinski v. New York*, 324 U.S. 401, 414 (1945) (Frankfurter, J.). This heightened sensitivity to procedures that comport with First Amendment doctrine went entirely missing here.

While a judge or a special master may exercise some latitude in deciding how narrowly or broadly to apply a constitutional principle, judicial actors may not ignore precedent. Judges have a duty to apply constitutional principles to difficult new circumstances.[5] A judge's ultimate reference point is the constitutional freedom that is given to their keeping. Celebrated holdings like *Brown v. Board of Ed.*, 347 U.S. 483 (1954); *Miranda v. Arizona*, 384 U.S. 436 (1966); or the Pentagon Papers decision, *New York Times Co. v. United States*, 403 U.S. 713 (1971), would never have emerged had judges shirked their duty to apply constitutional principles to those situations. It is now the task of this Court to ensure that foundational First Amendment liberties are protected during the course of a criminal investigation into journalists examining a story about a candidate campaigning to be elected President.

---

[5] *See, e.g.*, Robert H. Bork, THE TEMPTING OF AMERICA: THE POLITICAL SEDUCTION OF THE LAW 162-63 (1990) (judicial role includes applying constitutional principles to new circumstances); Michael W. McConnell, *On Reading the Constitution*, 73 Cornell L. Rev. 359, 361-62 (1987) (constitutional principles should be applied to new circumstances).

### B. *Bartnicki* Requires Strict Relevancy Determinations.

The Special Master should have analyzed *Bartnicki* as securing its own bundle of substantive rights. Rather than ignoring the constitutional predicates underlying *Bartnicki*, the Report should have recognized its significance as an outright barrier to the seizure of newsgathering materials and, therefore, as requiring that it significantly narrow its relevancy determinations. As explained above, *Bartnicki* protects a journalist's receipt, use and publication of information that was stolen by sources in all circumstances *except* where the journalist "played a part" in the theft. *See* Section I.A., *supra*. These protections establish a baseline rule that the Special Master was obliged to follow—only communications and documents seized from Project Veritas (if any) that evidence its journalists' participation in the theft of information not already in the possession of the sources would fall outside the scope of *Bartnicki*'s protections. In contrast, documents comprising press deliberations, editing, and journalistic operations after Project Veritas received the property from the sources would remain off-limits.

No such First Amendment barriers were recognized by the Special Master. Instead, the Report reasons that because the Government supposedly showed in secret affidavits and other filings that Project Veritas was "involved" in obtaining access to the Biden diary and other items after they were stolen—involvement that, according to the Government, constitutes conspiracy to transport stolen property and to possess stolen goods, interstate transportation of stolen property, possession of stolen goods, accessory after the fact, and misprision of felony, *see* Report at 7-9, 19 & n.11—the Government is entitled to seize *all* of Project Veritas' confidential source communications and newsgathering material. Not only are all of these "crimes" precluded as a matter of law by the very holding of *Bartnicki*, the Report fails to make the predicate finding that the Government has proven the Project Veritas journalists "played a part" in the underlying theft of the Biden diary and other property.

In other contexts, lower courts have followed Supreme Court precedent and built First Amendment protections that should apply to criminal investigations and prosecutions even against low-value, obscene speech. *See, e.g.*, *Heller v. New York*, 413 U.S. 483 (1973); *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989) (explaining that the special protections afforded against search and seizures of First Amendment materials stem from a concern about prior restraint); *Matter of Kitty's East*, 905 F.2d 1367 (10th Cir. 1990).[6] In these matters, courts turn to the protective precedential principles generated in related First Amendment jurisprudence as a source for rules governing criminal searches and seizures. This Court should do the same here, but with reference to *Bartnicki* and high-value, journalistic conduct. Otherwise, it would be difficult to fathom that Petitioners should enjoy less First Amendment protection against government raids than smut peddlers.

### 1. Compelled Disclosure of High-Value First Amendment Information Should Have Triggered Strict Scrutiny

Because the government's investigation implicates concerns at the core of the First Amendment—private political association and confidential news sources and information—strict scrutiny should have been applied. *See, e.g.*, *Americans for Prosperity Foundation v. Bonta*, 141 S.Ct. 2373, 2383 (2021); *accord Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010).

---

[6] *See also Roaden v. Kentucky*, 413 U.S. 496, 503-04 (1973) (describing a "higher hurdle" to determine reasonableness when search warrants touch on First Amendment materials); *A Quantity of Books v. Kansas*, 378 U.S. 205, 212 (1964). The trend is also clear in the context of civil litigation, where courts have developed burden-shifting analyses to protect against overly burdensome compelled disclosure of First Amendment information. *See, e.g.*, *Black Panther Party v. Smith*, 661 F.2d 1243, 1268 (D.C. Cir. 1981); *In re Motor Fuel Temperature Sales Practices Litigation*, 258 F.R.D. 407, 414-16 (D. Kan. 2009). Thus, faced with First Amendment concerns, courts overseeing civil claims impose a more exacting relevancy standard and usually require the information to go to the "heart of the matter" to permit its compelled disclosure. *Black Panther Party*, 661 F.2d at 1268. Some form of burden shifting should have occurred here, where the threat of criminal sanctions menaces First Amendment liberties.

Strict scrutiny requires a showing of a "substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Bonta*, 141 S.Ct. at 2383. But the Report here fails to meet First Amendment scrutiny tailoring requirements—a substantial relationship between information sought and the investigation at hand. In doing so, the Special Master invokes a weak relevancy standard, allowing compelled disclosure so long as she could hypothetically find relevance—indeed, any imaginable relevance—in the information. *See generally* Section II, *infra.* The Report gives no countervailing weight to the sensitive First Amendment concerns that arise from disclosing confidential sources, donor information, or upcoming stories critical of the current administration. This cannot be what Justice Powell meant by protecting the independent values of the First Amendment during the course of a criminal investigation.

The fact that the Government's investigation also focuses on the content of speech—newsgathering related to presidential candidate Joe Biden—further confirms that strict scrutiny applies. *See, e.g.*, *Matal v. Tam*, 137 S.Ct. 1744, 1763 (2017) (viewpoint discrimination determined broadly). The investigation seems undertaken not to vindicate any real interests of justice, but rather to stifle the press from investigating the President's family. It is impossible to imagine the government devoting resources and manpower to investigating an abandoned diary had the diary not been written by someone with the last name Biden. This, too, signals that strict scrutiny is warranted.

Instead of harmonizing the independent values of the First Amendment in a criminal investigation, the Special Master ignored weighty free speech concerns. The Report's approach offers but a crabbed analysis of the competing constitutional concerns—robbing the First Amendment of its full protection. This sort of administrative rubber stamping effectively vitiates

First Amendment protections for the free press. This Court should therefore reject the Special Master's analysis and recommendations.

### 2. The Report's Arguments for Distinguishing *Bartnicki* Are Unavailing.

For three reasons, none of which is persuasive, the Report dismisses as "misplaced" Petitioner's argument that *Bartnicki* prohibits the government from punishing journalists' receipt and use of newsworthy information even if the information was obtained unlawfully by a source.

First, the Report contends that *Bartnicki* only addressed journalists' "civil liability." Report at 7. In fact, the Court held that the First Amendment prohibits the government's use of statutes prescribing criminal penalties to punish the receipt and publication of information of public concern "absent a need…of the highest order." *Id*., 532 U.S. at 527 & n.3 (*citing* criminal provisions of 18 U.S.C. § 2511(1)(c) and 18 Pa. Cons. Stat. §5725(a)). Furthermore, perhaps because *Bartnicki* was considering the penalty provisions of a federal criminal statute, it has been followed in the criminal context. *See Jean v. Massachusetts State Police*, 492 F.3d 24, 31 (1st Cir. 2007) (enjoining threatened prosecution of journalist for receiving and publishing stolen information). In any event, the notion that journalists would receive less substantive and procedural protections when accused of a crime gets things exactly backwards; threatened criminal penalties impose a far greater First Amendment chill than civil suits, and for that reason trigger numerous additional and interlocking procedural safeguards.

Second, the Report insists that *Bartnicki* does not apply when the government seizes documents pursuant to "valid search warrants." Report at 7 & n.4. But that begs the question whether such warrants, even if proper under the Fourth Amendment alone, could survive First Amendment scrutiny. Relatedly, the Report fails to explain whether the warrants here were based on a finding of probable crimes committed by the sources—in which event the present circumstances are no different than in *Bartnicki*—or the probable cause finding was made as to

Project Veritas after consideration of the limitations imposed by *Bartnicki*. As discussed in the remainder of Section I, any probable cause finding as to Project Veritas must be scrutinized to ascertain whether it was based on a prosecution theory precluded by *Bartnicki*—the receipt by Project Veritas of materials already stolen by the sources. The Report supposes that *Bartnicki* does not protect the "unlawful acquisition of information," *id.* at 7, but does not explain how that principle applies in these circumstances. To be sure, the use of secondary theories of liability (conspiracy, aiding and abetting, accessory, misprision) to evade the force of *Bartnicki* has been rejected by cases construing it. *See, e.g.*, *Jean*, 492 F.3d at 31 ("the fact that [the recipient of the stolen property in *Bartnicki*] received the tape 'passively' and Jean received the tape 'actively' is a distinction without a difference"); *Democratic National Cmte.*, 392 F.Supp.3d at 434-35 (rejecting argument that publisher could "be held liable for the theft as an after-the-fact coconspirator of the stolen documents"). The Report does not address, let alone distinguish, this authority.

