UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re Search Warrant dated November 5, 2021    :              21 Misc. 813 (AT)
                                          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re Search Warrant dated November 3, 2021    :              21 Misc. 819 (AT)
                                          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re Search Warrant dated November 3, 2021    :              21 Misc. 825 (AT)
                                          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE
TO PUBLIC PORTION OF THE PETITIONERS' OBJECTIONS DATED MAY 2, 2023**


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Jacqueline Kelly
Robert B. Sobelman
Mitzi Steiner
Assistant United States Attorneys
- Of Counsel -

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................. 2

STANDARD OF REVIEW ............................................................................................. 5

APPLICABLE LAW ....................................................................................................... 6

DISCUSSION .................................................................................................................. 8

   I.   The Special Master Correctly Rejected the Petitioners' Novel First and Fourth
      Amendment Contentions and Incorrect Application of *Bartnicki* ....................... 8

      A.  *Bartnicki* Does Not Provide For An Evidentiary Privilege ........................ 10

      B.  The First and Fourth Amendments Do Not Provide An Independent Basis for
           Privilege Over the Responsive Materials .................................................... 16

   II.  The Special Master Correctly Concluded that the Responsive Materials Are Not
       Protected By the Qualified Journalists' Privilege ............................................. 20

      A.  Categories of Responsive Materials Containing Nonconfidential Materials............. 20

      B.  Categories of Documents Not Subject to the Qualified Journalists' Privilege .......... 26

   III.  The Petitioners Have Waived Any Applicable Qualified Journalists' Privilege ............. 26

   IV.  The Special Master Correctly Stated the Law Regarding Attorney-Client Privilege and
       the Crime-Fraud Exception ............................................................................. 30

CONCLUSION ............................................................................................................... 30

## **TABLE OF AUTHORITIES**

### **Cases**

*Ayala v. Ayers*, 668 F. Supp. 2d 1248 (S.D. Cal. 2009)..............................................27

*Baker v. F & F Inv.*, 470 F.2d 778 (2d Cir. 1972) ........................................................7

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) .................................................9, 10, 11, 13

*Branzburg v. Hayes*, 408 U.S. 665 (1972)..............................................................6, 13

*Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011) ............................................6

*Cockrum v. Donald J. Trump for President, Inc*., 365 F. Supp. 3d 652 (E.D. Va. 2019) ...........15

*Cohen v. Cowles Media Co*., 501 U.S. 663 (1991).......................................................13

*Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410 (S.D.N.Y. 2019)..............13, 15

*Doane v. United States*, No. 08 Mag. 17 (HBP), 2009 WL 1619642 (S.D.N.Y. June 5, 2009)...18

*Doe v. DiGenova*, 642 F. Supp. 624 (D.D.C. 1986) ....................................................18

*Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988) .....................................................18

*Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29 (2d Cir. 1999)............................passim

*In re Petroleum Prod. Antitrust Litig*., 680 F.2d 5 (2d Cir. 1982)..................................7

*In re Search Warrant dated Nov. 5, 2021*, No. 21 Misc. 813 (AT), 2021 WL 5845146 (S.D.N.Y. Dec. 8, 2021)..................................................................2, 3, 17, 18

*In re Search Warrant dated Nov. 5, 2021*, No. 21 Misc. 813 (AT), 2022 WL 500919 (S.D.N.Y. Feb. 18, 2022) ...................................................................3, 17

*In re Search Warrant Executed on Nov. 5, 2021*, No. 21 Misc. 813 (AT), 2023 WL 3005726 (S.D.N.Y. Mar. 21, 2023) ...........................................................passim

*In re Search Warrants Executed on Apr. 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150 (S.D.N.Y. May 28, 2021).........................................................9, 18

*In re Sims*, 534 F.3d 117 (2d Cir. 2008) ............................................................28, 30

*In re Zyprexa Injunction*, 474 F. Supp. 2d 385 (E.D.N.Y. 2007) ................................15

*Inside Radio, Inc. v. Clear Channel Commc'ns, Inc*., 208 F.R.D. 537 (S.D.N.Y. 2002) ............27

*N.Y. Times Co. v. Gonzales*, 382 F. Supp. 2d 457 (S.D.N.Y. 2005)...............................19

*N.Y. Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006).......................................19, 23

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ................................................13

*Pinkard v. Johnson*, 118 F.R.D. 517 (M.D. Ala. 1987)............................................27, 30

*Schiller v. City of New York*, 245 F.R.D. 112 (S.D.N.Y. 2007)....................................28, 29

*Smith v. Daily Mail Publ'g Co*., 443 U.S. 97 (1979)..................................................13

*United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012)................................................................ 16

*United States v. Burke*, 700 F.2d 70 (2d Cir. 1983)................................................................. 7, 8

*United States v. Cutler*, 6 F.3d 67 (2d Cir.1993) ......................................................................... 22

*United States v. Harris and Kurlander*, 22 Cr. 457 (LTS) ........................................................... 3

*United States v. Spinosa*, No. 21 Cr. 206 (PAE), 2021 WL 2644936 (S.D.N.Y. June 28, 2021)  15

*United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013)............................................................... 27

*United States v. Treacy*, 639 F.3d 32 (2d Cir. 2011) ..................................................... 6, 8, 19, 22

*United States. v. Weissman*, No. S1 94 Cr. 760 (CSH), 1996 WL 737042 (S.D.N.Y. Dec. 26, 1996)................................................................................................................................................. 28

*von Bulow by Auersperg v. von Bulow*, 828 F.2d 94 (2d Cir. 1987) ........................................... 28

*Wheeler v. Goulart*, 593 A.2d 173 (D.C. 1991)............................................................................. 27

## **Statutes**

18 U.S.C. §§ 2314......................................................................................................................... 3

18 U.S.C. §§ 371............................................................................................................................ 3

42 U.S.C. § 2000aa ...................................................................................................................... 18

## **Regulations**

28 C.F.R. § 50.10 ..................................................................................................................... 18, 19

## PRELIMINARY STATEMENT

On March 21, 2023, the Special Master issued a Report and Recommendation (the "R&R)

regarding the Special Master's review of certain materials seized by the Government from the

Petitioners pursuant to judicially authorized search warrants.  As directed by the Court, the Special

Master and the parties engaged in a three-step process: first, the Special Master reviewed the

materials for responsiveness and provided those responsive materials to the Government's filter

team; second, the Government's filter team reviewed the materials for applicable privileges; and

third, the Petitioners reviewed the responsive materials designated by the filter team for release to

the Government's investigative team (the "Responsive Materials") and raised objections to those

designations to the Special Master.   The R&R contained the Special Master's conclusions

regarding the Petitioners' objections, including: (i) that the qualified journalists' privilege does not

apply to any of the materials designated as responsive; (ii) that attorney-client privilege does not

apply to several documents over which the Petitioners had claimed privilege; and (iii) that the

crime-fraud exception to attorney-client privilege applied to ten documents.  The Petitioners object

almost entirely to these findings, arguing that the R&R is flawed in numerous respects, including

because in it, the Special Master (i) rejects the Petitioners' novel theory that *Bartnicki* and the First

Amendment shield entirely the Responsive Materials from review; (ii) rejects the Petitioners'

sweeping interpretation of the reach of the qualified journalists' privilege; (iii) determined that the

crime-fraud exception overrides attorney-client privilege for certain documents; and

(iv) determined that numerous business-related communications are not protected by attorney-

client privilege.  (*See* Obj. 15 (Dkt. No. 127, 21 Misc. 813 (AT)).  These arguments, like those

presented by the Petitioners in their briefing before the Special Master, largely ignore or distort

the governing legal standards in favor of asking this Court to adopt an all-encompassing,

unqualified super-privilege for anyone who claims to be engaged in journalistic or news-related

activities.  The Court should soundly reject this entreaty and adopt the Special Master's R&R in its entirety.

