

June 2, 2023

*VIA ECF*

Honorable Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *In re Search Warrant dated November 5, 2021*, Case No. 21-MC-00813 (AT)

Dear Judge Torres,

The American Civil Liberties Union Foundation ("ACLU"), Freedom of the Press Foundation ("FPF"), and the Foundation for Individual Rights and Expression ("FIRE") write in support of neither party to urge the Court to affirm that the First Amendment protects a reporter's right to receive and possess expressive materials on matters of public concern, even if those materials were unlawfully obtained by a third party.[1]

## I. Introduction

The freedom of the press, "broadly defined," is what "maintain[s] . . . our political system and an open society." *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967). Against that backdrop, the Supreme Court held more than two decades ago in *Bartnicki v. Vopper* that a radio host and another individual could not be held liable for airing a taped conversation, even though the defendants should have known that the conversation had been illegally recorded by a third party, because they had lawfully obtained the tape and the speech was addressed to a matter of public concern. 532 U.S. 514, 517–18 (2001). Applying *Bartnicki*, a court in this district recently held that Wikileaks could not be held liable for receiving stolen Democratic National Committee documents. *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 434 (S.D.N.Y. 2019).

The Special Master's Report and Recommendation in this case risks creating confusion about whether *Bartnicki* shields *only* a reporter's publication of information that a third party unlawfully obtained, or whether it also protects the reporter's knowing receipt or possession of such unlawfully obtained information. Here, it is undisputed that Project Veritas learned about the diary only *after* it was stolen. Government's Memorandum of Law in Response to the Public Portion of the Petitioners' Objections Dated May 2, 2023, at 4, Doc. 137. But the Report (perhaps inadvertently) suggests that the First Amendment does not protect Project Veritas' subsequent receipt and possession of the diary, in addition to any other unlawful activity alleged here. The relevant section of the Report addresses Petitioners' argument "that *Bartnicki* renders the crimes

---

[1] The ACLU's New York affiliate, the New York Civil Liberties Union, is not a party to this amicus letter brief.

under investigation here—including interstate transportation of stolen goods and possession of stolen goods—'non-crimes.'" Report & Recommendation of Special Master ("Report") 7, Doc. 118. The Report rejects this argument out of hand, stating that "*Bartnicki* addresses liability for *publication* of unlawfully obtained *information* (there, by a source) and does not 'protect' unlawful acquisition of *information*." *Id.* (second and third emphases added).

In referring to "information" rather than goods, and specifically distinguishing between the "*publication*" of information and its "acquisition," the Report appears to be referring to the already stolen diary, rather than to other allegations of unlawful activity. And in concluding that *Bartnicki* does not apply to Project Veritas' unlawful "acquisition" of the diary, the Report would appear to deny First Amendment protection to the mere receipt and possession of documents that were unlawfully obtained or disclosed by a third party. While the Government's Memorandum of Law in Response to the Public Portion of the Petitioners' Objections Dated May 2, 2023, Doc. 137, does not rely on the Report's distinction between publication of stolen documents on the one hand, and the receipt and possession of stolen documents on the other, it also does not exclude this interpretation of the Report.

Limiting First Amendment protection to publication would reduce *Bartnicki* to a nub: the right to publish newsworthy information is of little use without the concomitant right to possess the information on which publication depends. Such a ruling would also undermine decades of precedents recognizing that constitutional protection for newsgathering, an obviously necessary antecedent to publication, is essential for the First Amendment's Press Clause to have any effect.

Amici do not claim familiarity with the factual details of the investigation at issue here, including disputes regarding the extent of Petitioners' firsthand involvement in their sources' alleged crimes. Amici also lack sufficient information to opine on whether any allegedly stolen items besides Ms. Biden's diary warrant First Amendment protection. Amici therefore do not write to advocate for any party. But, amici respectfully submit, the Court should affirm that the First Amendment necessarily protects a reporter's right to receive and possess, as well as publish, documents, like the diary, that touch on matters of public concern and that were previously stolen by a third party.

## II. Argument

### A. Courts have long protected lawful newsgathering as a necessary precursor to publication and rejected pre-publication burdens on speech.

