**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Search Warrant Dated November 5, 2021 | Case No.: 21 Misc. 813 (AT) |
| In re Search Warrant Dated November 3, 2021 | Case No.: 21 Misc. 819 (AT) |
| In re Search Warrant Dated November 3, 2021 | Case No.: 21 Misc. 825 (AT) |

**PETITIONERS' PUBLIC REPY IN SUPPORT OF OBJECTIONS TO REPORT AND RECOMMENDATION**

BARR & KLEIN PLLC
Benjamin Barr (admitted *pro hac vice*)
444 N. Michigan Ave., Ste. 1200
Chicago, IL 60611
202-595-4671
ben@barrklein.com

Stephen R. Klein (admitted *pro hac vice*)
1629 K Street NW Ste. 300
Washington, D.C. 2006
202-804-6676
steve@barrklein.com

*Counsel for Project Veritas and
  James O'Keefe*

GRAVES GARRETT LLC
Edward D. Greim
Todd P. Graves (admitted *pro hac vice*)
Graves Garrett, L.L.C.
1100 Main Street St. 2700
Kansas City, MO 64105
(816) 256-4144
edgreim@gravesgarrett.com

SCHAERR | JAFFE LLP
Erik S. Jaffe
1717 K Street NW, St. 900
Washington, DC 20006
(202) 787-1060
ejaffe@schaerr-jaffe.com

*Counsel for Project Veritas*

Jeffrey H. Lichtman
Law Offices of Jeffrey Lichtman
11 E. 44th St., Suite 5011
New York, New York 10017
212-581-1001
jl@jeffreylichtman.com

Marc A. Fernich
Law Office of Marc Fernich
800 Third Avenue, Suite 18
New York, New York 10022
212-446-2346
maf@fernichlaw.com

*Counsel for James O'Keefe*

THE DICKERSON LAW GROUP, P.A.
Brian E. Dickerson
6846 Trail Boulevard
Naples, FL 34108
202-570-0248
bdickerson@dickerson-law.com

Eric Franz
The Law Offices of Eric Franz, PLLC
One Old Country Road, Suite 347
Carle Place, New York 11514
212-355-2200
eric@efranzlaw.com

*Counsel for Spencer Meads*

GREENBERG TRAURIG LLP
Adam S. Hoffinger
Steven Harrison
2101 L Street N.W., Suite 1000
Washington, D.C., 20037
202-331-3173
hofferinga@gtlaw.com

*Counsel for Eric Cochran*

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

THE CRITICAL FACTS ARE NOW LARGELY UNDISPUTED ........................... 2

ARGUMENT ....................................................................................................... 4

I.     The Validity of the Search Warrants Was at Issue Before the Special Master and Is Now Before the Court ......................................................... 4

II.     The Report Raises Myriad First Amendment Concerns ........................ 9

      A.   The Protection of Substantive First Amendment Rights Works Separately from Privilege Determinations .................................... 9

      B.   First Amendment Interests Require Separate Consideration from Fourth Amendment Concerns ..................................................... 12

      C.   Immediacy of Relief is Paramount in First Amendment Jurisprudence ......... 13

      D.   *Bartnicki* Should be Given Effect Here ..................................... 16

III.    This Court Should Apply the Journalistic Privilege to Protect Petitioners' Newsgathering Materials .......................................... 18

      A.   The Materials are Confidential, so the *Petroleum Products* Test Applies ..... 19

      B.   The Government Failed to Meet its Burden Under *Petroleum Products* and *Gonzales* .................................................. 24

         1.   *The Government Falls Far Short of Meeting its Relevancy Burden* ..... 24

         2.   *The Government Cannot Meet its Burden to Show Unavailability Elsewhere* ......................................................... 27

         3.   *"Necessary to a Claim."* ................................................. 28

      C.   The Government's Waiver Theory Fails .................................... 29

IV.    The Government's Contention that Certain Petitioners' Communications with Legal Counsel Are Not protected by the Attorney-Client Privilege Is Based on a Misreading of the Law ............................................. 32

V.     The Government's Defense of the Special Master's Crime-Fraud Exception Analysis Is Unpersuasive and Confirms the Analysis Is Erroneous ..... 36

CONCLUSION .................................................................................................. 39

## INTRODUCTION

Eighteen months ago, this Court appointed a Special Master : "In light of the potential First Amendment concerns that may be implicated by the review of the materials seized from Petitioners, the Court finds that the appointment of a special master will 'help[] to protect the public's confidence in the administration of justice.'" *See* December 8, 2021 Order (Doc. 48) at 3. The privileges to be considered included "grounds related to any First Amendment concerns, journalistic privileges, and attorney-client privileges." *Id*. at 4.

We now know that these were not idle concerns. The Government long ago *did* decide that Petitioners' alleged newsgathering "crimes" all occurred months after someone else had "stolen" the Biden diary. The Government *did* seize materials related to Petitioners' newsgathering. The Government absolutely *did not* obtain the required approvals of the Attorney General to raid journalists for newsgathering materials. *See* (Doc. 99). And now, the Government filter and investigative team apparently disagree with each other about the "crime" allegedly committed by Petitioners: it is either the transportation of confidential source materials across state lines so that it could be vetted by journalists and, if authenticated, used to prepare a news story about Candidate Joe Biden (per the investigative team), or it is the mere possession of that material while it was being vetted (per the government filter team). Both theories, however, rely on a claim that the Biden diary was stolen by others. Both theories are utterly unsupportable under *Bartnicki v. Vopper*, 532 U.S. 514 (2001) and cases that have applied it.

Seizure of newsgathering materials under a legal theory precluded by the Constitution requires that those materials not be disclosed to the investigative team. The Government complains that this will cause its investigation to come to an end, but that is precisely the right result—long overdue—under the First Amendment. Given that First Amendment injury has already occurred, continues to occur, and must be staunched without delay, there is no other defensible outcome.

1

The Government's position is unsupported by law or reason. Like the Special Master, the Government now claims that not only the public policy-based journalistic privilege, but also the First Amendment itself are irrelevant when materials are seized via search warrant. No decision of any court takes this position, and it is contrary to Supreme Court precedent. It defies reason and entire swaths of the law. Far from "protect[ing] the public's confidence in the administration of justice" (Doc. No. 48 at 3) when "First Amendment concerns" may be implicated, the Special Master will have told the public that federal courts are closed to even considering First Amendment rights when journalists and their fellow sources are raided for their allegedly "criminal" newsgathering. The loss of First Amendment freedoms for even minimal amounts of time is an irreparable injury; closing the courthouse to vindication of these freedoms for months or years until trial that may never occur is intolerable. Whether under the First Amendment or the common law journalistic privilege, this Court must step in to halt a serious attack on one of our Republic's foundational institutions.

## THE CRITICAL FACTS ARE NOW LARGELY UNDISPUTED

The relevant facts described in Petitioners' Public Objection to R&R (Doc. 127) ("Pub. Obj.") have not been contradicted by the Government. Indeed, the Government's Public Response (Doc. 137) ("Gov't Pub. Resp.") confirms those facts.

The sources who provided Ashley Biden's diary and other property to Project Veritas in September 2020 acquired that property—in the Government's vernacular, one of the sources "stole" it—in or about June 2020. *Id.* at 4. According to the Government, the source stole "a handwritten journal containing highly personal entries, tax records, a digital storage card containing private family photographs, and a cellphone, among other things" and then enlisted another source to help sell the property. *Id.* Several months later, the sources "made contact with an employee of Project Veritas, who requested photographs of the… property." *Id.* The

2

photographs confirmed that the sources already had possession, and were exercising control, over all of the Biden property. *See* Pub. Obj. at 50; *see also* Government's Sealed Response ("Gov't Sealed Resp.") at 3 (describing text messages sent to Project Veritas in which the sources confirmed they already possessed the Biden property).

Approximately a week later, the sources delivered the diary, personal documents, a camera, a cellphone, and other materials to Project Veritas in New York. Gov't Pub. Resp. at 4. Project Veritas paid the travel expenses incurred by the sources, *see id.*, and later paid the sources consideration for the newsworthy information they delivered regarding which Project Veritas prepared a news story about the Biden diary. *See* Petitioners' Objections to R&R—Sealed Portion ("Sealed Obj.") at Exhibit D.

The Government's Public Response does not assert that any of the above-described conduct of Project Veritas was unlawful.[1] Indeed, the Government does not even suggest that Project Veritas knew, or had reason to believe, that the property was stolen before the sources delivered it to New York. And the Government has not disputed the point made in Petitioners' opening brief that a journalist's payment to a source in exchange for the receipt of newsworthy information does not make the receipt unlawful. *See* Sealed Obj. at 16 (citing cases).[2] Instead, the Government uses vague, factually unsupported phrases throughout its Response to characterize Project Veritas' ***subsequent*** actions as unlawful. *See* Gov't Pub. Resp. at 10 (referring to Petitioners' "direct involvement in the criminal conduct under investigation"); *id.* at 14 (asserting that certain Petitioners "were actively involved in the unlawful conduct under investigation—the interstate

---

[1] As discussed below, the Government filter team argues in its Sealed Response that the mere possession of stolen property is unlawful. *See infra* at Section V. Not only is this argument inconsistent with the position set forth in the Government's Public Response, it is plainly contrary to law.

