```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   12/21/2023
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Search Warrant dated November 5, 2021,                    21 Misc. 813 (AT)

In re Search Warrant dated November 3, 2021                     21 Misc. 819 (AT)

In re Search Warrant dated November 3, 2021,                    21 Misc. 825 (AT)

**ORDER**

ANALISA TORRES, District Judge:

In November 2021, the Honorable Sarah L. Cave issued three search warrants for

electronic devices at the residences of James O'Keefe, Spencer Meads, and Eric Cochran, all

members of Project Veritas, an "undercover investigative journalism" organization. Judge Cave

found probable cause that the devices contained evidence of federal crimes. The Federal Bureau

of Investigation (the "FBI") executed the warrants and seized 47 devices. Project Veritas,

O'Keefe, Meads, and Cochran (collectively, "Petitioners") initiated this action to stop the

Government from reviewing the devices, arguing that they "contain vast amounts of information

protected by the First Amendment" and the attorney-client privilege. ECF No. 1 at 1.[1]

On December 8, 2021, the Court appointed the Honorable Barbara S. Jones (retired) (the

"Special Master") to oversee the review of the materials seized during the FBI searches. ECF

No. 48. On March 21, 2023, the Special Master issued a report and recommendation (the

"Report"). ECF No. 118. The Report recommended that all documents responsive to the search

---

[1] All ECF citations are to the docket in 21 Misc. 813 unless otherwise noted.

warrants and not protected by the attorney-client privilege should be disclosed to the

Government's investigative team. *Id.* Petitioners object to the Special Master's

recommendation. Pet'r Public Obj., ECF No. 127; Pet'r Sealed Obj., ECF No. 130. For the

reasons stated below, the Court OVERRULES Petitioners' objections and ADOPTS the Special

Master's recommendation.

## BACKGROUND

I.    Factual Background

Project Veritas is "a national media organization dedicated to undercover investigative

journalism." Pet'r Public Obj. at 4 (quoting *Project Veritas Action Fund v. Rollins*, 982 F.3d

813, 817 (1st Cir. 2020)). During the events at issue, Meads and Cochran worked for Project

Veritas, and O'Keefe was its president. *Id.* The Government alleges that Petitioners played a

role in a conspiracy (the "Conspiracy") involving the "theft and interstate transportation of

certain property stolen from" an individual (the "Victim") who "was an immediate family

member of a then-former government official who was a candidate for national political office."[2]

Gov. Public Opp. at 2, 4, ECF No. 137.

In September 2020, Aimee Harris and Robert Kurlander, two individuals not employed

by Project Veritas, discovered that the Victim had stored items—including a journal—in a

Florida house where Harris was temporarily residing. Gov. Public Opp. at 4. The Government

claims that Harris and Kurlander contacted Petitioners, who then paid the two to travel to New

York and hand over the Victim's journal. *Id.* There, Harris allegedly revealed that the Victim

had additional items in the Florida residence, and, "at Project Veritas's request," she and

---

[2] The Government has been "circumspect in its public statements to the Court regarding the relevant factual background and its investigation." Report at 3. Petitioners state that the property belonged to Ashley Biden, the daughter of then-presidential candidate Joseph R. Biden, Jr. Pet'r Public Obj. at 4.

Kurlander returned to Florida to retrieve them.  *Id.*  The Government alleges that they stole additional items from the Victim and gave them to a Project Veritas employee in Florida, who transported the items to New York.  *Id.* at 4–5.  "Project Veritas subsequently paid Harris and Kurlander $20,000 each for the stolen property."  *Id.* at 5.

On August 25, 2022, Harris and Kurlander each pleaded guilty to one count of conspiracy to commit interstate transportation of stolen property.  *Id.* at 3; *see* Plea Order, *United States v. Harris & Kurlander*, No. 22 Cr. 457 (S.D.N.Y. Aug. 29, 2022), ECF No. 11.  During Harris' plea allocution, she stated that she "found property, including a journal, belonging to another person in a place where [she] was living," and, although Harris knew that she "did not have a right to take the property," she transported the journal with "another person" from Florida to New York City in September 2020.  Plea Tr. at 20:1-10, 21:1-8, *United States v. Harris*, No. 22 Cr. 457-1 (S.D.N.Y. Aug. 25, 2022), ECF No. 12.  Kurlander similarly said that he agreed to transport to New York City "items [that] were stolen from a residence in Florida," despite knowing that "they were wrongfully obtained."  Plea Tr. at 21:25–22:13, *United States v. Kurlander*, No. 22 Cr. 457-2 (S.D.N.Y. Aug. 25, 2022), ECF No. 14.

II.    Procedural Background

On November 3 and 5, 2021, the Honorable Sarah L. Cave issued search warrants authorizing the seizure of electronic devices from the residences of Meads, Cochran, and O'Keefe.  ECF Nos. 127-2; 127-3; 127-5.

