

**CALLI LAW, LLC**
One Flagler Building, Suite 1100
14 Northeast 1st Avenue
Miami, Florida 33132
T. 786.504.0911
F. 786.504.0912
www.calli-law.com

# JAMES O'KEEFE AND PROJECT VERITAS'S BRIEF ON FIRST AMENDMENT AND JOURNALISTIC PRIVILEGES

**Introduction**

This brief defends the constitutional bases for, and expansive scope of, the privileges applicable to the confidential reporters' materials seized by the government in its pre-dawn raids on the homes of journalists James O'Keefe, Spencer Meads, and Eric Cochran. The First Amendment and the Reporters' privileges (consistent with associated due process and Fourth Amendment overlays on those privileges) protect the seized materials and preclude their disclosure to the government.  The government cannot undermine these privileges with its manufactured claims of wrongdoing. *Bartnicki v. Vopper*, 532 U.S. 514 (2001) held that journalists may lawfully receive material from sources *even if* that material is illegally obtained by the sources themselves. Its application here demonstrates that the offenses the government recited in its search warrants are not crimes. Project Veritas and its journalists lawfully received the abandoned Ashley Biden diary from their sources. Their privileges must be respected.

**Background**

Project Veritas "is a national media organization dedicated to 'undercover investigative journalism.'" *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 817 (1st Cir. 2020). Its reporting continues an American tradition of investigative journalism established by pioneering muckrakers like Nellie Bly, whose use of an alias and cover story revealed the dirty underbelly of political dealing in the late 19th century, and advanced by later journalists whose reporting on the leaked Pentagon Papers exposed the truth about the United States' conduct in the Vietnam War. *See New York Times Co. v. U.S.*, 403 U.S. 713 (1971). Like its predecessors, Project Veritas's reporting uses confidential sources, secret recordings, and other undercover investigative methods to accurately expose the American political underbelly. While the government may not like the Project Veritas's investigative journalism methods, Project Veritas operates within established

First Amendment protections and succeeds in exposing what the powerful would prefer stay hidden. As Justice Brandeis famously observed, "Sunlight is said to be the best of disinfectants." Louis Brandeis, *What Publicity Can Do*, HARPER'S WEEKLY (Dec. 20, 1913).

Unsurprisingly, those who wield power have long sought to suppress such newsgathering and reporting, and to keep the truth in shadow. The government continues that ignoble tactic here, raiding journalists' homes to seize confidential source and newsgathering material because of Project Veritas's investigation of a potential story about President Biden and the first family itself.

Our previous *ex parte* submissions to the Special Master detailed the facts of Project Veritas's newsgathering regarding the abandoned diary. *See* 12/13/21 *Ex Parte* Submission and 12/17/21 *Ex Parte* Submission. Our March 30, 2022, Petition for Return of Property Pursuant to Rule 41(g) discusses the facts in a form appropriate for the eyes of the government investigative team, and which the government cannot reasonably deny. (Docket No. 70) at 3-14. We incorporate that discussion by reference here.

## <u>Argument</u>

This brief elaborates on the Constitutional rationale supporting the aggrieved journalist's privileges. Our discussion below proceeds by (1) discussing the substantive First Amendment rights at issue, including foundational publishing, newsgathering, and associational rights, the Supreme Court's rule in *Bartnicki,* and the Second Circuit's law on the reporter's privilege; (2) addressing the intersection between those substantive First Amendment rights and procedural protections; and (3) setting forth the analytical frame work that the Special Master should use in giving these rights and procedural protections due effect.

I.      **Publishing, Newsgathering, and Associational Privacy are Protected by the First Amendment**

The First Amendment protects a variety of rights, including the right to speak or publish, the right to gather information for such purposes, and the right to privately associate with others in furtherance of these and other purposes. These various rights are essential to effective newsgathering and reporting. In particular, secrecy is an essential shield allowing reporters, sources, and financial supporters to feel sufficiently safe to bring important and controversial public interest stories to light without fear of government or private retribution. *See, e.g.*, *New York Times Co. v. U.S.*, 403 U.S. 713 (1971).

*First*, the most obvious aspect of the freedoms of speech and the press is the right to disseminate information and opinion to the public. Given the centrality of directly communicative activities, efforts to "punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979). To the extent government action has the intent or effect of suppressing the communication of information, it is subject to heightened, and often strict, scrutiny. This protection is enforced "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Critically, the press acts as a surrogate for the public, ensuring that citizens are informed about matters of public import. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980).

The right to publish information is reflected in a variety of protections against official action that seeks to suppress such publication. Most relevant in this case, First Amendment jurisprudence specifically protects the right to publish information regardless of whether its source may have violated the law in obtaining or disclosing it.

