UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
In re Search Warrant dated November 5, 2021         :          21 Misc. 813 (AT)
                                                    :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
In re Search Warrant dated November 3, 2021         :          21 Misc. 819 (AT)
                                                    :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
In re Search Warrant dated November 3, 2021         :          21 Misc. 825 (AT)
                                                    :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE
TO PETITIONERS' BRIEFS DATED APRIL 1, 2022**


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Jacqueline Kelly
Robert B. Sobelman
Mitzi Steiner
Assistant United States Attorneys
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 2

APPLICABLE LAW ................................................................................................. 3

DISCUSSION ........................................................................................................... 5

    A.  Petitioners Have Waived Any Applicable Privilege ..................................... 6

    B.  The Responsive Materials Contain Nonconfidential Information And Are Not Protected By the Qualified Journalists' Privilege ........................................ 9

    C.  Even if the Responsive Materials Contain Confidential Information, They Are Still Not Protected By the Qualified Journalists' Privilege ................................ 13

    D.  *Bartnicki* Does Not Provide For An Evidentiary Privilege ........................ 14

    E.  The First and Fourth Amendment Do Not Provide An Independent Basis for Privilege Over the Responsive Materials .................................................. 18

CONCLUSION ........................................................................................................ 21

## TABLE OF AUTHORITIES

### Cases

*Ayala v. Ayers*, 668 F. Supp. 2d 1248 (S.D. Cal. 2009)...................................................... 7

*Baker v. F & F Inv.*, 470 F.2d 778 (2d Cir. 1972) .......................................................... 4

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) .............................................................. 15, 16

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ................................................................... 3

*Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011) ............................................ 3

*Cockrum v. Donald J. Trump for President, Inc*., 365 F. Supp. 3d 652 (E.D. Va. 2019) ............ 18

*Cohen v. Cowles Media Co*., 501 U.S. 663 (1991)....................................................... 17

*Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410 (S.D.N.Y. 2019)............. 16, 18

*Doane v. United States*, No. 08 Mag. 17 (HBP), 2009 WL 1619642 (S.D.N.Y. June 5, 2009)... 20

*Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29 (2d Cir. 1999)................................. passim

*In re Petroleum Prod. Antitrust Litig*., 680 F.2d 5 (2d Cir. 1982)................................... 4

*In re Sims*, 534 F.3d 117 (2d Cir. 2008) .......................................................... 7, 8, 9

*Inside Radio, Inc. v. Clear Channel Commc'ns, Inc*., 208 F.R.D. 537 (S.D.N.Y. 2002) ............. 6

*N.Y. Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006)........................................... 11

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ................................................ 17

*Pinkard v. Johnson*, 118 F.R.D. 517 (M.D. Ala. 1987)............................................ 7, 9

*Schiller v. City of New York*, 245 F.R.D. 112 (S.D.N.Y. 2007)................................. 7, 8, 9

*Smith v. Daily Mail Publ'g Co*., 443 U.S. 97 (1979)................................................... 17

*United States v. Burke*, 700 F.2d 70 (2d Cir. 1983)................................................ 4, 5

*United States v. Cutler*, 6 F.3d 67 (2d Cir.1993) ................................................... 11

*United States v. Spinosa*, No. 21 Cr. 206 (PAE), 2021 WL 2644936 (S.D.N.Y. June 28, 2021) 18

*United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013)................................................ 6

*United States v. Treacy*, 639 F.3d 32 (2d Cir. 2011) ......................................... passim

*United States. v. Weissman*, 1996 WL 737042 (S.D.N.Y. Dec. 26, 1996)..................... 7

*von Bulow by Auersperg v. von Bulow*, 828 F.2d 94 (2d Cir.1987) ............................ 7

*Wheeler v. Goulart*, 593 A.2d 173 (D.C. 1991)....................................................... 7

*Zyprexa Injunction*, 474 F. Supp. 2d 385  (E.D.N.Y. 2007)...................................... 18

**<u>Regulations</u>**

28 C.F.R. § 50.10 ..................................................................................................................... 21

## PRELIMINARY STATEMENT

To date, the Special Master has released to the filter team approximately 184 items deemed responsive to judicially-authorized search warrants for the electronic devices reviewed by the Special Master (the "Responsive Materials").[1]  The filter team determined that, except for four items that might potentially be subject to the attorney-client privilege, none of the Responsive Materials are covered by "[t]he First Amendment and the Reporters' privileges," Br. 2,[2] that the Petitioners attempt to invoke.

In their submissions, the Petitioners largely ignore the governing legal standard, instead devoting pages and pages to discussions of legal principles that are mostly irrelevant, ultimately inviting the Special Master to "formulat[e] and apply[] a speech-protective rule of privilege."  Br. 18.  The Special Master need not "formulate" any new rule to resolve this motion and should simply apply settled Second Circuit precedent.  Under that precedent, any qualified journalists' privilege that might otherwise apply is overcome where the material relates to nonconfidential information that is relevant to a significant issue in the case and not reasonably obtainable from other available sources.  That standard is met here.  The Responsive Materials should be released to the investigative team.