Third, the Report contends that *Bartnicki* only applies to the "*publication* of unlawfully obtained information." Report at 7 (emphasis in original). This is simply wrong. *See Bartnicki* at 527 ("It is true that the delivery of a tape recording might be regarded as conduct, but given that the purpose of such a delivery is to provide the recipient with the text of recorded statements, it is like the delivery of a handbill or a pamphlet, and as such, it is the kind of 'speech' that the First Amendment protects"); *see also id.* at 525 n.8 (First Amendment protects party who received the stolen property as well as party who published it); *Jean,* 492 F.3d at 33 (construing *Bartnicki* to apply to the receipt of unlawfully acquired materials).

What is more, the Report's superficial distinction between acquisition and publication of information ignores that the alleged "crimes" here do not involve the underlying illegal conduct,

if any, but only the downstream activities of journalists that are intrinsic to the publication process and not otherwise illegal. For example, the crimes alleged by the government—"interstate transportation of stolen property and possession of stolen goods," Report at 7—involve not the underlying supposed crime of theft in the acquisition, but the simple receipt of such information and handling of it for purposes of potential publication. Each of those downstream activities was present in *Bartnicki* in one way or the other, and adopting the limiting view of the Special Master would make the Supreme Court's holding a dead letter.

*Bartnicki* left open the question of whether publication by the underlying thief might be protected. *Id.* at 528. What is clear from *Bartnicki*, however, is that the mere receipt and possession of unlawfully obtained material is not itself a basis for liability or other restrictions on First Amendment activity. While *Bartnicki* and the First Amendment may not permit journalists to violate "valid" criminal laws, they do set limits on what laws may be validly applied to newsgathering activities. Neither the law nor the government may circumvent that First Amendment limitation by claiming to criminalize not the publication itself, but the mere possession or transportation of newsworthy material. That is mere sophistry that turns *Bartnicki* on its head in the name of limiting it to its facts, rather than giving due respect to the legal principles therein. If the claimed "crime" under investigation is no crime at all, then its invocation cannot satisfy the First Amendment's demand for a substantial or compelling governmental interest under strict scrutiny.

As a consequence of its dismissive treatment of *Bartnicki*, the Report did not perform the required assessment of the underlying factual record to ascertain whether—as the Government alleged in the related prosecution of the individuals mentioned above—the individuals had stolen the Biden diary and her other property **before** ever approaching Project Veritas. Nor did the Special

Master endeavor to determine if the search warrants that she viewed as precluding any First Amendment analysis or the application of the Journalistic Privilege were issued on the basis of a prosecution theory foreclosed by *Bartnicki* or were narrowly tailored to government interests permitted by *Bartnicki*. This was plain error.

### C.  Even If *Bartnicki* Were Not Controlling, the Report Errs In Failing To Conduct a First Amendment Analysis.

In rejecting any consideration of First Amendment requirements, the Report gives short shrift to foundational constitutional requirements not addressed, much less satisfied, by the limited non-constitutional tests courts use to apply the Journalistic Privilege. *See* Section II, *infra*. Indeed, the cases applying that privilege generally duck resolution of the constitutional questions. Report at 9 n.6. Even if one viewed the evidentiary privilege itself as more limited, that merely establishes that the constitutional questions are now ripe for determination. *See* Sections I.A and B, *supra*.

The framework briefed by Petitioners here turns on constitutional requirements that go well beyond the judicially-created parameters of any mere evidentiary privilege and cannot be so easily ignored. Based on such foundational constitutional principles, and the particular holding of *Bartnicki* regarding what downstream conduct by journalists is immune from legal liability, the Report errs in not conducting a closer First Amendment inquiry using traditional First Amendment standards that the Government cannot even pretend to satisfy.

The Report argues that the seizure of journalist materials "pursuant to judicially authorized warrants" would satisfy a supposed *First* Amendment carve-out for speech-infringing investigations based on mere "probable cause that the offenses under investigation were committed and that the seized devices contained evidence of that criminal conduct." Report at 8-9. The Report thus refuses to apply the stricter First Amendment tests and assumes that the lenient Fourth Amendment test for probable cause was constitutionally sufficient to protect First Amendment

interests. Indeed, the Special Master repeatedly relies on *presumed* compliance with the Fourth Amendment to ignore even the most basic of First Amendment scrutiny. *See* Report at 9 n. 6 (untested judicial warrant, interest in erroneously categorized "criminal" activity, and supposed minimization procedures as reason to ignore quite different First Amendment interests at stake); *id.* at 9 (rejecting synergistic impact of Fourth and First amendment concerns by claiming that Fourth Amendment suppression inquiry premature). But as shown above, that presumption is not even correct under Fourth Amendment doctrine: the Fourth Amendment applies more strictly when it intersects with the First Amendment. *See* Sections I.A. and I.B., *supra*.

From the perspective of First Amendment doctrine, if it is premature to question compliance with the Fourth Amendment, then the mere presumption of compliance is inadequate to support a First Amendment interest. The concerns of the First and Fourth Amendments are quite different, and the injuries and remedies flowing from violation of each are different as well. While a simple Fourth Amendment violation may be remedied by later suppression of the improperly obtained evidence, the First Amendment violation of improper disclosure cannot possibly be remedied. *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 433 (1963) (First Amendment "freedoms need breathing space to survive"); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality) (loss of First Amendment freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury"). Indeed, precisely because of the consequences of disclosure and chilling of sources, First Amendment concerns can and must be addressed before a violation is complete, not merely noted after the fact with no meaningful remedy. *See* Section I.B., *supra*. If supposed compliance with laxer Fourth Amendment standards is to substitute for the usual First Amendment requirements of proving a genuine and lawful interest and a narrowly tailored response, then the least the Court must do is ensure that the Fourth Amendment requirements were actually met. To

merely presume the government's compliance based on a non-adversary decision by a magistrate does not even remotely satisfy any conceivable First Amendment test. *See, e.g., Bantam Books*, 372 U.S. at 70 (criminal procedure requires "judicial superintendence" to ensure First Amendment rights are protected).

As for the Report's suggestion (*id.* at 8-9) that there is no First Amendment concern because it is the journalists themselves who are being investigated, that proposition is not rational. It again shows the error in dismissing *Bartnicki* as irrelevant. If the bland assertion that a journalist has violated the law is sufficient to eliminate First Amendment concerns, without inquiry into whether such law could validly be applied to journalists at all, then *Bartnicki* is largely vitiated. The journalistic activities protected by *Bartnicki* could not exist if "possession" of stolen information were a sufficient crime to abnegate First Amendment protections of journalists. Transporting, say, the Pentagon Papers from Virginia to Washington, D.C., likewise would be considered a crime that vitiates First Amendment protections for the journalists who then report on that document. Forwarding an illegally obtained email sent to a journalist would constitute a "transportation" by interstate wire that would supposedly be different from mere publication of a story. The examples are endless and show the Report's proposed test to be increasingly problematic.

These arguments taken in their totality demonstrate serious constitutional deficiencies in the Report. First Amendment interests are fragile and require special protection by courts. *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977). Both *Branzburg* and *Zurcher* call for the harmonization of First and Fourth Amendment principles where criminal investigations touch on press operations. And part of that harmonization involves applying relevant First Amendment doctrine to the matter at hand. For these reasons, the Report's recommendations should be rejected as insufficiently protective of Petitioners' First Amendment freedoms.

## II.        The Report Misapplied the Journalistic Privilege

The common law journalistic privilege protects journalists precisely in situations like this. Search warrants to news organizations like Project Veritas are sufficiently intrusive and damaging to a free press—and are supposed to be sufficiently rare—that they can only be approved at the highest levels of the Department of Justice ("DOJ") after careful inquiry under the relevant rules. Those rules, long codified at 28 C.F.R. 50.10, were revised just before this dispute unfolded.[7] The DOJ's concerns inform the common law journalistic privilege and also (as shown below) lay bare the problems with the Report's analysis.

The Report finds that three large categories of documents—most of those at issue—fall within the ambit of the privilege because they were "gathered in a journalistic investigation." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011); Report at 13-15. Project Veritas was unquestionably engaged in newsgathering. Yet despite that finding, the Report quickly pivots to eviscerate the privilege, going so far as to say that "the concerns animating the qualified journalist's privilege are not concerns here." Report at 9. Why? Search warrants were issued by a magistrate, the Report observes, and Project Veritas is itself being investigated for criminal activity. *Id*. Yet the

---

[7] See July 19, 2021, Memorandum of Attorney General Merrick Garland. The Memorandum provides that, subject to narrow exceptions, the Department of Justice "will no longer use compulsory legal process for the purpose of obtaining information from or records of members of the news media acting within the scope of newsgathering activities, as set out below." It also provides that approvals are necessary for compulsory process that does allegedly fall within an exception: "the limited circumstances in which it remains permissible to use compulsory legal process for the purpose of obtaining information from or records of a member of the news media, current exhaustion and component approval requirements continue to apply. Further, as an interim measure while regulations are drafted, additional advance approval must also be obtained from the Deputy Attorney General for any use of compulsory legal process for the purpose of obtaining information from or records of a member of the news media." See https://www.justice.gov/ag/page/file/1413001/download. These regulations were eventually promulgated by revisions to 28 CFR 50.10.

Report acknowledges facts that should have counseled caution: the alleged criminal activity is the very process of newsgathering. *Id.* at 9 n.7 ("these very facts are the subject of the Government's investigation"). Setting aside the constitutional validity of the theory of investigation, at a very minimum this is reason to apply the privilege ***all the more carefully***. That is certainly the course the DOJ claims to take under its own regulations. Instead, the Report puts its faith in search warrants supported by materials that Petitioners cannot see and that cannot be tested here. This renders the Report unreliable, and the Court's *de novo* review should find the Journalistic Privilege applies.