## **BACKGROUND**

On November 4, 2021, the Federal Bureau of Investigation ("FBI") executed search warrants at Spencer Meads's and Eric Cochran's residences for certain electronic devices.  On November 6, 2021, the FBI executed a similar search warrant at James E. O'Keefe III's residence for cellphones.  The Government obtained the search warrants at issue as part of an ongoing grand jury investigation (the "Investigation") into the theft and interstate transportation of certain property stolen from an individual (the "Victim").  The warrants were supported by detailed affidavits and authorized by a federal magistrate judge, who found probable cause to believe that the subject premises and the devices therein contained evidence of federal crimes, including conspiracy to transport stolen property across state lines and interstate transportation of stolen property.[1]

On December 8, 2021, this Court appointed the Special Master to "oversee the review of the materials" seized pursuant to the aforementioned search warrants.  *In re Search Warrant dated Nov. 5, 2021*, No. 21 Misc. 813 (AT), 2021 WL 5845146, at *2 (S.D.N.Y. Dec. 8, 2021).  Specifically, the Court directed the Special Master to conduct "an initial review of the extracted materials to determine what materials are responsive to the search warrants," with a subsequent

---

[1] The Government provided the affidavits to the Special Master on an *ex parte* basis on December 13, 2021 and submitted an *ex parte* letter to the Special Master, at the Special Master's invitation, on December 29, 2021 ("Gov't *Ex Parte* S.M. Ltr."), in which the Government provided, among other things, an overview of the pertinent facts related to the Government's ongoing investigation.  The Government will provide both the affidavits and the letter to this Court on an *ex parte* basis contemporaneously with filing this memorandum, and requests that they remain under seal.

filter review to be conducted by the Government's filter team.  *Id.*  The Court further provided that

the filter team—after reviewing the responsive materials to determine if any should be withheld

from the investigative team—should release the materials to the Petitioners, who would then have

the opportunity to raise any objections.  *Id.*  The Court directed the Special Master to resolve any

disputes and then to provide the Responsive Materials that were not privileged to the investigative

team.  *Id.*  In the course of establishing this procedure, the Court rejected the Petitioners' attempt

to challenge the search warrants.  *Id.* at *1 ("The Court shall not consider arguments related to the

validity of the search warrants because that issue is not before the Court."); *see also In re Search*

*Warrant dated Nov. 5, 2021*, No. 21 Misc. 813 (AT), 2022 WL 500919, at *1 (S.D.N.Y. Feb. 18,

2022) ("As the Court has already made clear, the issue of the validity of the search warrants is not

before the Court, and, therefore, there is no impending decision on the merits in this action.").

On March 7, 2022, the Special Master issued an interim report, updating the parties on the

materials that had been released to the Government's filter team and soliciting proposals from the

parties as to the process for resolving privilege disputes.  (Dkt. No. 61, 21 Misc. 813 (AT)).  Later

that month, the Special Master set forth such procedures as well as a briefing schedule.[2]

On August 25, 2022, Aimee Harris and Robert Kurlander each pled guilty to one count of

conspiracy to commit interstate transportation of stolen property, in violation of 18 U.S.C. §§ 371

and 2314.  *See United States v. Harris and Kurlander*, 22 Cr. 457 (LTS).  Under the terms of his

plea agreement, Kurlander agreed to cooperate with the Government.  The Information to which

Harris and Kurlander pled guilty contains a summary of their criminal conduct, including conduct

---

[2] For completion of the record, the Government requests that the Court direct the Special Master
to publicly docket the Special Master's orders dated March 14 and 21, 2022.

connected to Project Veritas, one of its employees, and two of its executives.  (Dkt. No. 2, 22 Cr. 457 (LTS)).   In addition, Harris's and Kurlander's plea allocutions included specific admissions regarding their criminal conduct.  (Dkt. Nos. 12 & 14, 22 Cr. 457 (LTS)).

Specifically, Harris and Kurlander pled guilty to conspiring to steal, transport across state lines, and sell personal property that belonged to the Victim, whom Harris and Kurlander knew was an immediate family member of a then-former government official who was a candidate for national political office.  The Victim had stored the property, including a handwritten journal containing highly personal entries, tax records, a digital storage card containing private family photographs, and a cellphone, among other things, in a private residence in Delray Beach, Florida, at which Harris was temporarily residing.  After Harris stole the property, she enlisted Kurlander to help her facilitate its sale.  Harris and Kurlander then made contact with an employee of Project Veritas, who instructed them to use an encrypted application to communicate with Project Veritas and requested photographs of the Victim's property.  After receiving the photographs, Project Veritas offered to pay for Harris and Kurlander's transportation of the property from Florida to New York City.  Harris and Kurlander subsequently traveled to New York City with the Victim's property at Project Veritas's expense and met with some of the organization's employees.  During that meeting, Harris described the circumstances of how she had obtained the Victim's property, provided the property to Project Veritas employees, and disclosed that the Victim had stored additional property in the residence where Harris continued to have access.  After the meeting, and at Project Veritas's request, Harris and Kurlander returned to Florida to obtain more of the Victim's property in order to provide it to Project Veritas.  They later met with a Project Veritas employee in Florida and gave that employee more of the Victim's stolen property, believing that Project

4

Veritas would transport or cause the transport of the stolen property from Florida to Project Veritas's offices in New York, which Project Veritas subsequently did.   Project Veritas subsequently paid Harris and Kurlander each $20,000 for the stolen property.

On March 21, 2023, after reviewing the Petitioners' objections to the Government filter team's determinations and soliciting briefing from the parties, the Special Master issued her Report and Recommendation (the "R&R").   *In re Search Warrant Executed on Nov. 5, 2021*, No. 21 Misc. 813 (AT), 2023 WL 3005726 (S.D.N.Y. Mar. 21, 2023).[3]

On May 2, 2023, the Petitioners filed public and non-public objections to the R&R.   This memorandum is submitted by the Government's investigative team to respond to the public objections, which should be overruled in their entirety.   A separate memorandum will be submitted under seal by the Government's filter team to respond to the Petitioners' non-public objections on or before June 6, 2023.   (Dkt. No. 136, 21 Misc. 813 (AT)).