"Without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). "[E]ntrenched in Supreme Court case law is the principle that the First Amendment's protections for free speech include a constitutionally protected right to gather news." *Nicholas v. Bratton*, 376 F. Supp. 3d 232, 279 (S.D.N.Y. 2019); *see also, e.g.*, *People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 829 (4th Cir. 2023) ("The right to gather information plays a distinctly acute role in journalism."), *petition for cert. filed*, Nos. 22-1148 & 22-1150 (May 26, 2023); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (recognizing the "undoubted right to gather news from any source by means within the law" (internal quotation marks and citation omitted)); *CBS, Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975) ("The protected right to publish the news would be of little value in the absence of sources from which to obtain it." (citing *Branzburg*, 408 U.S. at 681)).

Recognizing that "a free press cannot be made to rely solely upon the sufferance of government to supply it with information," *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 104 (1979), the Supreme

Court has consistently upheld journalists' right to procure and publish information on matters of public concern, even where a third-party unlawfully obtained or disclosed that information. *See, e.g.*, *Florida Star v. B.J.F.*, 491 U.S. 524, 536 (1989) (barring liability for publishing the identity of a rape victim, where the information was unlawfully released by police officers); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 830 n.1, 832 (1978) (barring liability for the publication of information unlawfully disclosed by a participant in a judicial misconduct proceeding); *Okla. Publ'g Co. v. Okla. Cnty. Dist. Ct.,* 430 U.S. 308 (1977) (per curiam) (reversing injunction against the publication of information obtained when journalists attended closed juvenile detention hearing). *Cf. N.Y. Times Co. v. United States,* 403 U.S. 713 (1971) (per curiam) (declining to enjoin the publication of the stolen Pentagon Papers).

The First Amendment protects even "surreptitious, confrontational, unscrupulous, and ungentlemanly" newsgathering methods. *J.H. Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1355 (7th Cir. 1995). Such protection is necessary for the Press Clause to effectuate our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). For similar reasons, the Supreme Court has broadly defined what constitutes a matter of legitimate public concern. Speech touches on matters of public concern whenever it "can be fairly considered as relating to any matter of political, social, or other concern to the community . . . . The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotation marks and citation omitted).

Courts have long recognized that "otherwise valid laws may become invalidated in their application when they invade constitutional guarantees, including the First Amendment's guarantee of a free press." *Ampersand Publ'g, LLC v. NLRB*, 702 F.3d 51, 56 (D.C. Cir. 2012); *see, e.g.*, *Jean v. Mass. State Police*, 492 F.3d 24, 31 (1st Cir. 2007) (*Bartnicki* barred liability for knowingly receiving illegal recording under criminal wiretapping statute).

### B. The First Amendment bars prosecutions of journalists for mere receipt and possession of stolen documents.

In *Bartnicki*, the Supreme Court directly addressed whether journalists could be held liable for unlawful activity perpetrated by their sources. In that case, the defendants received and published a taped telephone conversation that had been surreptitiously recorded in violation of federal and state wiretap statutes. 532 U.S. at 519–520. The Supreme Court assumed that the defendants "kn[e]w—or at least had reason to know—that the interception was unlawful." *Id.* at 517–18. It nonetheless held that they could not be held liable under the wiretap laws for broadcasting the unlawfully recorded information because "[t]he normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it." *Id.* at 516. The Court added that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Id.* at 529–30; *see also Jean*, 492 F.3d at 31 (observing that the Court did not distinguish "between Yocum [who found the tape in his mailbox] and Vopper, who received the tape directly from Yocum and thus knew the tape had been recorded illegally at the time that he received it" (citing *Bartnicki*, 532 U.S. at 519, 525 n.8)).

Here, it appears to be undisputed that someone else had already stolen Ms. Biden's diary before Petitioners acquired it or even knew it existed. Government's Memorandum of Law in Response to the Public Portion of the Petitioners' Objections Dated May 2, 2023, at 4, Doc. 137. The Report acknowledged that Petitioners cannot be held culpable for publishing the contents of the diary, but appeared to suggest more generally that *Bartnicki* does not bar criminal charges for receipt and possession of stolen information, even if the information touches on matters of public concern. Report 7, Doc. 118. That distinction is dangerous, and it would turn *Bartnicki* on its head. The Supreme Court premised its decision on the "significant legal distinction between stealing documents and disclosing documents that someone else had stolen previously." *Democratic Nat'l Comm.*, 392 F. Supp. 3d at 431. While the Court acknowledged that a journalist who steals documents may be held liable for that offense, *see Bartnicki*, 532 U.S. at 532 n.19, it did not suggest that reporters could be prosecuted for merely receiving or possessing stolen documents.