[2] By not disputing the point in its opposition brief the Government has conceded it. *See infra* at 8-9 (citing cases).

transportation of stolen property, as well as the theft of certain of the property itself."). But the only factual allegations that purport to evidence this "involvement" concern a Project Veritas "request" that the sources provide the remaining Biden property in their possession, the receipt of that property in Florida, and the transport of that property to New York. *Id.*

The Government provides no facts or reasoning (nor could it) to show how receipt of property in response to a request constitutes "interstate transportation of stolen property" much less "the theft of certain property itself." Rather, when purporting to describe exactly what the Project Veritas journalists **did** the Government resorts to wordsmithing, depicting the journalists' request to the sources as an entreaty to "return[] to Florida" (where the sources already lived) "to obtain more of the [Biden] property" (which the sources already had). *Id.*

The Government acknowledges that its target is one or more of the Petitioners but appears to admit that it lacks evidence that would support criminal charges, warning that its investigation will be "shut down," and its plan to bring charges "frustrated," unless it is granted access to Project Veritas' confidential newsgathering materials. Gov't Pub. Resp. at 11, 25.

## ARGUMENT

**I.     The Validity of the Search Warrants Was at Issue Before the Special Master and Is Now Before the Court.**

The Government attempts to evade Petitioners' Fourth Amendment arguments by asserting that the validity of the search warrants is "not before the Court." Gov't Pub. Resp. at 17. Citing earlier rulings of the Court on unrelated issues, the Government claims that the Court has "now twice expressly ruled" that Petitioners' Fourth Amendment challenge is "premature." *Id.* Neither of those opinions, however, addressed Fourth Amendment objections raised by Petitioners. *See* 12/8/21 Mem. Op., 2021 WL 5845146 (appointing Special Master); 2/18/22 Mem. Op., 2021 WL 500919 (allocating responsibility for Special Master fees).

What is more, subsequent to these rulings Petitioners placed the validity of the search warrants squarely at issue. Their Petition for Return of Property (Doc. No. 70) argued, *inter alia*, that the search warrants violated the First and Fourth Amendments and requested an inquiry regarding the information submitted to, and withheld from, the Magistrate Judge. *Id.* at 29-46. That motion is pending. Petitioners' Objections (Doc. No. 127) likewise argued that "any probable cause finding as to Project Veritas must be scrutinized to ascertain whether it was based on a prosecution theory precluded by *Bartnicki*—the receipt by Project Veritas of materials already stolen by the sources." Pub. Obj. at 18; *see also id.* at 21 ("the Fourth Amendment applies more strictly when it intersects with the First Amendment"). The validity of the search warrants was directly raised with the Special Master and, although she declined to address the issue, it is ripe for decision by this Court.

The Government cites two decisions in support of its contention that Petitioners' Fourth Amendment challenge is "premature." *See* Gov't Pub. Resp. at 9, 17-18. Neither case supports the Government's position. Contrary to the Government's description of *Doane v. United States,* No. 08 Mag. 17 (HBP), 2009 WL 1619642, (S.D.N.Y. June 5, 2009), the court there not only entertained but also **granted** the petitioner's pre-indictment challenge to the seizure of his business records and ordered the return of documents that fell outside the scope of the warrant. *Id.* at *9 ("there is no justification for providing unindicted persons with less procedural protection than accorded those under indictment."). *Doane* relied on other decisions of this Court recognizing that Rule 41(e), as amended in 1989, does not permit a court to defer its review of the validity of searches or to engraft an irreparable harm requirement. *Id.* at *8.[3]

---

[3] The *Doane* court did deny as premature petitioners' motion to preclude the government from making future evidentiary use of the returned documents and directed that Doane maintain all of the originals should the government seek to subpoena and use the documents in post-indictment proceedings. *Id*. at *15.

And unlike Doane and Petitioners, the movants in *In re Search Warrants Executed on Apr. 28, 2021,* No. 21 Misc. 425 (JPO), 2021 WL 2188150, (S.D.N.Y. May 28, 2021) did not actually challenge the validity of the search warrants; rather they only sought the return of documents seized from their law offices and devices "so that they may review them in the first instance for responsiveness and privilege." *Id.* at *1. The *Search Warrants Executed on Apr. 28, 2021* court, moreover, was considering an attorney-client privilege claim, not a privilege rooted in the Constitution. *Id.* While a breach of the attorney-client privilege may be remedied by later suppression of the improperly obtained evidence, a violation of the First Amendment is irreparable. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality) (when "First Amendment interests were either threatened or in fact being impaired…for even minimal periods of time [this] unquestionably constitutes irreparable injury").

Nor do the Government's rote recitals of an "ongoing grand jury investigation," Gov't Pub. Resp. at 2, 9, 18, 23-25, preclude this Court from scrutinizing the representations made to the Magistrate Judge in the search warrant applications. Petitioners have provided the Court with ample reason to conclude that the Government sought search warrants for the residences of Project Veritas journalists independent of any actual grand jury investigation. *See* Petition for Return of Property (Doc. No. 70) at 43-45 (*citing United States v. Eastern Air Lines*, Inc., 923 F.2d 241 (2d Cir. 1991)). In all events, it is apparent that there is no "ongoing" grand jury investigation presently—despite having seized hundreds of thousands of Project Veritas emails, ready access to Ashley Biden and her associates, and a cooperating defendant who admits to possessing and attempting to sell Biden's diary and other property, the Government complains that if this Court does not allow its prosecutors and agents access to Project Veritas' newsgathering materials its

investigation will be **shut down**. Gov't Pub. Resp. at 11, 25. Put another way, doing nothing but waiting for windfall access to newsgathering materials is not conducting a grand jury investigation.

The Government has cited no decision denying a media organization the right to challenge pre-indictment the seizure of its newsgathering materials. Instead, the Government attaches significance to the absence "of any case in which the *Gonzales* standard has been applied to materials obtained by search warrant." Gov't Pub. Resp. at 25, n.11. But the absence of any decision analyzing the seizure of newsgathering materials from a media organization under *Gonzales* or the First Amendment should be unsurprising—as far as Petitioners are aware, prior to the November 2021 seizure of electronic devices from Project Veritas journalists, no other group of federal prosecutors and agents has defied the Privacy Protection Act, and the Attorney General Guidelines, to procure search warrants to seize newsgathering materials.[4]

The Government must not be permitted to continue its cat-and-mouse ploy of touting the sealed search warrant affidavits, *see* Gov't Pub. Resp. at 14 (citing "evidence described in detail in the sealed affidavits"), while insisting that the Court may not revisit the probable cause determination made in reliance on those affidavits, *see id.* at 18 (contending that challenges to search warrants cannot be entertained pre-indictment). The Government's unprecedented use of warrants to seize newsgathering materials has caused (and continues to cause) irreparable harm to First Amendment interests. *See Elrod*, 427 U.S. at 373. If the First Amendment overrides the government's interest in keeping classified documents from being published, *see New York Times Co. v. United States*, 403 U.S. 713 (1971), then surely free press interests warrant re-examination

---

[4] The Government suggests that Petitioners have "abandoned" their assertion made to the Special Master that the prosecutors and agents acted in bad faith. Gov't Pub. Resp. at 16 n.7. When government investigators engage in conduct that is expressly prohibited by statute and DOJ regulations, it is not plausible to view that conduct as having been undertaken in good faith.

of a sealed probable cause determination to prevent "punish[ing] the dissemination of material that is embarrassing to the powers-that-be." *Id.* at 724 (Douglas, J., concurring).

Scrutiny of the representations the Government made to obtain the warrants is especially justified where evidence subsequently revealed by the Government calls into question the core premise of the probable cause determination. As explained in Petitioners' Objections, nearly a year after obtaining the warrants on the premise that Project Veritas was "actively involved in the…theft of certain property," Gov't Pub. Resp. at 14, the Government revealed that the property was **already stolen** by third parties before they offered it to Project Veritas. *See* Criminal Information, No. 1:22-cr-00457-LTS, Doc. No. 2 ("Criminal Information") at ¶ 1. Remarkably, the Government reiterates this admission in its Public Response, *id.* at 4 ("***After*** Harris stole the property, she [and] Kurlander…then made contact with…Project Veritas") (emphasis added). And yet the Government ignores altogether—as did the Special Master—the point made by Project Veritas that there can be no probable cause to believe it was "actively involved" in the theft of already-stolen property. *See* Pub. Obj. at 17-20, 49-51 (explaining journalist's receipt and transportation of stolen newsworthy information is protected by *Bartnicki* and cases construing it). By failing to address this point in its Public Response, the Government has conceded it. *See, e.g., In re Jumei Int'l Holding Ltd. Sec. Litig.*, Case No. 14-CV-9826, 2017 WL 96176, *5 n.4 (S.D.N.Y. Jan. 10, 2017) (Pauley, J.) ("Plaintiffs did not address Defendants' argument that the Complaint fails to plead motive, and thus concede that point"); *LBF Travel, Inc., v. Fareportal, Inc.*, No. 13-CV-9143, 2014 WL 5671853, *16 (Gorenstein, J.) ("because LBF has not disputed defendants' arguments on this issue, we deem its claims on this point to be abandoned"); *In re UBS AG Sec.Litig.*, No. 07-CV-11225, 2012 WL 4471265, at *11 n.19 (S.D.N.Y. Sept. 28, 2012) (Sullivan, J.) ("Although the UBS Defendants addressed this argument in their opening brief . . . Plaintiff did not respond to it

in its opposition brief [and] has conceded the point by silence"); *First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392-33 & n.116 (S.D.N.Y. 2002) (Kaplan, J.) (plaintiff waived argument when it failed to make it in opposition brief)).