Judge Cave approved the warrants based on detailed affidavits submitted by the Government.[3]  The affidavits established probable cause that Petitioners' devices contained evidence of federal crimes related to the Conspiracy—specifically, (1) conspiracy to transport

---

[3] The affidavits were provided on an *ex parte* basis to the Special Master and to the Court.  *See* Gov. Public Opp. at 2 n.1; ECF No. 42.

stolen property across state lines and possess stolen goods, (2) interstate transportation of stolen property, (3) possession of stolen goods, (4) aiding and abetting, (5) accessory after the fact, and (6) misprision of felony, in violation of 18 U.S.C. §§ 2, 3, 4, 371, 2314, and 2315.  ECF No. 127-2 at 3; ECF No. 127-3 at 2; ECF No. 127-5 at 2; *see* Gov. Public Opp. at 2.  The warrants authorized the Government to seize from the devices seven categories of evidence pertaining to the time period from August 1, 2020, to the date of seizure.  ECF No. 127-2 at 3; ECF No. 127-3 at 2; ECF No. 127-5 at 2.

On November 4, 2021, the FBI seized seventeen devices from Meads' residence and twenty-eight from Cochran's.  *Id*. at 8; ECF No. 127-4 at 2–4.  On November 6, 2021, the FBI executed the warrant for O'Keefe's home and seized two mobile phones.  Pet'r Public Obj. at 2, 9; ECF No. 127-4 at 1.

On November 10, 2021, Petitioners brought a motion requesting that the Court (1) halt the Government's review of the electronic devices, and (2) appoint a special master to review the devices before releasing them to the Government.  ECF No. 1; 21 Misc. 819, ECF No. 8; 21 Misc. 825, ECF No. 8.  Typically, a "filter team" at the United States Attorney's Office—a group of attorneys not involved in the Government's investigation—conducts a review of seized materials and then releases responsive, non-privileged materials to the Government's investigative team.  ECF No. 48 at 2–3.  "The objective of the responsiveness review is to determine whether the information the government seized [falls] within the scope of the categories of information sought in the search warrants."  *United States v. Nejad*, 436 F. Supp. 3d 707, 734 (S.D.N.Y. 2020) (cleaned up).  Given that the First Amendment may be implicated when a journalist's device is seized, the Court appointed the Special Master to review the seized materials prior to the filter team in order to "protect the public's confidence in the administration

4

of justice." ECF No. 48 at 3 (cleaned up).[4]

The Court directed the Special Master to proceed in three stages: (1) conduct an initial review to determine whether seized materials are responsive to the seven categories of documents specified in the warrants, (2) send only the responsive materials to the Government's filter team to determine if information should be withheld, and (3) review Petitioners' objections to the filter team's decisions. *See id.* at 4; Report at 1.

The Special Master reviewed documents on every device that contained accessible content and identified 1,021 documents responsive to the warrants.[5] Report at 4. The filter team reviewed those documents and found that seventeen are potentially protected by the attorney-client privilege. *Id.* at 5. Petitioners objected to the release of the remaining 1,004 documents on three bases: (1) that the documents are not responsive, (2) that the documents, although responsive, are protected by the reporter's privilege and the First Amendment, and (3) that certain documents are protected by the attorney-client privilege. *Id.* The Special Master agreed that sixty-one additional documents are not responsive. *Id.* at 19. For the remaining 943 documents (the "Responsive Materials"), the Special Master determined that the reporter's privilege does not prevent the release of the documents. *Id.* at 13–17. For the seventy-six documents which Petitioners claim are protected by the attorney-client privilege, the Special Master found that twenty-four are privileged or partially privileged, that forty are not privileged, and that, for the other ten, the privilege is vitiated by the crime-fraud exception. *Id.* at 17–19; *see*

---

[4] Although some of Petitioners' arguments challenged the validity of the search warrants, the Court declined to consider that issue because it "is not before the Court." ECF No. 48 at 2.

[5] In an interim March 7, 2022 update, the Special Master notified the Court that the Government had provided materials from fifteen of the forty-seven seized electronic devices. ECF No. 61 at 1. Of the fifteen devices, the Special Master determined that there were no responsive documents on ten and released materials from the other five to the filter team. *Id.* at 2. As to the thirty-two other devices, the Government was either unable to access the device or had determined that the device "did not contain data from the time periods set forth in the search warrants." *Id.* at 1–2.

ECF No. 118-1 (spreadsheet documenting the Special Master's review).

## LEGAL STANDARD

The Court reviews de novo all objections to conclusions of law and findings of fact made or recommended by the Special Master.  Fed. R. Civ. P. 53(f)(3)–(4).  A ruling on a procedural matter is reviewed for abuse of discretion.  *Id.* R. 53(f)(5).

## DISCUSSION

### I.   The Reporter's Privilege

Petitioners contend that, as journalists, they are not required to turn over the Responsive Materials to the Government.  The Special Master rejected this argument.  After sorting each document into one of eight groups, the Special Master held that the privilege afforded to reporters does not apply to four groups of documents, and that the Government demonstrated a need sufficient to overcome the privilege as to the other four.  Report at 13–17; *see* ECF No. 118-1 (spreadsheet documenting the Special Master's review).  Petitioners now argue that the Special Master both used the wrong legal standard to evaluate their claim of the journalist's privilege and misapplied the legal standard that she did use.