In *Bartnicki v. Vopper*, 532 U.S. 514, 525 (2001), the Supreme Court held that a radio host may not be held liable for publishing information provided by a third party that obtained that information illegally, provided that the publisher played no part in the illegal acquisition and the material relates to a matter of public concern. The complaining party, Bartnicki, had used his cell phone to discuss union negotiations, including threats of illegal conduct, and an unknown party illegally intercepted and recorded his conversation. The recording was subsequently provided to Mr. Vopper, a radio host, who played the recording on his radio show. *Id.* at 518-19.  Bartnicki sued Vopper, arguing that the broadcast of the illegally intercepted conversation was itself illegal. But because Vopper, the media defendant, played no part in the illegal interception of the conversation, the Supreme Court held that the First Amendment immunized him from liability. *Id.* at 525.

Under *Bartnicki*, the Supreme Court established a clear safe-harbor for reporters and publishers dealing with newsworthy information of uncertain or even plainly illegal provenance: unless a reporter or publisher played a part in the illegal acquisition of information, they are protected by the First Amendment and no liability or other punishment can attach. 532 U.S. at 525. Lower court interpretations of *Bartnicki* elaborate upon this broad principle. Even publishers who openly solicit the receipt of stolen material face no liability provided they played no part in its acquisition. *See Democratic National Cmte. v. Russian Federation*, 392 F.Supp.3d 410, 434-35 (S.D.N.Y. 2021); *Allen v. Beirich*, 2021 WL 2911736 at *4-5 (4th Cir. July 12, 2021); *Jean v. Massachusetts State Police*, 492 F.3d 24, 31 (1st Cir. 2007). Publishers may, without liability or punishment, even be in "active collaboration" or may aggressively "solicit[] stolen information" because those are "common journalistic practices." *Jean*, 492 F.3d at 31; *see also Russian Federation*, 392 F.Supp.3d at 435. The only relevant inquiry is whether the publisher played a part

in the acquisition of stolen material. And under Southern District of New York precedent, "played a part" means a publisher must "participate in the theft." *Russian Federation*, 392 F.Supp.3d at 435; *accord. Jean*, 492 F.3d at 31.

Thus, in *Beirich*, the Southern Poverty Law Center paid an accountant formerly associated with a white supremacist organization to reveal its membership lists. 2021 WL 2911736 at *1-2. Because the SPLC interacted and paid for the information *after* the insider had stolen it, the organization was completely immunized from liability per *Bartnicki*. *Russian Federation* goes even further. That case involved the Wikileaks controversy, in which persons solicited information that the Russian Federation hacked from the Democratic National Committee's computers. 392 F.Supp.3d at 417-418. Even though there were meetings in Italy to discuss possible items of interest to Wikileaks, such general meetings were not sufficient to invoke liability under *Bartnicki*. *Id.* at 432-33. Because the Committee could make no showing that Wikileaks participated in the hacking of the Committee's computers, but only actively solicited and encouraged delivery of stolen material, no liability could attach per *Bartnicki*.

**Second,** a related First Amendment protection that ensures the right to publish is the right to *gather* newsworthy information for purposes of potential publication. In *Branzburg v. Hayes*, 408 U.S. 665, 681-82 (1972), the Supreme Court recognized First Amendment protection for newsgathering, including the right to gather news "from any source by means within the law."

The right to gather information for purposes of publication is not only derivative of the right to speak and publish, it both directly and indirectly reflects the right of expressive association protected by the First Amendment. That right encompasses not only the right to work together with others to further common speech or press interests, but also the right to do so privately, without government insistence on knowing who is associating in support of particular viewpoints.

*See NAACP v. Alabama*, 357 U.S. 449, 462 (1958). In the context of the press, and especially a non-profit entity engaging in hard-hitting investigative journalism, such associational privacy is essential to allow donors and sources to come forth without fear of retaliation from the powerful private and governmental interests whose wrongdoing is being exposed.

The right to privately associate shields "dissident expression from suppression by the majority." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). This is most acute in the context of newsgathering and reporting critical of those in power—something Project Veritas and its journalists regularly engage in — because the state (or in this case, a powerful family intertwined with it) has a "special incentive to repress opposition and often wields a more effective power of suppression." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 828 (1978) n.11 (quoting T. Emerson, Toward a General Theory of the First Amendment 9 (1966)).

The black letter law is that forced disclosure of otherwise private association—between and journalists and sources, between non-profit organizations and donors, and otherwise—is a restraint on the freedom to associate. *NAACP v. Alabama*, 357 U.S. at 462. As the Supreme Court recently confirmed, where government seeks to invade associational privacy, it must survive "exacting scrutiny"—overcoming the significant hurdle of demonstrating a substantial relationship between disclosure and a sufficiently important governmental interest that cannot be served through less restrictive means. *Americans for Prosperity Foundation v. Bonta* ("*AFP*"), 141 S.Ct. 2373, 2383 (2021); *accord Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010); *Citizens Union of City of New York v. Attorney General of New York*, 408 F.Supp.3d 478, 493 (S.D.N.Y 2019).