---

[1] On April 12, 2022, the Special Master informed the parties that an additional 169 items had been released to the filter team, and the filter team's review of those materials remains ongoing.

[2] "Br." refers to the brief filed by Project Veritas and James E. O'Keefe, III, on April 1, 2022; "Ltr." refers to the letter filed by Spencer Meads on April 1, 2022; "S.M. Mot." refers to O'Keefe and Project Veritas' motion for the appointment of a Special Master filed on November 12, 2021 (Dkt. No. 1, 21 Misc. 813 (AT)); "S.M. Opp'n" refers to the Government's opposition motion to the appointment of a Special Master (Dkt. No. 29, 21 Misc. 813 (AT)); "Gov't Ltr." refers to the Government's *ex parte* submission to the Special Master dated December 29, 2021; "Prop. Mot." refers to the Petitioners' motion for the return of property filed on March 30, 2022 (Dkt. No. 70, 21 Misc. 813 (AT)).  As Meads' letter dated April 1, 2022, largely is an incorporation of the arguments articulated in the brief field by Project Veritas and O'Keefe, the Government's response focuses on that brief.

## FACTUAL BACKGROUND

On November 4, 2021, the Federal Bureau of Investigation ("FBI") executed search warrants at Meads' and Cochran's residences for certain electronic devices.  On November 6, 2021, the FBI executed a similar search warrant at O'Keefe's residence for cellphones.  The search warrants at issue were obtained by the Government as part of an ongoing grand jury investigation (the "Investigation") into the theft and interstate transportation of certain property stolen from an individual (the "Victim").  The warrants were supported by detailed affidavits, and authorized by a federal magistrate judge, who found probable cause to believe that the subject premises and the devices therein contained evidence of federal crimes, including conspiracy to transport stolen property across state lines and interstate transportation of stolen property.[3]

On December 8, 2021, the Court appointed the Special Master to "oversee the review of the materials" seized pursuant to the aforementioned search warrants.  *In re Search Warrant dated Nov. 5, 2021*, No. 21 Misc. 813 (AT), 2021 WL 5845146, at *2 (S.D.N.Y. Dec. 8, 2021). Specifically, the Court directed the Special Master to conduct "an initial review of the extracted materials to determine what materials are responsive to the search warrants," with a subsequent filter review to be conducted by the Government's filter team.  *Id.*  The Court further provided that the filter team—after reviewing the responsive materials to determine if any should be withheld from the investigative team—should release the materials to Petitioners, who would then have the opportunity to raise any objections.  *Id.*  The Court directed the Special Master to resolve any

---

[3] The Government provided the affidavits to the Special Master on an *ex parte* basis on December 13, 2021, and submitted an *ex parte* letter to the Special Master, at the Special Master's invitation, on December 29, 2021, in which the Government provided, among other things, an overview of the pertinent facts related to the Government's ongoing investigation.

2

disputes and then to provide the Responsive Materials that were not privileged to the investigative team. *Id.* In the course of establishing this procedure, the Court rejected the Petitioners' attempt to challenge the search warrants. *Id.* at *1 ("The Court shall not consider arguments related to the validity of the search warrants because that issue is not before the Court."); *see also In re Search Warrant dated Nov. 5, 2021*, No. 21 Misc. 813 (AT), 2022 WL 500919, at *1 (S.D.N.Y. Feb. 18, 2022) ("as the Court has already made clear, the issue of the validity of the search warrants is not before the Court, and, therefore, there is no impending decision on the merits in this action").

To date, the Special Master has released to the filter team approximately 184 responsive items. The filter team determined that, aside from four items that might implicate the attorney-client privilege, none of the Responsive Materials are privileged. The Petitioners have asserted blanket objections to the release of any of the Responsive Materials.

## APPLICABLE LAW

The Second Circuit recognizes a "qualified evidentiary privilege for information gathered in a journalistic investigation."[4] *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011) (citing cases). It is the burden of the person or entity claiming privilege to show entitlement to it. *Id.* at 309. Further, the protection accorded by the privilege is not absolute. *Id.* at 307 (citing *Branzburg v. Hayes*, 408 U.S. 665, 690-91 (1972)). It may yield, for example, to law enforcement interests in certain circumstances. *See Branzburg*, 408 U.S. at 690-91 (finding "no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said

---

[4] The Second Circuit has expressly declined to "wade into the[] constitutional waters" to determine whether "the reporter's privilege is derived from the First Amendment rather than a federal common law of privileges." *United States v. Treacy*, 639 F.3d 32, 43 (2d Cir. 2011); *see also Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29, 33, 35 n.6 (2d Cir. 1999).

to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial").