### A.  The Common Law Journalistic Privilege Protects Project Veritas and its Journalists.

In the Second Circuit, journalists' confidential and nonconfidential materials are qualifiedly protected from compelled disclosure as a matter of federal common law. *See Gonzalez v. National Broadcasting Co., Inc*. 194 F.3d 29, 32 (2d Cir. 1999). Protections for confidential materials are based in part on the federal public policy of "protect[ing] the important interests of reporters and the public in preserving the confidentiality of journalists' sources." *Id*. at 33 (citing *In re Petroleum Products Antitrust Litigation*, 680 F.2d 5, 7-8 (2d Cir. 1982)). But nonconfidential materials are also protected because of a broader policy concern: the "paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters." *Gonzalez*, 194 F.3d at 33, 35 (citing *Baker v. F. & F. Inv.*, 470 F.2d 778, 782 (2d Cir. 1972)). *Gonzalez* articulated other policies as well, including avoiding the "wholesale exposure of press files to litigant scrutiny," severe burdens on the press, chilling of sources, and perverse incentives that would punish journalists' record-keeping. *Id*. Indeed, *Gonzalez* looked to the DOJ guidelines that echo these concerns. *Id*. at 33 (collecting Second Circuit authority developing the privilege and stating "[w]e quoted with approval, for

instance, Justice Department Guidelines discouraging any attempt to subpoena the press to appear before grand juries, and stipulating that 'all reasonable attempts should be made to obtain information from non-press sources before there is any consideration of subpoenaing the press.'") (internal citations omitted).

Neither the Government nor the Report disputed that this federal common law privilege applies to Project Veritas and its journalists. *See* Report at 6, n 3. This is a qualified privilege, so once the privilege applies, it is the burden of the party seeking to pierce it to show that the requested information falls within a qualification. *Gonzalez*, 194 F.3d at 36. In the Second Circuit, the required showing depends on whether the compelled disclosure would violate the journalist's interest in "confidential" or "nonconfidential" materials. *Id*. The test for disclosure of confidential materials is more demanding: the materials must be "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *Petroleum Products*, 680 F.2d at 7. *Gonzalez* articulated a lower but still substantial test for non-confidential materials: they must be of "likely relevance" to a "significant issue" in the case, and not "reasonably obtainable" from other sources. *Id*., 194 F.3d at 36.

On this much, the parties and Report seem to agree. The Report repeatedly erred, however, in classifying confidential documents as "nonconfidential" or as not journalistic at all. The Report also erred in applying each of the applicable tests. The compounding effect of the Report's successive errors not only eviscerates the common law privilege with respect to Project Veritas' reporting, but if it were to become a template for other cases within this Circuit, would provide an easy roadmap for sidestepping the privilege any time journalists are served with search warrants. That cannot be. This judicial district is a national and worldwide locus of investigative journalism. No decision from its courts—the key half-dozen or so Second Circuit opinions, or the few dozen

district court orders that have considered similar issues—provides support for the Report's dismissive treatment of this well-developed common law privilege. In its *de novo* review, this Court should decide that the more stringent test for confidential materials applies here, and that even under the less stringent test, Project Veritas' materials are protected from discovery.

### B. The Report's Constricted Understanding of "Confidential" Materials and Newsgathering Would Eviscerate the Journalistic Privilege

#### 1. Sources and Communications Are "Confidential" if They Were Gathered Under an Understanding of Confidentiality

The Report recognizes that in this Circuit, "[t]he protection accorded by the [journalistic] privilege, 'although not absolute, is at its highest when the information sought to be protected *was acquired* by the journalist through a promise of confidentiality.'" Report at 6 (quoting *Chevron*, 629 F.3d at 307) (emphasis added). Importantly, the test turns on something that is exclusively within the reporter's control: whether there was a "promise" of confidentiality at the moment information "was acquired." *Id*.[8] After this moment, it is the ***reporter*** who decides how to use the acquired information, and whether to later shed anonymity or the conditions of any other promise. The journalist has a vested interest, too, in keeping confidential work product that builds upon the confidential information, analyzing and testing it against other sources.

For all of these reasons, it is the reporter, not the source, who controls the privilege. *See U.S. v. Cutler*, 6 F.3d 67 (2d Cir. 1993) (in conflict over subpoena between source and reporter, applying journalistic privilege asserted by TV stations in response to subpoenas issued by their own source, an attorney they had interviewed on-camera, and sustaining the privilege with respect

---

[8] For this reason, the converse is also true: when courts decline to apply the heightened test for confidentiality, it is because the information was not originally obtained in confidence. *Gonzales*, 194 F.3d at 36 ("because the outtakes were not materials ***obtained by NBC in confidence***, the [heightened scrutiny] *Petroleum Products* test is not applicable.") (emphasis added).

to notes but rejecting it with respect to outtakes); *see also U.S. v. Cuthbertson*, 630 F.2d 139, 148 (3d Cir. 1980) (source cannot waive the journalist's privilege). Again, the reason for the privilege is not to protect sources from later revealing facts; it is to protect journalists' most sensitive newsgathering and internal deliberations about what to reveal and how to reveal it, which in turn promotes the free flow of information, protecting "the important interests of reporters and the public." *Gonzalez*, 194 F.3d at 33 (citing *Petroleum Products*, 680 F.2d at 7).

### 2. *The Report Errantly Creates a New Exception to the Common Law Rule*

The Report recognizes that Project Veritas acquired the relevant materials and related information under an agreement of confidentiality, and the Government does not appear to dispute this. Regarding Category 1 of the materials analyzed by the Court, "Communications with Sources and Communications that Identify Sources," the Report admits that "[i]n a typical case, communications between reporters and confidential sources (and reporters' communications that name sources) would be considered confidential materials, and the standard for evaluating their disclosure would be the most exacting." Report at 13. That is correct. Under Second Circuit doctrine, the heightened test of *Petroleum Products* controls: the materials and information must have been "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *Petroleum Products*, 680 F.2d at 7.

The Report errs because, having recognized this standard, it pivots to create a novel and unworkable rule that, so far as Petitioners know, has never been applied by any court. Specifically, the Report treats a situation where some element of an initial relationship of confidentiality is later lost (either because of government compulsion of a source, or by the sources' own uncoerced decision) as identical to the situation in which confidentiality had never arisen in the first place. The Report relies solely on out-of-Circuit authority for this position, but neither of the cited cases actually support it. As shown below, the Report's novel view  of the common law would unravel

the journalistic privilege in most cases where the journalists themselves are being targeted by the Government or a private party.

The Report's first cited case, *U.S. v. Criden,* 633 F.2d 346, 358-359 (3d Cir. 1981), employed the Third Circuit's version of the stringent test for confidential sources and merely held that the source's decision to come forward did not waive the journalistic privilege. *Id.* In applying that heightened test, it ruled in favor of requiring a reporter to disclose a phone call she received from the prosecutor about which the prosecutor had already testified. *Id.* However, the *Criden* court took pains to note that it was using the heightened test to balance the journalistic privilege against the defendant's "countervailing constitutional rights" to support his motion to dismiss for prosecutorial misconduct by the journalist's source. *Id.* at 359.[9] Further, rather than requiring the journalist to disclose a confidential source based on waiver, it only required her to testify about a conversation that the source had already disclosed in open court. *Id.*

The Report's second cited case is even less helpful for its position. *In re Grand Jury Empaneled February 5, 1999*, 99 F.Supp.2d 496 (D. N.J. 2000) involved an audio interview of a witness who, having been heavily quoted in a magazine expose, was never confidential. In this respect, it is no different from Second Circuit cases like *Gonzalez*, where the source was never confidential at all. *Id.*, 194 F.3d at 31 ("On January 3, 1997, NBC aired a segment on its "Dateline" television program reporting on what it described as pervasive abuses by law enforcement officers in Louisiana . . . [t]he report included a videotaped stop of one of [NBC's] employees, Pat Weiland, by Deputy Pierce.").

---

[9] This presumably included the defendant's Sixth Amendment confrontation right since the prosecutor had already testified about his conversation with the reporter. *Id.*

Importantly, neither out-of-jurisdiction case stands for the proposition that a third party—whether the source itself or the Government—can unilaterally waive or downgrade the journalist's qualified privilege. The Report's reasoning that the Government's coercive action—seizure of the sources' devices and forced access to many of the sources' conversations with Project Veritas' journalists—retroactively destroys confidentiality, *id.* at 13-14, is devoid of legal authority and conflicts with the well-established rule that "confidentiality" is determined based on whether a "promise" was made when the information was "acquired." *Chevron*, 629 F.3d at 307.

The unsavory incentives a self-help rule creates are obvious; it does not take a crystal ball to realize that such an "exception" to the privilege would quickly swallow the rule. The subsequent act of simply unmasking the confidential source effectively becomes the Government's evidentiary "cheat code" for unlocking the easier-to-meet *Gonzalez* test.

Such an approach is also directly contrary to the spirit of *Criden*, the only case cited in the Report in which a confidential source later decided to testify. Again, that court only endorsed a "question by question" approach in which the journalist would first be asked if the conversation to which the prosecutor had admitted had occurred. But further information in that conversation—such as the identity of other confidential sources—would be subject to an independent analysis under the Third Circuit's heightened test. *Criden*, 633 F.2d at 359-360. *Criden* never suggested that that particular source's loss of confidentiality applied in blanket fashion to everything about the journalist-source conversation—let alone to remove the protection of confidentiality from other conversations with that source, or from other sources or information.