## STANDARD OF REVIEW

When reviewing a Special Master's report and recommendation, this Court "must decide de novo all objections made to findings of fact" and "conclusions of law," and reviews a "ruling on a procedural matter only for an abuse of discretion."   Fed. R. Civ. P. 53(f)(3)-(5).

---

[3] For completion of the record, the Government requests that the Court direct the parties to publicly docket the following submissions to the Special Master: the Petitioners' April 1, 2022 brief ("Pet. S.M. Br.") and letter, the Government's April 13, 2022 brief ("Gov't S.M. Br."), and the Petitioners' April 20, 2022 reply brief.

## APPLICABLE LAW

The Second Circuit recognizes a "qualified evidentiary privilege for information gathered in a journalistic investigation."[4]  *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011) (citing cases).  It is the burden of the person or entity claiming privilege to show entitlement to it. *Id.* at 309.  Further, the protection afforded by the privilege is not absolute.  *Id.* at 307 (citing *Branzburg v. Hayes*, 408 U.S. 665, 690-91 (1972)).  It may yield, for example, to law enforcement interests in certain circumstances.  *See Branzburg*, 408 U.S. at 690-91 (finding "no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial").

The qualified journalists' privilege applies to information derived from both confidential and nonconfidential sources.  *See United States v. Treacy*, 639 F.3d 32, 42 (2d Cir. 2011) ("a journalist possesses a qualified privilege protecting him or her from the compelled disclosure of even nonconfidential materials"); *Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29, 35 (2d Cir. 1999) (the "qualified privilege for journalists applies to nonconfidential, as well as to confidential, information").  However, the principles behind protecting these two types of journalistic information —and the corollary standard required to overcome the privilege in each context—are distinct.  The purpose of the qualified privilege with regards to confidential material is to "protect the important interests of reporters and the public in preserving the confidentiality of journalists'

---

[4] The Second Circuit has expressly declined to "wade into the[] constitutional waters" to determine whether "the reporter's privilege is derived from the First Amendment rather than a federal common law of privileges."  *United States v. Treacy*, 639 F.3d 32, 43 (2d Cir. 2011); *see also Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29, 33, 35 n.6 (2d Cir. 1999).

sources." *In re Petroleum Prod. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982); *see also Baker v. F & F Inv.*, 470 F.2d 778, 781-83 (2d Cir. 1972) (recognizing journalist's right to protect confidential sources).  Where the privilege is established, information from confidential sources or materials may only be obtained upon a showing that the information is "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *Gonzales*, 194 F.3d at 33 (quoting *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d at 7).  This "demanding burden has been imposed by the courts to reflect a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment." *United States v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983).

By contrast, the purpose of the qualified privilege with regards to nonconfidential sources is to, among other things, avoid "burden[ing] the press with heavy costs of subpoena compliance," "otherwise impair[ing] its ability to perform its duties" by deterring "potential sources . . .  from speaking to the press . . . because of the likelihood that they would be sucked into litigation," and the "symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties." *Gonzales*, 194 F.3d at 35.  This "showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought." *Id*. at 36.  Consequently, the protected interest where confidential sources are not involved is "narrower," and the privilege is more "easily overcome." *Id.* at 36.  In those circumstances, the privilege is overcome where "the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Id.* at 36.

The qualified privilege applies similarly to compelled disclosure in civil and criminal cases. *See Treacy*, 639 F.3d at 43 ("[W]here a reporter is not protecting a confidential source or confidential materials, the showing required to overcome the journalist's privilege is the same in a criminal case as it is in a civil case—namely, the showing required by *Gonzales*—and that . . . is true whether the party seeking to overcome the privilege is the prosecution or the defense."); *Burke*, 700 F.2d at 77 ("We see no legally-principled reason for drawing a distinction between civil and criminal cases when considering whether the reporter's interest in confidentiality should yield to the moving party's need for probative evidence."). Indeed, the Second Circuit has recognized that it "once set too *high* a bar for overcoming the privilege in criminal cases and consciously lowered that bar" to the standard articulated in *Gonzales*. *Treacy*, 639 F.3d at 43; *see also Gonzales*, 194 F.3d at 34 n.3.

## **DISCUSSION**

The Petitioners fail to articulate any persuasive reason to set aside the Special Master's conclusions regarding the inapplicability of the qualified journalists' privilege to the Responsive Materials as well as the other privileges and protections the Petitioners claim shield the Responsive Materials from disclosure to the Government's investigative team. With the exception of the materials for which the Special Master has concluded that there is a valid claim of attorney-client privilege, the Responsive Materials should be provided to the Government's investigative team without further delay.

## I. The Special Master Correctly Rejected the Petitioners' Novel First and Fourth Amendment Contentions and Incorrect Application of *Bartnicki*

The Petitioners' primary objection is that the Special Master rejected their attempt to manufacture a novel privilege arising from the First and Fourth Amendments that would

conveniently support their overbroad claim that all of the Responsive Materials are privileged. (Obj. 10-22).  The Special Master correctly turned aside the Petitioners' "ambitious six-part framework" as "unnecessary."  *In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at *4.  Indeed, this Court "must apply the Second Circuit's standard here," and the "Petitioners have not established any reason to modify the Second Circuit standard."  *Id.*

*First*, "[t]here is no basis to declare a First Amendment interest that affords additional protection here."  *Id.* at *5 n.6.  "Given the judicially authorized search warrants, the government's interest in investigating criminal conduct, and the strict procedure [created by this Court] for avoiding intrusion into non-responsive materials, no such reason exists here."  *Id.*  The Supreme Court's decision in *Bartnicki v. Vopper*, 532 U.S. 514 (2001), on which the Petitioners heavily and misguidedly rely, provides no basis to find otherwise.  As the Special Master noted, *Bartnicki* does not "protect" the unlawful acquisition of information by the press: "[i]t does not suggest that people are free to commit unlawful acts simply because they are journalists."  *In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at *4.

*Second*, this Court should "not apply a heightened standard of scrutiny to the warrants because of Fourth Amendment concerns."  *Id.* at *5.  In light of the Government's reliance on judicially-authorized warrants and the status of the Government's ongoing grand jury investigation, the Petitioners' "invocation of the Fourth Amendment is premature."  *Id.* (citing *In re Search Warrants Executed on Apr. 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021)).  Rather, the purpose of this proceeding "is to adjudicate privilege, not to pass on the propriety of the warrants, and there is no legal basis for incorporating a Fourth Amendment analysis into the privilege review."  *Id.*

### A.    *Bartnicki* Does Not Provide For An Evidentiary Privilege

The Petitioners inaccurately argue that the Responsive Materials are privileged because the Supreme Court's holding in *Bartnicki* provides them blanket protection from any criminal investigation into the offenses articulated in the search warrants.  (Obj. 14-22).  Not so.  As an initial matter, as discussed below, the Petitioners' repeated unsworn claim to the Special Master that they "played no part" in the "illegal acquisition" of the Victim's property (*see* Obj. 11; Pet. S.M. Br. 5) is false and, in any event, insufficient to immunize them from investigation before the totality of the evidence is known to the Government.  Moreover, the holding of *Bartnicki* is entirely immaterial to the question of whether the qualified journalists' privilege attaches to the Responsive Materials.  To the extent *Bartnicki*'s principles are relevant in the privilege context, they are already accounted for by the established *Gonzales* standard.  Further, and most fatally to the Petitioners' argument, even if *Bartnicki* were applicable, the Petitioners would not be entitled to its protection due to the evidence of their direct involvement in the criminal conduct under investigation.