Limiting *Bartnicki* to publication of records that were unlawfully obtained or disclosed by a source—and excluding from its reach the receipt and possession of such documents—would afford legislators and prosecutors an easy end-run around the First Amendment. They could simply ban the receipt or possession of such records, instead of their publication. Of course, one cannot report what one cannot receive or possess, so a prohibition on receipt or possession of stolen records would effectively prohibit a great deal of reporting.

The First Amendment does not indulge such workarounds. *Cf. Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 53 (1988) (cautioning against substitution of alternate legal theories to circumvent established protections for press freedoms); *Buehrle v. City of Key West*, 813 F.3d 973, 977 (11th Cir. 2015) ("The government need not ban a protected activity such as the exhibition of art if it can simply proceed upstream and dam the source. Consistent with the Supreme Court's teaching, the right to *display* a tattoo loses meaning if the government can freely restrict the right to obtain a tattoo in the first place."). Indeed, the Supreme Court has held that interfering with the right to possess expressive materials intended for publications runs "[t]he risk of prior restraint." *Fort Wayne Books v. Indiana*, 489 U.S. 46, 50 (1989) (addressing seizures of First Amendment materials without sufficient safeguards). Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

Thus, Judge Koetl recently recognized in the Wikileaks case that "[j]ournalists are allowed *to request documents that have been stolen* and to publish those documents." *Democratic Nat'l Comm.*, 392 F. Supp. 3d at 436 (emphasis added). The court accordingly rejected the DNC's attempt to hold Wikileaks "liable for the theft [of the stolen DNC documents] as an after-the-fact coconspirator," reasoning that this "argument would eviscerate *Bartnicki*" and "render any journalist who publishes an article based on stolen information a coconspirator in the theft." *Id.* at 435. The court also turned down attempts to hold several other defendants liable for aiding and abetting publication of the stolen documents, holding that liability could not be imposed where the defendants "would have been entitled to publish the stolen documents themselves" under *Bartnicki*. *Id.* at 436.

Other authorities bolster *Democratic National Committee*'s conclusion that press freedoms extend to receipt and possession, as well as publication, of stolen documents relating to matters of public concern. Decades before *Bartnicki*, the Privacy Protection Act of 1980, 42 U.S.C. 2000aa-1 *et seq*., prohibited searches and seizures of newsgathering materials except where journalists themselves (as opposed to their sources) have committed crimes. Anticipating state legislative efforts to avoid

4

the Act by criminalizing the mere "possession" of newsgathering materials, Congress clarified in the Act that its protections still apply where a journalist is accused of an offense that "consists of the *receipt*, *possession*, communication, or withholding of [newsgathering] materials or the information contained therein." *Id.* at §§ 2000aa(a)(1) & (b)(1) (emphasis added).

And in 2021, Attorney General Merrick Garland issued a memorandum providing that the Department of Justice "will no longer use compulsory legal process for the purpose of obtaining information from or records of members of the news media acting within the scope of newsgathering activities," subject to narrow exceptions. The memorandum and subsequent implementing regulations contain an exception for "a member of the news media who has used criminal methods, such as breaking and entering, to obtain government information" but, notably, contain no exemption for journalists whose *sources* engaged in criminal conduct. *See* Memorandum from the Attorney General to the Deputy Attorney General et al., Use of Compulsory Process to Obtain Information from, or Records of, Members of the News Media (July 19, 2021), https://www.justice.gov/ag/page/file/1413001/download; 28 CFR § 50.10 (2022) (revisions to DOJ regulations in accordance with memorandum).

### III. Conclusion

Opening the door for criminalization of journalists' receipt or possession of expressive materials would result in censorious prosecutions under existing law and inspire legislators to conjure up disastrous new ways to thwart journalists seeking to expose malfeasance. Amici urge this Court to affirm that the First Amendment protects a reporter's right to receive and possess documents on matters of public concern that were unlawfully obtained or disclosed by a third party. Any other result would undermine not only the Supreme Court's holding in *Bartnicki*, but also decades of precedent protecting newsgathering and other necessary antecedents to constitutionally protected speech.

Respectfully submitted,

*s/ Brian Hauss*
Brian Hauss
Brett Max Kaufman
American Civil Liberties
  Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
bhauss@aclu.org
bkaufman@aclu.org

*Counsel for Proposed Amici Curiae*

CC: All Counsel of Record (ECF)