In sum, Petitioners presented the issue of the validity of the search warrants to the Special Master and that issue is now before this Court. It is appropriate for the Court to examine the validity of the warrants now not only given the fundamental constitutional issues at stake, but also because of the stark contradiction between the premise on which the Government procured the warrants, and the evidence now of record that refutes this premise.

## II.      The Report Raises Myriad First Amendment Concerns

### A.  The Protection of Substantive First Amendment Rights Works Separately from Privilege Determinations

The Special Master's Report focuses on the common law journalistic privilege, but deeper concerns are at issue. A single government raid into the home of a journalist creates multiple constitutional injuries—or, at the very least, inquiries—that require a separate and distinct analysis. First Amendment considerations have been errantly lumped by the Special Master into a generic privilege analysis, doing damage to substantive constitutional rights.

Most journalists regularly consult with inside sources to obtain information that will place a particular issue in a more meaningful context for the public.[5] Inside sources often provide high-value information on the condition of anonymity.[6] Investigative journalism uses sleuthing to

---

[5] D. Broder, BEHIND THE FRONT PAGE, 317-22 (1987). *See generally* Jeremy Herb and Sean Lyngaas, *Inside the furious week-long scramble to hunt down a massive Pentagon leak*, CNN, April 15, 2023, https://www.cnn.com/2023/04/15/politics/pentagon-leak-week-long-scamble/index.html; Jeremy Barr and Will Sommer, *Behind-the-scenes videos of Tucker Carlson were leaked. Was it a crime?*, WASHINGTON POST, June 1, 2023, https://www.washingtonpost.com/media/2023/06/01/tucker-carlson-media-matters-fox-news-timothy-burke/.

[6] E. Abel, LEAKING: WHO DOES IT? WHO BENEFITS? AT WHAT COSTS? 10 (1987); *see also* Sarah Abrams, *Woodward and Bernstein Defend Anonymous Sources*, HARVARD GAZETTE (Dec. 8, 2005), available at https://news.harvard.edu/gazette/story/2005/12/protecting-deep-throat-and-others/.

produce high-value speech "concerning public affairs" that "is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1965). This is the core of Project Veritas' work—offering the public a glimpse into candid happenings in corporate America, so-called woke trends in academia, or, as it contemplated here, a candidate for President. None of this is accomplished through staid and static means of newsgathering, like running stories about President Biden's favorite Corvette.[7] Rather, it involves "meeting with information thieves[,]" encouraging inside sources to come forward with controversial secrets, and otherwise swimming through the dirty underbelly of the American political life. *Democratic Nat'l Comm. v. Russian Federation*, 392 F.Supp.3d 410, 435 (S.D.N.Y. 2019). And hard-hitting, undercover journalism is most in need of First Amendment protection given its propensity to publish controversial stories of high value to the American public.

Journalistic privilege remains a doctrine that is "uniformly regarded as confusing, ambiguous, inconsistent, and the subject of significant criticism." RonNell Andersen Jones, *Rethinking Reporter's Privilege*, 111 MICH.L.REV. 1221, 1225 (2013). The decades after *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972), and *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), have brought little clarity. And as explained in detail below, the Special Master's analysis of the journalistic privilege all but eviscerates it in deferring to the government's interest in using search warrants as an investigative tool into the operations of a free press.

The American Civil Liberties Union Foundation, Freedom of the Press Foundation, and the Foundation for Individual Rights and Expression correctly illustrate the precious liberty at stake here: the freedom of journalists to expose malfeasance. "Amici urge this Court to affirm that the

---

[7] Stephanie Wagner, *Jay Leno on 'Burning Rubber' in Joe Biden's '67 Corvette on 'Jay Leno's Garage' : It Was 'Very Fun'*, PEOPLE, Sept. 7, 2022, https://people.com/tv/jay-leno-on-having-joe-biden-on-his-show-jay-lenos-garage-we-were-burning-rubber/.

First Amendment protects a reporter's right to receive and possess documents on matters of public concern that were unlawfully obtained or disclosed by a third party." Amici Br. at 5. Without this protection, journalists would serve at the mercy of those in power who can investigate on a whim and force journalists to reveal their secret sources and confidential newsgathering materials. This serves to chill the news media and cause journalists to engage in self-censorship to avoid intrusions by political actors. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964); *Smith v. California*, 361 U.S. 147, 154 (1959).

This Court should turn to the separate bundle of "independent values" protected by the First Amendment referred to in Justice Powell's concurrence in *Stanford Daily*. 436 U.S. at 564. Without taking judicial account of these interests, the damage done by government intrusion into newsgathering materials and sources cannot be remedied—something widely recognized in other areas of First Amendment law. *See, e.g.*, *Americans for Prosperity Found. v. Bonta,* 141 S.Ct. 2373, 2380, 2386 (2021); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460–62, (1958); *NAACP v. Button*, 371 U.S. 415, 430–31 (1963). That is particularly true for compelled disclosure of newsgathering materials, recognized as a cardinal evil in First Amendment caselaw. *See, e.g.*, *Carey v. Hume*, 492 F.2d 631, 639 (D.C. Cir. 1974) (courts should "make compelled disclosure by a journalist a last resort after pursuit of other opportunities has failed. . . .") *Blankenship v. Fox News Network, LLC*, 2020 WL 5308515 at *3-4 (S.D. W.Va. Sept. 4, 2020) ("compelled disclosure is not the least restrictive method in obtaining this information, because it would necessarily require this Court to suppress…First Amendment rights in the process").

The time for protection of these fundamental First Amendment rights is now.

**B.  First Amendment Interests Require Separate
Consideration from Fourth Amendment Concerns**

At the Government's urging, the Special Master found "no basis" to consider First Amendment interests here "[g]iven the judicially authorized search warrants [and] the government's interest in investigating criminal conduct." R&R at 9 n.7. The Supreme Court has rejected this very reasoning.

"[W]hile the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause…, it is otherwise when materials presumptively protected by the First Amendment are involved." *Fort Wayne Books, Inc. v. Indiana,*, 489 U.S. 46, 63 (1989); *see also Guan v. Mayorkas*, 530 F.Supp.3d 237, 264 (E.D.N.Y. 2021) ("That the Government conducts a search, thereby implicating Fourth Amendment rights, does not mean that the same search may not also implicate First Amendment rights"). *Fort Wayne Books* emphasized the "special Fourth Amendment protections accorded searches for and seizure of First Amendment materials" in the context of confiscation of allegedly obscene books and films. *Id.* at 62-64. To be sure, the prohibition against prior restraints was of primary concern in *Fort Wayne Books*, but the Court also made clear that a pre-seizure adversarial hearing was required even where the seizure was based on criminal RICO violations in addition to obscenity laws. *Id.* at 66. The Court found the *ex parte* affidavits submitted in support of the seizure petition insufficient to safeguard First Amendment interests. *Id.* ("the petition for seizure and the hearing thereon were aimed at establishing no more than *probable cause to believe* that a RICO violation had occurred). (emphasis in original).

*Fort Wayne Books* followed a long line of Fourth Amendment decisions recognizing the need for a pre-seizure adversarial judicial hearing to protect any threatened invasion of First Amendment liberties. *United States v. Thirty-seven Photographs*, 402 U.S. 363 (1971); *Carroll v.*

12

*Princess Anne*, 393 U.S. 175 (1968); *Freedman v. Maryland*, 380 U.S. 51 (1965). *Cf. Roaden v. Kentucky*, 413 U.S. 496 (1973); A *Quantity of Books v. Kansas,* 378 U.S. 205 (1964); *Marcus v. Search Warrant*, 367 U.S. 717 (1961). Because search warrants are issued *ex parte*, there is no opportunity to challenge them until after they have been executed and the First Amendment freedoms in question have been damaged. But judicial intervention at the earliest opportunity can prevent or diminish this irretrievable loss.

The Special Master's reasoning is even more extreme, and less defensible, than the position advanced by the government in *Fort Wayne Books*. As noted above, the Report found the mere existence of "judicially authorized search warrants [and] the government's interest in investigating criminal conduct" enough to render unnecessary any consideration of First Amendment interests, or even reason to re-examine the supporting affidavits. R&R at 9 n.7. But the warrants to search the residences of Project Veritas journalists established no more than probable cause to believe that a petty theft violation had occurred, and such a finding untested by adversarial proceedings does not support seizure of First Amendment protected materials. *Fort Wayne Books*, 489 U.S. at 66.

This Court should decline to adopt the Special Master's ill-considered reasoning. If the First Amendment requires a pre-seizure adversarial hearing before the contents of a porn shop are seized, surely it requires no less before a raid on a press room.