#### A.  Legal Standard

The Second Circuit has "long recognized the existence of a qualified privilege for journalistic information" to prevent the "wholesale exposure of press files to litigant scrutiny."[6] *Gonzales v. Nat'l Broadcasting Co., Inc.*, 194 F.3d 29, 32, 35 (2d Cir. 1999).  Recognizing that journalists are not "passive collectors of information whose evidence is a convenient means for

---

[6] The Second Circuit has declined to decide whether the reporter's privilege arises from the First Amendment or federal common law, stating that it only would need to answer the question if "Congress legislates to modify the privilege or do away with it."  *Gonzales*, 194 F.3d at 35 n.6.  The Court, therefore, does not address that issue.  The Circuit's standard is informed by First Amendment principles.  *See, e.g.*, *von Bulow ex rel. Auersperg v. von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987) ("[T]he process of newsgathering is a protected right under the First Amendment . . . which results in the journalist's privilege.").

the government" to advance its investigations, *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 170 (2d Cir. 2006), the privilege seeks to avoid "the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties," *Gonzales*, 194 F.3d at 35.  Under the privilege, reporters do not have to disclose "information gathered in a journalistic investigation."  *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011).  However, the privilege is not absolute, and reporters may still have to turn over information if the party seeking disclosure—here, the Government—proves that they have overcome the privilege.  *Id.*

The level of proof that the Government must offer to overcome the privilege depends on whether the information is confidential—that is, whether it was "acquired by the journalist through a promise of confidentiality."  *Id.* at 307.  If the information is not confidential, the privilege is overcome by demonstrating that "the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 35–36.  The showing required to obtain confidential materials, however, is more demanding in order "to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources."  *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982).  If the information is confidential, the privilege can be overcome only if the information is "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources."  *Id.* (internal citations omitted).

The Special Master analyzed Petitioners' assertion of the reporter's privilege using these tests for confidential and nonconfidential information.  Report at 8–9.  Petitioners argue that these are the wrong legal standards to apply for three reasons.

First, Petitioners contend that these tests insufficiently protect their First Amendment

rights, and argue that the Special Master should have deployed a stricter test. Pet'r Public Obj. at 14–16, 20. Petitioners are incorrect. In *Branzburg v. Hayes*, the Supreme Court held that the First Amendment does not provide journalists with a privilege against testifying before a grand jury in response to a subpoena. 408 U.S. 665, 682, 684 (1972). Reporters may still refuse to turn over documents following *Branzburg*, but if they do so, courts must evaluate their assertion of the journalist's privilege under the binding tests articulated by the Second Circuit.[7] *Petroleum Prods.*, 680 F.2d at 8, 9 n.12.

Petitioners do not explain how their proposed standard differs from the legal framework outlined by the Circuit. Petitioners contend that the Special Master "invoke[d] a weak relevancy standard" and disclosed documents upon "hypothetically find[ing] relevance—indeed, any imaginable relevance—in the information." Pet'r Public Obj. at 16. But, this argument challenges the Special Master's application of the framework, not the framework itself.

Second, Petitioners contend that, in addition to using the Second Circuit's tests, the Special Master should have conducted a "closer First Amendment inquiry." *Id.* at 20. Petitioners do not specify what such an inquiry entails, but imply that it requires the Court to assess the validity of the search warrants and whether "the *Fourth* Amendment requirements were actually met." *See id.* at 21–22 (emphasis added).

Petitioners' argument is inconsistent with Supreme Court precedent. In *Zurcher v. Stanford Daily*, a district court held that, because of the First Amendment interests at stake, a search of a college newspaper's premises was impermissible unless the Government could show that a restraining order would be futile and that materials would otherwise be destroyed. 436

---

[7] Indeed, the Circuit's tests for the reporter's privilege incorporate the limits set forth by the *Branzburg* concurrence, which notes that a reporter who is "called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation" or "without a legitimate need of law enforcement" may still assert a claim to privilege. 408 U.S. at 710 (Powell, J., concurring).

U.S. 547, 552 (1978).  The Supreme Court rejected the lower court's holding, finding that if a court carefully applies the Fourth Amendment's warrant requirements, that would "afford sufficient protection" against potential First Amendment harms.  *Id.* at 565.  This approach obligates courts to "focus searchingly" on the First Amendment question and police the requirements of specificity and reasonableness when determining probable cause under the Fourth Amendment.  *Id.* at 565–66.  It does not, however, create a higher standard or a separate procedure to issue a warrant for reporting-related materials.  *See id.* at 569–70 (Powell, J., concurring) ("[T]he usual procedures contemplated by the Fourth Amendment do indeed apply to the press, as to every other person."); *see also Branzburg*, 408 U.S. at 682 ("The First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability.").[8]

The protections set forth in *Zurcher* were observed here: the search warrants, which specified not only locations that the Government could search but also items that the Government could seize, were authorized by a magistrate judge after the submission of detailed affidavits demonstrating probable cause.[9]  Additional Fourth Amendment challenges are, therefore, "premature at this juncture."  *In re Search Warrants Executed on Apr. 28, 2021*, No.