Controversial organizations have frequently, and successfully, called upon courts to protect their membership information, donor lists, or internal strategies from exposure. *See Brown v.*

*Socialist Workers '74 Campaign Committee*, 459 U.S. 87 (1982). In *Perry*, the court blocked political opponents of a ballot proposition regarding same-sex marriage from obtaining internal campaign strategy documents because the government could not meet its heightened burden to demonstrate that its need for the information outweighed the impact on associational rights. 591 F.3d at 1152. Similarly, in *AFP*, the government could not compel 501(c)(3) non-profit organizations that were frequently critical of the state itself to disclose donor lists to the state because the claimed government interest in preventing fraud could be achieved in a much narrower manner. 141 S. Ct. at 2384-86.[1] A similar result occurred in *Citizens Union*, where the Southern District of New York rejected far-reaching donor disclosure requirements because they drastically impaired associational rights. 408 F. Supp. 3d at 504-06.

The associational privacy protections that apply to expressive associations with particular "political" interests apply even more forcefully to news organizations (and non-profit ones, at that), regardless of whether they have a viewpoint or political leaning, and regardless of the direction of any such leaning. Whether it is Project Veritas or Mother Jones, the press includes those with overt viewpoints, as well as those who feign neutrality. And whether applied to entities categorized as the "press" or simply to political or advocacy groups, the First Amendment protections for private association are the same. Protecting Project Veritas's ability to engage in newsgathering about one of the most powerful political families in the country is every bit as constitutionally significant as preserving the rights of the Socialist Workers Campaign Committee to advocate against the capitalist system, the NAACP to advocate against racism, or any other topic touching upon matters of public and political interest.

---

[1] In such an inquiry, the Court was careful to explain that courts should examine the *breadth*, not necessarily the *severity*, of the burden in examining the tailoring of any governmental action touching on protected First Amendment freedoms. *AFP*, 141 S.Ct. at 2385.

Because Project Veritas is an upstart news organization using investigative practices that require confidentiality and which are often decried by the powerful subjects of its reporting, its associational privacy is especially in jeopardy. Without the ability to preserve its atmosphere of trust with sources, tipsters, and whistleblowers; without the ability to preserve internal editorial deliberations; without the ability to protect donors sharing similar convictions, Project Veritas's First Amendment activity would be ineffective and the First Amendment's promise of freedom of speech and the press would ring hollow.[2]

The different First Amendment interests involved in newsgathering and reporting often coalesce in the form of a First Amendment or common-law reporters' privilege that shields reporters and news organizations from unduly intrusive inquiries into their sources, methods, editorial deliberations, and other aspects of their investigation and reporting. While all courts recognize some form of a reporter's privilege, there is less agreement on the precise scope of that privilege, or the level of scrutiny applied in the application of that privilege.[3] Such uncertainty stems, in part, from Justice Powell's concurrence in *Branzburg* that called for a "proper balance"

---

[2] Donor particularly acute here because Project Veritas is a 501(c)(3) non-profit organization in addition to a media organization, and the electronic devices seized by the government contain communications with donors. As a non-profit, Project Veritas depends upon its many contributors, not advertisers, for support. The act of giving financial contributions to an organization is an important way Americans commonly associate with one another. *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014). And many donors seek privacy in their contributions for fear of reprisal should their names be revealed to the current administration or public. Given the government's treatment of Project Veritas and its reporters, this fear is self-evidently well-founded. *See Talley v. California*, 362 U.S. 60, 65 (1960).

[3] At least as to confidential sources, the Southern District of New York recognizes a qualified federal common law reporter's privilege. *The New York Times Co. v. Gonzales*, 382 F. Supp. 2d 457, 508 (S.D.N.Y. 2005). The Second Circuit has not determined the "precise contours of any such qualified privilege." *The New York Times Co. v. Gonzales*, 459 F.3d 160, 169 (2d Cir. 2006).

between press freedoms and government investigative interests on a "case-by-case basis." 480 U.S. at 710 (Powell, J., concurring).[4]

While courts may vary on their formulations of the reporter's privilege, in the Supreme Court and in the Second Circuit, the reporter's privilege provides strong protection against actions that would interfere with publication, newsgathering, or associational privacy, particularly with sources and among reporters, publishers, and their supporters. In the context of reporters, such actions typically involve subpoenas to testify about newsgathering and confidential sources or search warrants designed to reveals such matters.

Whether viewed as a qualified reporter's privilege or a First Amendment privilege, the relevant standard in the Second Circuit comes down to asking if the information sought is "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *In re Petroleum Products Antitrust Litigation*, 680 F.2d 5, 7 (2d Cir.1982) (per curiam); *see also* n.3, *supra* (per *Burke*, the balancing test applies broadly to civil and criminal matters touching upon journalists' privileges). The Second Circuit extends this privilege to both confidential and non-confidential sources, as well as information relied on by journalists. *See, e.g.*, *von Bulow v. von Bulow*, 811 F.2d 136 (2d Cir. 1987); *U.S. v. Cutler*, 6 F.3d 67 (2d Cir. 1993); *Gonzales*, 194 F.3d 29. The privilege assures the confidentiality of sources and the free flow of information to the public. *von Bulow*, 811 F.2d at 143.