The qualified privilege applies to information derived from both confidential and nonconfidential sources. *See Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29, 35 (2d Cir. 1999) (the "qualified privilege for journalists applies to nonconfidential, as well as to confidential, information"); *Treacy*, 639 F.3d at 42 ("a journalist possesses a qualified privilege protecting him or her from the compelled disclosure of even nonconfidential materials"). However, the principles behind protecting these two types of journalistic information —and the corollary standard required to overcome the privilege in each context—are distinct. The purpose of the qualified privilege with regards to confidential material is to "protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources." *In re Petroleum Prod. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982); *see also Baker v. F & F Inv.*, 470 F.2d 778, 781-83 (2d Cir. 1972) (recognizing journalist's right to protect confidential sources). Where the privilege is established, information from confidential sources or materials may only be obtained upon a showing that the information is "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *Gonzales*, 194 F.3d at 33 (quoting *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d at 7). This "demanding burden has been imposed by the courts to reflect a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment." *United States v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983).

By contrast, the purpose of the qualified privilege with regards to nonconfidential sources

is to, among other things, avoid "burden[ing] the press with heavy costs of subpoena compliance," "otherwise impair[ing] its ability to perform its duties" by deterring "potential sources . . . from speaking to the press . . . because of the likelihood that they would be sucked into litigation," and the "symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties." *Gonzales*, 194 F.3d at 35. The "showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought." *Id*. at 36. Consequently, the protected interest where confidential sources are not involved is "narrower" and the privilege is more "easily overcome." *Id.* at 36. In those circumstances, the privilege is overcome where "the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Id.* at 36.

The qualified privilege applies similarly to compelled disclosure in civil and criminal cases. *See Burke*, 700 F.2d at 77 ("We see no legally-principled reason for drawing a distinction between civil and criminal cases when considering whether the reporter's interest in confidentiality should yield to the moving party's need for probative evidence."); *Treacy*, 639 F.3d at 43 ("[W]here a reporter is not protecting a confidential source or confidential materials, the showing required to overcome the journalist's privilege is the same in a criminal case as it is in a civil case—namely, the showing required by *Gonzales*—and that . . . is true whether the party seeking to overcome the privilege is the prosecution or the defense."). Indeed, the Second Circuit has recognized that it "once set too *high* a bar for overcoming the privilege in criminal cases and consciously lowered that bar" to the standard articulated in *Gonzales*. *Id. See also Gonzales*, 194 F.3d at 34 n.3.

## DISCUSSION

Despite the Petitioners' varied arguments and factual claims, only one is before the Special Master, and thus, the Government focuses its response on that question: whether any qualified

5

journalists' privilege that may otherwise apply to the Responsive Materials has been overcome.  It has.  First, Petitioners have waived any privilege that might have otherwise applied through their selective disclosure of the facts of their "investigation."  But even assuming the qualified journalists' privilege could apply, it provides no basis to withhold the Responsive Materials.  As explained below, the Responsive Materials necessarily contain nonconfidential information.  Under the *Gonzales* standard, any qualified privilege is overcome because the Responsive Materials are, by the nature of their responsiveness to the search warrants, necessarily relevant to a significant issue and are not reasonably obtainable from other available sources given that they were obtained from the Petitioners' electronic devices in their personal possession.  *See Gonzales*, 194 F.3d at 36.  Further, even assuming *arguendo* that certain of the Responsive Materials potentially contain confidential information, the privilege would be overcome because the Responsive Materials necessarily are highly material and relevant to the Government's investigation and not obtainable from other available sources, as the development of the facts turns on the precise information and communications in the Petitioners' possession at particular points in time.  *See id.* at 33.  The Special Master should therefore overrule the Petitioners' objections and provide the Responsive Materials to the investigative team.

## A. Petitioners Have Waived Any Applicable Privilege

Like other privileges, the qualified journalists' privilege may be waived.  *See, e.g.*, *United States v. Sterling*, 724 F.3d 482, 509 (4th Cir. 2013) (concluding that any journalists' privilege that may have applied was waived by author's disclosure of information to a third party after promising confidentiality to his source); *Inside Radio, Inc. v. Clear Channel Commc'ns, Inc.*, 208 F.R.D. 537, 543-44 (S.D.N.Y. 2002) (concluding that newsletter publisher waived qualified privilege in civil defamation litigation by putting intent of station newsletter's publisher at issue, through

assertion in article that station's newsletter had printed knowingly false statements); *Ayala v. Ayers*, 668 F. Supp. 2d 1248, 1250–51 (S.D. Cal. 2009) (finding implied waiver of the journalists' privilege as a result of author's production of unpublished book manuscript to Petitioner's counsel, while refusing to provide the same material to Respondent's counsel); *Wheeler v. Goulart*, 593 A.2d 173, 175 (D.C. 1991) ("[W]hat [a reporter] chose to say to others out-of-court she cannot now refuse to repeat in court."); *see also Pinkard v. Johnson*, 118 F.R.D. 517, 523 (M.D. Ala. 1987) ("A reporter is not free to give a sworn statement to a litigant, and later invoke the qualified reporter privilege to keep this information from the Court."). "The party seeking to invoke a privilege has the burden of establishing the non-waiver of the privilege." *United States. v. Weissman*, 1996 WL 737042, at *25 (S.D.N.Y. Dec. 26, 1996).