For all of these reasons, it simply cannot be true that government coercion or the self-identification of a source (as in *Criden*) eviscerates the privilege for confidential materials. Any such modification of the journalistic privilege would incentivize attacks on the press through

coercion against confidential sources. Confidential sources, in turn, knowing that they will be aggressively targeted as an entry point for efforts to undermine journalistic privilege, will be less likely to come forward to journalists with newsworthy information. This Court should not give sanction to the Report's novel quasi-waiver theory, as it will damage the "paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters." *Gonzalez*, 194 F.3d at 35.

### 3. *Materials that discuss information obtained from confidential sources should also be treated as confidential.*

The Report addresses Petitioners' privilege objections by organizing the documents into eight categories. The first category is "Communications with Sources and Communications that Identify Sources," but as discussed below, most of the other categories contain documents that should have been in Category 1.

For example, Category 2 is "Internal Project Veritas Documents about the Biden Property and Potential Story." As more fully discussed in the sealed filing, this category contains the following:

(1) Discussions about the confidential sources;

(2) Discussions of other confidential sources;

(3) Discussions of the confidentially-provided information and possible strategies for corroborating it, some of which would have involved secrecy and confidentiality.

All or most of these materials should have been classified in Category 1 as confidential. Yet for reasons that the Report never explains, it simply states, "these documents do not implicate confidential sources. Some of these documents reflect analysis of the Biden materials and others are more ministerial." Report at 15. But because that analysis is of information "acquired by the journalist through a promise of confidentiality," the analysis is also confidential. *Chevron*, 629 F.3d at 307. To hold otherwise would lead to the unworkable rule that journalists waive

confidentiality for confidentially-obtained information merely by memorializing and discussing it internally.

Category 3 is "External Communications During Investigation of Potential Story." Once again, the Report states that "these materials do not implicate confidential sources," citing a quote from *Gonzalez* regarding filmed interview outtakes, which were not confidential in the first place and are not relevant here. Report at 15. Further, as discussed in Project Veritas' Sealed Objections to the Report, some of the "external communications" were themselves with confidential sources.

Category 4 is "Communications Regarding the Decision Not to Publish." Once again, these communications discuss the contents of materials and information received in confidence, which should place them in Category 1. The Report assumes, however, that because discussion of "editorial" decisions are not covered by the journalistic privilege, any discussion of confidential materials included within an editorial discussion are outside the privilege. The sole case cited for that conclusion, *Guzman v. News Corp.*, 877 F. Supp.2d 74 (S.D.N.Y. 2012), was an employment discrimination case. The editor was asked to reveal internal discussions about whether to publish an allegedly racist cartoon and redact a picture, matters the plaintiff claimed were relevant to showing racism. Not surprisingly, the privilege for confidential information did not apply because there is no free-standing "editorial privilege" that protects cartoons or other matters not involving confidential sources or newsgathering.

Here, Project Veritas' discussions about whether to publish the material, unlike the cartoon in *Guzman*, are saturated with information obtained from confidential sources. The Report erred by limiting confidential information protections to direct communication with sources and failing to extend those protections to internal communications memorializing and discussing that information.

The Report similarly misclassifies as non-confidential documents within Categories 5 (communications to determine the source of the leak); 6 (communications with law enforcement regarding the deposit of the diary); and 7 (communications that post-date the deposit). The rule, again, is that to the extent such communications discuss the confidential information, they remain subject to the *Petroleum Products* test; if the communications discuss any other information gathered in the newsgathering process that is nonconfidential, they are at least subject to *Gonzalez*.

Instead of applying that simple principle, the Report once again seems to apply its own *ad hoc* rule: if the purpose of the communication is not strictly to gather news, any confidential sources or information it happens to internally discuss are completely stripped of the privilege. The problem is that in each of Categories 5, 6, and 7, there exist numerous documents that discuss the sources and their information—in other words, Category 1 documents. The issue is systematic rather than an occasional error. The only explanation is that the Report employs an assumption— not explicitly discussed, and not supported by authority—that news organizations destroy the privilege as they generate internal communications about confidential information. If this were the law, it would be an especially bitter irony with respect to Category 5, which consists of communications in which Project Veritas tries to maintain and protect the integrity of its confidential sources in the face of an alleged leak. The very attempt to maintain confidentiality would destroy it. One can hardly craft a rule better calculated to trigger "wholesale exposure of press files to litigant scrutiny," severe burdens on the press, chilling of sources, and perverse incentives to punish journalists' record-keeping. *Gonzalez*, 194 F.3d at 33, 35.

### C. The Report Errantly Applies the Tests
### Applicable to Nonconfidential and Confidential Documents

The Report compounds its threshold error in misclassifying confidential information when it applies a diluted version of both the *Petroleum Products* and *Gonzalez* tests. First, the Report

makes no effort to determine whether Project Veritas' materials were of "likely relevance" to a "significant issue" in the underlying criminal case, let alone "critical." Instead, it relies simply on the fact that a warrant had found probable cause, and that the materials had been recovered under the warrant. Such an analysis directly conflicts with the Privacy Protection Act of 1980 and DOJ's own implementing regulations. The Report, moreover, contains little or no reasoning regarding the second prong of either test—whether the materials are "reasonably available" from other sources, let alone "unobtainable."

### 1. *Likely Relevance to a Significant Issue or Critical to the Case*

#### a. **The Report fails to discuss or identify "likely relevance" or specific issues.**

The Report contains virtually no analysis (i) outlining what issues, as a matter of law, rise to the level of "significant issues" in the underlying case, and (ii) explaining how and why Project Veritas' communications with those sources are "of likely relevance" to those issues. *Gonzalez*, 194 F.3d at 36. Instead, with respect to the core category of documents (Category 1, communications with sources or that identify sources), the Report simply concludes: "[t]hese documents are the most relevant to the essential elements of the crimes under investigation [and] necessary to the Government's investigation." Report at 14. And in applying the *Gonzalez* factors to every other succeeding category, the Report simply states that the materials are "relevant to the crimes under investigation."

The Report identifies in a footnote "the crimes listed in the search warrant," which "include conspiracy to transport stolen property across state lines, interstate transportation of stolen property, and possession of stolen goods."[10] Report at 7 n 4. Turning to the applicable statutes, one

---

[10] Later, in applying the crime-fraud exception, the Report mentions additional crimes, although the Report refrains from stating who is alleged to have committed them. *See* Report, at 19, n. 11.

finds a relatively narrow range of elements and issues. *See* 18 U.S.C. §§ 2314, 2315. If the Biden diary and materials were initially stolen by the sources, then Project Veritas' liability—even assuming *arguendo* that *Bartnicki* does not preclude the government from charging a journalist for receiving stolen but newsworthy information—depends on whether Project Veritas ever learned the materials were stolen by its sources, and if so, when. *See, e.g.*, § 2314. (transporting, transmitting, or transferring property across state lines, is unlawful only if it is done "knowing the same to have been stolen, unlawfully converted, or taken"). Yet the Report's discussion of each category (and the accompanying materials) contains no analysis about whether the subject materials are "critical" or even "of likely relevance" to these points.[11]

In fact, on their face, several categories seem highly ***unlikely*** to be relevant, as shown in Project Veritas' Sealed Objections to the Report. For example, as the Report recognizes, certain communications occurred after the decision was made not to publish the Biden diary story. These later communications concerning the decision not to publish, determination of the source of a leak, delivery of the Biden materials to local law enforcement, or about ministerial matters items, all have one thing in common. They have nothing to do with, let alone are "likely" relevant to, whether Project Veritas knew the Biden materials were stolen, any other "important issue," or critical to the case as a whole. This is reason alone to reject the Report's conclusion that the government has met its burden.

---

[11] This is yet another consequence of the Report resting its conclusions on a previous *ex parte* finding of probable cause that was based on undisclosed materials, and then failing to make any effort to distinguish between newsgathering activity that was purportedly covered by that finding, and activity that was not.

**b. It was error to rely on the search warrants as a proxy for meeting the common law "relevance" standard when the warrants were unlawful under the Privacy Protection Act.**

The Report's fundamental error is its reliance on the existence of warrants grounded in the newsgathering "crimes" of receipt, possession, and communication of materials that were allegedly stolen by someone else. As an initial matter, the Report does not directly consider—as it should have—the question of whether Project Veritas can actually be charged with these crimes. *See* Report at 7-8 (discussing *Bartnicki v. Vopper*, 532 U.S. 514 (2001), and finding that the case does "not provide general principles applicable to my Review"). But without even reaching *Bartnicki*, the Privacy Protection Act of 1980 (42 U.S.C. 2000aa-1 et seq.) and DOJ's implementing regulations foreclose a federal court from developing federal common law that would directly contravene these enactments.

The Privacy Protection Act protects journalists' "work product materials" and "documentary materials," instructing that:

> Notwithstanding any other law, *it shall be unlawful* for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any [such] materials[12] possessed by a person reasonably

---

[12] "Documentary materials" are "materials upon which information is recorded, and includes, but is not limited to, written or printed materials, photographs, motion picture films, negatives, video tapes, audio tapes, and other mechanically, magnetically or electronically recorded cards, tapes, or discs, but does not include contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used as, the means of committing a criminal offense." 42 U.S.C. §2000aa-7(a).