The holding of *Bartnicki* "addressed the narrow question of whether civil liability may be imposed on a publisher who obtained information in a lawful manner but from a source who obtained it unlawfully, a question the Supreme Court answered in the negative."  *In re Search Warrant Executed on Nov. 5, 2011*, 2023 WL 3005726, at *4.  Specifically, the Supreme Court held that members of the media could not be held *civilly* liable for disclosing illegally intercepted communications where those making the disclosures did not participate in the interception, but did know—or at least had reason to know—that the interception was unlawful.  *See Bartnicki*, 532 U.S. at 528, 534.  The Court based its holding on the need to weigh "privacy concerns" against "the interest in publishing matters of public importance."  *Id*. at 534.  The holding of *Bartnicki*

thus dictates whether those involved with the dissemination of illegally obtained materials, in a matter of public concern, can be held liable in a civil case.

Here, however, "the question is whether the Government may receive documents responsive to valid search warrants." *In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at *4. *Bartnicki* "does not speak to this issue," nor does it provide any "general principles" concerning the valid privileges that may apply. *Id*. Indeed, if *Bartnicki* had any applicability in this matter (which it does not), it would be in the future assessment of ultimate liability, not in prematurely shutting down a federal criminal investigation. *See id*. ("*Bartnicki* certainly does not foreclose a government investigation of unlawful acts in acquiring material or excuse unlawful conduct by a journalist.").

Further, to the degree that *Bartnicki*'s principles are applicable, they are encompassed in the firmly rooted standard for the qualified journalists' privilege articulated in *Gonzales* and its progeny. The *Gonzales* standard encapsulates similar First Amendment concerns as *Bartnicki*, including "the public policy interest in safeguarding the confidentiality of those who convey information to the press," "the pivotal function of reporters to collect information for public dissemination," and the "symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties." *Gonzales*, 194 F.3d at 35; *see also Bartnicki*, 532 U.S. at 534-35. Thus, the *Gonzales* holding reflects the same underlying principles and establishes the standard for those protections in the privilege context. Here, the *Gonzales* test requires only that the Government establish that the Responsive Materials, which are nonconfidential in nature, are "of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d. at 36. Since the

Responsive Materials were seized pursuant to judicially authorized warrants, and are not reasonably available from other sources, they easily clear this threshold.

The Petitioners nevertheless argue that *Bartnicki* requires that the privilege attach to everything except "communications and documents seized from Project Veritas (if any) that evidence its journalists' participation in the theft of information not already in the possession of the sources." (Obj. 14). That is plainly inconsistent with the *Gonzales* standard and basic principles of relevance. To be of "likely relevance to a significant issue in the case," *Gonzales*, 194 F.3d at 36, each piece of evidence need not prove guilt on its own. Rather, each piece of evidence may be a brick in the evidentiary wall, which may join with numerous other pieces of evidence gathered in the course of the Government's investigation to establish that the crimes under investigation were committed. And under *Gonzales*, once the qualified privilege has been overcome, there is no basis for further protecting otherwise responsive content based on a party's subjective evaluations of the relative strength of a particular piece of evidence. "Nor does *Bartnicki*'s holding restrict the evidence the Government may receive under" Second Circuit case law governing the qualified journalistic privilege. *In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at *4.

Finally, even if the Court were to take the unprecedented view that the holding in *Bartnicki* should be read to create additional First Amendment protections akin to an evidentiary privilege (which it cannot), the Petitioners would still not be entitled to such protection because there is probable cause to believe that they were actively involved in the unlawful conduct under investigation. *See id*. at *4 n.4, *5 ("the Government is investigating the conduct of the Petitioners as well") & n.7. The Supreme Court's First Amendment jurisprudence draws a clear and critical

12

distinction "between stealing documents and disclosing documents that someone else had stolen previously." *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 431 (S.D.N.Y. 2019); *see generally id*. at 430-31 (canvassing relevant case law).  In *Bartnicki*, for example, a radio commentator published a recording that he had legally obtained but which he knew or had reason to know had been illegally intercepted by a third party.  532 U.S. at 517-18.  The defendants in that civil case were protected by the First Amendment, but that protection rested on three factual assumptions: (1) they "played no part in the illegal interception" and learned about it only after it had occurred; (2) "their access to the information on the tapes was obtained lawfully, even though the information itself was intercepted unlawfully by someone else"; and (3) "the subject matter of the [recorded] conversation was a matter of public concern." *Id*. at 525.  These first two factual predicates reflect long-standing Supreme Court precedent drawing a distinction between active involvement in criminal conduct and passive receipt of stolen property or information.  *See, e.g.*, *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (upholding press's right to publish information of public concern obtained from documents stolen by a third party); *Smith v. Daily Mail Publ'g Co*., 443 U.S. 97, 99, 103 (1979) (state officials may not constitutionally punish publication of "lawfully obtained" truthful information absent need to further state interest of the highest order).  Put simply, even members of the news media "may not with impunity break and enter an office or dwelling to gather news." *Cohen v. Cowles Media Co*., 501 U.S. 663, 669 (1991); *see also Branzburg*, 408 U.S. at 691 ( "It would be frivolous to assert . . . that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws.").

13

As the Government has previously explained, the Petitioners fall on the wrong side of that distinction.  (*See* Gov't S.M. Br. 17-18; S.M. Opp'n 1, 3-4, 7 (Dkt. No. 29, 21 Misc. 813 (AT)); Gov't *Ex Parte* S.M. Ltr. 4-9).  For example, and as publicly described in connection with Harris's and Kurlander's guilty pleas, Harris and Kurlander, at Project Veritas's request, returned to Florida from New York after providing certain property stolen from the Victim to Project Veritas in New York, in order to obtain more of the Victim's property on Project Veritas's behalf.  They later met with a Project Veritas employee in Florida and gave that employee more of the Victim's stolen property, believing that Project Veritas would transport or cause the transport of the stolen property from Florida to the Project Veritas's offices in New York, which Project Veritas subsequently did.  Project Veritas subsequently paid Harris and Kurlander each $20,000 for the stolen property.  Thus, this case does not involve mere passive receipt, let alone passive receipt and subsequent publication by a journalist of information on a matter of public concern.  Rather, based on the evidence gathered to date, including evidence described in detail in the sealed affidavits submitted in support of the search warrants at issue, there is evidence demonstrating (at the very least) probable cause to believe that Project Veritas, O'Keefe, Meads, and Cochran were actively involved in the unlawful conduct under investigation—the interstate transportation of stolen property, as well as the theft of certain of the property itself.