### C.  Immediacy of Relief is Paramount in First Amendment Jurisprudence

It is widely recognized that the loss of First Amendment freedoms for even a short period of time constitutes irreparable injury. *Elrod*, 427 U.S. at 373 (1976). That is, timeliness of relief is of peculiar significance in First Amendment considerations. *See, e.g., Citizens United*, 558 U.S. 310, 334 (2010) ("Today, Citizens United finally learns, two years after the fact, whether it could have spoken during the 2008 Presidential primary—long after the opportunity to persuade primary

voters has passed."); *id.* at 324 (burden of lengthy litigation chills First Amendment rights). Fragile rights must not be lost due to delayed judicial procedures and the passage of time. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 609 (1976) (quoting A. Bickel, THE MORALITY OF CONSENT 61 (1975)); *see also Bridges v. California*, 314 U.S. 252, 268 (1941) (timeliness of securing First Amendment rights of paramount importance since government hindrances usually impact the "precise time when public interest" is at its highest).

So important is the value of free speech that it operates to modify a fundamental constitutional norm: the requirements of Article III. Instead of needing to meet more rigorous standing and ripeness standards applicable to other litigants, those bringing First Amendment claims face relaxed Article III standards. Indeed, the Supreme Court has regularly described the First Amendment as possessing "transcendent value to all society. . . ." *Bigelow v. Virginia*, 421 U.S. 809, 816 (1975). This reflects a normative constitutional value—to protect against the threat of criminal sanctions for any member of society exercising their right of free speech. *Gooding v. Wilson*, 405 U.S. 518, 520-21 (1972). This also reflects consequentialist reasoning: without relaxed standards for First Amendment claims, free expression "might be the loser." *Dombrowski v. Pfister*, 380 U.S. 479, 483 (1965). The Supreme Court has been clear: First Amendment rights deserve early, rigorous consideration and protection.

Throughout our legal system, there is a recognized special need to protect against the chilling effect of government conduct touching on First Amendment rights and to do so quickly. *New York Bar Ass'n v. Reno*, 999 F.Supp. 710, 715-16 (N.D.N.Y. 1998) (quoting 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3532.3, at 159). This stems from the recognition that courts are charged with a duty to protect the inimitable quality of those rights—the fear of irretrievable loss. And just as Article III concerns give way to

14

free speech interests, the need to exhaust administrative remedies is often modified in favor of preserving First Amendment rights. *See, e.g., Able v. U.S.*, 88 F.3d 1280, 1288-89 (2d Cir. 1996) (gay and lesbian challenge to National Defense Authorization Act governing military service by gays and lesbians did not require exhaustion of administrative remedies due to immediacy of First Amendment concerns); *National Advertising Co. v. Town of Babylon*, 900 F.2d 551, 555 (2d Cir. 1990) (facial challenge against sign regulations did not require exhaustion of administrative remedies); *Schelske v. Austin*, 2022 WL 17835506 at *16 (N.D. Tex. Dec. 21, 2022) (compelled COVID vaccination requirement impacted First Amendment rights, necessitating immediate review, not exhaustion of administrative remedies). Without a judicial escape valve to protect fragile First Amendment rights, the opportunities to speak, to advocate, or to witness one's faith would be eviscerated by elongated governmental proceedings. Therein, the process becomes the punishment.

Each day that the Government retains and threatens to access Petitioners' confidential newsgathering materials exacerbates First Amendment injuries. These injuries include a reduction in the willingness of sources to come forward to Project Veritas with tips, hesitation by other sources to provide *Bartnicki*-protected information illegally acquired by these sources; a reluctance by the journalists to accept and investigate such information, and the reluctance of third-party donors, supporters, and sources of information to generally associate with Project Veritas. The promise of some after-the-fact, indeterminate remedy are insufficient to redress the irreparable injury that arises from the seizure of sensitive newsgathering material. The Government's approach—kicking the First Amendment ball down the field—precludes any cure for present injuries.

15

### D. *Bartnicki* Should be Given Effect Here

It stands to reason that if smut peddlers may rely on substantive First Amendment precedent to challenge *ex parte* seizures in criminal investigations, publishers of hard-hitting political news should enjoy the same right. But the Special Master's Report turned a blind eye to the First Amendment in reasoning that "*Bartnicki* does not speak to this issue, nor does it provide general principles applicable to [her] review." R&R at 7. Such a myopic view has no basis in existing caselaw where Fourth and First Amendment rights intersect. Indeed, the only way this investigation remains alive is by reading *Bartnicki* out of this case. As such, for several reasons, the Special Master's reasoning should be rejected as insufficiently protective of newsgathering.

The Government contends that "if *Bartnicki* had any applicability in this matter (which it does not), it would be in the future assessment of ultimate liability, not in prematurely shutting down a federal criminal investigation." Gov't Pub. Resp. at 11. This is incorrect, if not hyperbolic. *Bartnicki* protects a substantive bundle of press rights—the ability of journalists to freely receive material that was illegally acquired, provided the journalists played no part in that illegal acquisition. 532 U.S. at 525. Just as obscenity prosecutions must recognize relevant First Amendment precedent, so too must criminal investigations of press operations.[8] And that means there is a concomitant need to protect speech at every "stage[] of the speech process. . . ." *Citizens United*, 558 U.S. at 336. To simply defer consideration of these rights permits prosecutors an "easy end-run around the First Amendment." Amici Br. at 4.

A *Bartnicki* analysis must necessarily serve as the gateway to determine if compelled disclosure should be permitted in the first place. *Bartnicki* held that the state may not punish

---

[8] Obscenity cases recognize that special First Amendment doctrinal protections arise in free speech jurisprudence, including the prior restraint doctrine. Similarly, *Bartnicki* established its own special First Amendment rule. Like the prior restraint doctrine at play in *Fort Wayne Books*, the *Bartnicki* doctrine must be given effect in this matter regardless of the government's pretext for this investigation.

delivery for publication or receipt of already-stolen newsworthy material. Therefore, the government may lawfully punish a journalist engaged in newsgathering—to be sure, the use of a search warrant to invade a journalist's files constitutes punishment—only with proof the journalist was an active participant in the theft. The conduct the Government artfully labels as "active involvement," *see* Gov't Pub. Resp. at 14 (the solicitation of already-stolen information, its delivery, and payment for it) has all been found to be immune from punishment by *Bartnicki* itself or cases applying it.

As noted above, labeling an obscenity investigation a "racketeering investigation" did not permit an end-run around substantive First Amendment protections. *Fort Wayne Books, Inc.*, 489 U.S. at 65. Just the same, the Department of Justice labeling an investigation of the press as one sounding in "conspiracy to transport stolen property across state lines, interstate transportation of stolen property, and possession of stolen goods," R&R at 7 n.4, does not permit an end-run around the First Amendment. Contrary to this precedent, the Magistrate Judge permitted the seizure of Petitioners' newsgathering materials without allowing an adversarial hearing, and there is nothing that can be done about that at this stage. But the Special Master's refusal to follow *Bartnicki* or even to consider First Amendment interests at this juncture, is a missed opportunity to provide the immediate relief First Amendment precedent requires and prevent the irreparable injury that will result from disclosure of Petitioners' newsgathering materials to government investigators. This Court must intervene to rectify these errors.

At a minimum, this intervention requires that time-honored protections afforded to other parties asserting First Amendment interests be realized here. These are largely detailed in Petitioners' opening objections brief, but include:

- Allow for an adversarial hearing—a *Bartnicki* hearing—to test the mettle of the government's prosecution theory.[9] that it can read *Bartnicki* protections out of this investigation.

- Impose a traditional burden-shifting rule to require the government to demonstrate that Project Veritas journalists "played a part" in the underlying theft of the Biden diary and other property. Petitioners' Objections at 14. Along with this, apply strict scrutiny in making these relevancy determinations to adequately protect free speech interests. *Id*. at 15-16.

- Impose stricter relevancy determinations per *Bartnicki*, such that only communications and documents seized from Project Veritas (if any) that evince its journalists' participation in the theft of information not already in possession of the sources would fall outside of *Bartnicki*. Other documents and information amounting to press deliberations, editing, and journalistic operations would be shielded from compelled disclosure. *Id.* at 14.

### III.   This Court Should Apply the Journalistic Privilege to Protect Petitioners' Newsgathering Materials.

The Government's Public Response parrots the Report's flawed application of the journalistic privilege, offering few original or alternative arguments. Yet that very torpor is notable, as the Response fails to dispute a string of key contentions:

- That Project Veritas and its reporters were engaged in newsgathering.

- That Project Veritas obtained the sources' materials under a promise of confidentiality.

- That the Privacy Protection Act and related DOJ Regulations—a standard of conduct that the Second Circuit has lauded as supportive of the common law journalistic privilege—applies to its conduct in seeking warrants.[10]

- The strong public policy rationales for the journalistic privilege (indeed, the Government never mentions them or grapples with how its arguments would dangerously undermine them).

---

[9] Other federal courts have self-fashioned "*Heller* hearings" to protect free speech interests at issue in obscenity raids. *See, e.g., Multi-Media Distributing Co., Inc. v. U.S.*, 836 F.Supp. 606, 614-15 (N.D. Indiana 1993); *Supreme Video, Inc. v. Schauz*, 15 F.3d 1435, 1442-43 (7th Cir. 1994) (discussing invocation of a *Heller* hearing); *see also Heller v. New York*, 413 U.S. 483 (1973).