---

[8] *Branzburg* states that "[o]fficial harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification" and may raise independent First Amendment concerns.  408 U.S. at 707–08; *see United States v. Sterling*, 724 F.3d 482, 492 (4th Cir. 2013).  Indeed, the Supreme Court has left open the possibility of enjoining a criminal prosecution if the litigant makes a significant showing of "bad faith and harassment."  *Younger v. Harris*, 401 U.S. 37, 53–54 (1971).  Petitioners allege that the Government has acted in bad faith by violating the Privacy Protection Act and internal Department of Justice regulations, *see* Pet'r Public Reply at 7 n.4, ECF No. 152, and by discriminating against them based on viewpoint, *see* Pet'r Public Obj. at 16.  Petitioners' challenges to the warrants are premature, insufficient to demonstrate bad faith, and rest on speculation—not evidence.  Because Petitioners have not established actual doubts about the integrity or intentions of the Government, the Court shall not entertain independent relief pursuant to the First Amendment.

[9] Petitioners, who have been able to "litigate the [Government's] entitlement to the material it seeks before it is turned over," have received more process than required by *Zurcher*, which held that "presumptively protected materials are not necessarily immune from seizure under warrant for use at a criminal trial."  436 U.S. at 566–67.  At a later stage, Petitioners may raise any Fourth and First Amendment challenges to a grand jury indictment that may arise from the Government's investigation.

21 Misc. 425, 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021).  The Court adheres to its prior

decision that "the validity of the search warrants . . . is not before this Court."  ECF No. 48 at 2.

 Third, Petitioners contend that, pursuant to the Supreme Court's decision in *Bartnicki v.*

*Vopper*, 532 U.S. 514 (2001), the Special Master should have only required the disclosure of

documents "that evidence its journalists' participation in the theft of information not already in

the possession of" Harris and Kurlander.  Pet'r Public Obj. at 14.  In *Bartnicki*, the Supreme

Court held that the First Amendment protects the publication of information by a "law-abiding

possessor of information," even if the publisher received the information from a source who

obtained it unlawfully.  532 U.S. 514, 529 (2001); *see* Amicus Br. at 3, ECF No. 143.  Here, the

Government is investigating whether Petitioners *participated* in the theft of the Victim's journal

and the other items.  Gov. Public Opp. at 10.  *Bartnicki* does not protect such conduct.  *Dem.*

*Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 431 (S.D.N.Y. 2019) (noting that *Bartnicki*

is premised on the "significant legal distinction between stealing documents and disclosing

documents that someone else had stolen previously"); Amicus Br. at 4.[10]

 Petitioners' objections to the legal standard applied by the Special Master are, therefore,

without merit.

### B.  The Special Master's Application of the Privilege Test

 Petitioners next object to how the Special Master applied the Circuit's legal framework

on two grounds.  First, they contend that the Special Master deemed information that should

have been confidential as nonconfidential, lowering the Government's burden to overcome the

---

[10] The Court rejects Petitioners' argument that *Bartnicki* is an "outright barrier to the seizure of newsgathering materials."  Pet'r Public Obj. at 14.  The Supreme Court in *Bartnicki* did not create an independent privilege preventing the seizure of materials responsive to a warrant.  Petitioners also contend that the Special Master was required to assess the underlying factual record to determine whether Petitioners were actually involved in the theft. *See id*. at 17, 19.  This is another attempt to challenge the scope and validity of the search warrants.  For the reasons stated above, that issue is not before this Court.

reporter's privilege.  Second, they argue that the Government did not meet its burden to overcome the privilege.

### 1.   Confidentiality

Petitioners argue that they acquired "the relevant materials and related information" under an agreement of confidentiality and that the Report erred by applying the Second Circuit's less stringent test for nonconfidential materials.  Pet'r Public Obj. at 27.  The Court disagrees.

Confidential information is information "acquired by the journalist through a promise of confidentiality."  *Chevron Corp.*, 629 F.3d at 307.  Documents that would reveal such information are also protected as confidential.  *See Petroleum Prods.*, 680 F.2d at 7 (upholding reporter's privilege not to provide "documents which contained the names of confidential sources"); *see also United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980) ("The compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes.").

However, a source who initially sought confidentiality may disclose to the public her identity and the information that she secretly provided.  In that unusual case, the reporter is no longer safeguarding secret information, and the source does not expect confidentiality—so there is "no issue of betrayal of a promised confidence."  *Chevron Corp.*, 629 F.3d at 307.  This public information is, therefore, not entitled to the Second Circuit's heightened protection for confidential materials.  *See Gonzales*, 194 F.3d at 35 (imposing a higher burden specifically to "preserv[e]" and "safeguard[]" non-public information); *Schiller v. City of New York*, 245 F.R.D. 112, 120 n.2 (S.D.N.Y. 2007) ("[W]here the source has no expectation of confidentiality, [the heightened] consideration does not come into play."); *see also United States v. Criden*, 633 F.2d 346, 358 (3d Cir. 1980) ("[D]efendants probably should be required to prove less to obtain the

reporter's version of a conversation already voluntarily disclosed by the self-confessed source than to obtain the identity of the source itself.").