---

[4] *Branzburg* concerned whether there is a constitutionally based privilege in the First Amendment for reporters to refuse to testify before a grand jury. The Second Circuit relies on *Branzburg* more generally to weigh whether a "reporter's interest in confidentiality should yield to the moving party's need for probative evidence." *U.S. v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983). This includes application to civil and criminal matters, not just grand juries or subpoena matters. Justice Powell's concurrence offered a broader discussion of the need to protect reporters, whatever the basis. The Second Circuit has left certain details of the privilege for another day, but what is important for present purposes is that the court acknowledges the existence of a privilege based on underlying First Amendment concerns. *Gonzales*, 459 F.3d at 173-74.

*Third*, regardless of the ultimate scope of the First Amendment and/or common-law reporter's privilege, the one required component is a thorough consideration of the First Amendment concerns at stake in government efforts to investigate newsgathering, sources, and other activities by the press. Those concerns, and therefore the strength of the privilege and the level of scrutiny involved, are especially strong if there are compounding factors, such as government bad-faith, or indications of content or viewpoint discrimination. *See Branzburg*, 408 U.S. at 710 (Powell, J., concurring) (where governmental suppression of the press, disguised as governmental inquiries, are "not being conducted in good faith, [the newsman] is not without remedy."); *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 163 (2015) (strict scrutiny if content or viewpoint based burdens).

Those factors are present here. The government's investigation focuses on the content of speech—newsgathering items related to Ashley Biden, internal communications about a diary, and press deliberations—and seems undertaken not to vindicate any real interests of justice, but rather to stifle the press from investigating the President's family. It is impossible to imagine the government investigating an abandoned diary (or perhaps the other belongings left behind with it), had the diary not been written by someone with the last name "Biden." Journalists courageous enough to investigate news stories about the President's family thus face the heavy hand of the administration. *See, e.g.*, *Matal v. Tam*, 137 S.Ct. 1744, 1763 (2017) (viewpoint discrimination extends to a broad perspective on a topic); *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 393-94 (1993) (viewpoint discrimination defined broadly).

Furthermore, Project Veritas recently learned that, in November 2020, the government began covertly obtaining its email communications and other data from Microsoft Corporation. *See* (Docket No. 64). As far as we can determine, the government's purported filter team did not

review these materials for First Amendment privileges, enabling the investigative team to obtain voluminous privileged information. All of this continued in the shadows of the proceedings before the District Court in contravention of the District Court's desire to respect "any First Amendment concerns, journalistic privileges, and attorney-client privileges," and to institute a process that would "not only be fair but also appear to be fair." (Docket No. 48). Government candor about the extent of its invasion of journalists' newsgathering material is lacking, and thus the level of constitutional scrutiny of its motives, methods, and factual claims must accordingly be stricter still.

## II.    Constitutional Procedures Are Regularly Strengthened to Protect First Amendment Interests

Project Veritas's rights are not only secured by substantive First Amendment guarantees. When government conduct potentially imperils First Amendment interests, it also triggers strengthened applications of various other procedural and Constitutional protections. Indeed, the history underlying the development of the Fourth Amendment is itself the story of the British Crown's attacks on the press. *See Stanford v. State of Texas*, 379 U.S. 476, 482 (1965). All too frequently, compulsory legal process and searches and seizures of newsgathering materials have been an "instrument for stifling liberty of expression." *Marcus v. Search Warrant*, 367 U.S. 717, 729 (1965).

Procedural guarantees play a large role in protecting substantive First Amendment concerns. Henry P. Monaghan, *First Amendment 'Due Process'*, 83 HAR. L. REV. 518 (1970) (quoting *Speiser v. Randall*, 357 U.S. 513, 520 (1958)).  Cases such as *New York Times Co. v. Sullivan*, 376 U.S. 254 (1965), demonstrate the use of procedural safeguards to vindicate substantive First Amendment rights. There, the Court imposed a heightened burden of proof on defamation plaintiffs seeking to suppress political speech, and queried whether Courts needed to act as a backstop against potentially hostile juries casually finding actual malice in order to punish

unpopular speakers. *Id.* at 295 (Black and Douglas, JJ., concurring); *id.* at 300 (Goldberg and Douglas, JJ., concurring). Such procedural safeguards can be seen in *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485 (1984), where the court endorsed independent appellate review of facts used to suppress or punish First Amendment activity. And it can be seen in various other cases similarly use heightened procedure in the service of constitutional substance. *See A Quantity of Books v. Kansas*, 378 U.S. 205 (1964) (discussing need for adversarial as opposed to *ex parte* procedures when seizing potentially protected materials); *Freedman v. State of Maryland*, 380 U.S. 51 (1965) (same); *Heller v. New York*, 413 U.S. 483, 492-93 (1973) (warrant sufficient where judge reviewed entire explicit video before finding probable cause).