Further, the "[w]aiver of a privilege may be either express" or "implied in circumstances where it is called for in the interests of fairness." *In re Sims*, 534 F.3d 117, 131-32 (2d Cir. 2008). Under the "fairness doctrine," it follows that "a party that discloses some privileged information cannot thereafter rely on the privilege to withhold related information necessary to gain a complete picture of the facts." *Schiller v. City of New York*, 245 F.R.D. 112, 120 (S.D.N.Y. 2007). Indeed, a party may forfeit the journalists' privilege by using information they seek to protect "during the course of th[eir] litigation" since the "fairness doctrine prevents prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information." *Id.* (*citing von Bulow by Auersperg v. von Bulow*, 828 F.2d 94, 101 (2d Cir.1987)). That is because a party is not entitled to "use the privilege both as a shield and a sword." *In re Sims*, 534 F.3d at 132. Thus, "a party cannot partially disclose privileged communications or affirmatively rely on privileged communications *to support its claim*

*or defense* and then shield the underlying communications from scrutiny by the opposing party." *Id.*

Yet that is exactly what Petitioners have done here. In its recently filed motion for the return of property, Petitioners provide an extensive recitation of their version of events. It describes in detail: how "sources" first contacted Project Veritas; what the sources allegedly told them; their interactions with the sources; the steps Project Veritas allegedly took to authenticate the diary; their production of a "video news story" about it; their internal views regarding the authenticity of the diary; their internal decision-making about whether to publicize it; and their alleged reasons why they chose not to do so. *See* Prop. Mot. 3-7. Petitioners explicitly incorporated that discussion by reference in their brief regarding privilege. *See* Br. 3. But these disclosures tell only part of the story, as a review of the affidavits submitted in support of the warrants makes clear.

The strategic purpose of these partial disclosures is evident: Petitioners seek to persuade the Court, the Special Master, and apparently the public[5] that because they were following "common journalistic practices," their actions were subject to a First Amendment "safe-harbor," and therefore the Court and Special Master should sustain their privilege claims. Br. 5. Put differently, Petitioners seek to use their partial disclosures as a sword, while shielding the remainder of their communications and documents from disclosure. The Petitioners, with the assistance of counsel, affirmatively injected what they claim to be privileged materials "during the course of this litigation." *Schiller*, 245 F.R.D. at 120. They cannot now seek to "distort[] the

---

[5] *See, e.g.*, Project Veritas, *FBI and Southern District of New York Raid Project Veritas Journalists' Homes*, YouTube (Nov. 5, 2021), https://youtu.be/nNpbvsS7K0g (O'Keefe video statement regarding nature of purported investigation).

judicial process" by "selective disclosure during litigation of otherwise privileged information." *Id.* As such, the Petitioners have waived any privilege they might enjoy over the Responsive Materials. *See In re Sims*, 534 F.3d at 133-34; *Pinkard*, 118 F.R.D. at 523.

**B.** **The Responsive Materials Contain Nonconfidential Information And Are Not Protected By the Qualified Journalists' Privilege**

The Responsive Materials—totaling 184 items deemed responsive to judicially authorized search warrants of the Petitioners' devices—are not protected by the qualified journalists' privilege and should be produced by the Special Master to the investigative team.

Assuming the qualified privilege might attach to the Responsive Materials, the privilege is just that: qualified. And the proper test to overcome the qualified privilege is the one prescribed in *Gonzales* for non-confidential information.[6] That is because the Responsive Materials do not contain confidential information collected during a journalistic investigation. Indeed, as discussed above, the Petitioners themselves have made the details of their "investigation" public. Even if this does not result in waiver, at minimum, the Petitioners' disclosure of the details of their "investigation" substantially weakens any potential protection the qualified privilege might otherwise provide and supplies ample basis to conclude that the Responsive Materials do not contain confidential information.

In addition, the seized materials are all electronic devices that were in the possession of Petitioners and do not include any of the Victim's stolen property that Petitioners may deem

---

[6] The Government is unaware of any case in which the *Gonzales* standard has been applied to materials obtained by search warrant, for which a showing of probable cause has been made, rather than other evidence sought after charges have been brought in a prosecution. Nevertheless, for the purposes of the discussion of the legal principles applicable to the Special Master's review, the Government assumes *arguendo* that the test would apply to such materials and the Petitioners have offered no alternative standard.