"Work product materials", are "materials, other than contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used, as the means of committing a criminal offense, and—(1) in anticipation of communicating such materials to the public, are prepared, produced, authored, or created, whether by the person in possession of the materials or by any other person; (2) are possessed for the purposes of communicating such materials to the public; and (3) include mental impressions, conclusions, opinions, or theories of the person who prepared, produced, authored, or created such material." 42 U.S.C. §2000aa-7(b).

> believed to have a purpose to disseminate to the public a newspaper, book,
> broadcast, or other similar form of public communication, in or affecting interstate
> or foreign commerce…"

42 U.S.C. §2000aa(a) and (b) (emphasis added). The Government has pointed to an exception that applies when the journalist is a "suspect," that is, when there is probable cause to believe the journalist "has committed or is committing the criminal offense to which the materials relate." *Id*. at §2000aa(a)(1) and (b)(1). Yet, anticipating that the Government would seek to unduly broaden this exception by making newsgathering the relevant "crime," Congress included this key carveout:

> …a government officer or employee may not search for or seize such materials
> under the provisions of this paragraph *if the offense* to which the materials relate
> *consists of the receipt, possession, communication*, or withholding of such materials
> *or the information contained therein*…

*Id*. (emphasis added). That is precisely what happened here: it is Project Veritas' receipt of the Biden diary and other material transported to New York by the sources, its subsequent receipt of additional material delivered by the sources in Florida, and its "possession, communication, [and] withholding of such materials" as it investigated a story about Biden's alleged abuse by her father that comprise the alleged "crimes" for which the warrants sought to show probable cause. Report at 7 n 4.

Significantly, the Attorney General with much fanfare revised DOJ policy regarding all forms of compulsory process—including subpoenas and search warrants—in 2021. *See* Memorandum of Merrick Garland, *supra* at n.1. The policy changes were memorialized in revised regulations at 28 C.F.R. 50.010 in 2022. The regulations flatly prohibit such compulsory process against journalists engaged in newsgathering, and other process is still subject to mandatory high-level review and advance authorization by "Main Justice." Importantly, "[a]ll authorizations

pursuant to this section must comply with the provisions of the Privacy Protection Act (PPA), 42 U.S.C. 2000aa(a) *et seq."*

In exercising its authority (derived from Fed. R. Evidence 501) to apply a federal common law of privileges, it cannot be that a district court can satisfy the Second Circuit's mandate to require the Government to specifically prove at least "likely relevance" to an "important issue" by relying on  warrants that, based on the record, were unlawful under federal statute. "Reason and experience… governs a claim of privilege" *unless* "a federal statute" (among other sources of authority) "provides otherwise." Fed. R. Evidence 501 (emphasis added). If a course of action by the Government likely violated a federal statute, it is contrary to the letter and spirit of Rule 501 to rely on that very Government action to circumscribe a privilege asserted by a private party. To the contrary, the Government's violation of a federal statute should cause a district court to put the Government to its proof in establishing an exception to the privilege. This, the Government did not do.

### c.   Relying on secret warrants as an advance adjudication of the journalistic privilege is fundamentally unfair and defeats the purpose of the privilege.

Compounding the problem of relying on unlawful warrants, neither the argument nor factual showing that supported the warrants has been made available to Petitioners. For that reason, by relying on the existence of "warrants" (and, perhaps, undisclosed supporting materials) as the showing that satisfies the first part of the *Gonzalez/Petroleum Products* tests, the Report effectively circumvents a key part of those tests. In other cases, the pleadings, facts, and likely evidentiary record are well-developed before journalists are subject to judicial compulsion, and the Government must actually make a showing to overcome the privilege. *Compare U.S. v. Treacy*, 639 F.3d 32 (2d Cir. 2011) (a Wall Street Journal reporter was subpoenaed by the government at

trial to testify regarding a non-confidential source, and after full argument in an adversary proceeding, the trial court fashioned questions the government could ask at trial to protect the journalistic privilege). Here, in contrast, a seizure of journalistic records was just the first step in the matter, before any information or indictment was available to explain the state of the law and facts. Adding insult to injury, the inquiry into the privilege ends up being resolved before it starts: the warrants and seizures are found to justify themselves.

It remains true that every decision in this Circuit of which Petitioners are aware allows the journalistic privilege to be litigated in an adversary proceeding. Here, the Report—and any decision by this Court—cannot simply cite the warrants (and any undisclosed support) as simultaneously constituting the Government's showing, and as the reason that the Government prevails in meeting the first part of the *Gonzalez/Petroleum Products* test. Were that the case, the government could effectively preclude a challenge to any search warrant of a newsroom or journalist's residence simply by sealing the supporting affidavits. In short, this Court should take up the question of whether Project Veritas can actually be charged for this conduct under *Bartnicki* and its progeny.

### 2. *Not Reasonably Obtainable, or Unobtainable*

With respect to the availability from other sources element of the *Gonzalez/Petroleum Products* tests, the following constitutes the sum total of the Report's analysis:

> Though Harris and Kurlander may have provided their communications with Petitioners to the Government, it is unclear whether they provided all of the communications at issue here. To the extent they provided some of these communications, it would be strange to withhold all of the communications because some might be duplicative of those already in the Government's possession. Moreover, the documents here contain metadata associated with Petitioners' devices that may be important to the Government's investigation.

Report at 14-15. The Report, in essence, concludes that unless Project Veritas can satisfy the Court that the Government already has *all* of communications with its sources, including "metadata

associated with Petitioners' devices that may be important," the Government has carried its burden. Even under the less-demanding *Gonzalez* standard for non-confidential journalists materials, this is flatly inconsistent with the law.

First, the burden was on the Government to show that Project Veritas' materials were not "reasonably available" from others. *Gonzalez*, 194 F.3d at 36.[13] In the face of an uncertain record about what information the government has obtained from Project Veritas' sources, the Report was required to find that the burden was not met. Instead, the Report found that so long as this prong was "unclear," the Government must prevail. Report at 15. Second, the Report fails to explain what "metadata associated with Petitioners' devices" could be relevant, or why corresponding data (which Petitioners understand to mean the time, author, recipients, and editing history of electronically transmitted documents) is not already present on the corresponding electronic communications within the sources' devices.

Indeed, there is no finding at all regarding the unavailability of the data elsewhere. Courts in this District require more. *See In re McCray, Richardson, Santana, Wise, and Salaam Litigation*, 991 F.Supp.2d 464, 470-471 (S.D.N.Y. 2013) (collecting cases and quashing subpoena for film outtakes of civil rights plaintiffs under *Gonzalez* because defendants could make no showing that "similar information" could not be obtained elsewhere, such as by deposing plaintiffs).

### D.   The Government's Waiver Argument Is Misplaced

The Government invoked the "fairness doctrine" to contend that the high-level factual recitations in Project Veritas' public pleadings worked a waiver of all its journalistic privileges.

---

[13] The Report erroneously applies the "reasonably available" standard under the *Petroleum Products* test, which the Report applies in the alternative to only one category of documents, category 1 (communications with confidential sources). Report at 14. In fact, the heightened test requires something more: that the materials be "not obtainable from other available sources." *Petroleum Products*, 680 F.2d at 7. Regardless of the test, the Report does not explain its reasoning.

The Report observes that the government "raises a serious waiver argument,"  but then does not actually rely on waiver principles in ruling on Petitioners' privilege claims. *Id.* at 11-12. The Government's argument, however, is not at all serious and the Report should have rejected it outright.

As the Report recognizes, the purpose of the fairness doctrine is to "prevent prejudice to a party and distortion of the judicial process" where a privilege holder selectively discloses some information and withholds related information. *Id.* at 11. In the context of this Special Master process, however, none of that has occurred.

As an example of possible prejudice to the Government, the Report speculates that "it is possible that some of the documents could be used [by the Government] to rebut arguments made in Petitioners' filings with the Court." *Id.* at 12. But the Report ignores the fact that the Government filter team has had access to ***all*** 1,021 of the confidential documents seized from Project Veritas determined by the Special Master to be relevant, including documents containing information described in Project Veritas' pleadings. Significantly the Government filter team has not cited a single confidential document that is inconsistent with Project Veritas' factual statements. Put another way, the Government filter team has had every opportunity to rebut the factual statements made in Project Veritas' pleadings but apparently cannot do so.

The Government's at-issue waiver argument also relies on unspecified factual statements made by Project Veritas "out of court."  Report at 11. But it is well-settled in the Second Circuit that the fairness doctrine "does not come into play when…the privilege-holder or his attorney has made extrajudicial disclosures, and those disclosures have not subsequently been placed at issue during litigation." *In re Von Bulow,* 828 F.2d 94, 102 (2d Cir. 1987) (citing cases).

In sum, the Government's at-issue waiver argument should play no role in the disposition of Petitioners' objections to the Report.

**E.**   **Conclusion**

At bottom, the Report fails to give teeth to the journalistic privilege precisely where it is most needed. The Government claims that newsgathering into one of the country's most powerful political families, undertaken to obtain and review materials after they were allegedly stolen, was itself an independent crime. Because a magistrate issued a search warrant (albeit on a showing that Petitioners cannot see or test in an adversary proceeding), the Report assumes that the finding of probable cause answers all questions of privilege and, as a result, "concerns animating the qualified journalist's privilege are not concerns here." Report at 9. That view of the common law is antithetical to the "paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters," *Gonzalez*, 194 F.3d at 33. This Court should not accept the Report's recommendation, and should instead find that the privilege protects Petitioners' communications with the sources as well as internal discussion of the materials and information obtained from the sources.