The Petitioners' unsworn protestations to the contrary are unpersuasive, and their reliance on cases involving mere "solicitation" of stolen property (*see* Obj. 11, 17, 44-45) are inapposite based on the evidence developed to date, including that set forth in the Government's *ex parte*

submission to the Special Master.[5]  (*See* Gov't *Ex Parte* S.M. Ltr. 4-6).  Therefore, although the Court need not reach this issue to determine the applicability of the qualified journalists' privilege, the Petitioners are not entitled to additional First Amendment protection with regard to the conduct at issue.  *See, e.g.*, *Democratic Nat'l Comm.*, 392 F. Supp. 3d at 431; *Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652, 657 (E.D. Va. 2019) (rejecting First Amendment argument to dismiss civil complaint by respondent where respondent was alleged to have conspired with the parties who illegally obtained the information at issue); *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 396 (E.D.N.Y. 2007) (discussing Pentagon Papers case and concluding that, in contrast to the Pentagon Papers case, the reporter in question in *Zyprexa Injunction* was "deeply involved in the effort to illegally obtain" documents).  As such, even assuming *arguendo* that *Bartnicki* applies in this context, no related privilege would attach to the materials that were in the Petitioners' possession, were deemed responsive to the search warrants, and therefore constitute evidence of their involvement in criminal conduct.[6]

---

[5] To be clear, the Court need not resolve this apparent dispute in order to rule on the Petitioners' objections.  In the context of evaluating the applicability of potential privileges, and exceptions thereto, the Government's demonstration of probable cause is sufficient.  *Cf. United States v. Spinosa*, No. 21 Cr. 206 (PAE), 2021 WL 2644936, at *5 (S.D.N.Y. June 28, 2021) ("To invoke the crime-fraud exception, a party must demonstrate that there is a factual basis for a showing of *probable cause* to believe that a fraud or crime has been committed—or has been attempted—and that the communications in question were in furtherance of the fraud or crime." (emphasis added)).

[6] The Petitioners' hyperbolic attempt to suggest hypotheticals that might somehow support their argument fails as well.  For example, the Petitioners suggest that under the Special Master's ruling, "[f]orwarding an illegally obtained email sent to a journalist would constitute 'transportation' by interstate wire that would supposedly be different form mere publication of a story."  (Obj. 22).  Separate and apart from any potential First Amendment protection of such conduct, Second Circuit

**B.    The First and Fourth Amendments Do Not Provide An Independent Basis for Privilege Over the Responsive Materials**

In addition to attempting to import *Bartnicki* into a context in which it has no bearing, the Petitioners also attempt to manufacture a novel privilege concocted from the purported interplay between the First and Fourth Amendments to support their overbroad claim that all of the Responsive Materials are privileged.  (*See* Obj. 20-22).  Their argument is meritless.

The Petitioners contend that the Court should displace the Second Circuit's well-settled *Gonzales* standard with constitutional law tests and analyses drawn from cases far afield from those governing evidentiary privilege in federal criminal investigations.  As discussed above, the *Gonzales* standard already accounts for the very First Amendment principles about which the Petitioners purport to be concerned.  Similarly, the Petitioners argue that Fourth Amendment principles somehow also bear on their newly-invented privilege, though they ignore the fact that the searches and seizures here are presumptively reasonable under the Fourth Amendment because they are being conducted pursuant to judicially-authorized search warrants.  Nevertheless, on the basis of this novel "privilege," the Petitioners argue that the Responsive Materials should be subject to a blanket privilege because, among other things, the search warrants were somehow "unlawful."  (Obj. 37).[7]

The Petitioners' arguments—which are unfounded in fact and law—are entirely irrelevant

---

precedent would appear to place such conduct outside the ambit of Section 2314.  *See United States v. Aleynikov*, 676 F.3d 71, 76-77 (2d Cir. 2012) (holding that theft and subsequent interstate transmission of purely intangible property is beyond the scope of Section 2314, and reversing conviction of defendant who stole and transmitted across state lines an investment bank's propriety source code for high-frequency trading).

[7] The Petitioners appear to have abandoned their frivolous assertion, made to the Special Master, that the Government acted in "bad-faith."  (Pet. S.M. Br. 18).

to the analysis of the qualified privilege that the Special Master found uniformly does not attach to the Responsive Materials.  *See In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at *7-9.  As the Petitioners acknowledged in their brief to the Special Master, "[t]he different First Amendment interests involved in newsgathering and reporting often coalesce in the form of a First Amendment or common-law reporters' privilege."  (Pet. S.M. Br. 9; *see also* Obj. 26 (recognizing that the Second Circuit has a "well-developed common law privilege")).  And as the Petitioners concede, the *Gonzales* standard provides the applicable test within the Second Circuit for assessing the qualified journalists' privilege.  (*See* Obj. 24-26).  The various First Amendment principles articulated by the Petitioners "coalesce" in—and are not separate and apart from—the established *Gonzales* standard.  The Petitioners' attempt to create a new, additional First Amendment privilege to layer on top of the *Gonzales* test for evaluating the qualified privilege should be rejected.

Further, to the extent the Petitioners challenge the veracity of the search warrants under the Fourth Amendment (*see, e.g.*, Obj. 37 (describing the search warrants as "unlawful")), their claims are premature, improperly raised in this forum, and irrelevant to whether the Responsive Materials are privileged.  This Court has now twice expressly ruled that it "shall not consider arguments related to the validity of the search warrants because that issue is not before the Court."  *In re Search Warrant dated Nov. 5, 2021*, 2021 WL 5845146, at *1; *see also In re Search Warrant dated Nov. 5, 2021*, 2022 WL 500919, at *1.  The Special Master agreed and, consistent with this Court's instructions, carried out the mandate to conduct a responsiveness review of the devices and resolve any privilege disputes.  *In re Search Warranted Executed on Nov. 5, 2021*, 2023 WL 3005726, at *5 ("The invocation of the Fourth Amendment is premature.  My role is to adjudicate privilege,

17

not to pass on the propriety of the warrants, and there is no legal basis for incorporating a Fourth Amendment analysis into the privilege review."); *see also In re Search Warrant dated Nov. 5, 2021*, 2021 WL 5845146, at *2–3. The Petitioners cannot prematurely raise potential Fourth Amendment challenges to the search warrants at this pre-indictment stage of an ongoing grand jury investigation. *See In re Search Warrants Executed on Apr. 28, 2021*, 2021 WL 2188150, at *2 ("any pre-indictment suppression motion would be premature at this juncture"); *Doane v. United States*, No. 08 Mag. 17 (HBP), 2009 WL 1619642, at *9 (S.D.N.Y. June 5, 2009) (petitioner's motion to suppress was not "ripe for adjudication" because "[n]o criminal charges have been brought").