[10] The Government asserts that the DOJ's implementing regulations at 28 C.F.R. § 50.10 do not themselves create a cause of action or privately enforceable rights. Gov't Pub. Resp. at 18-19. Petitioners' position here has not been to argue that the PPA or regulations are elements of the privilege, so that violating them also violates the privilege, but instead, that the PPA and regulations foreclose the Government's position that the mere issuance of warrants must be taken to completely satisfy both prongs of the privilege.

- That the Biden items were stolen long before Project Veritas was contacted by its sources, and that under the Government's apparent criminal theories, even absent *Bartnicki*, it must prove whether and when Project Veritas knew the items were stolen.

- That at all times, the Government has the burden of proving an exception to the privilege. *See Gonzales v. National Broadcasting Co., Inc*. 194 F.3d 29, 36 (2d Cir. 1999).

With these points no longer open to contention, the Government has a tough row to hoe, and yet it limits its public and sealed Responses to just a few points. First, it mistakenly argues that none of the materials at issue count as "confidential," so that its burden is lower in proving that it fits within a common law exception to the privilege. Second, it wrongly claims that the very fact that a search warrant yielded "responsive" documents satisfies the privilege—rendering the privilege a virtual nullity. Finally, it claims that the privilege was lost or waived. As shown below, the Government's few arguments that were not anticipated in Petitioners' Objections fail.

### A.  The Materials Are Confidential, so the *Petroleum Products* Test Applies.

Citing no authority, the Government offers the befuddling proposition that, for various reasons, information gathered with an understanding of confidentiality usually ***does not*** receive "confidential" treatment for purposes of the journalistic privilege. Gov't Pub. Resp. at 21-22. This flatly contradicts the controlling standard. *See Chevron Corp. v. Berlinger*, 629 F.3d 297, 307 (2d Cir. 2011) (holding that information "acquired by the journalist through a promise of confidentiality" is confidential). The Government's reasoning is in reality a policy argument for silently overturning the entire line of authority summarized in *Chevron*.[11]

***First***, the Government floats a brand-new assertion that Project Veritas emails and other electronic communications discussing or conveying its sources' confidences can never receive

---

[11] This section would have been the place for the Government to oppose the argument in Petitioners' Objections (Doc. 127 at 31) that the Report seriously erred in deciding that editorial decision-making communications are somehow categorically outside of the journalistic privilege. The Government's silence and failure to defend the Report on this point is yet another concession—albeit a necessary one, given the law—that the Report's reasoning lacks legal support.

protection because the confidential information was originally received in hard-copy form. Gov't Pub. Resp. at 21 (Petitioners' communications "obtained from electronic devices…do not include any of the Victim's stolen property…"). Of course, Petitioners' emails are replete with discussions of the content of the Biden diary and other materials. But according to the Government, because Petitioners' sources handed over the Biden diary in hard-copy, confidentiality was lost as soon as the information left its native paper format by being scanned, quoted verbatim, or discussed inside of Project Veritas, including in electronic communications. Such a bizarre rule would nullify the privilege in modern journalism, utterly surrendering the public policy benefits of having a privilege in the first place. Few newsrooms analyze confidential material with every reporter physically present, clustered around a table bearing originals of hard copy documents received from sources, a web of photos and strings tacked to a cork wall behind them. The Court can take judicial notice that journalists are not troglodytes and communicate about their work via email, Signal, Zoom, and other modern conveniences. Confidential source material retains its protection when it is transmitted or discussed electronically, even if it originally entered the newsroom as a package or a tape recording, as in *Bartnicki*.

     ***Second***, the Government argues that because Project Veritas ultimately chose not to publish the news story it had prepared using the confidential information, all protection is lost. Gov't Pub. Resp. at 21. Again, it cites no authority for this claim, which makes little sense. The public relies on journalists to decide what news is of public concern (and even when it is, whether it is "fit to print"), and different reporters and editors make different choices. The underlying newsgathering activity is therefore what the journalistic privilege protects. The "talisman invoking the journalist's privilege is intent to disseminate to the public at the time the gathering of information commences." *Von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 145 (2d Cir. 1987) (test is whether reporter

was gathering information for purposes of possible public dissemination, not whether it was eventually published). Later editorial decision-making, which might mean some notes and information go unpublished, does not diminish their protection. *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980) ("Like the compelled disclosure of confidential sources, it may substantially undercut the public policy favoring the free flow of information to the public that is the foundation for the privilege… Therefore, we hold that the privilege extends to *unpublished materials* in the possession of CBS" (emphasis added)). Protection for all of these activities does not vary based on later editorial publishing decisions, just as attorneys' draft briefs do not lose work product protection because those draft arguments are omitted from the brief that is ultimately filed.

**Third**, the Government claims that any confidentiality was lost as some details of Project Veritas' investigation became known, or sources entered pleas after being unmasked by the Government. Gov't Pub. Resp. 21-22. While the identity of a confidential source may become known (either through the source's own decision or due to interference by the Government or other third party), this does not in one fell swoop render all of the confidential information provided by that source, non-confidential. *See, e.g.*, *U.S. v. Treacy*, 639 F.3d 32, 42 (2d Cir. 2011) (noting that confidentiality can apply to both "the information sought" from the journalist *and* the identity of confidential sources).

The same principle applies when some information from a confidential source is revealed by the media, either in a story or in self-defense where, as here, it comes under attack. As shown in Petitioners' Objections (Doc. 127) at 26-27 in a point completely un-rebutted by the Government, it is the reporter, not the source, who controls the privilege, and a partial disclosure does not vitiate all applications of the privilege. *See United States v. Cutler*, 6 F.3d 67 (2d Cir.

21

1993) (applying journalistic privilege asserted by TV stations in response to subpoenas issued by their own source, and sustaining the privilege with respect to notes but rejecting it with respect to outtakes); *see also Cuthbertson*, 630 F.2d at 148 (sources who executed waivers of confidentiality could not waive the journalist's privilege).

Relatedly, it should be unremarkable that Project Veritas has been forced to discuss some of its newsgathering techniques in order to defend itself in a proceeding where the Government is unlawfully treating newsgathering as criminal. To hold that a defense of journalistic privilege works a waiver would incentivize the Government to obtain search warrants based on ever-more-exotic theories that newsgathering activities are crimes, in the process violating both the Privacy Protection Act and its own regulations that are supposed to prevent this conduct. Under the Government's theory, a media entity that it decides to raid based on an assertion that the newsgathering is criminal is forced into a Hobson's Choice: it must either say nothing at all about its newsgathering process, thereby foregoing its arguments that the seized materials are not evidence of a crime, seriously undermining its journalistic privilege; or it must explain how its newsgathering activity was not a crime, and thereby be deemed to have waived confidentiality and the protections afforded by the journalistic privilege.

No privilege works in such illogical and self-defeating fashion. Instead, principles of waiver match the underlying purposes of the privilege. The journalistic privilege does not exist merely to promote confidentiality, so that a loss of some confidentiality destroys all confidentiality, thereby eliminating the need for the privilege. Instead, the journalistic privilege is meant to protect a free and vigorous press that is not afraid (for example) to receive and vet newsworthy information about a candidate for President of the United States. *See Gonzales*, 194 F.3d at 33, 35 (the privilege protects the "paramount public interest in the maintenance of a vigorous, aggressive and

22

independent press capable of participating in robust, unfettered debate over controversial matters," but also is intended to avoid "wholesale exposure of press files to litigant scrutiny," severe burdens on the press, chilling of sources, and perverse incentives that would punish journalists' record-keeping.) In order to advance these underlying public policies, the loss of some confidentiality when it becomes necessary to litigate arguments supporting the application of the privilege must therefore be acceptable.

This argument is familiar because it is consistently applied in adjudication of the attorney-client, work product, deliberative process, and other privileges. Each of these privileges protect confidentiality not for its own sake, but rather to promote the underlying activities: attorney-client communications, free development of legal theories, zealous advocacy, robust internal deliberations in government decision-making, and the development of good policy. In each case, a loss of some confidentiality in the form of disclosures like privilege logs is appropriate because it allows courts to ensure the privilege is accurately applied and fairly litigated—again, promoting the underlying goals of the privilege. *See* Local Civil Rule 26(a)(2)(A) (specifying required elements for logs used to claim privilege); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,* 274 F.R.D. 106, 112 (S.D.N.Y.2011) (Scheindlin, D.J.) ("The standard for testing the adequacy of the privilege log is whether, as to each document, it sets forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed." (internal footnote and quotation marks omitted). This is particularly necessary for privileges that are less familiar and more difficult to apply, like the deliberative process privilege, where the elements turn on the difficult question of whether communications are "predecisional" and "deliberative." *Auto. Club of New York, Inc. v. Port Auth. of New York & New Jersey*, 297 F.R.D. 55, 59 (S.D.N.Y. 2013). Here, any discussion by Project Veritas of its journalistic techniques was

precisely to show why the journalistic privilege, and First Amendment-derived privileges, apply in the first place. Those necessary defense measures cannot strip otherwise privileged newsgathering material of its confidential character.