Here, Petitioners promised to keep the identities of Harris and Kurlander confidential. But, Harris and Kurlander pleaded guilty, and revealed to the public that they were the ones who provided the Victim's journal and additional items to Project Veritas. Petitioners, therefore, are not "protecting the identity of any source." *United States v. Treacy*, 639 F.3d 32, 42 (2d Cir. 2011).

Petitioners argue that the public disclosure of the identity of a confidential source "does not in one fell swoop render all of the confidential information provided by that source, non-confidential." Pet'r Public Reply at 21, ECF No. 152. Petitioners, however, fail to identify any information provided under a promise of confidentiality that remains confidential. Petitioners speculate that ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████.[11]

Petitioners also contend that internal Project Veritas documents related to the confidential sources are confidential. This argument also fails. Such documents are only protected as confidential when disclosing them would reveal the identity of the sources or the confidential information that the sources provided. *See Gonzales*, 194 F.3d at 36 ("[W]here the protection of confidential sources is not involved, the nature of the press interest protected by the privilege is narrower."); *Petroleum Prods.*, 680 F.2d at 7. Were the confidential sources' names not public, the stringent *Petroleum Products* test would apply not only to their names, but to any documents

---

[11] The Government's filter team filed its brief under seal directly with the Court. The filter team is directed to file its brief on the docket.

and communications that would identify them.  Here, because Harris and Kurlander have publicly pleaded guilty, that test does not apply.  *See United States v. Cutler*, 6 F.3d 67, 73–75 (2d Cir. 1993) (ordering disclosure of reporters' unpublished notes as to public statements by the defendant but barring disclosure of unpublished notes as to statements by anonymous government officials).  The Court concludes, therefore, that the internal Project Veritas documents are not confidential.

Petitioners next argue that because the reporter, not the source, controls the privilege, it follows that Harris and Kurlander's public admissions of guilt have no bearing on whether the information is confidential.  Petitioners conflate two distinct issues: the questions of (1) who may assert the privilege, and (2) whether the information is confidential.  It is true that the reporter is the holder of the privilege, *see N.Y. Times Co.*, 459 F.3d at 167–68, and only she can waive it, *see In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000); *In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987).  But, the Court does not reach the question of whether Petitioners waived the privilege.  *See* Report at 16 n.10 (also declining to reach the Government's argument regarding waiver).  Whether information is confidential turns on whether the information sought is currently public through the source's own actions.  The Court does not blind itself to information already in the public record.  Therefore, it must take into account Harris and Kurlander's decision to identify themselves.  *See Treacy*, 639 F.3d at 42; *see Schiller v. City of New York*, 245 F.R.D. 112, 120 n.2 (S.D.N.Y. 2007) ("[W]here the source has no expectation of confidentiality, [the heightened] consideration does not come into play.").  Thus, although Harris and Kurlander are not the privilege-holders, the fact that their identities are no longer confidential reduces the showing required to overcome the privilege.

Finally, the Court rejects Petitioners' contention that finding the documents non-

confidential "eviscerates" the reporter's privilege.  Pet'r Public Obj. at 25, 29.  The reporter's privilege protects all materials gathered in a journalistic investigation in order to avoid impairing the press from carrying out its duties.  *Gonzales*, 194 F.3d at 35.  But, confidential materials receive an additional layer of protection because "[f]orcing the press to breach a promise of confidentiality threatens its ability in the future to perform its public function to acquire information for publication."  *Chevron Corp.*, 629 F.3d at 307.  Here, Petitioners are not being forced to break a promise of confidentiality.  The Court concludes, therefore, that the Responsive Materials are not confidential, and the Special Master was not required to apply the Second Circuit's heightened test for confidential materials.[12]

### 2.  Application

To overcome the reporter's privilege, a party seeking nonconfidential information from a reporter must demonstrate that the materials (1) are of likely relevance to a significant issue in the case, and (2) are not reasonably obtainable from other available sources.  *Gonzales*, 194 F.3d at 36.  The Court concludes that the Government has met its burden.

### a.  Relevance

Petitioners advance two general objections regarding relevance.  First, Petitioners contend that the Special Master set too low of a bar for determining whether the Responsive Materials were likely relevant to the case.  *See* Pet'r Public Obj. at 33–35.  Petitioners are incorrect.

The Government's investigation is focused on Petitioners' actions.[13]  The Responsive

---

[12] The Court shall not reach Petitioners' objections to the Special Master's finding that four groups of documents were not gathered in a journalistic investigation.  As described below, the Court holds that even if Petitioners could invoke the reporter's privilege as to all of the Responsive Materials, the Government has overcome the privilege.

[13] This alone distinguishes Petitioners' case from the majority of criminal cases involving the reporter's privilege, where the Government seeks to pry information from reporters about their sources' alleged criminal conduct.  *See, e.g.*, *Branzburg*, 408 U.S. at 667–79; *N.Y. Times Co.*, 459 F.3d at 163; *Sterling*, 724 F.3d at 488–92.