These procedural protections are especially important in the context of criminal proceedings, where the threat to the First Amendment and the likelihood of chilling protected speech can be particularly severe. The Supreme Court thus demands heightened procedural sensitivity to potential threats to First Amendment interests, even where the subject matter of the speech is not particularly valued. *See, e.g.*, *Heller v. New York*, 413 U.S. 483 (1973) (sexually explicit materials); *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989) (same). This sensitivity has led courts to build First Amendment protections into how criminal procedure operates. *See, e.g.*, *Matter of Kitty's East*, 905 F.2d 1367 (10th Cir. 1990) (finding that "the special protections of the First Amendment justified the exercise of equitable jurisdiction"). As explained in *Bantam Books*, 372 U.S. at 66, this is "but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks." The Supreme Court's insistence on stringent procedural safeguards even at the outer edges of the First Amendment—obscenity investigations—necessarily demands equal or greater procedural safeguards for core First

Amendment activities such as political newsgathering and publication, and related associational activities.

Just as procedure is used in a variety of contexts to protect speech, in this case such procedural safeguards manifest in a First Amendment or reporters' privilege to ensure privately held information by newsgatherers remains protected. That procedure must employ "sensitive tools" to preserve these fragile rights to speech, press and association. *Speiser*, 357 U.S. at 525. Where searches and seizures in criminal investigations implicate such First Amendment concerns, the Fourth Amendment requires heightened vigilance to protect such overlapping and hence heightened constitutional interests.

Under standard Fourth Amendment procedure, unreasonable searches and seizures are prohibited. *Katz v. U.S.*, 389 U.S. 347, 353 (1967). The Fourth Amendment requires that a warrant: (1) be based upon probable cause; (2) be supported by a sworn affidavit; and (3) describe with particularity the place to be searched and the persons or things to be seized. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). Probable cause exists where "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been committed. *Caroll v. U.S.*, 267 U.S. 132, 162 (1925).

Importantly, Fourth Amendment procedure places the burden on government to establish probable cause. Probable cause exists where known facts would impart in a man of "reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. U.S.*, 517 U.S. 690, 696 (1996). Where available evidence indicates that no offense has been committed, no finding of probable cause is the result. *Bell v. Neukirch*, 979 F.3d 594, 608 (8th Cir. 2020); *Thompson v. Anderson*, 447 F. Supp. 584, 587-88 (D. Maryland 1977). But even where some

probable cause might exist, the warrant also must be sufficiently "particular"—else it become a "general warrant" carrying a greater risk of government officials indiscriminately rummaging through an individual's belongings. *Carpenter v. U.S.*, 138 S.Ct. 2206, 2213 (2018).

Where a warrant is sought against the press, however, or in other contexts where First Amendment concerns are at stake, each of the elements for a warrant should be subject to heightened attention and scrutiny, and the government should be held to its burdens of demonstrating that the warrant itself is justified, its scope is no broader than necessary to serve substantial or compelling interests, and that its execution is scrupulously limited to minimize the impact on First Amendment rights.[5]

In *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978), the Supreme Court held that where subjects of search warrants presented credible First Amendment concerns, the requirements of the Fourth Amendment would be applied with "scrupulous exactitude." (Quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)). Courts must pay particular attention to the types of material searched and seized—as a "seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Id.* (quoting *Roaden v. Kentucky*, 413 U.S. 496, 501 (1973)). The Court assured the press that the usual preconditions for a warrant— "probable cause, specificity with respect to the place to be searched and the things to be seized, and overall reasonableness"—along with an attention to underlying First Amendment interests would protect newsgathering concerns. *Id.* at 565-66. Justice Powell similarly emphasized in his

---

[5] Those requirements, of course, are simply restatements of the ordinary tests for exacting or strict scrutiny, translated to the requirements of the Fourth Amendment. *Cf. AFP*, 141 S. Ct. at 2383.

concurrence that courts must "take cognizance of the independent values protected by the First Amendment." *Id.* at 569 (Powell, J., concurring).[6]

Since *Zurcher*, it is common for courts in criminal proceedings to require greater rigor in applying the elements of the Fourth Amendment. In *Lesoine v. County of Lackawana*, 2000 WL 572466 at *2 (M. D. Penn. May 5, 2000), for example, the court required strict precision must be given to the particularity of a warrant implicating the seizure of items potentially protected by the First Amendment. *Id.* at *9. This requires warrants to specifically separate non-criminal from criminal items to avoid overly broad searches and seizures. *Id.* at *10. Because the warrants in

---

[6] In the wake of *Zurcher*, Congress in 1980 sought to strengthen procedural and substantive protection for the press still further and passed the Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa. The Senate Judiciary Committee Report for the Act provides that the "Committee believes that the search warrant procedure in itself does not sufficiently protect the press and other innocent third parties." Sen. Judiciary Comm. Rep. No. 874, 96th Cong., 2d Sess. 1980, at 3951. For work-product materials, the Act makes it illegal for government officials in connection with a criminal investigation to search or seize materials held by a person reasonably believed to intend to disseminate a public communication. 42 U.S.C. § 2000aa-7(a), (b). Attempting to dampen criticism of its often-heavy-handed investigatory tactics, the DOJ has also professed commitment to heightened procedures for protecting the press. *See, e.g.*, Department of Justice, *Justice Manual*, 9-13.400, *available at* https://www.justice.gov/jm/jm-9-13000-obtaining-evidence; Attorney General Memorandum for the Deputy Attorney General, The Associate Attorney General, Heads of Department Components, United States Attorneys, Federal Prosecutors, July 19, 2021, *available at* https://www.justice.gov/ag/page/file/1413001/download. As the aggrieved journalists have discussed at length elsewhere, the government's seizures violated the PPA, the DOJ regulations for using compulsory process to obtain information from journalists (28 C.F.R. § 50.10), and DOJ's own guidance.