9

confidential.  Indeed, Petitioners chose not to publish the results of their purported investigation and actually provided the Victim's stolen property, through deceptive means, to law enforcement, all of which further undermines any need to protect any allegedly confidential information. Further, to the extent the two individuals who sold the Victim's stolen property to the Petitioners can be considered "sources" for purposes of the *Gonzales* standard, these individuals have already identified themselves as the sources in question, and their identities have been confirmed through public references made by Petitioners.  *See, e.g.*, S.M. Mot. 3-4; Gov't Ltr. 2-9.  The Responsive Materials—which, by their nature as responsive to the search warrants, pertain directly to the potentially criminal conduct on the part of the Petitioners and their associates—are therefore nonconfidential, as the details of the Petitioners' purported investigation are already publicly known, the Petitioners' "sources" have already been revealed to the Government, and the search warrants themselves do not otherwise seek to uncover confidential information.

Since the Responsive Materials contain only nonconfidential information, the qualified privilege can be "easily overcome" with a mere showing that "the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 36.  Here, that standard is easily satisfied.

*First*, the Responsive Materials are necessarily relevant to a significant issue, namely, the facts that are the subject of the Government's ongoing grand jury investigation of the criminal offenses listed in the search warrants.  Indeed, by authorizing the search warrants, a federal magistrate judge has already determined that probable cause exists that the offenses under investigation were committed and that the seized devices contain evidence of that criminal conduct.  Further, the Special Master has determined that the Responsive Materials fall within the

10

narrow scope of the search warrants and are therefore relevant to facts at issue in the criminal conduct under investigation.  That showing more than satisfies the first prong of the *Gonzales* test. *See Gonzales*, 194 F.3d at 36 (concluding that qualified privilege was overcome in civil rights action where materials sought, including "certain unedited, unbroadcast videotapes . . . as well as deposition testimony from NBC representatives" were relevant to a significant issue in the case because they "may assist the trier of fact in assessing whether [the defendant] had probable cause to stop the NBC vehicle and might help determine whether he engaged in a pattern or practice of stopping vehicles without probable cause, as the Plaintiffs allege"); *see also N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 170-72 (2d Cir. 2006) (concluding that qualified privilege was overcome where the Government subpoenaed reporters for testimony and records in a grand jury investigation focused on, among other things, the reporters' "unauthorized disclosures of imminent plans of federal law enforcement to seize assets and/or execute searches of two organizations under investigation for funding terrorists" because the evidence from the reporters was "critical to this inquiry" in that the journalists "as the recipients of the disclosures . . . are the only witnesses— other than the source(s)—available to identify the conversations in question and to describe the circumstances of the leaks"; and "the reporters were not passive collectors of information," but, rather, "[t]he communications to the two foundations were made by the reporters themselves and may have altered the results of the asset freezes and searches," such that "the reporters' actions are central to (and probably caused) the grand jury's investigation"); *Treacy*, 639 F.3d at 43 (concluding that the Government was entitled to subpoena reporter's testimony at trial, despite assertion of qualified privilege, where the materials included exculpatory statements that could provide circumstantial evidence of guilt); *United States v. Cutler*, 6 F.3d 67, 73 (2d Cir.1993)

(concluding criminal defendant could overcome qualified privilege where the information sought was "probably the only significant proof regarding his assertedly criminal behavior" and therefore relevant to "defend[ing] against the charge that his statements were criminally contemptuous").

*Second*, the Responsive Materials are not reasonably attainable from other sources. Although the investigative team is unaware of the content of the Responsive Materials, the information contained therein necessarily required the recovery of the Petitioners' electronic devices. That is because the nature of the Petitioners' communications with each other and other potential coconspirators regarding the criminal offenses indicates that the Responsive Materials are likely solely obtainable from the Petitioners' personal devices.[7] For example, there is evidence that the Petitioners used encrypted applications to communicate with one another about the commission of the offenses under investigation, in an apparent effort to avoid law enforcement scrutiny. *See, e.g.*, S.M. Opp'n 12; Gov't Ltr. 6. Moreover, even if the Responsive Materials were available from an alternative source, their existence on the Petitioners' devices—including related metadata, reflecting timing and location—is itself substantial evidence that is directly pertinent to the Investigation, may bear on the Petitioner's involvement in the criminal conduct, and is, by its unique nature, unobtainable from other sources.

In sum, the qualified journalists' privilege, to the extent it potentially applies to the Responsive Materials, is plainly overcome because the Responsive Materials constitute evidence of the facts that are the subject of the Government's ongoing grand jury investigation and are not reasonably obtainable from alternative sources.

---

[7] To the extent Petitioners are suggesting that the materials should have been obtained by subpoena, it bears noting that Project Veritas has interposed the same overbroad privilege claims in response to a subpoena served on the entity.

**C.**   **Even if the Responsive Materials Contain Confidential Information, They Are Still Not Protected By the Qualified Journalists' Privilege**

Further, even if the Special Master were to construe any of the Responsive Materials as relating to confidential information, they would still not be protected by the qualified journalists' privilege.[8]  The fact that the Special Master has designated the Responsive Materials as responsive to the search warrants establishes that they are evidence of the facts at issue in the Government's ongoing criminal investigation, and therefore are highly material and relevant to the development of those facts.  Further, for the reasons set forth above, the Responsive Materials—including the very fact that the Responsive Materials were saved on the devices and the metadata associated with those materials—is not available from other sources apart from the devices themselves.