**III.   The Special Master Erred in Applying the Crime-Fraud Exception.**

The conclusion in the Report that the crime-fraud exception applies to ten Project Veritas attorney-client privileged documents should be rejected for two, independently sufficient reasons. ***First***, the Report contains literally ***no*** analysis that identifies the predicate future crime/fraud or explains how any one of the documents furthered that crime/fraud, making impossible any informed review by this Court. ***Second***, in place of its own analysis the Report apparently adopted the reasons argued by the government for applying the crime-fraud exception, but that reasoning is contrary to well-settled Second Circuit authority, including the very decisions cited in the Report.

41

**A. The Report Contains No Analysis of the Necessary Elements of the Crime-Fraud Exception to the Attorney-Client Privilege.**

Neither the government investigative team, nor its filter team, invoked the crime-fraud exception in the extensive government briefs submitted to the Special Master in early 2022. The filter team identified numerous documents as privileged or potentially privileged, but the words "crime-fraud exception" did not appear in any of the government's pleadings.

Nearly eight months later, the Special Master raised the crime-fraud issue *sua sponte* and directed the parties to submit briefs on the question of whether the exception applied to fourteen documents that she had selected. The government filter team, and the affected Petitioners, submitted letter briefs that addressed, document-by-document, whether the government had met its burden of proving facts showing probable cause to believe that: (1) a crime or fraud post-dating the legal advice was committed; and (2) that the communication in issue was in furtherance of that conduct. *See, e.g.*, *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986).[14] The Report, however, did not address the applicability of the exception document-by-document. Instead, the Report's discussion of the issue is limited to three short paragraphs, and there are just three sentences of "reasoning":

> Based on the materials submitted to me, including the search warrant affidavits, the government's correspondence to me, and the guilty pleas [in No. 1:22-cr-00457-LTS], I find that the government has satisfied its burden of proving facts that show probable cause to believe that crimes or frauds have been committed. . . . In making these determinations, I am mindful that the burden is not satisfied by a showing that the material in question might provide evidence of a crime or fraud. Rather the communication itself must have been in furtherance of a fraud or crime and must have been intended to facilitate the fraud or crime.

---

[14] As the content of these letter briefs discusses attorney-client privileged information, copies will be submitted with Project Veritas' Sealed Objections to Report as Exhibits A and B, respectively.

Report at 18-19 (internal quotation marks and citation omitted). From this cursory explanation it is not possible to discern the Report's reasoning as to either prong of the exception.

Federal Rule of Civil Procedure 53 contemplates that special masters will fulfill their responsibilities by making findings of fact and conclusions of law. *See* FRCP 53(f)(3) and (4). This Court reviews any legal conclusions and factual determinations made by special masters *de novo*, i.e., without deference. *Id.* "When we review a [lower] court's decision *de novo*, we take note of it, and study the reasoning on which it is based." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 168 (2d Cir. 2001). While the Report concluded that the crime-fraud exception applied, it provided this Court no reasoning to study. Report at 18-19.

When a lower court's analysis is insufficient to determine whether it applied the correct legal standard "it precludes meaningful appellate review." *Beskovic v. Gonzales*, 467 F.3d 223, 224 (2d Cir. 2006); *see also In re Petrobras Sec. Litig.*, 786 Fed.Appx. 274; 278-79 (2d Cir. 2019) (summary order) ("it is impossible…to properly apply the relevant standard of review… because the [lower] court entirely failed to explain its thought process"); *cf. Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence"). The Report failed adequately to explain its reasoning with respect to both elements of the crime-fraud exception.

### 1. The Finding That a Crime was Committed by Someone at Some Unspecified Time Is Insufficient.

Although the Report recites there is probable cause to believe that "crimes or frauds have been committed," the Report does not identify the specific crime/fraud, when it occurred, or even *who* committed it. The Second Circuit has rejected similar generalized approaches to analysis of the crime-fraud exception. *See, e.g., In re Richard Roe, Inc.*, 68 F.3d 38, 41 (2d Cir. 1995)

(reversing production order and directing "[i]f [on remand] production is ordered, the court shall specify the factual basis for the crime or fraud that the documents or communications are deemed to have furthered [and] which of the parties asserting claims of privilege possessed a criminal or fraudulent purpose with respect to those documents or communications").

The perfunctory recital in a footnote of crimes alleged by the government, Report at 19 n.11, not only lacks the required specific factual basis, but also focuses on alleged ***past*** wrongdoing. As demonstrated in Project Veritas' crime-fraud submission, only those attorney-client communications "where the desired advice refers *not to prior wrongdoing*, but to *future wrongdoing*" are subject to the exception. *U.S. v. Zolin*, 491 U.S. 554, 562-63 (1989) (emphasis in original); *see also In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1041 (2d Cir. 1984) ("communications with respect to advice as to past or completed frauds are within the privilege"). The Report did not address this case law nor make any document-specific findings that the subject communications furthered ***future*** wrongdoing.

As discussed in Project Veritas' Sealed Objections to Report, there is a clear conflict between the government's description of conduct by individuals it accused of stealing Ashley Biden's property, versus the probable portrayal of these same events in the search warrant affidavits submitted in 2021. To justify the extraordinary search of journalists' residences, the government would have needed to persuade the Magistrate Judge that the journalists personally stole Biden property or, at the least, directed the sources to enter premises without authorization to steal that property. Put another way, if the Magistrate Judge issued the warrants on the basis of a probable cause finding that Project Veritas violated the law merely by receiving and transporting property stolen by the sources, the warrants would be facially invalid under *Bartnicki*. *See, e.g.*, *Allen v. Beirich*, No. 19-2419, 2021 WL 2911736 at *5 (July 12, 2021) (holding that *Bartnicki*

precludes liability where "the [publisher] was [not] even in contact with [source] before the theft, much less that the [publisher] was aware of [source's] plans in advance").

After the warrants were procured and executed, however, Project Veritas made the Court aware of the circumstances under which the sources approached Project Veritas in September 2020 with the Biden property **already in hand**. *See, e.g.*, Petition for Return of Property (Doc. No. 70) at 3-4. And more recently, the government charged two individuals with acquiring the Biden property in June 2020 and marketing it for more than two months before approaching Project Veritas. *See* Criminal Information, No. 1:22-cr-00457-LTS, Doc. No. 2 ("Criminal Information"). These allegations induced those individuals to plead guilty but cannot be reconciled with the likely portrayal of Project Veritas in the search warrant affidavits. *See* Project Veritas' Sealed Objections to Report at 13.

The Report did not resolve, or even discuss, this obvious conflict in the government's theories of culpability. This Court, and the parties, are left to speculate about the reasoning underlying the Special Master's determination that the first prong of the crime-fraud exception has been satisfied, making it impossible for this Court to conduct an informed review. *See, e.g.*, *Gough v. Saul*, 799 Fed.Appx. 12, 15 (2d Cir. 2020) (summary order) (on *de novo* review, reversing where ALJ "did not explain how the evidence conflicted, nor did the ALJ explain how he purported to resolve that conflict").

### 2. *The Report Effectively Ignores the "In Furtherance" Element.*

This Court and the parties also do not know why the Special Master believed that any one of the ten privileged communications was itself in furtherance of a crime or fraud. For example, in its crime-fraud submission Project Veritas demonstrated that ten of the fourteen privileged communications identified by the Special Master could not have furthered the alleged conspiracy to commit interstate transportation of the Biden property—the communications occurred ***after***

September 19, 2020 by which time **all** the Biden property had been delivered to Project Veritas in New York. *See* Project Veritas Crime-Fraud Submission at 4. The Report did not address this evidence. As noted above, "communications with respect to advice as to *past* or completed frauds are within the privilege." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1041 (emphasis added). The Court can only guess at why the Special Master concluded otherwise. As for the few privileged communications that occurred prior to September 19, the Report does not explain how the advice sought by the journalists was intended to further any ongoing or future crime.

The Report cited *In re Omnicom Grp. Inc. Sec. Litig.*, 233 F.R.D. 400 (S.D.N.Y. 2006) as authority for its blanket determination that the ten attorney-client privileged communication were "in furtherance of" some unspecified crime. Report at 19. That decision, however, illustrates why the Report's conclusion-without-analysis approach is improper. In declining to apply the crime-fraud exception, the *In re Omicron Grp.* court emphasized the need for reliable findings based on an adequate record:

> There is no question that the courts have placed considerable emphasis on protecting the legitimate use of the attorney-client privilege because of the significant policies that the privilege embodies. As the Supreme Court stated in *Upjohn*…the attorney-client privilege is the oldest of the privileges for confidential communications known to the common law and is enforced in order to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. Necessarily, then, court findings that would deprive the client of that protection should be based on an adequate record and bear some assurance of reliability.

*Omnicom Grp,*, 233 F.R.D. at 405 (internal citation and quotations omitted). The Report, however, contains no document-specific findings in its three sentences of reasoning, let alone citation to any supporting evidence. Project Veritas should not be deprived of the protection of its attorney-client privilege on the basis of such inadequate findings and an indeterminate record.

**B.  The Government Has Not Met Its Burden of Proving Either Element
of the Crime-Fraud Exception to the Attorney-Client Privilege.**

Although the government did not invoke the crime-fraud exception, in order to enjoy its fruits, the government bears the burden of making out a prima facie case satisfying the two crime-fraud elements. *In re Grand Jury Subpoenas*, 798 F.2d at 34. We show in Project Veritas' Sealed Objections to Report, document-by-document, how the government's submission to the Special Master relied on conclusory reasoning that has been rejected in numerous Second Circuit decisions. We explain below the proper standard for application of the exception and how the factors relied upon by the government—and apparently adopted by the Special Master— contravene those standards.