The Petitioners also attempt to invoke the Privacy Protection Act (the "PPA"), 42 U.S.C. § 2000aa *et seq*., and certain Department of Justice regulations and guidelines, including 28 C.F.R. § 50.10. (Obj. 23, 33, 35-37). None of these provisions, however, provides any support for finding the existence of a privilege where none otherwise exists or for any other relief in this forum. The PPA sets forth a private right of action for damages where the Government unlawfully searches for or seizes documents or work product materials intended for public dissemination in or affecting interstate or foreign commerce. *See* 42 U.S.C. §§ 2000aa(a) and (b), 2000aa-6. Indeed, the PPA expressly provides that "an issue relating to the compliance, or the failure to comply, with guidelines issued pursuant to [the PPA] may not be litigated, and a court may not entertain such an issue as the basis for suppression or exclusion of evidence." 42 U.S.C. § 2000aa-12; *see also Doe v. DiGenova*, 642 F. Supp. 624, 631 (D.D.C. 1986) ("the [PPA] specifically provides that a failure to comply with the guidelines may not be litigated"), *aff'd in part and rev'd in part on other grounds*, *Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988).

18

Similarly, it is well-settled that 28 C.F.R. § 50.10 "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person."  28 C.F.R. § 50.10(t) (effective Nov. 3, 2022); 28 C.F.R. § 50.10(j) (effective Jan. 21, 2015) (same); *see also N.Y. Times Co. v. Gonzales*, 382 F. Supp. 2d 457, 484 (S.D.N.Y. 2005) (28 C.F.R. § 50.10 "confer[s] no substantive rights or protections such as may be privately enforced"), *vacated and remanded on other grounds*, 459 F.3d 160 (2d Cir. 2006).  Moreover, the Second Circuit has found no reason merely "because the Department of Justice has adopted strict guidelines for itself with respect to subpoenaing reporters, *see* 28 C.F.R. § 50.10, [to] adopt the same principles as binding propositions of law" with respect to the qualified privilege.  *Treacy*, 639 F.3d at 43.  That is because the "Justice Department's internal regulations governing the issuance of subpoenas to journalists, . . . exist wholly apart from any privilege established in the case law."  *Id.* at 43 n.3.  Accordingly, neither the PPA nor Department of Justice regulations provide any support for the Petitioners' objections.

In sum, the Petitioners' novel theory—and their premature, misguided challenges to the search warrants and the Investigation more broadly—form no basis for the application of any privilege.  Put simply, the validity of the Government's search warrants, the investigative steps taken during its Investigation, the strength of the evidence gathered to date, and whether additional charges are forthcoming, is not before this Court.  Accordingly, the Court should join the Special Master in declining the Petitioners' invitation to engage with what amounts to a pre-indictment suppression motion or to allow a narrow privilege determination to be transformed into a wide-ranging referendum on the Government's investigation.

**II.    The Special Master Correctly Concluded that the Responsive Materials Are Not Protected By the Qualified Journalists' Privilege**

The Petitioners next argue that the Special Master misapplied the qualified journalistic privilege.  This argument, too, should be rejected.  The Special Master correctly determined that none of the Responsive Materials are shielded by the qualified journalists' privilege.  As the Special Master noted, the applicable privilege standard "depends on whether the documents are confidential, nonconfidential, or not subject to the privilege." *In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at \*5.  Although the investigative team for the Government has not reviewed any of the Responsive Materials, it adopts the categories set forth in the R&R for purposes of this discussion.

**A.    Categories of Responsive Materials Containing Nonconfidential Materials**

The Special Master correctly applied the *Gonzales* test to determine that four categories of the Responsive Materials were not protected by the qualified journalistic privilege and should be produced by the Special Master to the investigative team: (i) communications with sources and communications that identify sources; (ii) internal Project Veritas documents about the Victim's property and potential story; (iii) external communications during investigation of potential story; and (iv) communications regarding the decision not to publish.[8]  *In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at \*8.  Here, as the Special Master concluded, the proper test to overcome the qualified privilege is the one prescribed in *Gonzales* for non-confidential

---

[8] As the Government set forth in its brief to the Special Master, although the Government is unaware of any case in which the *Gonzales* standard has been applied to materials obtained by search warrant, for which a showing of probable cause has been made, the Government assumes *arguendo* that the test would apply to such materials and the Petitioners have offered no reasonable alternative standard.

information.  *Id.* at *7-8.  That is because even as to "communications with sources and communications that identify sources," it is clear that the Responsive Materials do not contain confidential information collected during a journalistic investigation.  Rather, the Petitioners themselves have made the details of their "investigation" public, including by confirming the identity of their sources in their public court filings.  *Id.* at *7.

The Petitioners argue nonetheless that the Responsive Materials should be deemed confidential "if they were gathered under an understanding of confidentiality."  (Obj. 26).  The Petitioners' argument fails on its face.  The Responsive Materials were obtained from electronic devices that were in the possession of the Petitioners and do not include any of the Victim's stolen property that the Petitioners may deem confidential.  Indeed, the Petitioners chose not to publish the results of their purported investigation which further undermines any alleged need to protect its confidentiality.  Further, to the extent Petitioner argues that "it is the reporter, not the source, who controls the privilege" (Obj. 26), that argument also fails where, as noted above, the Petitioners have repeatedly described their investigation in court filings and other public statements, including by referencing the identity of their "sources."  *See, e.g.*, Pet. S.M. Mot. at 3-4 (Dkt. No. 1, 21 Misc. 813 (AT)); Pet. Prop. Mot. at 3-7 (Dkt. No. 70, 21 Misc. 813 (AT)); *FBI and Southern District of New York Raid Project Veritas Journalists' Homes*, https://youtu.be/nNpbvsS7K0g (O'Keefe video statement regarding nature of purported investigation).  The Responsive Materials—which pertain directly to the criminal conduct on the part of the Petitioners and their associates—are therefore nonconfidential, as the details of the Petitioners' purported investigation are already publicly known, the Petitioners' "sources" have already been confirmed through public references made by the Petitioners and Harris's and

Kurlander's guilty pleas, and the search warrants themselves do not otherwise seek to uncover confidential information.