### B.  The Government Failed to Meet its Burden Under *Petroleum Products* and *Gonzales*

A sure sign that the Government has misunderstood the journalistic privilege is this: it would have this Court apply the same factors, and reach the same answer, regardless of whether journalists' information is confidential. The Government's analysis can be reduced to a single, self-proving factor: so long as a journalist's materials are the fruits of a search warrant, both tests are necessarily satisfied. Although admittedly this is a groundbreaking case—the parties' diligent search of the case law has yielded no prior example of the Government brazenly seizing newsroom communications under the theory that newsgathering was itself a crime—there is no legal support for this proposition and the Government's theory cannot be the law.

### 1.  *The Government Falls Far Short of Meeting its Relevancy Burden.*

*First*, as a threshold matter and at the broadest level of generality, the Government is wrong that the search warrants are simultaneously un-challengeable (a shield) and also categorically dispositive for piercing the journalistic privilege (a sword). As shown in Section I, the validity of the search warrants and the existence of probable cause cannot be assumed, as the Government's underlying theory does not support a crime. Because the Government puts all of its eggs in this basket, the failure of this proposition alone should doom all of the Government's arguments.

*Second*, at a finer level of detail, the Government is also wrong to equate the relevancy test for the journalistic privilege with the probable cause standard. The relevancy showing required under either the confidential or non-confidential prongs of *Gonzales* rests on a higher plane than

any conclusion that can be drawn from the awkward cobbling together of a (1) warrant allegedly supported by probable cause; and (2) a decision that a given item was responsive to that warrant.

Even non-confidential materials require a higher showing than probable cause: they must be of "***likely*** relevance" to a "***significant*** issue" in the case. *Gonzales*, 194 F.3d at 36 (emphasis added). This requires: (1) a finding that the theory in the case is valid and an identification of what the most "significant issues" are under that valid theory, and (2) a finding that the materials are not only possibly, but "likely," relevant to one of those "significant" issues. *Id*. at 32, 36 (in civil rights claim that had advanced from the pleadings stage into discovery, finding that news video outtakes of police stops would help the "trier of fact" determine the plaintiffs' and defendants' opposing claims of whether police had a "pattern and practice" of stopping without probable cause, noting that videos can "provide unimpeachably objective evidence of [police] conduct").

In sharp contrast to the showing necessary to obtain the video clips in *Gonzales*, probable cause in the warrant context "does not require certainty or even a more-substantial-than-not likelihood. It requires only a 'fair probability' that evidence of the violation at issue will be found in the place to be searched." *United States v. Balkissoon*, 579 F.Supp.3d 367, 373 (E.D.N.Y. 2022) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008). Nor must the finding be specific to an offense: the offense that in retrospect is deemed to have supported probable cause for an arrest need not even be "closely related to" the offense identified by the arresting officer at the time of arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

The *Gonzales* factors are much more stringent than the search warrant standard applied by the Special Master. That evidence was "responsive" to a warrant reveals only that, in the Special

Master's opinion, the items seized were within the scope of the warrant. But with this conclusion, any value of the responsiveness finding is fully exhausted. It leaves unresolved the questions *Gonzales* requires courts to address before ordering disclosure of even non-confidential journalistic materials.

First, a probable cause analysis tells us only that the totality of the facts alleged suggest some possibility of a crime. It does not necessarily tell us what underlying theory of criminal liability any particular part of the evidence allegedly supports, or that the underlying theory is sufficiently valid to support discovery and sufficiently definite to allow the identification of specific issues—all part of what must be analyzed under the *Gonzales* test. *Id.*, 194 F.3d at 36.

Second, even if the theory supporting probable cause for a warrant turns out to be the theory later being investigated, the warrant's probable cause finding fails to tell us that the specific evidence seized is actually relevant to a ***significant*** issue," or merely responsive to one of the eight broad categories, or six statutory sections, enumerated within the warrant. *See, e.g.*, Doc. 70, Ex. B, C and E. For at least these reasons, then, the Special Master's probable cause-based "responsiveness" finding is not logically equivalent to, and cannot be passed off as satisfying, the *Gonzales* test.

***Third***, at an even finer level of detail, it is impossible to tell whether the Report actually considered the privilege issue document-by-document, or merely applied a high-level filter to identify any and all documents having something to do with the Biden diary story. The Report's reasoning is utterly opaque. How can anyone—either Petitioners, this Court, or future journalists, prosecutors, or members of the public looking for guidance—know whether the Government has actually met its burden on either prong of the test? We are told that the Special Master reviewed the still-sealed warrant applications, R&R (Doc. 118) at 8, but we do not know that the Master did

anything other than apply the same categorical rule urged by the Government: that documents seized via warrant *a fortiori* satisfy *Gonzales*. In particular, we do not know if the Government ever showed, or the Special Master concluded, that the warrants were issued on a valid criminal theory, or a theory precluded by *Bartnicki* as the government filter team now asserts. *See infra* at Section V. In the absence of a valid criminal theory, the seized materials—confidential or not—cannot meet the relevancy test.

## 2.   *The Government Cannot Meet Its Burden to Show Unavailability Elsewhere.*

The Government's Response confirms that it failed to meet its burden to prove that materials meeting the relevance standard are not reasonably available elsewhere. The Government begins by claiming that Project Veritas reporters' use of "encrypted" communications (to be clear, this simply means commonly-used services like Signal and WhatsApp) meets the standard of unavailability. But why? To the extent Project Veritas used secure channels to communicate with confidential sources who are now cooperating with the Government, the communications are indeed "otherwise available." The filter team surely has access to the electronic devices seized from the sources, but it has not submitted a declaration or other showing that the source communications seized from Petitioners are not available on those devices. With respect to encrypted newsroom communications that were purely internal and therefore not available from cooperating sources, the Government must still show that there is something relevant to a significant issue in the secure internal communications that cannot be obtained elsewhere. Encryption alone does not meet the standard.

On this latter point, the Government adds little of substance. Even if any of the alleged offenses are permissible under *Bartnicki* (and they are not) the Government fails to explain how specific evidentiary facts in those communications that are "likely relevant" on "significant"

elements of those crimes cannot be found from the sources themselves, or in the hundreds of thousands of Project Veritas emails that the Government seized from Microsoft. There is simply no attempt to show that the communications seized from Petitioners disclose basic facts that are not reasonably available elsewhere.

The Government once again resorts to its "metadata" arguments, but even after Petitioners challenged it to explain how the metadata is likely relevant to a significant issue, the Government fails to do so. The "mere existence of communications on devices" is not an independent evidentiary fact; it is the communications themselves that matter. As discussed immediately above, the Government has not shown that any of the materials reveal any information that the Government does not already have (or cannot obtain) from other sources. And given that the content of these communications cannot be shown to be both important and unavailable elsewhere, the "timing" is even less relevant. The "location" of Project Veritas reporters using their devices is also irrelevant, as the transportation of the Biden materials is already known to the Government through their sources. Again, the Government makes no showing that a particular reporter's location is both relevant and otherwise unknowable to it.

Without limiting any of these points, it is also true that if the Government only needed location metadata or the timing (as opposed to the contents) of electronic communications, it could access that information without forcing the disclosure of internal or other confidential communications. In short, the Government has utterly failed to meet its burden on this point.

### 3.   *"Necessary to a Claim."*

Finally, the Government would have the Court simply ignore the requirement that confidential materials must be "necessary or critical to the maintenance of the claim" in order to support piercing the journalistic privilege. *See Petroleum Products*, 680 F.2d 5, 7 (2d Cir. 1982).

Without citation to authority, the Government insists that this requirement only applies in indicted cases, not in investigations where allegations have not ripened into "claims" Gov't Pub. Resp. at 25-26. This argument cannot be reconciled with the Government's position that it has made such a convincing showing in its sealed warrant affidavits of claimed criminal conduct that any and all *Gonzales* requirements have been satisfied and consideration of the First Amendment is not permitted. Gov't Pub. Resp. at 9-12. Put another way, it simply cannot be that the Government's warrant affidavits are conclusive claims for *Gonzales* purposes but mere allegations when it concerns the requirements of *Petroleum Products*.

### C.  <u>The Government's Waiver Theory Fails</u>

The crux of the Government's waiver argument is that Project Veritas somehow forfeited its journalistic privilege by discussing the evidence in its publicly filed briefs. The argument did not succeed below—the Special Master did not make a finding of waiver with respect to any of the documents she determined to release to the Government investigation team—but the Government reprises the argument at great length before this Court. *See* Gov't Pub. Resp. at 26-30. The argument fails for three, independently sufficient reasons.

***First***, in its lengthy discussion of "waiver" the Government cites just one instance where the source of a fact revealed in Project Veritas' briefs is a privileged document. Gov't Pub. Resp. at 30 (citing James O'Keefe statement to Project Veritas staff regarding his decision not to publish the Biden diary story). The text of that statement is now available to the Government and it does not explain how it has been disadvantaged by the disclosure of the statement in Project Veritas' brief. Nor does the Government provide any legal authority for the proposition that a journalist's disclosure of one privileged document forfeits the journalistic privilege for all of the journalist's newsgathering materials. As for the Government's generic description of evidence discussed in

Project Veritas' briefs, Gov't Pub. Resp. at 29, all of this information is available from sources other than the documents for which Project Veritas has asserted privilege, including the hundreds of thousands of Project Veritas emails that the government secretly seized from Microsoft, the government's filings in connection with the Kurlander/Harris pleas, and numerous witnesses.