Materials "go[] to the heart of the [potential] prosecution," *United States v. Sterling*, 724 F.3d 482, 499 (4th Cir. 2013), because they will help the Government and any grand jury to determine "whether crimes have been committed and who committed them," *Branzburg*, 408 U.S. at 691. The reporter's privilege does not prevent the Government from investigating whether a journalist has committed a crime.  *See United States v. Sanusi*, 813 F. Supp. 149, 156 (E.D.N.Y. 1992) ("[T]he court must be confident that the person asserting the privilege does not do so as a means of justifying otherwise illegal conduct."); *see also Cutler*, 6 F.3d at 73 ("Crimes and torts committed in news gathering are not protected by the First Amendment." (cleaned up)).  Of course, the Government cannot use a "bland assertion that a journalist has violated the law" to obtain otherwise privileged materials.  Pet'r Public Obj. at 22.  Here, however, the Government's claims have been vetted through two independent layers of review.  First, a magistrate judge scrutinized the Government's proffered affidavits and found probable cause to believe that the seized devices contain evidence of crimes.  Second, the Special Master—an independent official and retired federal judge—reviewed the materials to determine whether they were, in fact, responsive to the warrants and relevant to the Government's case.  Petitioners offer no reason to doubt their impartial determinations.[14]

The Second Circuit's decision in *New York Times Co. v. Gonzales* is instructive.  459 F.3d 160 (2d Cir. 2006).  In that case, a leaker alerted two *New York Times* reporters to an impending asset freeze on nonprofit organizations suspected of supporting terrorism.  *Id.* at 163. The *Times* journalists, upon receiving the tip, contacted the organizations in advance of the asset

---

[14] The Court rejects Petitioners' argument that the Special Master was required to enumerate the elements of each offense and explain why each document was likely relevant.  Pet'r Public Obj. at 33.  That would merely duplicate the Special Master's review to determine whether documents were responsive to the seven enumerated categories in the search warrants.  Moreover, the Special Master's responsiveness review was far from pro forma, marking documents from ten of the fifteen devices as non-responsive and, upon Petitioners' objections, marking an additional sixty-one documents as non-responsive.

freeze and, by forewarning them, may have frustrated the freeze.  *Id.*  Through a grand jury

proceeding, the Government sought to obtain phone records from the *Times* in order to identify

the leaker.  *Id.* at 164–65.  The Second Circuit held that the reporter's privilege did not bar the

Government from obtaining the information because, among other things, the journalists "were

not passive collectors of information whose evidence is a convenient means for the government

to identify" the leaker.  *Id.* at 170.  Rather, the "reporters' actions [were] central to (and probably

caused) the grand jury's investigation," and "[t]heir evidence as to the relationship of their

source(s) and the leaks themselves to the informing of the targets [was] critical to the []

investigation."  *Id.*

Like the *New York Times* journalists, Petitioners are not "passive collectors of

information whose evidence is a convenient means for the [G]overnment" to further its

investigation.  *Id.*  Indeed, their actions are not only "central to" the Government's investigation,

*id.*, but are the subject of the investigation itself.

Second, Petitioners contend that several categories of documents are "highly unlikely to

be relevant" because they occurred "after the decision was made not to publish the [Victim's]

diary story" and "have nothing to do with . . . whether Project Veritas knew the [Victim's]

materials were stolen."  Pet'r Public Obj. at 34.  Petitioners' speculative argument is contradicted

by the documents, which the Court has reviewed and finds to be relevant as to whether

Petitioners (1) knew that the journal was stolen, and (2) played a role in the theft and

transportation of the materials.  *See United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir.

2010) ("[E]vidence need not be sufficient by itself to prove a fact in issue . . . [and] is relevant if

it has any tendency to make the existence of any fact that is of consequence to the determination

of the action more probable or less probable than it would be without the evidence." (cleaned

up)).[15]

b.  Obtainability

Petitioners argue that the Responsive Materials are obtainable from other sources already within the Government's possession.  *See* Pet'r Public Obj. at 38–39.  The Court disagrees. Whether evidence is on Petitioners' devices is relevant to Petitioners' knowledge and intent. Moreover, as the Government's filter team discusses in its sealed opposition papers, timestamps and even message threads vary between devices.  Gov. Sealed Opp. at 4.

Accordingly, Petitioners' objections regarding the reporter's privilege are OVERRULED.

II.    The Attorney-Client Privilege

Petitioners object to the Special Master's findings that (1) certain documents are not protected by the attorney-client privilege, and that (2) ten documents, although privileged, fall within the crime-fraud exception.  Report at 17–18.

A.  Legal Standard

The attorney-client privilege protects "confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance."  *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007).  The privilege "encourages full and frank communications between a client and counsel, which in turn promotes an understanding of and compliance with the law and the administration of justice."  *Spectrum Dynamics Med. Ltd. v. Gen. Elec. Co.*, No. 18 Civ. 11386, 2021 WL 3524081, at *2 (S.D.N.Y. Aug, 10, 2021).  The privilege is narrowly construed because it "renders relevant information undiscoverable."  *Erie*, 473 F.3d at 418.  The party invoking the privilege "must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of

---

[15] Petitioners' relevance objections filed under seal are duplicative of the publicly filed objections addressed by the Court.  The Court has reviewed the documents and finds that Petitioners' objections lack merit.