While these statutory and regulatory tests may act as independent bases for rejecting attempts to search or access confidential materials, they also serve as a *minimum* measure of reasonableness under the Fourth Amendment, as adjudged by the political branches themselves. That is not to say they define the maximum procedures required for a reasonable Fourth Amendment search—that is for courts to decide—but only that DOJ's failure to comply with its statutory limits or internal guidelines necessarily makes a search *unreasonable*. *See generally Environmentel LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011); *see also Fed. Defenders of N.Y. v. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) ("Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations . . . .") (citations omitted).

controversy failed to limit their reach to photography unprotected by the First Amendment, they were fatally overbroad.

The *Lesoine* case illustrates the merger of First Amendment substance with Fourth Amendment procedure. Substantive cases such as *Roth v. U.S.*, 354 U.S. 476 (1957) and *Miller v. California*, 413 U.S. 15 (1973) set the boundaries of protected versus illegal conduct, and then the Fourth Amendment requirements were applied with rigor and attention to detail to enforce those boundaries and prevent searches and seizures of material protected by the First Amendment. *Lesoine*, 2000 WL 572466 at *10-11.

Other cases similarly reflect the interaction between First Amendment substance and the Fourth Amendment's requirement of probable cause for a search or seizure. Where particular conduct either is not illegal at all or is protected by the First Amendment notwithstanding a law declaring the conduct illegal, there can be no probable cause for the search or seizure of persons or their effects. *See Glik v. Cuniffe*, 655 F.3d 78, 87-88 (1st Cir. 2011) (where state law only barred secret recording of police, but not open recording, there was no probable cause to arrest person openly recording police conduct or to seize that person's phone); *Leonard v. Robinson*, 477 F.3d 347, 361 (6th Cir. 2007) (views expressed by a speaker did not provide probable cause to arrest speaker as First Amendment protects speakers against viewpoint discrimination).

Where First Amendment rights have been established in a case, any aspect of a criminal investigation process that touches upon them must be reviewed with sensitivity toward their protection. *See Bantam Books,* 372 U.S. at 63 (this is "but a special instance of the larger principle that freedoms of expression must be ringed about with adequate bulwarks"). "If the First Amendment protects flag burning, funeral protests, and Nazi parades—despite the profound offense such spectacles cause—it surely protects political [] speech despite popular opposition."

*McCutcheon,* 572 U.S. at 191. In this matter, sensitive materials seized from journalists should enjoy presumptive First Amendment privileges across the board to protect against chilling Project Veritas's newsgathering efforts. First Amendment substantive protections must be integrated into Fourth Amendment procedure, as has been done in numerous earlier cases, lest First Amendment rights dissolve through the insensitive application of procedure.

### III.    Formulating and Applying a Speech-Protective Rule of Privilege

Given the substantive and procedural constitutional factors discussed above, the scope and requirements of the privileges as applied in this case should be as follows.

*First*, because there is ample evidence that the government's conduct in this case was both in bad faith and viewpoint discriminatory, the Special Master should apply strict scrutiny to any government attempt to circumvent a First Amendment or reporters' privilege or any government claim to justify its conduct under the Fourth Amendment.

Strict scrutiny requires the government to prove a compelling government interest that is served in a manner narrowly tailored. *Republican Party of Minnesota v. White*, 536 U.S. 765, 774 (2002). And even without strict, *i.e.*, invariably fatal, scrutiny, First Amendment concerns with donor and source privacy and fundamental chilling effects require a minimum of "exacting" scrutiny, which demands a substantial relationship between disclosure and a sufficiently important government interest. *AFP*, 141 S.Ct. at 2383.

*Second*, under the *Burke/Petroleum Products* line of reasoning, the government must make a showing that the information requested is "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *Burke*, 700 F.2d at 77 (*quoting Petroleum Products*, 680 F.2d at 7). Other courts might formulate this differently under a traditional First Amendment balancing test, such as the Ninth Circuit did in *Perry*, 591

F.3d at 1160, but it is effectively a more detailed application of strict or exacting scrutiny under the First Amendment.

*Third*, any claimed government interest in seizing and reviewing the newsgathering and other private materials seized from Project Veritas reporters must be narrowly defined to legitimate interests not already rejected as a substantive matter by the Supreme Court. In practical terms, this means this Court should reject any claimed government interest that parallels comparable interests rejected as insufficient by the Supreme Court in *Bartnicki*. The disingenuous recitation of offenses upon which the government predicated its warrants (conspiracy to transport stolen property and to possess stolen goods, interstate transportation of stolen property, possession of stolen goods, accessory after the fact, and misprision of a felony) are a perfect example.[7] *Bartnicki* renders these non-crimes as to Project Veritas and its journalists.