Finally, the third prong of the *Gonzales* test for confidential information—whether the Responsive Materials are "necessary or critical to the maintenance of [a] claim"—seems on its face to be inapplicable to the instant circumstances.  That is because the evidence at issue was obtained through the execution of a search warrant, after a showing of probable cause, and the Government has yet to initiate a prosecution.  There is therefore no pending civil claim or criminal charge.  Indeed, the *Gonzales* test appears to have been exclusively applied in the post-indictment context, rather than during the pendency of a criminal investigation where a "claim" is necessarily

---

[8] The Petitioners appear to argue that the *Gonzales* test for confidential material, as opposed to nonconfidential material, is applicable.  *See* Br. 10, 20.  However, the Petitioners provide no basis for their claim, aside from broadly implying that the Responsive Materials contain "highly confidential private communications and source material gained during the course of protected newsgathering."  *Id*. at 20.  Such an unparticularized articulation of the purported confidential information contained in the Responsive Materials cannot properly form the basis for an assertion of the qualified privilege for confidential information.  Further, to the extent that the Petitioners argue that "communications with donors" constitute confidential information, *see id*. at 9 n.2, 21, they concede that none of the Responsive Materials contain donor information, *id*. at 21 n.8, and therefore the Special Master need not decide that issue at this time.

absent.   Thus, at the pre-charge stage of the Government's investigation, the Government's satisfaction of the first two prongs of the *Gonzales* test is sufficient to overcome the privilege. Moreover, should the Special Master construe the third prong of the *Gonzales* standard as applying equally to a Government investigation, as to a charged criminal offense, the Responsive Materials are "necessary" and "critical" to the Government's investigation, as the communications between co-conspirators that are uniquely stored on their phones are likely to be the clearest evidence of their knowledge and intent.   Thus, even if the Responsive Materials contain confidential information, the qualified privilege would not attach.

### D.    *Bartnicki* Does Not Provide For An Evidentiary Privilege

Petitioners also appear to argue that the Responsive Materials are privileged because the criminal offenses articulated in the search warrants do not subject them to criminal liability under the Supreme Court's holding in *Bartnicki*.  *See* Br. 2, 6, 19-21; Ltr. 2.  Not so.  As an initial matter, as discussed below, the Petitioners repeated unsworn claim that they "played no part" in the "illegal acquisition" of the Victim's property, *see* Br. 5, is false and, in any event, insufficient to immunize them from investigation before the totality of the evidence is known to the Government.

Moreover, the holding of *Bartnicki* is entirely immaterial to the question of whether the qualified journalists' privilege attaches to the Responsive Materials.   Rather, to the degree *Bartnicki*'s principles are relevant in the privilege context, they are already embodied in the established *Gonzales* standard.  Further, even if *Bartnicki* were applicable, the Petitioners would not be entitled to its protection due to the evidence of their direct involvement in the criminal conduct under investigation.

The holding of *Bartnicki* speaks *solely* to potential civil liability, rather than whether materials in their possession might be subject to a qualified privilege.  In *Bartnicki*, the Court held

14

that members of the media could not be held *civilly* liable for disclosing illegally intercepted communications where those making the disclosures did not participate in the interception, but did know—or at least had reason to know—that the interception was unlawful.  The Court based its holding on the need to weigh "privacy concerns" against "the interest in publishing matters of public importance."  *Bartnicki v. Vopper*, 532 U.S. 514, 534 (2001).  The holding of *Bartnicki* thus dictates whether those involved with the dissemination of illegally obtained materials can be held liable.  However, it does not provide any guidance with regard to whether privileges apply where the Government seizes materials during the pendency of an ongoing grand jury investigation to ascertain the factual basis for potential criminal charges.  If *Bartnicki* has any applicability, it would be in assessing ultimate liability, not in cutting off a federal criminal investigation.

Further, to the degree that *Bartnicki*'s principles are applicable, they are embodied in the firmly rooted standard for the qualified journalists' privilege articulated in *Gonzales* and its progeny.  The *Gonzales* standard encapsulates similar First Amendment concerns as *Bartnicki*, including the "the public policy interest in safeguarding the confidentiality of those who convey information to the press," "the pivotal function of reporters to collect information for public dissemination," and the "symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties."  *Gonzales*, 194 F.3d at 35; *see also Bartnicki*, 532 U.S. at 534-35.  Thus, the *Gonzales* holding reflects the same underlying principles and establishes the standard for those protections in the privilege context.