We note preliminarily the distinct possibility that the Special Master viewed the government's crime-fraud showing through the wrong lens. The Report recited that the attorney-client privilege "is to be construed narrowly because it renders relevant evidence undiscoverable." Report at 17. But the Report failed to recognize that once the privileged status of documents has been established (as is the case for the ten documents at issue), "given the importance of the privilege, exceptions to it are narrow." *See U. v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997) (*abrogated on other grounds by Loughrin v. U.S.*, 573 U.S. 351 (2014)). Given the cursory treatment of the crime-fraud issue in the Report, it is fair to conclude that the Special Master applied a lenient standard to evaluate the government's proof, rather than strictly construing the proof as required to find an exception to the privilege.

*1.  The Government Has Not Proven a Post-Advice Crime/Fraud*

The ten attorney-client communications at issue occurred between September 15, 2020 and October 28, 2020, and all but two of them post-date September 17, 2020. The timing matters. The Report recited that it relied on "the guilty pleas [in No. 1:22-cr-00457-LTS]" in making its crime-

fraud determination. Report at 18. The conspiracy offense to which the defendants there pled guilty, however, allegedly occurred "in or about September 2020," and the last overt act was completed on September 17. *See* Criminal Information at ¶¶ 21, 23.

The "crimes" mentioned in passing in the Report's discussion of the crime-fraud issue, *id.* at 19 n.11, all concerned the transportation of the Biden diary and property from Florida to New York. The government has alleged that this transportation occurred no later than September 19, 2020. *See* Criminal Information at ¶¶ 18-19. A violation of 18 U.S.C. § 2314 "is complete when the defendant transports in interstate commerce property worth more than $5,000 that the defendant knew was obtained by fraud." *U.S. v. Wallach*, 979 F.2d 912, 918 (2d Cir. 1992); *see also U.S. v. Lartey*, 716 F.2d 955, 967 (2d Cir. 1983) (the offense of delivering a controlled substance is completed upon each delivery, even if part of a continuing course of conduct). All but three of the Project Veritas attorney-client privileged communications occurred after September 19, 2020.

The government's crime-fraud submission did not provide evidence of any crime or fraud post-dating September 19, 2020, and the Report cited no evidence of any such offense. Therefore, the seven attorney-client communications post-dating September 19 "are within the privilege." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1041.

As for the three remaining privileged communications, the conduct relied upon by the government to satisfy the first prong of the crime-fraud exception—the delivery of property to Project Veritas by sources who allegedly stole it—is not an offense **by Project Veritas**, and the Report did not find to the contrary. According to the Report, the Special Master relied on "the search warrant affidavits" (presumably those submitted to obtain warrants to search the O'Keefe, Meads, and Cochran residences), unspecified "government correspondence" (the content of which

is not described), and "the guilty pleas [in No. 1:22-cr-00457-LTS]" to find "probable cause to believe that crimes have been committed." Report at 18-19.[15] But conspicuously absent from the Report is a finding of probable cause to believe a crime or fraud was committed ***by Project Veritas***. Every decision construing the crime-fraud exception of which we are aware has required the government to prove that a crime or fraud was committed ***by the client***. *See, e.g.*, *Clark v. U.S.*, 289 U.S. 1, 15 (1933) ("[a] client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law").

The Report's high-level reference to affidavits, correspondence and guilty pleas is no substitute for a probable cause finding specific to Project Veritas. The guilty pleas are proof of crimes committed by those defendants, and their crimes cannot vitiate the attorney-client privilege belonging to Project Veritas. Indeed, as explained below, the government's factual allegations in support of those guilty pleas actually ***disprove*** any criminal responsibility on the part of Project Veritas. And the reference to unspecified "government correspondence" is hardly the kind of proof that the law requires to justify invading the privilege. *See Omnicom Grp,*, 233 F.R.D. at 405 ("court findings that would deprive the client of that protection should be based on an adequate record and bear some assurance of reliability"). Undisclosed and undescribed arguments bear ***no*** assurance of reliability.

As for the search warrant affidavits, the Project Veritas provided ample reasons for the Special Master to discern that the affidavits must have been incomplete and/or misleading. Project Veritas' Sealed Objections to the Report explains in detail the factual statements we called to the attention of the Special Master that were made elsewhere by the government which contradict the

---

[15] In its discussion of the crime-fraud exception, the Report does not purport to adopt the probable cause findings by the various magistrate judges who approved the search warrants.

likely core premise of the search warrant affidavits—that Project Veritas journalists were "involved in" the theft of the Biden diary. *Id.* at 12. Simply put, these government statements constitute admissions that the Biden diary and property were already stolen (if they were stolen at all) ***before*** the sources approached Project Veritas.

We directed the Special Master's attention to specific communications and photographic evidence Project Veritas received from the sources ***before*** they brought the Biden diary and other property to New York. *See* Project Veritas' Crime-Fraud Exception at 2 n.1 & Exhibit A. Nothing further will be said about this evidence here, lest the government reprise its waiver argument, except to note that the evidence would have led any reasonable observer to believe that the sources had already acquired complete dominion and control over the Biden diary and property. This evidence further negates any inference the government invited the Magistrate Judge (and the Special Master) to draw that Project Veritas tasked the sources to acquire the Biden property—the sources ***already possessed it***. Stated another way, how could there be probable cause to believe that Project Veritas was involved in the theft of property that its journalists understood the sources had already acquired?

The Special Master was duty-bound to consider ***this*** factual record when deciding if the government carried its burden to show probable cause to believe that Project Veritas (not just its sources) committed a crime or fraud. This record belies the government's claims that Project Veritas tasked the sources to steal property, as well as the government's more artfully ambiguous accusations of wrongdoing. *See, e.g.*, Gov't Crime-Fraud Submission at 1 (contending its affidavits show that PV "engaged in a concerted effort…to [] steal personal items"). And this record renders illusory the Report's attempt to distinguish *Bartnicki* by insisting that it does not protect the "unlawful acquisition" of information or "excuse unlawful conduct by a journalist." *Id.* at 8. In

fact, the record contains **no** credible evidence of unlawful acts by Project Veritas. As explained above, under *Bartnicki* it is lawful for a journalist to receive information even if stolen by the source. This record demonstrates that, even if the sources "stole" the Biden property, that theft occurred well before they contacted Project Veritas.

There is no indication in the Report that the Special Master took account of this proof evidencing the provenance of the Biden diary and property, or instead merely relied on search warrant affidavits and other government communications that omitted it. In these circumstances the Report's determination that the government has satisfied the first prong of the crime-fraud exception cannot stand.

### 2.   *The Government Has Not Satisfied the "In Furtherance" Element.*

Whereas more generalized proof may satisfy the first prong of the crime-fraud exception, the government must provide granular proof to carry its burden under the second prong of the exception. For **each** attorney-client communication, the proponent of the exception must prove that the communication itself was for the purpose of furthering the contemplated offense. There is nothing at all granular about the Report's three-sentence application of the exception. *Id.* at 19 (stating only that "the government has, with respect to 10 documents, satisfied its burden"). And to the extent the Report purports to incorporate by reference the government's arguments, that approach also fails because the government's submission is woefully insufficient.

The law governing application of the second prong of the crime-fraud exception is well-established. *See U.S. v. Doe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999) (for second time, reversed lower court's crime-fraud determination that documents may be *evidence* of a crime without finding that communications were intended to *further* a crime) (emphasis added); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) ("the exception applies only when the court determines that the client communication or attorney work product in question was *itself* in furtherance of the crime or

fraud.") (emphasis in original); *In re Grand Jury Subpoenas*, 798 F.2d at 34 (same); *see also In re Gen. Motors LLC Ignition Switch Litig.*, 14-MD-2543 (JMF) 2015 WL 7574460 at *6 (S.D.N.Y. Nov. 25, 2015) ("[p]laintiffs do not provide a factual basis for a good faith belief that the communications and work product they seek—let alone any particular communications or work product they seek—were made with the intent to further a crime or fraud"); *In re 650 Fifth Ave.*, No. 08-CV-10934 (KBF), 2013 WL 3863866, at *2 (S.D.N.Y. July 25, 2013) ("[t]he Government must provide particularized evidence that *each* challenged communication was made *in furtherance of* the crime or fraud.") (emphasis in original).

In re Grand Jury Subpoenas* is especially instructive. There the Second Circuit vacated an order requiring production of privileged documents where the lower court failed to explain  how each document was intended to facilitate or conceal the alleged criminal activity. *In re Grand Jury Subpoenas*, 798 F.2d at 34.

The crime/fraud exception to the attorney-client privilege cannot be successfully invoked merely upon a showing that the client communicated with counsel while the client was engaged in criminal activity. The exception applies only when there is probable cause to believe that the communications with counsel were intended in some way to facilitate or to conceal the criminal activity. While the [prosecutor's] affidavit provides a temporal nexus between the alleged crimes and Richard Roe Corporation's communications with its attorneys, it does not support a finding that those communications were in furtherance of those crimes….We conclude that the documents themselves are insufficient alone or in combination with the [prosecutor's] affidavit to show the *requisite purposeful nexus*. *Id.* at 34 (internal citations omitted) (emphasis added).