Further, the *Gonzales* test for nonconfidential materials is easily met here. Despite the Petitioners' empty protestations to the contrary, there can be no serious dispute that (i) the materials are relevant to the crimes under investigation, and (ii) that they are not reasonably available elsewhere. *First*, by authorizing the search warrants, a federal magistrate judge has already determined that probable cause exists that the offenses under investigation were committed and that the seized devices contain evidence of that criminal conduct. Indeed, the Special Master has rightly determined that the Responsive Materials fall within the narrow scope of the search warrants and are therefore relevant to facts at issue in the criminal conduct under investigation. That showing more than satisfies the first prong of the *Gonzales* test. *See Gonzales*, 194 F.3d at 36 (concluding that qualified privilege was overcome in civil rights action where materials sought, including "certain unedited, unbroadcast videotapes . . . as well as deposition testimony from NBC representatives" were relevant to a significant issue in the case because they "may assist the trier of fact in assessing whether [the defendant] had probable cause to stop the NBC vehicle and might help determine whether he engaged in a pattern or practice of stopping vehicles without probable cause, as the Plaintiffs allege"); *see also Treacy*, 639 F.3d at 43 (concluding that the Government was entitled to subpoena reporter's testimony at trial, despite assertion of qualified privilege, where the materials included exculpatory statements that could provide circumstantial evidence of guilt); *United States v. Cutler*, 6 F.3d 67, 73 (2d Cir. 1993) (concluding criminal defendant could overcome qualified privilege where the information sought was "probably the only significant proof regarding his assertedly criminal behavior" and therefore relevant to

"defend[ing] against the charge that his statements were criminally contemptuous").[9]

Similarly, in *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 170-72 (2d Cir. 2006), the Second Circuit concluded that the qualified privilege was overcome where, as here, the relevant materials were directly related to the crimes in question.  In that case, the Government subpoenaed third parties for reporter records related to the "unauthorized disclosures of imminent plans of federal law enforcement to seize assets and/or execute searches of two organizations under investigation for funding terrorists."  *Id*. at 170.  The Court found that the qualified privilege was inapplicable since "the reporters were not passive collectors of information," but, rather, "[t]he communications to the two foundations were made by the reporters themselves and may have altered the results of the asset freezes and searches," such that "the reporters' actions are central to (and probably caused) the grand jury's investigation."  *Id*.  Here too, the Responsive Materials are directly relevant to the crimes at issue and are therefore integral to the Government's ongoing grand jury investigation.

The Petitioners nevertheless argue that the Special Master "circumvents" this part of the *Gonzales* test by relying on the affidavits submitted in support of the warrants.  (Obj. 37).  However, the fact that the Petitioners are not privy to the same information presented by the Government to the magistrate who found probable cause has no bearing on the Special Master's analysis.  For instance, the Petitioners argue that the Special Master did not sufficiently analyze the crimes under investigation, including by assessing whether the Responsive Materials were

---

[9] The Petitioners' reliance on the PPA to defeat the relevance prong of the *Gonzales* test for qualified journalists' privilege is also misplaced.  (Obj. 35).  The Petitioners cite no authority for relying on the PPA in this context whatsoever, never mind where the purported privilege holders are the "suspects" under investigation.

relevant to Project Veritas's knowledge that the materials were stolen and when Project Veritas became aware of that fact.  (Obj. 34).  But there is no requirement that the Special Master articulate a detailed factual analysis that would provide the Petitioners with the equivalent of pre-indictment discovery.  Relatedly, the Petitioners appear to argue, in sum and substance, that it is unfair that they cannot adjudicate the relevance of the Responsive Materials because the factual record is not sufficiently developed *to them* to allow a full adversarial hearing.  (Obj. 37 – 38).  But none of the precedent they cite can reasonably be read to necessitate the Government revealing the contents of an ongoing grand jury investigation in order to litigate privilege pre-indictment.  Those cases are simply inapposite in this posture, and the Petitioners identify no authority that would prevent the Court from relying on the affidavits and the issuance of the warrants to inform its analysis here.

*Second*, the Special Master also rightly concluded that the Responsive Materials are not reasonably attainable from other sources.  *In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at *8.  As the Special Master noted, although Harris and Kurlander may have provided some duplicative communications, that does not indicate that no additional relevant information would be contained on the Petitioners' electronic devices.  Rather, the nature of the Petitioners' communications with each other and other potential coconspirators regarding the criminal offenses – including the use of encrypted applications – indicates that the Responsive Materials are likely solely obtainable from the Petitioners' personal devices.[10]  Moreover, even if the Responsive Materials were available from an alternative source, their existence on the

---

[10] To the extent the Petitioners suggest that the Responsive Materials may have been obtained by subpoena, it bears noting that Project Veritas has interposed the same overbroad privilege claims in response to a subpoena served on the entity in November 2021.  Indeed, despite this Court's denial of Project Veritas's motion for an extension of the subpoena's return date (Dkt. No. 40), the entity has not produced a single document pursuant to that subpoena.

Petitioners' devices—including related metadata, reflecting timing and location—is itself substantial evidence that is directly pertinent to the Investigation, may bear on the Petitioner's involvement in the criminal conduct, and is, by its unique nature, unobtainable from other sources.

Further, even under the more stringent test for confidential information, the categories of documents the Special Master identified would still not be protected by the qualified journalists' privilege. The fact that the Special Master has designated the Responsive Materials as responsive to the search warrants establishes that they are evidence of the facts at issue in the Government's ongoing criminal investigation, and therefore are highly material and relevant to the development of those facts. For the reasons set forth above, the Responsive Materials—including that the Responsive Materials were located on the devices and include the metadata associated with those materials—are not available from other sources apart from the devices themselves.

The third prong of the *Gonzales* test for confidential information—whether the Responsive Materials are "necessary or critical to the maintenance of [a] claim"—seems on its face to be inapplicable to the instant circumstances. That is because the evidence at issue was obtained through the execution of a search warrant, after a showing of probable cause, and the Government has yet to initiate a prosecution of the Petitioners and would potentially be frustrated in doing so without access to the Responsive Materials. Indeed, to date, the *Gonzales* test appears to have been exclusively applied in the post-indictment context, rather than during the pendency of a criminal investigation where a criminal "claim" is necessarily absent.[11] Thus, at this stage of the Government's investigation, its satisfaction of the first two prongs of the *Gonazales* analysis is the

---

[11] The Government is unaware of any case in which the *Gonzales* standard has been applied to materials obtained by search warrant, for which a showing of probable cause has been made, rather than other evidence sought after charges have been brought in a prosecution.

most relevant and apt analysis.  Moreover, to the extent the third prong of the *Gonzales* standard does apply equally to a Government investigation, as to a charged criminal offense, the Responsive Materials are "necessary" and "critical" to the Government's investigation, as there is probable cause to believe they consist of evidence of criminal offenses under investigation.  Accordingly, even if the Court concluded that these materials are confidential—which they are not—the *Gonzales* test is still satisfied here.

### B.    Categories of Documents Not Subject to the Qualified Journalists' Privilege

The Special Master concluded that no qualified journalists' privilege applies to the remaining four categories of documents: (i) communications regarding a blog's publication of the Victim's diary; (ii) communications regarding the deposit of the Victim's property with law enforcement; (iii) communications that post-date the deposit of the Victim's property; and (iv) miscellaneous administrative documents.  *In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at *8-9.  The Petitioners generally argue that these categories too should be treated as subject to the qualified journalists' privilege because they relate to the same subject matter.  (Obj. 30 – 32).  As the Government's investigative team has not seen the Responsive Materials, it is not in a position to fully assess the Petitioners' claim.  However, even assuming *arguendo* that the *Gonzales* test applied to all of the Responsive Materials, because the Special Master had previously found that these documents were responsive to the warrants, and because the same reasoning regarding relevance and unavailability would similarly apply, the Government maintains that no qualified journalists' privilege would protect these materials from disclosure.