*Second*, the Government's reliance on the fairness doctrine is both hypocritical and misplaced. "Fairness considerations…come into play where the party asserting the privilege makes factual assertions, the truthfulness of which may be assessed only by an examination of the privileged communications or documents." *American S.S. Owners Mut. Protection and Indem. Ass'n, Inc. v. Alcoa S.S. Co., Inc.*, 232 F.R.D. 191, 199 (S.D.N.Y. 2005) (internal quotations and citations omitted). That the Government would invoke this doctrine, at the same time it is using the search warrant probable cause findings as a sword and the sealing of the supporting affidavits as a shield, is at best disingenuous. Even more telling, as noted in Petitioners' Objections, *id.* at 40, the Government filter team has had access to *all* of the documents for which Project Veritas is asserting privilege but has not cited *even one instance* where those privileged documents contradict statements in Project Veritas' public briefs.

*Third*, the Government labors unsuccessfully to create the illusion of unfairness where none exists. It accuses Project Veritas of making strategic "partial disclosures" in order to "persuade the Court, the Special Master, and apparently the public that…[Project Veritas] w[as] following 'common journalistic practices.'" Gov't Pub. Resp. at 29. Most fundamentally, it is troubling that the authors of the Government's Public Response—its investigation team—claim to know that Project Veritas's factual representations are "partial" and inconsistent with other content in the confidential materials reviewed by the Special Master. These materials, of course, were not to be accessed by the investigation team under the protocol established by the Court. *See* 12/8/21

Mem. Op., 2021 WL 5845146. Either the investigation team has violated that protocol, or their description of Project Veritas's factual representations as "partial" is speculative and not to be credited. In either event, as noted above, the Government's filter team, which had access to all of the documents for which Project Veritas is asserting privilege, has not shown (nor can it) that any privileged documents are inconsistent with statements in Project Veritas' public briefs.

Equally ill-advised is the Government's accusation that Project Veritas sought to mislead the Special Master and the Court by "us[ing] their own partial disclosures as a sword, while shielding the remainder of their communications and documents from disclosure"). ***Shielding from whom?*** The Special Master had access to ***all*** 1,021 documents she determined to be responsive to the search warrants, including every document for which Project Veritas seeks protection under the First Amendment and journalistic privilege. *See* R&R (Doc. No. 118) at 4. So too did the filter team, which filed its own lengthy brief quoting and explaining the contents of the communications to its heart's content. Had any of these documents contradicted the statements in Project Veritas' public briefs, or revealed conduct inconsistent with "common journalistic practices," presumably the Special Master or filter team would have said so.[12]

Finally, the Government expresses concern that ***the public*** somehow was led astray by Project Veritas' factual statements in its briefs because its confidential newsgathering materials remained undisclosed in the Special Master's review process. Gov't Pub. Resp. at 29 (complaining Project Veritas sought to "persuade" the public about its "journalistic practices"). As explained in Petitioners' Objections, the fairness doctrine has no application to statements made to the public. *Id.* at 40. Nevertheless, it should be evident that the Government is not actually concerned about

---

[12] The Special Master observed that Petitioners "made several public disclosures *to the Court* about the very same content that they seek to protect in the review process." R&R (Doc. No. 118) at 12 (emphasis added). But she did not find that even a single one of those statements to the Court conflicted with the content of the documents she had reviewed.

fairness but instead is vexed that Project Veritas publicly disclosed ***actual facts*** contradicting the Government's narrative that Project Veritas is not engaged in journalism.

In sum, the factual statements in Project Veritas' public briefs are derived from sources other than the documents reviewed by the Special Master. The Government filter team and the Special Master had access to all the documents for which Project Veritas is asserting privilege and were able to compare the content of those documents with factual statements made in the briefs. In these circumstances the fairness doctrine is inapplicable and the Government's at-issue waiver argument fails.

## IV.  The Government's Contention that Certain Petitioners' Communications with Legal Counsel Are Not Protected by the Attorney-Client Privilege Is Based on a Misreading of the Law

The Government filter team's response to Petitioners' Objections continues to insist that nine of Petitioners' text communications with then-Chief Legal Officer ("CLO") Jered Ede are not attorney-client communications.[13] Petitioners rebut the Government's arguments document-by-document in Petitioners' Sealed Reply, and explain here that the Government's position is based on mistaken reading of three distinct aspects of attorney-client privilege law.

First, the Government argues that communications by which journalists convey factual information to CLO Ede, but where he does not respond with legal advice within that same communication, are not protected by the privilege. *See* Gov't Sealed Resp. at 20 ("Ede does [not]…provide any legal advice"); 21 ("Ede's further commentary…is not demonstrative of any kind [sic] legal advice"); 21-22 (facts conveyed by Meads not the "predicate" for Ede's legal advice); 22 ("there is no provision… of legal advice"); 23 ([b]oth of Ede's questions posed were

---

[13] Despite having taken a different position before the Special Master, the government filter team now acknowledges that two such text communications deemed non-privileged by the Special Master ***are*** protected by the attorney-client privilege. *See* Gov't Sealed Resp. at 22 (discussing 1B45_00020612 and 1B45_00019430).

factual in nature"); 24 ('[t]here is no…provision of legal advice whatsoever"); and 25 ("exchange

between Meads and Ede…was factual in nature").[14] This argument ignores the black letter law that

"the privilege exists to protect not only the giving of professional advice to those who can act on

it but also the giving of information to the lawyer to enable him to give sound and informed

advice." *Upjohn Co. v. U.S.*, 449 U.S. 383, 390 (1981). As explained in Petitioners' Objections

(Doc. No. 127), many of the documents that the *Upjohn* court found to be protected by the privilege

contained **only** facts. *Id.* at 396.

Second, the Government also points to the circumstance that text messages conveying these

facts to CLO Ede were copied to other journalists as reason to deem the communications non-

privileged. *See* Gov't Sealed Resp. at 20 (text sent to "eight Project Veritas employees"), 21 (text

sent to 13 non-lawyers and Ede"). But "the mere fact that a document is sent to many non-legal

and few legal personnel is not determinative of whether it is privileged." *In re Buspirone Antitrust*

*Litigation,* 211 F.R.D. 249, 253 (S.D.N.Y. 2002) (citing cases).

Third, the Government repeatedly points to the fact that communications from the

journalists to CLO Ede did not contain an express request for legal advice. Gov't Sealed Resp. at

20 ("Ede does [sic] provide nor is he asked to provide any legal advice"); 22 ("[t]here is

no…solicitation of legal advice"); 23 ("[t]here is no legal advice being sought…in this text

chain"); 24 ("[t]here is no solicitation…of legal advice whatsoever"); *id.* ("[t]here was no legal

advice sought"). But "[t]he request for legal advice or services need not be an express request, nor

need the implied request necessarily appear on the face of the document for which the claim of

privilege is made." *In re Buspirone Antitrust Litigation*, 211 F.R.D. at 254; *See also Urban Box*

*Network, Inc. v. Interfase Managers, L.P.*, No. 01 Civ. 8854(LTS)(THK), 2006 WL 1004472, at *4

---

[14] Inexplicably, the Government insists that the Special Master did not find that communications of a "factual nature" are not privileged, Gov't Sealed Resp. at 18, but then the filter team argues that same mistaken premise.

(S.D. N.Y. April 17, 2006) ("w]hen information is conveyed to an attorney, the communication need not specifically ask for legal advice in order to maintain the documents privileged status"); *In re Pfizer, Inc. Sec. Litig.*, 1993 WL 561125, at *6 (S.D. N.Y. Dec.23, 1993) ("[a]n implied request exists when an employee sends information to corporate counsel in order to keep them apprised of ongoing business developments, with the expectation that the attorney will respond in the event that the matter raises important legal issues"); *Cuno, Inc. v. Pall Corp.*, 121 F.R.D. 198, 202 (E.D. N.Y. 1988) (the application of the privilege "does not require that the request [for legal advice] be within the four corners of the document").