obtaining or providing legal advice." *Id.* at 419 (citation omitted).

"Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct." *Id.* If the predominant purpose of the communication is legal advice, the communication is privileged in its entirety even if it contains supplementary nonlegal advice. *Id.* at 420. By contrast, if the legal advice is "incidental to the nonlegal advice that is the predominant purpose of the communication," then disclosure should be ordered with any legal advice redacted. *Id.* at 421 n.8.

To determine the predominant purpose of the communication, a court must assess the communication "dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer." *Id.* at 420–21. Because a company's in-house counsel "mix[es] legal and business functions," *Bank Brussells Lambert v. Credit Lyonnais (Suisse)*, 220 F. Supp. 2d 283, 286 (S.D.N.Y. 2002), "communications between a corporation's employees and its in-house counsel . . . must be scrutinized carefully." *Spectrum*, 2021 WL 3524081, at *2. Requests for legal advice can be implicit if "an attorney is copied on the communications and the communications implicate specific legal issues." *Greater N.Y. Taxi Ass'n v. City of New York*, No. 13 Civ. 3089, 2017 WL 4012051, at *12 (S.D.N.Y. Sept. 11, 2017). But, "[m]erely copying a lawyer on a communication does not render it privileged." *Hayden v. Int'l Bus. Machs. Corp.*, No. 21 Civ. 2485, 2023 WL 4622914, at *4 (S.D.N.Y. July 14, 2023) (citation omitted).

Communications that would otherwise be protected by the attorney-client privilege are not protected "if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena Duces Tecum Dated September 15,*

*1983*, 731 F.2d 1032, 1038 (2d Cir. 1984). "[A]dvice in furtherance of such goals is socially perverse, and the client's communications seeking such advice are not worthy of protection." *Id.* A party seeking to overcome the attorney-client privilege must show probable cause that (1) a crime or fraud has been committed, and (2) the communications were in furtherance thereof. *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994) (citation omitted). The crime-fraud exception applies to communications "intended in some way to facilitate or to conceal the criminal activity." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995). The communication must "*itself* [be] in furtherance of the crime or fraud," and not only provide evidence of a crime or fraud. *Id.* The Court must find a "purposeful nexus" between the attorney-client communication and the crime or fraud. *Id.* (citation omitted); *see In re Omnicom Grp., Inc. Sec. Litig.*, No. 02 Civ. 4483, 2007 WL 2376170, at *11 & n.13 (S.D.N.Y. Aug. 10, 2007) (assuming that the purposeful-nexus test is less rigorous than a "preponderance of the evidence" standard). When a topic of an attorney's representation is found to be a crime or fraud, communications with the attorney as to that topic are "necessarily 'in furtherance of' [the] illegal conduct." *Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 440 (S.D.N.Y. 2013); *see In re Gen. Motors LLC*, No. 14 Misc. 2543, 2015 WL 7574460, at *7 (S.D.N.Y. Nov. 25, 2015) (citing *United States v. Ceglia*, No. 12 Cr. 876, 2015 WL 1499194, at *4–9 (S.D.N.Y. Mar. 30, 2015)).

### B.  Applicability of the Attorney-Client Privilege

The Court shall first address Petitioners' objections to the Special Master finding that eleven documents are not subject to the attorney-client privilege.[16] Report at 18; ECF No. 118-1. The Government, in its sealed opposition papers, states that two of the documents may be redacted. *See* Gov. Sealed Opp. at 22. For the nine remaining documents, Petitioners first argue

---

[16] Petitioners do not object to the Special Master's findings that other documents are not protected by the attorney-client privilege. *See* Pet'r Sealed Obj. at 37; Pet'r Sealed Reply at 13, ECF No. 155.

that the Special Master applied the wrong legal standard and protected only communications that contain actual legal advice, as opposed to communications made with the intent to obtain or provide legal advice.  Pet'r Public Obj. at 54.  Petitioners' argument relies on a shorthand notation utilized by the Special Master on the spreadsheet memorializing the review, *id.*, but the Report itself sets forth and applies the correct legal standard.  Report at 17–18.

Second, Petitioners contend that Project Veritas' legal counsel was advising the journalists on the legal issue of newsworthiness and that any facts communicated to the legal counsel were to aid this determination.  Pet'r Public Obj. at 55.  The Court disagrees.  Petitioners concede that the documents at issue do not include explicit requests for legal advice.  Pet'r Public Reply at 33–34.  And, the Court cannot conclude that Petitioners' communication of facts to Project Veritas' chief legal officer (the "CLO") constituted an implicit request for legal advice regarding newsworthiness.  The CLO was involved in both business and legal decisions.  Gov. Sealed Opp. at 23; *see* Pet'r Sealed Reply at 12–17, ECF No. 155 (citing cases analyzing the dual role of in-house counsel).  The documents do not indicate that the "predominant purpose" of the CLO's involvement was driven by legal concerns about newsworthiness.  *Erie*, 473 F.3d at 420; *see Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585, 596 (S.D.N.Y. 2015) (rejecting the privilege where there was "virtually no contemporaneous documentation supporting the view that" counsel was informed in order to provide legal advice); *cf. Hayden*, 2023 WL 4622914, at *6 (rejecting the privilege where there was no indication that the facts "served as a basis for any conversation that the plaintiff might have had with counsel" (cleaned up)).