While it remains a general proposition that protecting the integrity of the criminal investigatory process can sometimes be a compelling government interest, *Virginia Dept. of State Police v. Washington Post*, 386 F.3d 567, 579 (4th Cir. 2004), that generic interest is not meaningfully at issue here and there is no valid government interest in expanding the claimed object of the investigation to include the non-crimes of possessing the diary or related minor materials that served to corroborate its provenance and authenticity. Those items fall squarely within *Bartnicki*'s protections given that there is no credible claim that Project Veritas reporters themselves stole the diaries or anything else. Likewise, supposed potential offenses of being

---

[7] In campaign finance cases, the Supreme Court has similarly limited illegitimate interests and only weighed interests relating to corruption. Other government-invented interests were rejected as contrary to the First Amendment. *Buckley*, 424 U.S. at 48-49 ("[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment"); *Citizens United,* 558 U.S. at 350 (government has no interest in equalizing the ability of individuals to impact elections).

accessories after the fact, receiving allegedly stolen property, or similar derivative conduct is foreclosed by the holding and logic of *Bartnicki* as a substantive matter. At most, therefore, the government can only claim a theoretical interest in investigating whether Project Veritas reporters themselves took part in any supposed underlying crime in the acquisition of the diary and related materials (they did not), or in investigating the actual perpetrators of such a supposed crime. Giving *Bartnicki* practical effect here means asking whether a particular seized file was likely to contain evidence demonstrating that the Project Veritas reporters themselves "played a part" or "participated in the theft" of some underlying property. Thus, mere photographs of diary entries or other abandoned belongings provided by the sources to Project Veritas would have no bearing on this inquiry. Editorial deliberations about whether to publish a story about the information acquired would not be probative about involvement in an alleged theft. The prosecutors might well be interested in viewing highly confidential private communications and source material gained during the course of protected newsgathering, but its pursuit of non-crimes firmly within *Bartnicki's* protection cannot justify an invasion of the privileges at issue here. Failing to recognize the holding of *Bartnicki* and its progeny at the privilege review stage would chill free expression and association.

  ***Fourth,*** the government must demonstrate a tight fit—narrow tailoring—between its claimed interest in policing actual criminal acts, the methods it used to further those interests, and its efforts to minimize adverse impact of the First Amendment. Attempts to access more information than needed for its narrow legitimate interests are not narrowly tailored to those interests.

  Because *Bartnicki* protects journalists who receive and publish information if they did not participate in the alleged theft of that information, searches and seizures based on something less

than probable cause of actual involvement in a theft are impermissibly overbroad.  And even if the search was purportedly based upon a probable cause finding, it must initially be limited to materials narrowly probing that limited predicate before allowing the government to expand its search and review into a broader fishing expedition.  And it naturally follows that the government has no valid interest, either before or after such limited first-stage potential searches, in donor information necessarily involving persons even further removed from the events in this case. And searches that even indirectly threaten to reveal such information, regardless of whether the information is the intended target of the search, raise serious First Amendment threats that must be mitigated.[8]

*Fifth,* in evaluating the government's interest in investigating that narrow set of potential criminal conduct— what would be a petty theft under Florida law at worst—and in weighing such a paltry and hypothetical interest against the infringements on the First Amendment, substantial procedural safeguards must be applied to ensure that the government actually meets its constitutional burdens.  Thus, in establishing the existence of any claimed interest, the burden is on the government to demonstrate its need to infringe upon protected First Amendment rights. *Eldrod v. Burns*, 427 U.S. 347, 362 (1976). This is true even in the context of commercial speech, where constitutional protections are diminished. *See Edenfield v. Fane*, 507 U.S. 761, 770 (1993) ("It is well established that the party seeking to uphold a restriction on commercial speech carries

---

[8] Thus, while the initial batches of items provided by the Special Master to the Filter Team do not directly include donor information, the government's overbroad seizures of electronic devices swept such information up in its net, threatening the willingness of donors to contribute in the future if they know that government may, on a whim, obtain the internal operating communications of the Project Veritas parties. That inevitably leads to the disclosure of financial supporters, with many fearing potential retribution should the current Administration learn their identities, positions communicated critical of the government, and amount of giving. For these reasons, the internal deliberations and strategies requested in the current batch of information released by the Filter Team need protection to assure donors that their rights to anonymously support Project Veritas will be equally protected in the future.

the burden of justifying it"). Similarly, in demonstrating narrow tailoring, the government must prove that obvious alternative sources of information are insufficient to satisfy any supposedly legitimate and compelling investigative needs. *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) (burden on government to show that proposed alternatives are not as effective as government's approach). That the government had already seized the electronic devices of the sources who obtained and then passed on the diary would seem to make this a heavy lift for the government. Its burden of proof should be similarly heavy to overcome the obviously narrower means of accomplishing its claimed goals.