The Petitioners nevertheless argue that giving "practical effect" to *Bartnicki* requires that the privilege attach to everything except evidence "demonstrating that the Project Veritas reporters themselves 'played a part' or 'participated in the theft' of some underlying property."  Br. 20.  That

is plainly inconsistent with the *Gonzales* standard and basic principles of relevance.  To be of "likely relevance to a significant issue in the case," *Gonzales*, 194 F.3d at 36, each piece of evidence need not prove guilt beyond a reasonable doubt.  Rather, each piece of evidence may be a brick in the evidentiary wall, which will join with numerous other pieces of evidence gathered in the course of the Government's investigation to form a broader whole that establishes guilt for potential criminal charges.  And under *Gonzales*, once the qualified privilege has been overcome, there is no basis for further protecting otherwise responsive content based on a party's subjective evaluations of the relative strength of a particular piece of evidence.

Finally, even if the holding in *Bartnicki* could be read to create additional First Amendment protections in the privilege context (which it cannot), the Petitioners would not be entitled to such protection because there is probable cause to believe that they were actively involved in the unlawful conduct under investigation.  The Supreme Court's First Amendment jurisprudence draws a clear and critical distinction "between stealing documents and disclosing documents that someone else had stolen previously."  *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 431 (S.D.N.Y. 2019); *see generally id*. at 430-31 (canvassing relevant case law).  In *Bartnicki,* for example, a radio commentator published a recording that he had legally obtained but which he knew or had reason to know had been illegally intercepted by a third party.  532 U.S. at 517-18.  The defendants in that civil case were protected by the First Amendment, but that protection rested on three factual assumptions: (1) they "played no part in the illegal interception" and learned about it only after it had occurred; (2) "their access to the information on the tapes was obtained lawfully, even though the information itself was intercepted unlawfully by someone else"; and (3) "the subject matter of the [recorded] conversation was a matter of public concern."  *Id*. at 525.  These

16

first two factual predicates reflect long-standing Supreme Court precedent drawing a distinction between active involvement in criminal conduct and passive receipt of stolen property or information. *See, e.g.*, *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (upholding press's right to publish information of public concern obtained from documents stolen by a third party); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 99, 103 (1979) (state officials may not constitutionally punish publication of "lawfully obtained" truthful information absent need to further state interest of the highest order). Put simply, even members of the news media "may not with impunity break and enter an office or dwelling to gather news." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991).

As the Government has previously explained, the Petitioners fall on the wrong side of that distinction. *See* S.M. Opp'n 1, 3-4, 7; Gov't Ltr. 4-9. This case does not involve mere passive receipt, let alone passive receipt and subsequent publication by a journalist of information on a matter of public concern. Rather, based on the evidence gathered to date, including evidence described in detail in the affidavits submitted in support of the search warrants at issue, there is substantial evidence demonstrating probable cause to believe that Project Veritas, O'Keefe, Meads, and Cochran were actively involved in the unlawful conduct under investigation—the interstate transportation of stolen property, as well as the theft of certain of the property itself. The Petitioners' unsworn protestations to the contrary are unpersuasive in light of that evidence. And the Petitioners' citations to cases involving mere "solicitation" of stolen property, *see* Br. 5, are inapposite based on the evidence developed to date, including that set forth in the Government's

17

*ex parte* submission to the Special Master.[9]  *See* Gov't Ltr.  4-6.  Therefore, although the Special Master need not reach this issue to determine the applicability of the qualified journalists' privilege, the Petitioners are not entitled to First Amendment protection with regard to the conduct at issue.  *See, e.g.*, *Democratic Nat'l Comm.*, 392 F. Supp. 3d at 431; *Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652, 657 (E.D. Va. 2019) (rejecting First Amendment argument to dismiss civil complaint by respondent where respondent was alleged to have conspired with the parties who illegally obtained the information at issue); *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 396 (E.D.N.Y. 2007) (discussing Pentagon Papers case and concluding that, in contrast, the reporter in question was "deeply involved in the effort to illegally obtain" documents).  As such, even assuming *Bartnicki* has some import in this context aside from its embodiment in the qualified privilege, no related privilege attaches to materials that were in the Petitioners' possession that have been deemed responsive to the search warrants and therefore constitute evidence of their involvement in criminal conduct.

### E.    The First and Fourth Amendment Do Not Provide An Independent Basis for Privilege Over the Responsive Materials

Rather than engage with established precedent for the qualified journalists' privilege under *Gonzales*, the Petitioners attempt to manufacture a novel privilege based on a combination of the First and Fourth Amendments that would conveniently support their overbroad claim that all of

---

[9] To be clear, the Special Master need not resolve this apparent dispute in order to rule on the Petitioners' objections.  In the context of evaluating the applicability of potential privileges, and exceptions thereto, the Government's demonstration of probable cause is sufficient.  *Cf. United States v. Spinosa*, No. 21 Cr. 206 (PAE), 2021 WL 2644936, at *5 (S.D.N.Y. June 28, 2021) ("To invoke the crime-fraud exception, a party must demonstrate that there is a factual basis for a showing of *probable cause* to believe that a fraud or crime has been committed—or has been attempted—and that the communications in question were in furtherance of the fraud or crime." (emphasis added)).

18

the Responsive Materials are privileged.  Their argument is meritless.