The Report likewise contains no factual information or analysis showing the requisite **purposeful nexus**. Put another way, the Report does not explain how the various ordinary-course

topics of the attorney-client communications between the Project Veritas journalists and legal counsel facilitated or concealed any crime or fraud, much less any ongoing or future offense. Most fundamentally, as noted above, the Report did not even attempt to address the government's admissions that all the Biden property was delivered to New York on or before September 19, 2020, *see* Criminal Information at ¶ 19, and that the last overt act of the alleged conspiracy to obtain and transport the property occurred on September 17, 2020. *Id.* at ¶ 23. Any subsequent attorney-client communications could not have "furthered" the completed transportation of property or any alleged conspiracy to commit it.

Nor is the Report's blanket crime-fraud determination saved by reference to the government's arguments. As explained in Project Veritas' Sealed Objections to Report, *id.* at 15, the government's showing for many of the documents at issue merely asserted, without elaboration, that the communication "furthered" the transportation of property. Courts in the Second Circuit have consistently rejected such conclusory arguments. *See, e.g.*, *In re 650 Fifth Ave*, 2013 WL 3863866, at *2 ("this fails to demonstrate that every challenged communication by counsel []—taken one-by-one—was "in furtherance of" the crime or fraud, rather than evidence that their clients were engaged in such a crime or fraud"). As to the three communications that occurred before September 19, 2020, the government strained to describe how each communication might be evidence of an alleged offense. *See, e.g.*, Gov't Crime Fraud Submission at 4 (communications "relate to the Stolen Property"). But as the Report recognizes, "a showing that the material in question might provide evidence of a crime or fraud" does not satisfy the government's burden. *Id.* at 19 (*quoting In re Omnicom*, 233 F.R.D. at 408.

In sum, the Report contains no particularized findings, or document-by-document analysis, supporting its conclusion that the government met its burden of proving the subject

communications were in furtherance of any crime or fraud. And as demonstrated above and in Project Veritas' Sealed Objections to Report, the government's submission to the Special Master fell well short of satisfying the second prong of the crime-fraud exception with respect to any of the ten documents at issue.

## IV.    The Special Master Erred in Resolving Certain of Petitioners' Attorney-Client Privilege Objections.

The Report found that certain documents for which Project Veritas asserted attorney-client privilege were not entitled to protection because the communications were not "for the purpose of obtaining or providing legal advice." Report at 18. With no discussion of the individual communications, the Report observed that texts between Project Veritas employees and its legal counsel were "business communications (here, the business of journalism) that merely included a lawyer, or they were business communications where the lawyer was acting in a journalistic role, not an attorney role." *Id.*

Project Veritas' Sealed Objections to Report presents detailed reasons, specific to each document, that the attorney-client privilege protects the subject communications. We explain below, however, that the Report's privilege determinations exhibit two principal flaws.

***First***, the Report appears to conclude that communication of facts by the Project Veritas journalists to legal counsel are not privileged because those communications "do[] not contain legal advice." *See* Report at 18. This narrow perspective reflects a fundamental misunderstanding of the scope of the attorney-client privilege. In *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981) the Court recognized that "sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." Accordingly, the Court rejected the view that the privilege only protects advice, not the information communicated in order to secure that advice.

Such a view, we think, overlooks the fact that the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice. The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant. *Id.* at 390-91 (internal citations omitted). Indeed, many of the documents that the *Upjohn* court found to be protected by the privilege contained ***only*** facts. *Id.* at 396 ("While it would probably be more convenient for the Government to secure…the questionnaires…, such considerations of convenience do not overcome the policies served by the attorney-client privilege").

***Second***, the Report's perfunctory analysis of the attorney-client privilege also fails to take account of the specialized role of legal counsel for media organizations, a failure that is particularly acute in the assessment of those communications that concerned the process of authenticating the Biden diary. This flaw is a natural consequence of the Special Master's refusal to address the First Amendment arguments presented by Project Veritas. *See* Report at 9 n.6 ("[t]here is no basis to declare a First Amendment interest that affords additional protection here"). Had the Special Master weighed the important First Amendment interests at stake, she would have understood that counsel for media organizations routinely advise journalists on the element of ***newsworthiness***. Consideration of whether a potential story concerns newsworthy information is a fundamental step in minimizing the risk of defamation claims. Furthermore, whether a matter is private or one of public significance (i.e., newsworthy) is a predicate element in the analysis required by *Bartnicki*. *Id.* at 528 ("if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need . . . of the highest order.")

In the circumstance of this matter, a critical component of Project Veritas' legal risk analysis was authentication of the diary delivered by the sources. Stated another way, ***it made a difference*** whether the author of the diary recording possible sexual abuse by her father was the daughter of an individual then campaigning to become President of the United States. It cannot be seriously disputed that such conduct by a candidate for the highest public office would be a matter of public concern.

Without divulging details of these communications, it can be said generally that the primary means of authentication the Project Veritas journalists discussed with its CLO Jered Ede was confirmation that the handwriting in the diary was Ashley Biden's. Using an expert to compare known exemplars with questioned writings is one of the well-established methods to authenticate a document for purposes of admitting it in evidence. *See* Federal Rule of Evidence 901(b)(3) ("[a]comparison with an authenticated specimen by an expert witness"). There is no principled reason to treat differently for attorney-client privilege purposes CLO Ede's advice to his journalist-client on the process of authenticating a writing to establish its newsworthiness, then if he had communicated with them about the same exemplar information, and worked with an expert, to facilitate the admission of the writing as evidence at trial.

The Report's unduly narrow view of the role of legal advice in media organizations is precluded by the very precedent it cited. Report at 17. In *In re Cnty. of Erie*, 473 F.3d 413, 416 (2d Cir. 2007), the lower court ruled that the communications at issue concerned policy making and administration, not legal advice on Fourth Amendment issues. The proponent of the privilege, Erie County, petitioned for a writ of mandamus. *Id.* The Second Circuit likened the issue before it to "the question [of] whether the communication was generated for the purpose of obtaining or providing legal advice as opposed to business advice." *Id.* at 419. In granting the writ, the Second

Circuit found that the lower court's analysis failed to take account of the context within which the advice was requested. We have modified the *Erie* court's reasoning using bracketed language to illustrate its applicability here:

> The predominant purpose of a particular document—legal advice, or not—may also be informed by the overall needs and objectives that animate the client's request for advice. For example, [Project Veritas'] objective was to ascertain its obligations under the [First] Amendment and how those requirements may be fulfilled, rather than to save money or please the [readers] (even though these latter objectives would not be beyond the lawyer's consideration).

*Id.* at 421.

Like the trial court in *Cnty. of Erie*, the Report failed to take account of the context in which the Project Veritas journalists requested advice from counsel. The Report's reasoning that the journalists and CLO were merely engaged in the "business of journalism" when communicating about First Amendment and related risk issues is as unsupportable as the premise that the Erie County lawyers were merely engaged in the "business of policy." For the reasons stated above and in Project Veritas' Sealed Objections to Report at 30, the Report's conclusion that the advice in those communications was not for a legal purpose cannot be sustained.

## **CONCLUSION**

For the foregoing reasons, and based on the additional document-specific points addressed in Petitioners' accompanying sealed filing, this Court should accept these Objections; decline to adopt the Report's recommendations; find that the privileges claimed by Petitioners apply; and order that the documents at issue not be released to the Government's investigation team.

Dated: New York, New York
     May 2, 2023

                    Respectfully Submitted,

                    GRAVES GARRETT LLC

                    By: */s/ Edward D. Greim*

                        Edward D. Greim
                        Todd P. Graves (pro hac vice)
                        1100 Main Street St. 2700
                        Kansas City, MO 64105
                        (816) 256-4144
                        edgreim@gravesgarrett.com

                        SCHAERR | JAFFE LLP
                        Erik S. Jaffe
                        1717 K Street NW, St. 900
                        Washington, DC 20006
                        (202) 787-1060
                        ejaffe@schaerr-jaffe.com

                        *Counsel for Project Veritas*

| | |
|---|---|
| BARR & KLEIN PLLC<br>Benjamin Barr (admitted *pro hac vice*)<br>444 N. Michigan Ave., Ste. 1200<br>Chicago, IL 60611<br>202-595-4671<br>ben@barrklein.com<br><br>Stephen R. Klein (admitted *pro hac vice*)<br>1629 K Street NW Ste. 300<br>Washington, D.C. 2006<br>202-804-6676<br>steve@barrklein.com<br><br>*Counsel for Project Veritas and*<br>  *James O'Keefe* | Jeffrey H. Lichtman<br>Law Offices of Jeffrey Lichtman<br>11 E. 44th St., Suite 5011<br>New York, New York 10017<br>212-581-1001<br>jl@jeffreylichtman.com<br><br>Marc A. Fernich<br>Law Office of Marc Fernich<br>800 Third Avenue, Suite 18<br>New York, New York 10022<br>212-446-2346<br>maf@fernichlaw.com<br><br>*Counsel for James O'Keefe* |

| | |
|---|---|
| THE DICKERSON LAW GROUP, P.A.<br>Brian E. Dickerson<br>6846 Trail Boulevard<br>Naples, FL 34108<br>202-570-0248<br>bdickerson@dickerson-law.com<br><br>Eric Franz<br>The Law Offices of Eric Franz, PLLC<br>220 Old Country Road<br>Mineola, New York 11501<br>212-355-2200<br>eric@efranzlaw.com<br><br>*Counsel for Spencer Meads* | GREENBERG TRAURIG LLP<br>Adam S. Hoffinger<br>Steven Harrison<br>2101 L Street N.W., Suite 1000<br>Washington, D.C., 20037<br>202-331-3173<br>hofferinga@gtlaw.com<br><br>*Counsel for Eric Cochran* |