### III.    The Petitioners Have Waived Any Applicable Qualified Journalists' Privilege

The Special Master ultimately did not reach the waiver issue because the Special Master correctly determined that none of the documents at issue were protected by the qualified

journalists' privilege.  However, the Special Master acknowledged that the "Government raises a serious waiver argument" and that the "Petitioners' highly specific disclosures are incongruous with the privilege."  *In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at *6.

In event that this Court agrees with the Special Master's determination that none of the materials at issue are protected by the qualified journalists' privilege (and it should), this Court likewise need not address the Petitioners' objections related to waiver.  But if the Court determines that it must reach the issue of waiver, it should find that any otherwise applicable privilege has been waived.  Like other privileges, the qualified journalists' privilege may be waived.  *See, e.g.*, *United States v. Sterling*, 724 F.3d 482, 509 (4th Cir. 2013) (concluding that any journalists' privilege that may have applied was waived by author's disclosure of information to a third party after promising confidentiality to his source); *Inside Radio, Inc. v. Clear Channel Commc'ns, Inc*., 208 F.R.D. 537, 543-44 (S.D.N.Y. 2002) (concluding that newsletter publisher waived qualified privilege in civil defamation litigation by putting intent of station newsletter's publisher at issue, through assertion in article that station's newsletter had printed knowingly false statements); *Ayala v. Ayers*, 668 F. Supp. 2d 1248, 1250–51 (S.D. Cal. 2009) (finding implied waiver of the journalists' privilege as a result of author's production of unpublished book manuscript to Petitioner's counsel, while refusing to provide the same material to Respondent's counsel); *Wheeler v. Goulart*, 593 A.2d 173, 175 (D.C. 1991) ("[W]hat [a reporter] chose to say to others out-of-court she cannot now refuse to repeat in court."); *see also Pinkard v. Johnson*, 118 F.R.D. 517, 523 (M.D. Ala. 1987) ("A reporter is not free to give a sworn statement to a litigant, and later invoke the qualified reporter privilege to keep this information from the Court.").  "The party seeking to invoke a privilege has the burden of establishing the non-waiver of the privilege."

27

*United States. v. Weissman*, No. S1 94 Cr. 760 (CSH), 1996 WL 737042, at *25 (S.D.N.Y. Dec. 26, 1996).

Further, the "[w]aiver of a privilege may be either express" or "implied in circumstances where it is called for in the interests of fairness." *In re Sims*, 534 F.3d 117, 131-32 (2d Cir. 2008). Under the "fairness doctrine," it follows that "a party that discloses some privileged information cannot thereafter rely on the privilege to withhold related information necessary to gain a complete picture of the facts." *Schiller v. City of New York*, 245 F.R.D. 112, 120 (S.D.N.Y. 2007). Indeed, a party may forfeit the journalists' privilege by using information they seek to protect "during the course of th[eir] litigation" since the "fairness doctrine prevents prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information." *Id.* (*citing von Bulow by Auersperg v. von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987)). That is because a party is not entitled to "use the privilege both as a shield and a sword." *In re Sims*, 534 F.3d at 132. As the Special Master explained, although "reciting non-privileged facts in a complaint or other filing" does not necessarily "serve as a waiver of attorney-client communications about those facts . . . if those facts reveal privileged content, or put 'at issue' a privileged communication, the privilege may be waived." *In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at *6. Thus, "a party cannot partially disclose privileged communications or affirmatively rely on privileged communications *to support its claim or defense* and then shield the underlying communications from scrutiny by the opposing party." *Id*.

Yet that is exactly what the Petitioners have done here: they "have made several public disclosures to the Court about the very same content that they seek to protect in the review

28

process." *In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at *7.  For example, in the Petitioners' motion for the return of property, they provided an extensive recitation of their version of events.  It describes in detail: how "sources" first contacted Project Veritas; what the sources allegedly told them; their interactions with the sources; the steps Project Veritas allegedly took to authenticate the diary; their production of a "video news story" about it; their internal views regarding the authenticity of the diary; their internal decision-making about whether to publicize it; and their alleged reasons why they chose not to do so.  (*See* Pet. Prop. Mot. 3-7).  Petitioners explicitly incorporated that discussion by reference in their brief regarding privilege.  (*See* Pet. S.M. Br. 3).  But these disclosures tell only part of the story, as a review of the affidavits submitted in support of the warrants makes clear.

The strategic purpose of these partial disclosures is evident: the Petitioners seek to persuade the Court, the Special Master, and apparently the public that because they were following "common journalistic practices," their actions were subject to a First Amendment "safe-harbor," and therefore the Court and Special Master should sustain their privilege claims.  (Pet. S.M. Br. 5). Put differently, the Petitioners seek to use their own partial disclosures as a sword, while shielding the remainder of their communications and documents from disclosure.  The Petitioners, with the assistance of counsel, affirmatively injected what they claim to be privileged materials "during the course of this litigation."  *Schiller*, 245 F.R.D. at 120.  They cannot now seek to  "distort[] the judicial process" by "selective disclosure during litigation of otherwise privileged information." *Id*.  As such, the Petitioners have waived any privilege they might enjoy over the Responsive Materials.  *See, e.g.*, *In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at *8 n.10 ("Though I need not reach the Government's waiver argument in light of these findings, any

protection over these documents would be waived by the Petitioners' decision to print in full Petitioner O'Keefe's statement regarding the decision not to publish."); *see also In re Sims*, 534 F.3d at 133-34; *Pinkard*, 118 F.R.D. at 523.

## IV.   The Special Master Correctly Stated the Law Regarding Attorney-Client Privilege and the Crime-Fraud Exception

The Petitioners argue that the Special Master erred in applying the crime-fraud exception and in resolving certain of the Petitioners' attorney-client privilege objections.  (Obj. 41 – 54). While any particular applications of these doctrines will be assessed by the Government's filter team, the Special Master correctly set forth the appropriate legal standards as to both attorney-client privilege and the crime fraud exception and the analysis in the R&R is facially reasonable. *See In re Search Warrant Executed on Nov. 5, 2021*, 2023 WL 3005726, at *9-10.

## CONCLUSION

For the reasons set forth above, the Petitioners' objections should be overruled and the Court should authorize the Government's filter team to provide the Responsive Materials to the Government's investigative team.

Dated:  New York, New York
        May 23, 2022

                        Respectfully submitted,

                        DAMIAN WILLIAMS
                        United States Attorney

            By:     /s/
                        Jacqueline Kelly
                        Robert B. Sobelman
                        Mitzi Steiner
                        Assistant United States Attorneys
                        Tel.: (212) 637-2456/2616/2284

30