The Government's focus on the four corners of each text communication with CLO Ede ignores entirely the context in which these communications occurred. From the time of the initial meeting with the sources, the Project Veritas journalists were keenly aware of the legal risks attendant to publishing a story about the aberrant behavior of Joe Biden. As explained in Petitioners' Objections, *id.* at 56, it made a difference whether the author of the diary recording possible sexual abuse by her father was the daughter of an individual then campaigning to become President of the United States. For this reason, the authentication of the diary was a crucial component in the legal determination of whether the allegations in it were a matter of public concern, i.e., newsworthy, thereby making various defenses available to Project Veritas in a potential defamation action. Because the communications from the journalists to CLO Ede implicate this specific legal issue, the communications constitute implicit requests for legal advice. *See, e.g., Greater New York Taxi Ass'n v. City of New York*, No. 13 Civ. 3089 (VSB) (JCF), 2017 WL 4012051, at *12 (S.D.N.Y. Sept. 11, 2017) ("communications constitute implicit requests for legal advice where an attorney is copied on the communications and the communications implicate specific legal issues"),

The fourth, and most fundamental error in the Government's analysis of the attorney-client privilege issue is its *ipse dixit* assertions that determining the authenticity of the diary, and related assessment of the newsworthiness of the story, were not within the purview of legal counsel. *See* Gov't Sealed Resp. at 18 ("[e]stablishing the newsworthiness of a story and authenticating source material…are journalistic functions squarely within the purview of a news organization's reporters"). The authority that the Government relies upon for this proposition actually refutes it. Citing *In re Cnty. of Erie*, 473 F.3d 413 (2d Cir. 2007), the Government contends that "advising whether a story is newsworthy and how to authenticate source material in support of it is guidance 'that can be given by a non-lawyer' and is therefore not legal advice." Gov't Sealed Resp. at 19. But the *Cnty. of Erie* court determined that the advice at issue there was legal in character and privileged even though, according to the plaintiffs contesting the privilege, the Erie County Charter authorized only the County Sheriff and his direct appointees to provide guidance on searches of detainees. 473 F.3d at 421. In other words, it was irrelevant to the *Cnty. of Erie* analysis that advice on the underlying policy issue could have been given by a non-lawyer.

The Government's dismissive characterization of newsworthiness as the "business of a news organization," Gov't Sealed Resp. at 18, ignores the fact that courts frequently grapple with the ***legal*** question of whether a story, image or artistic rendering is "newsworthy." *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011) (analyzing when speech is a "matter of public concern" protected by First Amendment); *San Diego v. Roe*, 543 U. S. 77, 83 (2004) (per curiam) ("the boundaries of the public concern test are not well defined"); *Zacchini v. Scripps Howard Broadcasting Co.*, 433 U.S. 562 (1977) (examining newsworthy/public interest exception to the right of publicity); *Ann-Margret v. High Society Magazine, Inc.* , 498 F. Supp. 401 (S.D.N.Y. 1980) (considering scope of what constitutes a newsworthy event); *Ali v. Playgirl*, 447 F. Supp. 723, 727 (S.D.N.Y. 1978)

(holding that drawing of nude boxer resembling Mohammed Ali was not newsworthy). The issue is sufficiently complex that court decisions construing it have given birth to two related "doctrines." *See, e.g.*, Robert C. Post, *The Social Foundations of Privacy: Community and Self in the Common Law Tort,* 77 CAL. L. REV. 957, 997 & n.179 (1989). The public-figure doctrine provides greater First Amendment protection for speech about individuals who have thrust themselves into public controversies, requiring those public-figure plaintiffs to satisfy heightened burdens in defamation actions. *See, e.g.*, *Sullivan,* 376 U.S. 254. The newsworthy doctrine focuses not on the status of the plaintiff, but rather on the nature of the information at issue, and acts as a shield for speech on "matters of public concern." *See, e.g., Thornhill v. Alabama*, 310 U.S. 88, 101–02 (1940) (holding that the First Amendment "embraces at the least the liberty to discuss publicly and truthfully all matters of public concern").

The delivery of the Biden diary to Project Veritas implicated ***both*** doctrines. Whether the individual accused in the diary of inappropriate conduct would be considered a public figure in the defamation context required authentication of the diary in order to identify its author to a reasonable legal certainty. As explained in Petitioners' Objections, the authentication of a questioned writing is a process of sufficient legal character to be a subject of the Federal Rules of Evidence. *Id.* at 56 (citing FRE 901(b)(3)). Even after authentication, however, the issue of the newsworthiness of the diary's content remained. The Government's proclamation that CLO Ede's contribution to the resolution of this complex issue was "not legal advice" is both legally unsupported and utterly unrealistic. *See* Gov't Sealed Resp. at 19.

## V.   The Government's Defense of the Special Master's Crime-Fraud Exception Analysis Is Unpersuasive and Confirms the Analysis Is Erroneous.

Little can be said in this Public Response about the Special Master's crime-fraud exception ruling because, when properly undertaken, analysis of the issue must be fact-specific and

performed document-by-document. As explained in Petitioners' Objections, the Special Master's ruling lacks any reasoning or document-specific analysis. Pub. Obj. at 42-43. The Government did not invoke the crime-fraud exception, and the response of its filter team to the Special Master's invitation to pursue the issue is lackluster, at best. Petitioners' fact-specific rebuttal of the filter team's response is set forth in Petitioners' Sealed Reply. *See id*. at 17-27. We note here, however, a surprising (and telling) feature of the filter team's legal argument.

The Government has defended its seizure of Project Veritas' newsgathering materials by contending that its journalists conspired to steal, and did steal, Ashley Biden's property, if not her diary. *See, e.g*., Gov't Pub. Resp. at 14 (alleging that Petitioners were "actively involved in…the theft of certain of the property itself"). The Government's investigation team has never contended in its briefs that Project Veritas' mere possession of stolen property would justify the seizure of its newsgathering materials. Now, however, after Petitioners demonstrated that the Biden diary and other property was in the possession of the sources before they approached Project Veritas, *see* Pub. Obj. at 45-51, the Government filter team has set a new course.

Perhaps recognizing the problem—attorney-client communications occurring ***after*** the Biden property was acquired by the sources and delivered to New York could not have furthered the alleged conspiracy to commit interstate transportation of the property—but without acknowledging its dilemma, the Government filter team retreats to an equally untenable position. For the first time in these Special Master proceedings, the filter team expressly contends that Project Veritas' "acquisition and continued possession" of the Biden diary and other property was a crime. *See* Gov't Sealed Resp. at 12; *see also id.* (citing "conspiracy to possess stolen goods and actual possession of stolen goods"). The filter team then proceeds to argue that the journalists' communications with counsel post-delivery of the Biden property to New York facilitated that

supposed possessory offense and satisfies the "in furtherance" element of the crime-fraud exception. *See, e.g., id.* at 32 (arguing that certain text communications with counsel show "an express acknowledgment…of the illicit receipt of the stolen property evidence"); 33 (arguing that text is evidence of Project Veritas' knowledge that it is in possession of stolen property).

This shift in strategy is all the more remarkable given the absence of any attempt to reconcile this new position with the controlling case authority. As *amici* American Civil Liberties Union, Freedom of the Press Foundation, and Foundation for Individual Rights and Expression ably demonstrate, *Bartnicki* and its progeny "protect[] the reporter's knowing receipt or possession of…unlawfully obtained information." (Doc. No. 140) at 3; *see also id.* at 4 ("the right to publish newsworthy information is of little use without the concomitant right to possess the information on which publication depends"). Contrary to the Special Master's reading of *Bartnicki* as limiting First Amendment protections to the publisher of stolen information, *see* R&R (Doc. 118) at 7, *Bartnicki* held that the party who ***received*** the information and delivered it to the publisher also could not be held liable by the government. 532 U.S. at 527 ("given that the purpose of such a delivery is to provide the recipient with the text of recorded statements, it is like the delivery of a handbill or a pamphlet, and as such, it is the kind of 'speech' that the First Amendment protects"); *see also id.* at 525 n.8. And as Petitioners' Objections explained, *Bartnicki* has been construed by other courts to prevent the state from punishing journalists who receive stolen newsworthy information. *See Jean v. Massachusetts State Police*, 492 F.3d 24, 31 (1st Cir. 2007) (enjoining threatened prosecution of journalist for receiving and publishing stolen information); *Democratic Nat'l Comm.,* 392 F.Supp.3d at 435 (rejecting argument that journalist could "be held liable for the theft as an after-the-fact coconspirator of the stolen documents").

The Government's tactical shift raises further questions about the "crimes" theory the prosecutors and agents presented to the Magistrate Judge to procure the warrants to search the residences of Meads, Cochran, and O'Keefe. The Government filter team expressly relies on those probable cause findings to argue that the first element of the crime-fraud exception is satisfied, Gov't Sealed Resp. at 29 ("a federal magistrate judge had already determined that probable cause exists that the offenses under investigation were committed"). But the filter team, like their counterparts on the investigation team who authored the government's Public Response, refuse to address the evidence now in the record that the sources exercised complete dominion and control of the Biden diary and property **before** contacting Project Veritas. Regardless of the rote recital of statutory offenses in the warrant applications, if the Magistrate Judge found probable cause to believe the Project Veritas journalists conspired to possess, and received and possessed, stolen property, the warrants would be invalid under the First and Fourth Amendments. In that circumstance it would be unnecessary for the Court to reach the Journalistic Privilege issue or the application of the crime-fraud exception to the attorney-client privilege.[15]

## CONCLUSION

For the foregoing reasons, and based on the additional document-specific points addressed in Petitioners' accompanying Sealed Reply, this Court should accept Petitioners' Objections; decline to adopt the Report's recommendations; find that the privileges asserted by Petitioners apply; and order that the documents at issue not be released to the Government's investigation team.

---

[15] There is heightened need for scrutiny where the responsible prosecutors did not seek the Attorney General's authorization for the warrants as required by the DOJ Guidelines. *See* (Doc. 99) Public Reply at 18 (discussing 28 C.F.R. §§ 50.10 et seq).

Dated: New York, New York
       June 23, 2023

Respectfully Submitted,

*/s/ Edward D. Greim*
Edward D. Greim