Petitioners also argue that certain communications were related to their efforts to authenticate the documents and are, therefore, protected.  But, the documents indicate that questions regarding authentication were not analyzed as a legal issue, and, indeed, a non-lawyer

worked with the CLO on those determinations.  *See Urban Box Office Network, Inc. v. Interfase Mgrs., L.P.*, 2006 WL 1004472, at *5 (S.D.N.Y. Apr. 18, 2006) (where there is "simultaneous review by legal and non-legal personnel, it cannot be said that the primary purpose of the [communication] is to secure legal advice" (citation omitted)); *Doe v. Zucker*, No. 17 Civ. 1005, 2021 WL 6128429, at *5 (N.D.N.Y. Sept. 3, 2021) (holding that requests for "practical," non-legal guidance are not privileged).

Petitioners' additional objections largely repeat the general objections addressed above. Where they do not, the Court has reviewed the documents and agrees with the Special Master that the documents do not reflect requests for legal advice and, therefore, are not protected by the attorney-client privilege.

### C.   Applicability of the Crime-Fraud Exception

The Court shall next address the Special Master's decision that the crime-fraud exception vitiates the attorney-client privilege as to ten documents.  Report at 18–19.  Judge Cave determined that probable cause exists for the Conspiracy.  *Cf. United States v. Tucker*, 254 F. Supp. 3d 620, 624 (S.D.N.Y. 2017) (deferring to a prior determination of probable cause; there, a grand jury indictment); *United States v. Sabbeth*, 34 F. Supp. 2d 144, 150–51 (E.D.N.Y. 1999) (same).  The primary question before the Special Master, and now the Court, is whether a "purposeful nexus" exists between each document and the Conspiracy.  *Roe*, 68 F.3d at 40.

Petitioners first argue that the Conspiracy was completed on September 17, 2020, and that the seven documents created after that date cannot further the Conspiracy.  Pet'r Public Obj. at 47–48.  The Court has carefully reviewed the search warrants and the affidavits on which they are based, and concludes that the documents at issue—the latest of which is dated October 28, 2020—fall squarely within the timeframe of the Conspiracy.

Petitioners then raise objections on a document-by-document basis.  Documents intended to "conceal" criminal activity are not protected by the privilege.  *Roe*, 68 F.3d at 40.  Nor are documents that "indicate[] an intent to create or present misleading or false evidence."  *Gen. Motors*, 2015 WL 7574460, at *6–7 (citation omitted).  Nine of the ten documents fall into one of these two categories.

Nine documents[17] involve communications between Meads and the CLO about contractual agreements between Project Veritas, Kurlander, and Harris.  There is probable cause to believe that these documents furthered the Conspiracy. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

The tenth document, Document 1B45_00020106, also served to further the Conspiracy.

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[17] Specifically, documents 1B45_00009505, 1B45_00012043, 1B45_00013141, 1B45_00014213, 1B45_00017182, 1B45_00017477, 1B45_00018084, 1B45_00019813, and 1B45_00021841.

Petitioners' objections to the Special Master's rulings regarding the attorney-client privilege are, therefore, OVERRULED.[18]

## CONCLUSION

For the foregoing reasons, the Court OVERRULES Petitioners' objections and ADOPTS the Special Master's recommendation.

By **December 28, 2023**, the Government shall complete the record by filing on the docket: (1) the Special Master's March 14 and 21, 2022 orders, *see* Gov. Public Opp. at 3 n.2; (2) the parties' April 1, 13, and 20, 2022 briefs filed before the Special Master, *see id.* at 5 n.3; and (3) the Government filter team's June 9, 2023 opposition to Petitioners' sealed objections.

By **January 5, 2024**, the Government's filter team shall turn over the Responsive Materials which are not protected by the attorney-client privilege to the Government's investigation team.

SO ORDERED.

Dated: December 21, 2023
       New York, New York

ANALISA TORRES
United States District Judge

---

[18] Petitioners separately move for the return of their property pursuant to Federal Rule of Criminal Procedure 41(g). ECF No. 70. Petitioners' motion is another attempt to challenge the validity of the judicially authorized search warrants, *see id.* at 3, and, therefore, is not properly before this Court. The Government has returned the devices on which there were no responsive materials. ECF No. 74 at 2. For the remaining devices, the Government's investigation is not complete, and "the [G]overnment's need for the property as evidence continues." *United States v. King*, No. 21 Cr. 255, 2022 WL 875383, at *5 (S.D.N.Y. Mar. 24, 2022) (quoting *Podlog v. United States*, No. S2 92 Cr. 374, 1996 WL 403029, at *1 (S.D.N.Y. July 18, 1996)). Accordingly, Petitioners' motion is DENIED.