*Sixth,* because Fourth Amendment and due process protections are heightened when First Amendment interests are at stake, in any attempt to breach that privilege through its seizures, the government must demonstrate scrupulous adherence to the procedural and constitutional safeguards that exist as a condition to such warrants. Thus, the government must show that it acted with candor in the warrant application process, and did not withhold information from the magistrate judge that would have cast doubt on whether there was probable cause to believe an actual crime had been committed, whether the information sought was important to the investigation of such a crime, and whether that information could not have been obtained in a different manner that respected First Amendment interests. The intersection of the First and the Fourth Amendments here require an exacting inquiry and a heightened burden of proof.

Similarly, the government should be obliged to demonstrate that it complied with both the scope of the warrants issued, as well as any safeguards imposed by the magistrate judge (or by statutory and DOJ rules and procedures themselves) to limit the First Amendment injury from executing the warrant. Failing such compliance, the ensuing searches are unreasonable, the

government's hands are unclean, and hence the government would not have a substantial or compelling interest in accessing the materials thus improperly obtained.

In its raids on the homes of journalists, the government ignored virtually every DOJ regulation and guideline requiring that a First Amendment-sensitive approach should be used in investigations into the press. Despite an attorney proffer by the undersigned prior to the searches, the prosecutors failed to "pursue negotiations with the affected member of the news media," 28 C.F.R. § 50.10(a)(3) and proceeded with pre-dawn raids of journalists' homes. *See also* 42 U.S.C. § 2000aa-11a.2 (PPA's directive that DOJ impose "requirement that the least intrusive method or means of obtaining such materials be used"). Likewise, the prosecutors ignored Attorney General Merrick Garland's announcement that that the DOJ "will no longer use compulsory legal process for the purpose of obtaining information from or records of members of the news media acting within the scope of newsgathering activities." *See* July 19, 2021 Attorney General Memorandum, available at https://www.justice.gov/ag/page/file/1413001/download at 1.

It is apparent that these prosecutors never sought the high-level DOJ approvals needed when prosecutors wish to compel the news media to provide newsgathering materials. In fact, 28 C.F.R. § 50.10(d)(4) prohibits the use of warrants to seize newsgathering, and neither the Attorney General nor his designee could have approved such a request had the prosecutors made it – the regulations allow approval of an application for a news media search warrant pursuant to the PPA's "suspect exception" only "when the member of the news media is a subject or target of a criminal investigation for conduct ***not*** based on, or within the scope of, newsgathering activities." (emphasis added).

If prosecutors can simply declare a journalist a "thief"—without obeying DOJ's regulations, without following DOJ's guidelines, or without respecting First Amendment and

reporters' privileges—then *Bartnicki* and the free speech rights of the press are no more. Such faulty procedures render the ensuing searches unreasonable.

This framework draws from interrelated areas of substantive and procedural protections for speech, newsgathering, associational privacy, and Fourth Amendment protections in order to evaluate the government's improper efforts to invade the confidential communications and materials of journalists whose viewpoints and investigative methods they oppose. Holding the government to the strict constitutional limits surrounding such efforts is the only way to fulfill Justice Powell's promise in *Branzburg* that "no harassment of newsmen will be tolerated . . .[and] the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection." 408 U.S. at 709-10.

## Conclusion

The voluminous newsgathering materials the government seized in its pre-dawn raids were not likely to, and cannot, evidence an offense committed by Project Veritas or its aggrieved journalists. The seized materials only reveal a fully-protected journalistic investigation of the now-President and his family – legitimate and careful newsgathering. Under our American tradition favoring robust and wide-open discussion, undercover investigation of the politically powerful is not a crime. Per the Supreme Court's holding in *Bartnicki*, Project Veritas was protected by the First Amendment in accepting and considering whether to report on the abandoned Ashley Biden diary and the items abandoned along with it. Accordingly, coerced disclosure of the newsgathering materials, deliberations, and extensive other confidential materials was wholly inappropriate. Whether viewed under First Amendment substantive law or Fourth Amendment procedure, the government simply cannot meet its high burden to demonstrate the necessity of this information as weighed against the damage its disclosure would do to fragile First Amendment rights. The

Special Master should approve the privileges asserted by the Project Veritas and its journalists and forbid release of this information to the investigative team.

Respectfully,

CALLI LAW, LLC

/s/

By: _____

Paul A. Calli
Charles P. Short
14 NE 1st Avenue
Suite 1100
Miami, FL 33132
T. 786-504-0911
F. 786-504-0912
pcalli@calli-law.com
cshort@calli-law.com

*Admitted Pro Hac Vice*

Harlan Protass
PROTASS LAW PLLC
260 Madison Avenue
22nd Floor
New York, NY 10016
T. 212-455-0335
F. 646-607-0760
hprotass@protasslaw.com

Benjamin Barr
BARR & KLEIN PLLC
444 N. Michigan Avenue
Suite 1200
Chicago, IL 60611
T. 202-595-4671
ben@barrklein.com

Stephen R. Klein
BARR & KLEIN PLLC
1629 K. Street, NW
Suite 300
Washington, DC 20006
T. 202-804-6676

steve@barrklein.com

*Counsel for James O'Keefe,*
*Project Veritas and Project*
*Veritas Action Fund*