The Petitioners contend that although the *Gonzales* standard applies, the Special Master should heighten the "strength of the privilege" based on a collection of other First Amendment principles—each of which is already embodied in the *Gonzales* standard—such as the freedom of the press, or is irrelevant in the circumstances presented, such as associational privacy.  Br. 11, 14-15.  Similarly, the Petitioners argue that Fourth Amendment principles somehow also bear on their newly-invented privilege, though they ignore the fact that the searches and seizures here are presumptively reasonable under the Fourth Amendment because they are being conducted pursuant to judicially-authorized search warrants.   In any event, on the basis of this novel "privilege," the Petitioners argue that the Responsive Materials should be subject to a blanket privilege because, among other things, the search warrants were "fatally overbroad," the Government acted in "bad-faith," and the warrants bear "indications of viewpoint discrimination." Br. 11, 17-18; *see also* Ltr. 3.

The Petitioners' arguments—which are unfounded in fact and law—are entirely irrelevant to the Special Master's analysis of the qualified privilege that may attach to the Responsive Materials.  As Petitioners acknowledge, "[t]he different First Amendment interests involved in newsgathering and reporting often coalesce in the form of a First Amendment or common-law reporters' privilege."  Br. 9.  And as the Petitioners concede, the *Gonzales* standard provides the applicable test within the Second Circuit for assessing the qualified journalists' privilege.  *See* Br. 10.  The various First Amendment principles articulated by the Petitioners "coalesce" in—and are not separate and apart from—the established *Gonzales* standard.  The Petitioners' attempt to create a new, additional First Amendment privilege to layer on top of the *Gonzales* test for evaluating the

19

qualified privilege should be rejected.

Further, to the extent Petitioners challenge the veracity of the search warrants under the Fourth Amendment, their claims are premature, improperly raised in this forum, and irrelevant to whether the Responsive Materials are privileged.  The District Court has now twice expressly ruled that it "shall not consider arguments related to the validity of the search warrants because that issue is not before the Court."  *In re Search Warrant dated Nov. 5, 2021*, 2021 WL 5845146, at *1; *see also In re Search Warrant dated Nov. 5, 2021*, 2022 WL 500919, at *1.  Rather, the Special Master's mandate is to conduct a responsiveness review of the devices and resolve any privilege disputes.  *In re Search Warrant dated Nov. 5, 2021*, 2021 WL 5845146, at *2–3.  The Petitioners cannot prematurely raise potential Fourth Amendment challenges to the search warrants at this pre-indictment stage of an ongoing grand jury investigation.  *See In re Search Warrants Executed on Apr. 28, 2021*, 2021 WL 2188150, at *2 ("any pre-indictment suppression motion would be premature at this juncture"); *Doane v. United States*, No. 08 Mag. 17 (HBP), 2009 WL 1619642, at *9 (S.D.N.Y. June 5, 2009) (petitioner's motion to suppress was not "ripe for adjudication" because "[n]o criminal charges have been brought").  In any event, even if the Petitioners could somehow challenge the search warrants at this stage of the investigation, the Special Master has not been tasked with adjudicating such arguments.[10]

---

[10] The Petitioners also argue that privilege should attach to the Responsive Materials because the "DOJ's failure to comply with its statutory limits or internal guidelines necessarily makes a search *unreasonable*."  Br. 16 n.6, 23; *see also* Ltr. 3.  As explained above, the sole issue before the Special Master is whether the Responsive Materials are subject to the qualified privilege, and the

In sum, the Petitioners' novel theory—and their premature, misguided challenges to the search warrants and the Investigation more broadly—form no basis for the application of any privilege.  Put simply, the validity of the Government's search warrants, the investigative steps taken during its Investigation, the strength of the evidence gathered to date, and whether the Petitioners will ultimately be charged in connection with the Investigation, is not before the Special Master.  Accordingly, the Special Master should decline the Petitioners' invitation to engage with what amounts to a pre-indictment suppression motion or allow a narrow privilege determination to be transformed into a wide-ranging referendum on the Government's investigation.

## **CONCLUSION**

For the reasons set forth above, the Petitioners' objections should be overruled.

Dated: New York, New York
　　　　April 13, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:　　/s/_____
　　　　Jacqueline Kelly
　　　　Robert B. Sobelman
　　　　Mitzi Steiner
　　　　Assistant United States Attorneys
　　　　Tel.: (212) 637-2456/2616/2284

---

Petitioners should not be permitted to inject their premature suppression arguments into that analysis.  In any event, the Second Circuit has found no reason merely "because the Department of Justice has adopted strict guidelines for itself with respect to subpoenaing reporters, *see* 28 C.F.R. § 50.10, [to] adopt the same principles as binding propositions of law" with respect to the qualified privilege.  *Treacy*, 639 F.3d at 43.  That is because the "Justice Department's internal regulations governing the issuance of subpoenas to journalists, . . . exist wholly apart from any privilege established in the case law."  *Id.* at 43 n.3.