

**CALLI LAW, LLC**
One Flagler Building, Suite 1100
14 Northeast 1st Avenue
Miami, Florida 33132
T. 786.504.0911
F. 786.504.0912
www.calli-law.com

April 20, 2022

**JAMES O'KEEFE'S AND PROJECT VERITAS'S REPLY BRIEF ON FIRST AMENDMENT AND JOURNALISTIC PRIVILEGES**

## I.    Introduction

The government's dismissive treatment of the First Amendment issues, and its opposition brief in general, is a stunning pageant of hypocrisy and disingenuousness. In total, the government urges disclosure of journalists' confidential newsgathering materials to the government by arguing, in effect, that to prevent the disclosure of confidential information, journalists must first disclose that confidential information. Indeed, the government asserts that Mr. O'Keefe and Project Veritas have waived their privileges as to non-public information by merely describing publicly known facts, and then complains that they have not adequately described the confidential information in dispute and thus cannot meet their burden of keeping it confidential.  The government complains that Mr. O'Keefe and Project Veritas are being unfair by only discussing public information without giving the full picture of the protected information in dispute, but then repeatedly relies on secret affidavits to justify its supposed interest in confiscating phones, emails, and all manner of investigative work product and editorial discussions from reporters and publishers. On top of all that, the government blithely asserts that it has no other means of obtaining the information it needs, all the while failing to mention that any conceivable information it might need would be on the electronic devices it previously seized from the journalistic sources who obtained the abandoned items at the heart of this case. In short, the government's brief is an embarrassing mélange of contradiction and investigative abuse that mocks the Department of Justice's very name and gets the burden squarely wrong.

As for the fundamental First Amendment violations embodied in the government's attempt to access the journalistic materials in this case, the government refuses even to engage, instead erroneously claiming that such constitutional matters are already addressed and overcome by the

standards set forth in *Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29 (2d Cir. 1999). Of course, nothing could be further from the truth, and the government's treatment of *Gonzales* ignores the self-described limits of that case, the vast difference in the government's conduct in this case, and even the most basic of First Amendment standards for burdens of proof, narrow tailoring, and a legal and evidentiary foundation for its supposed interest in this as-applied challenge. Even if the government could satisfy the *Gonzales* test itself, because the Second Circuit declined to wade into the constitutional thicket in that case, compliance with the *Gonzales* test would not resolve the further constitutional limits argued here. In light of the strict standards set forth in the recent Supreme Court decision in *Americans for Prosperity Foundation v. Bonta* ("*AFP*"), 141 S. Ct. 2373 (2021), any narrow reading of the *Gonzales* privilege would be entirely inadequate to save the government's current conduct from First Amendment challenge. Indeed, even the bare validity of the asserted law enforcement interest in this case is doubtful given the lack of any underlying theft of the abandoned property at issue, the lack of any asserted crime by the initial acquirors, and the limits imposed by *Bartnicki v. Vopper*, 532 U.S. 514 (2001). Accepting, possessing, and transporting newsworthy material for newsgathering purposes, even if stolen (or otherwise illegally obtained by others), cannot be punished or criminalized. And where there was no initial theft at all, merely the provision of abandoned property by sources to journalists, the non-crime of transporting such property cannot support an investigative interest.

The Constitution is not an ornamental decoration. But the government believes substantive precedent may be wholly cast aside as irrelevant – effectively arguing the First Amendment newsgathering interests of members of the press may be trodden down by a zealous government without limitation so long as no indictment is issued. This is not the case; this cannot be the case – the damage to freedom of the press occurs not when an indictment is issued, but rather when, as

in this case, the reporter's notebook is seized. In this instance, a free press collides with a criminal investigation. But criminal investigation does not empower the federal government to put the First Amendment on hold. In just such an instance, Justice Powell reminded future courts that they "will be available to newsmen under circumstances where legitimate First Amendment interests require protection." *Branzburg v. Hayes*, 408 U.S. 665, 710 (Powell, J., concurring). Such a day is upon the Court, and the time to protect First Amendment interests is now. For freedom of the press to continue free from governmental overreach via seemingly unrestricted investigations, the Court must champion journalists' legitimate First Amendment newsgathering interests. This requires the incorporation of the substantive protection of *Bartnicki v. Vopper*, 532 U.S. 514 (2001), into criminal procedure.

To that end, the law calls upon the government to prove an exception to *Bartnicki* in the first instance (which they have not and cannot do), **not** on Mr. O'Keefe or Project Veritas to disprove the exception in a government-created vacuum while being threatened with a waiver of their First Amendment privileges should they do so. Unless the government produces genuine evidence that the journalists in this case themselves stole the relevant and newsworthy material, all downstream involvement with such items is protected by the First Amendment and may not be disclosed to the government.

## II.    Publishing, Newsgathering, and Associational Privacy are Protected by the First Amendment and Intersecting Procedural Protections.

The government makes no effort to dispute the basic First Amendment principles that govern this case, other than to assert that such principles are already addressed by the standards set forth in *Gonzales*. *See* Opp. Br. at 14-15, 18-19. That assertion is incorrect. *Gonzales* itself noted that it would not wade into the constitutional thicket and instead based its decisions on a

policy driven common-law privilege. If a properly protective reading of *Gonzales* is sufficient to bar the government from accessing the private information currently in dispute, then there would indeed be no need to go further. But if this Court agrees with the government that a weak reading of the *Gonzales* test effectively allows the government to see any and all information responsive to a broad and untested search warrant likely based on flawed or withheld information, then it would then have to wade into the very constitutional thicket that the Second Circuit has yet to address. The First Amendment is a binding limitation on government that imposes well-established speech-protective standards the government must overcome, not a mere invitation for *ad hoc* policymaking by courts. Before turning to proper application of the reporters' privilege, however, the government's concessions on constitutional matters, by failing to dispute those matters, are worth reviewing.

For example, the government does not dispute the strong First Amendment protections for the right to gather and communicate information to the public free from official retribution. Secrecy, in particular, often is an essential shield that allows reporters, sources, and financial supporters to feel sufficiently safe to bring important and controversial public interest stories to light without fear of government or private retribution. PV Br. at 4; *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979). And the government implicitly concedes that journalists such as Mr. O'Keefe and Project Veritas have that right regardless of whether the sources who provide information obtained or disclosed it illegally or otherwise in violation of some duty. PV Br. at 5-6; *Bartnicki*, 532 U.S. at 525. The government does not dispute this core protection, nor does it address the subsequent cases reading such protections broadly to include even active collaboration with or solicitation of information from sources who subsequently act illegally, so long as the journalists do not themselves engage in the underlying illegal acts. PV Br. at 5-6; *Jean v.*

*Massachusetts State Police*, 492 F.3d 24, 31 (1st Cir. 2007); *Democratic National Cmte. v. Russian Federation*, 392 F.Supp.3d 410, 434-35 (S.D.N.Y. 2021).

The government also does not dispute the existence of a First Amendment right to gather news "from any source" and the right to expressive association, including the right to keep such associations and internal deliberations private. *See Branzburg v. Hayes*, 408 U.S. 665, 681-82 (1972); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958); *AFP*, 141 S.Ct. at 2383. That concession is especially salient in the context of a not-for-profit entity such as Project Veritas, which shares the characteristics of both news entity and an educational organization that often communicates to the public with a distinct perspective on the issues of the day. Forced disclosure of private internal information—whether details about donors, investigative notes, or editorial deliberations— imposes a substantial burden on such freedom of association, and chills both colleagues and sources from association and information exchange. And the government does not dispute that the minimum constitutional test for government conduct imposing such burdens is "exacting scrutiny." PV Br. at 7, 18-19. Indeed, the Supreme Court recently recognized that the rigorous test for protecting non-profit donor information derives from the same lineage as protection for information gathered by or exchanged among reporters. *AFP*, 141 S. Ct. at 2383 (citing *Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539 (1963) for application of exacting scrutiny in context of a legislative subpoena).[1]

---

[1] Indeed, if anything, the First Amendment interests at stake for sources, newsgathering information, and internal deliberations are even stronger than for mere donations. While donations are sometimes thought of as somewhat passive or generic forms of expressive association, *Buckley v. Valeo*, 424 U.S. 1, 21 (1976) (discussing contributions), sources, reporters' notes, and editorial deliberations are the very core of expressive association by which a publisher obtains, analyzes, and decides newsworthy information it will (or won't) publish.

Finally, the government does not dispute that certain compounding factors, such as bad faith, content-based, or viewpoint-based burdens raise the level of scrutiny from exacting to strict, which for practical purposes is generally fatal. *Compare* PV Br. at 18.

Having conceded these fundamental First Amendment principles, and the exacting or strict scrutiny under which burdens on First Amendment rights are tested, the government merely pretends they are adequately addressed by the common-law journalists' privilege that it then improperly dilutes to little more than rational basis scrutiny. But while the various cases on the reporters' privilege are animated to a greater or lesser degree by the same policy concerns that undergird the First Amendment, they do not attempt to apply First Amendment standards directly and, to the extent they are less protective than the undisputed First Amendment rules, such lax judicial policymaking would necessarily yield to required constitutional protections.[2]

In additional to the basic First Amendment protections at issue in this case, there are also procedural protections under the Fourth Amendment and otherwise that take on heightened vigor when an underlying First Amendment right is involved. Other than to dispute the ripeness of testing the validity of the warrants, the government also does not address the fundamental Fourth Amendment and due process principles applicable to this case. Nor does it dispute that the usual constitutional protections are strengthened when the underlying materials being searched or seized are protected by the First Amendment. *Compare* PV Br. at 12-18; *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978). At a minimum, those protections require heightened scrutiny beyond the

---

[2] While the government claims that such cases are sufficient to satisfy constitutional standards, that claim is disingenuous given the government's acknowledgement in a footnote, that the "Second Circuit has expressly declined to 'wade into the[] constitutional waters' to determine whether 'the reporter's privilege is derived from the First Amendment rather than a federal common law of privileges.'" *See* Opp. Br. at 3 n.4 (quoting *Treacy* and *Gonzalez*).

otherwise lax burdens imposed by the Fourth Amendment or ordinary due process review. Henry P. Monaghan, *First Amendment 'Due Process'*, 83 HAR. L. REV. 518 (1970) (quoting *Speiser v. Randall*, 357 U.S. 513, 520 (1958)). Any procedure that fails to protect key substantive First Amendment rights, regardless of the scrutiny, eviscerates those identified rights.

While each element of establishing probable cause and adherence to the particularity requirement of the Fourth Amendment should be reviewed with greater vigor, an especially important procedural safeguard would be ensuring, at the outset, that the so-called "crimes" under investigation and that are the predicate for the warrants are in fact constitutionally permissible charges under *Bartnicki*. Narrowing the actions that can validly be charged, and hence investigated, is an important threshold consideration to prevent the government from jaunting off on a fishing expedition into First Amendment-protected waters by asserting non-crimes that it could not credibly prosecute. *Bell v. Neukirch*, 979 F.3d 594, 608 (8th Cir. 2020) (no probable cause if no underlying crime). Only by having such analysis at the threshold of any privilege determination can the government be held to its burden of establishing probable cause or any interest that would justify a burden on First Amendment rights. Such an analysis is not the equivalent of a Fourth Amendment suppression motion and is necessarily ripe at the time the government seeks *access* to the materials subject to privilege, not merely when it seeks to introduce such materials as evidence in court. Waiting until later to test the validity of the warrants would be too late and would irreparably harm First Amendment rights, not merely Fourth Amendment interests.

**III.    The Government Improperly Dilutes and Cannot Overcome even the Common-law Reporters Privilege.**

Regarding the legal test applicable to this case, the government essentially ignores the constitutional issues and focuses on the common-law privilege. Opp. Br. at 3 (citing *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011); *United States v. Treacy*, 639 F.3d 32, 43 (2d Cir. 2011); *Gonzales*, 194 F.3d at 33, 35 n.6. And the government seeks to weaken the test by claiming that the material at issue is non-confidential and any qualified privilege may be overcome if the material "is relevant to a significant issue in the case and not reasonably obtainable from other available sources." *Id*. But the material at issue in this case is indeed confidential and the relevant standard in the Second Circuit requires the government to show that the information sought is "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *In re Petroleum Products Antitrust Litigation*, 680 F.2d 5, 7 (2d Cir.1982) (per curiam).

**A.    Journalistic Investigations and Internal Discussions Do Not Lose their Privilege or Confidentiality by General Discussions of Public Facts.**

Before addressing the application of the journalists' privilege, the government claims that any privilege has been waived because Mr. O'Keefe and Project Veritas have already disclosed such information and their sources.  Opp. Br. at 6-9. It goes further and invokes the so-called "fairness doctrine" by claiming that "a party that discloses some privileged information cannot thereafter rely on the privilege to withhold related information necessary to gain a complete picture of the facts." *Schiller v. City of New York*, 245 F.R.D. 112, 120 (S.D.N.Y. 2007).

Mr. O'Keefe and Project Veritas, however, have not even remotely waived their privilege claims for the documents in dispute. At no point did they identify their sources or reveal the content or the details of the documents and communications currently under review, but instead discussed

generally known facts readily available from other sources. Even where such facts might also be contained in the private communications, that does not waive or vitiate the privilege for such communications. Were the government correct, then publishing any story at all that cited confidential sources and conveyed some of the newsworthy information they provided would, *ipso facto*, then waive privilege for all newsgathering information from such sources. The same flawed reasoning would treat the filing of any legal complaint reciting facts of a case as a waiver of any attorney-client or work-product privilege for communications or analysis involving such facts. That, of course, is not the law for any form of privilege. Although a fact may be obtainable from numerous sources, only one of which is privileged, privilege is not waived by including that fact in a pleading. The Petition for Return of Property filed by Project Veritas and its journalists (Doc. No. 70) recites facts derived from numerous sources identified by undersigned counsel, including witnesses (internal and external), Project Veritas documents, information obtained from third parties, public records, and even the government's own pleadings. The Petition does not quote the content of any witness interview or document, nor does it identify the source of the recited facts except where derived from records available from public or government sources.[3]

The cases cited by the government do not stand for the remarkable proposition that alleging facts waives underlying privileges. *See* Opp. Br. at 6-7. Rather, those cases merely recognize the unremarkable principle that when privileged ***content*** is disclosed in whole or in part, such disclosure waives the privilege. *See United States v. Sterling,* 724 F.3d 482, 509 (4th Cir. 2013)

---

[3] Although the investigative team members who constructed this novel waiver argument disclaim any knowledge of the "content of the Responsive Materials," Opp. Br. at 12, certainly the government filter team is well aware of the facts contained in the Project Veritas items at issue. And yet the government's argument is unsupported by a declaration from a government filter team member averring that the one or more facts recited in the Rule 41 Petition was derived from any particular item at issue, much less that the resulting factual picture is selective or incomplete. It is only the government that is relying on secret "facts" to make false allegations of criminal conduct against Project Veritas and its former journalists.

(privilege regarding the identity of a source waived where journalist revealed identity of source to third-party); *Wheeler v. Goulart*, 593 A.2d 173, 175 (D.C. 1991) (same); *Ayala v. Ayers*, 668 F. Supp. 2d 1248, 1250–51 (S.D. Cal. 2009) (privilege waived as to complete copy of journalist's manuscript provided to one litigant but denied to another litigant); *Pinkard v. Johnson*, 118 F.R.D. 517, 523 (M.D. Ala. 1987) ("both parties are entitled to depose [the reporter] concerning the substance of a conversation about which he has already submitted a signed affidavit).[4]

Perhaps the most egregiously hypocritical aspect of the government's waiver argument is that it simultaneously claims waiver from the basic factual recitation but then objects to the lack of detail about the content of the materials in dispute.  Opp. Br. at 7, 13 n.8.  Under the government's view, it can unlawfully seize newsgathering materials and yet the aggrieved journalist is foreclosed from supporting his privilege objections even with a high-level description of the facts.  But then if the journalist fails to provide a "particularized articulation of the purported confidential information contained in the Responsive Materials," Opp. Br. at 13 n.8, the journalist's claim will fail for lack of support.[5]  Such a Catch-22 is not the law and makes no sense.

The government also has the audacity to invoke the supposed "fairness doctrine" claiming that Mr. O'Keefe and Project Veritas are using the facts as a sword and shield. Opp. Br. at 7. As we said in our Rule 41(g) Petition, however, all of these facts are already known to the government

---

[4] The remaining decision cited by the government, *Inside Radio, Inc. v. Clear Channel Commc'ns, Inc.*, 208 F.R.D. 537 (S.D.N.Y. 2002) was not decided on a waiver theory, but rather on the ground that information supporting the plaintiff's libel claims was available only from its sources.  *Id.* at 542 ("the question whether [plaintiff] had any sources for the purportedly factual statements in the [] article and, if so, precisely what they told [plaintiff] not only is clearly relevant, but it is pivotal to the claim or defense and unavailable from anyone but [plaintiff]").

[5] Of course, Project Veritas and its journalists have supplied a "particularized articulation" of their non-responsiveness and privilege arguments, document-by-document, *ex parte* as the Special Master's Order permits.

by virtue of its seizure of Project Veritas emails and the electronic devices of Project Veritas's sources. As noted, the government has not supported its fairness argument with a declaration from the government filter team averring that Project Veritas's factual information is selective and somehow contradicted by the content of the items at issue. Indeed, the members of the government investigative team brag that they know far more than Project Veritas. Opp. Br. at 8. ("But these disclosures tell only part of the story, as a review of the affidavits submitted in support of the warrants makes clear"). The sheer hypocrisy of the government claiming to be the victim of informational unfairness is astounding given that the government repeatedly uses secret affidavits and *ex parte* submissions to support its claimed interests, using them not merely as swords, but as battle-axes. If anyone is "distort[ing] the judicial process" by selective and incomplete disclosure, Opp. Br. at 8-9, it is the government, not Mr. O'Keefe and Project Veritas. The government has selectively disclosed an undoubtedly exaggerated description of what it claims is in the affidavits supporting the search warrant yet refuses to share even redacted versions of those affidavits. The government is the party engaged in selective and unfair storytelling.[6]

Perhaps sensing the disingenuousness of its waiver arguments, the government also recasts the same claims as reasons to categorize the materials as non-confidential and hence supposedly less worthy of protection. Opp. Br. at 9-10. But its claims that merely describing the underlying facts renders the investigative materials non-confidential is unsurprisingly bereft of any authority

---

[6] Again, the government's description of its authority is misleading. *Schiller v. City of New York*, 245 F.R.D. 112 (S.D.N.Y. 2007) involved information in questionnaires for which the respondents never requested confidentiality. *Id.* at 119-20. The quoted language is *dicta* and, like *Sterling* and the other cases cited by the government for its stating-facts-is-a-waiver argument, involved disclosure of the **content** of the disputed documents. In *In re Sims*, 534 F.3d 117 (2d Cir. 2008), the Second Circuit rejected the argument that a litigant waives privilege merely by alleging facts or "asserting to his adversary that he believes he has done nothing wrong." *Id.* at 132. And *von Bulow by Auersperg v. von Bulow*, 828 F.2d 94, 101 (2d Cir.1987) concerned a different issue entirely—whether a client had waived the attorney-client privilege by consenting to his lawyer's publication of confidential communications in a book.

and lacks any logical support. Every news story based on confidential investigations eventually tells some of the facts discovered thereby, but that does not render all of the investigative materials non-confidential.  To accept the government's position would have the exception swallow the rule. Furthermore, even if the bare facts are revealed, the notes, discussions, and sources of the journalists would remain confidential, not to mention the many other items of information on a reporter's phone or computer.  The very overbreadth of the government's search and seizure, not to mention its secret seizure of Project Veritas emails for roughly a year, demonstrates the folly in trying to draw such a porous line between confidential and non-confidential information here.

In any event, the aggrieved journalists have made detailed objections to the Special Master *ex parte* and identify why the materials sought are indeed confidential and why their disclosure raises serious First Amendment concerns. The government's generic speculation that such material is not confidential simply does not suffice and is not even supported by an affidavit from the filter team.

### B.    The Government Cannot Justify Breaching the Journalists' Privilege.

Turning to the application of the improperly diluted *Gonzales* test, the government argues that "the privilege is overcome where 'the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources.'" Opp. Br. at 5 (quoting *Gonzales*, 194 F.3d at 36). As noted earlier, that standard is too lax for the materials here, is far laxer than the required First Amendment scrutiny, and in any event the government cannot even satisfy its own weaker test.

In seeking to establish relevance to a significant issue, the government references an interest in law enforcement and effective grand jury proceedings as a sufficient interest to overcome any privilege. Opp. Br. at 3-4. The lack of any underlying crime, and the substantive

protection against charges of derivative criminality provided by *Bartnicki*, make the interests the government asserts in this case trivial at best. Furthermore, as noted above, the First Amendment sets a substantial floor on what sorts of interests can justify burdening the freedoms of speech, the press, and association. In the half century since *Branzburg*, the Supreme Court has given considerably more weight to the First Amendment interests in associational and deliberative privacy, and hence any supposed government interest cannot be relied upon *en grosse* but must be demonstrated as-applied. And the burden of demonstrating such an interest is on the government, not on those whose First Amendment rights are being burdened.

The most the government offers in support of its claimed interest is its reliance on the existence of the search warrants themselves and a claimed grand jury investigation. In its recitation of the facts, the government claims that the search warrants were obtained "as part of an ongoing grand jury investigation . . . into the theft and interstate transportation of certain property stolen from an individual (the 'Victim')." Opp. Br. at 2. The government provides no supporting evidence that the warrants were actually obtained as part of a ***then-existing*** grand jury investigation. Specifically, the government does not even claim, much less demonstrate, that the informants or documents cited in the affidavits were presented to a grand jury. Nor does the government show that any of the FBI agents who procured and executed the warrants testified before a grand jury about those events before or after the search. In these circumstances, the government's searches are "independent of [any] investigation[] by the grand jury." *See United States v. Eastern Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir. 1991). And given the continued concealment from Mr. O'Keefe and Project Veritas of the supposedly damning affidavits, the government cannot satisfy due process standards, much less its burdens of proof, with such one-side and untested facts. Under the government's approach, all it must do is shout "thieves!" to completely drown out First Amendment rights during a criminal investigation. This is not and cannot be the correct standard of justice.

As best we can tell given the government's secrecy, the government lacks any basis for claiming that Project Veritas or its reporters were in any way involved in the acquisition of the abandoned diary and related items. To the extent the government claims otherwise in private communications with the Court, such claims should be disclosed in detail so their falsity can be established. The Constitution and *Bartnicki* would compel no less. After all, even smut-peddlers enjoy the right to an adversarial hearing with "rigorous procedural safeguards" to protect free speech interests. *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 62–63 (1989). It cannot be the case that journalists lack any right to similar procedural safeguards to protect their newsgathering—speech with far more First Amendment import.

Instead, the government seems only to assert that the alleged "crimes" it is investigating are conspiracy and "after-the-fact" transport of allegedly stolen property across state lines. Opp. Br. at 10. Apart from the constitutional frivolity of such "crimes" in light of the protections established by *Bartnicki*, investigation of them does not justify the breadth of the materials the government seeks to view. Indeed, the movement of the diary and associated items are largely a matter of public record and are readily reflected in other materials the government has obtained from other sources, including the cell phones of the persons who obtained such materials (and have not been charged with any crimes, such as theft). Those basic facts and failings should make it impossible for the government to demonstrate any genuine, much less important or compelling interest in seizing and reviewing the materials in this case.

The government's citation to the other *Gonzales* case, *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 170-72 (2d Cir. 2006), illustrates the weakness of its interests. *See* Opp. Br. at 11. That case applied a much stricter standard, held the government to its proof, and involved a leak of national security information that may have tipped an organization supporting terrorism to a raid.

*Id*. at 162.  The contrast with transporting an abandoned diary could not be starker.  On appeal the Second Circuit did not articulate the watered-down version of the need test advanced by the government here—mere relevance to any issue in the government's investigation. Rather, Judge Winter emphasized the seriousness of "the unauthorized disclosures of imminent plans of federal law enforcement to seize assets and/or execute searches . . . perhaps endangering federal agents" that the reporters were "the only witnesses . . . available to identify the conversations in question and to describe the circumstances of the leaks" and that "the government, having unsuccessfully sought the *Times*' cooperation, cannot be charged by the *Times* with having issued an unnecessarily overbroad subpoena."  *Id.* at 170-71. And Judge Winter emphasized that the result in that highly serious case should not foreshadow a similar result in cases with lesser facts:

> We emphasize that our holding is limited to the facts before us, namely the disclosures of upcoming asset freezes/searches and informing the targets of them. For example, in order to show a need for the phone records, the government asserts by way of affidavit that it has 'reasonably exhausted alternative investigative means' and declines to give further details of the investigation on the ground of preserving grand jury secrecy. **While we believe that the quoted statement is sufficient on the facts of this case, we in no way suggest that such a showing would be adequate in a case involving less compelling facts.**

*Id.* at 171 (emphasis added). It should certainly not foreshadow such a result in an investigation into an abandoned diary. The "showing" made by the government here is unsworn and does not address in any way exhaustion of alternative investigative means.

The facts in *NYT v. Gonzales* could not be more different than those at issue here. The government there did not even issue a subpoena, much less execute warrants at journalists' homes, and instead engaged in a dialogue with the Times as DOJ regulations require. *See* 28 CFR § 50.10(a)(3). The offense under investigation threatened national security and the safety of law

enforcement officers. And the journalists were the **sole** witnesses (other than the leakers) to the crime. In sharp contrast, the government here is conducting an unprecedented federal investigation of the receipt of a personal diary, and it has made unprecedented use of search warrants to seize newsgathering materials from journalists and their electronic communication service providers. Unlike in *Gonzales*, the government here has known the identity of the sources since 2020 and seized the electronic devices of the sources before seeking warrants to raid the journalists' homes.

Even assuming a minor law-enforcement interest in this case, however, the government still fails to demonstrate that the materials it seeks to review are **necessary** to its investigation or contain information not available from other sources. Rather, it merely asserts that "the Responsive Materials are, by the nature of their responsiveness to the search warrants, necessarily relevant to a significant issue and are not reasonably obtainable from other available sources given that they were obtained from the Petitioners' electronic devices in their personal possession." Opp. Br. at 6. It further argues that "the development of the facts turns on the precise information and communications in the Petitioners' possession at particular points in time."[7]

As for the government's claim that it needs the metadata associated with communications on petitioners' electronic devices, Opp. Brief at 13, the government once again ignores that it has alternative sources of such information, not the least of which is the seized electronic devices of the individuals whom it acknowledges acquired the underlying materials and reached out to Project

---

[7] Piggy-backing on the existence of a search warrant, the government passingly suggests, Opp. Brief at 9 n.6, that privileges may not even apply to materials subject to such a warrant and that in any event, their responsiveness to a warrant disclaiming any desire for non-confidential information makes them necessarily relevant and non-confidential. Apart from the sheer circularity of that argument—merely saying it does not make it so-- no sane litigant or jurist would simply take the government at its word that it was entitled to and complied with the warrant (hence the need for constitutional protection). That the government thus relies upon the warrant to overcome privilege demonstrates the absolute necessity of testing the validity of the warrant and the government's compliance therewith, before irreparably revealing privileged material to the government.

Veritas. There is no explanation why it needs the other side of any exchanges with those persons, much less all of the other internal communications it seeks. Indeed, having seized the sources' electronic devices, the government knows (or should know) the time of their initial contact with Project Veritas which post-dates the sources' acquisition of the subject diary and related property. It is apparent from information **already in the government's possession** that Project Veritas did not participate in any alleged theft, but merely received, evaluated, and sought to corroborate newsworthy abandoned items and information as it is entitled to do under *Bartnicki*. If the government wishes to allege that Project Veritas and its journalists engaged in conduct outside the protection of *Bartnicki*, then an adversarial hearing examining supporting evidence is warranted to protect the core First Amendment interests at stake.

The government also claims that the validity of the search warrants is not properly at issue in these proceedings.[8] *See* Opp. Br. at 3. But the validity of such warrants is essential to a proper First Amendment inquiry, as illustrated by the government's repeated reliance on the issuance and scope of those warrants to demonstrate its needs and its supposedly important interest in obtaining the materials in dispute. The talismanic significance the government gives to its untested warrants gets things exactly backwards when the First Amendment is involved. Were this just an ordinary Fourth Amendment case, it might be true that the validity of a warrant is tested only when evidence is sought to be introduced. But this is not such a case, and the burden on the First Amendment comes not from the **introduction** of such private information in court, but from the government's access to such information at all. Accordingly, to the extent the government relies on the warrants and supporting applications to establish an important or compelling interest as applied, or even

---

[8] Project Veritas and its journalists have challenged the validity of **all** the warrants procured by the government. *See* Petition for Return of Property (Doc. No. 70), and those arguments are incorporated herein by reference.

just a significant issue under its weaker test, then it is proper to test the legitimacy and honesty of the warrant and application ***now*** rather than after the information has been disclosed and the First Amendment harm irreparably consummated. That is ripe by definition. It is the disclosure of private and investigative information that constitutes the First Amendment injury, and the potential invalidity of the underlying warrant would be a critical point of failure in the government's attempt to overcome any common law or First Amendment privilege.

To press pause on the First Amendment now would be to eviscerate its meaning.  It remains black letter law that the loss of "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). It is feasible ***now*** to ensure that the harms done by the seizures are not compounded by releasing sensitive information to the government. *Bartnicki*'s protections must be given effect at this stage in order to prevent continuing First Amendment injuries from the government's investigation of a non-crime.

## IV.    Applying a First Amendment Based Rule of Privilege

As noted earlier, other than simply applying its lax reading of *Gonzales*, the government does not engage on the more stringent tests dictated by constitutional burdens at issue here.  To recap the application of the constitutional tests to this case:

First, the government does not dispute its lack of candor to this court regarding its secret email searches, it does not respond to the self-evident content and viewpoint-based nature of its investigation, and it does not dispute that such elements raise the level of scrutiny.  Thus, even assuming that the *Gonzales v. NBC* test might be relatively lax in ordinary circumstances, these are not ordinary circumstances and far greater scrutiny is required.  The government does not even

pretend to satisfy such scrutiny, and hence it cannot justify the substantial First Amendment burden it seeks to impose through disclosure of private newsgathering information.

Second, the government has not demonstrated that the confidential material it seeks is "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *United States v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983) (*quoting Petroleum Products*, 680 F.2d at 7). The government does not even remotely attempt to meet this burden, claiming only that because the government seeks to establish communications and the journalists' states-of-mind it necessarily needs to view the devices from the reporters themselves. That, in a phrase, is a fishing expedition. The government already had seized phones and other materials from the persons who initially obtained the materials, hence they already had access to any relevant communications about the diaries from the people who offered them. Seeing the same communications on a different phone adds nothing from the government's perspective but does create a threat of disclosing further internal communications within Project Veritas.

Third, the government makes no testable effort to defend the validity of the charges it claims to be investigating in light of the limits imposed on *Bartnicki*. Rather, it asserts active criminality based on secret affidavits. That simply cannot suffice under the First Amendment or under due process for matters involving constitutional rights. The government needs to put forth a testable theory of an actual crime that would survive a First Amendment motion to dismiss, not merely go hunting for some behavior it speculates might exist and then paw through everything it can to "investigate" its speculative theory. If the government claims to have evidence that Project Veritas participated in an alleged theft, then it needs to present that evidence openly so it can be tested, not hide behind its own claims of confidentiality in order to invade journalists' privileged

information. And transportation alone simply is not enough. *Bartnicki*, 532 U.S. at 527 ("given that the purpose of such a delivery is to provide the recipient with the text of recorded statements . . . it is the kind of 'speech' that the First Amendment protects"). The Pentagon Papers presumably found their way from the pentagon in Virginia, to newsrooms in New York, Washington, and elsewhere. If making it a crime to transport leaked (or pilfered) documents could circumvent protections for possession of and reporting on such documents, then no investigative reporter who relies on leaks or whistleblowers is safe.[9]

Fourth, the government has not demonstrated narrow tailoring between its claimed interest in policing actual criminal acts, the methods it used to further those interests, and its efforts to minimize adverse impact of the First Amendment. Much like the prior consideration of whether the material sought is critical to its interests and obtainable elsewhere, narrow tailoring under the First Amendment is a rigorous test that the government does not even flirt with satisfying.

Fifth, the government has not met its burden of proof of an important or compelling interest. Indeed, prosecuting the transport of the newsworthy products of an alleged petty theft

---

[9] The government not only mis-reads *Bartnicki*, it also mis-cites caselaw construing *Bartnicki* to argue that "Petitioners are not entitled to First Amendment protection with regard to the conduct at issue." Opp. Br. at 18. *Democratic Nat'l Committee v. Russian Fed'n*, 392 F. Supp. 3d 410 (S.D.N.Y. 2019) actually undermines the government's position. There, Judge Koeltl rejected the very same conspiracy, accessory-after-the-fact, and aiding and abetting theories upon which the government procured its search warrants here in seeking to criminalize "soliciting," or "encouraging" acquisition of, stolen information. *Id.* at 435. As for *In re Zyprexa Injunction*, 474 F. Supp. 2d 385 (E.D.N.Y. 2007), the court ordered an expert witness and attorney to return stolen documents while expressly stating that its ruling did not concern or impact the New York Times journalist who allegedly conspired to obtain the documents. *Id.* at 393 ("No newspaper or website is directed to do anything or to refrain from doing anything . . . . No person is enjoined from expressing an opinion or speaking or writing about the documents"). And *Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652, 657 (E.D. Va. 2019) was decided on the ground that, at the motion to dismiss stage, the court was bound to accept the plaintiffs' now-debunked allegations that the Trump campaign conspired with Russia to break into DNC computers to steal personal information that was not of public concern. *Id.* at 658-60. To the extent that *Cockrum* can be read to recognize a "conspiracy" exception to *Bartnicki*, that reading is inconsistent with Judge Koeltl's thorough discussion of the law in *Democratic Nat'l Committee*.

that itself has never been charged is such a paltry interest that it cannot survive any heightened First Amendment scrutiny. That the government seemingly has ***never*** prosecuted such trivial matters both undermines the claimed importance of its interest and confirms that the investigation and threatened charges here have more to do with the content of the newsgathering materials and the viewpoint of the potential reporting than it does with any content-neutral or viewpoint-neutral concern over property.

Sixth, having ducked the Fourth Amendment issues as premature—despite relying on the warrant and application to establish its interest—the government offers no defense of the validity of that warrant or the likely omissions from its application. The government invokes, no fewer than eight times, the content of the search warrant affidavits that it submitted to the Special Master *ex parte*, and the probable cause finding based on those affidavits. Opp. Br. at 2 & n.3, 8, 10, 13, 16, 17, 18 & n.9. This is the very prohibited sword-and-shield tactic that the government argues is unfair. Either these affidavits must now be unsealed, or the government and the Special Master may not rely in any way on the contents or the consequent—and highly questionable—probable cause finding.

That a magistrate Judge issued a warrant based on *ex parte* and likely misleading information from the government does not establish a valid government interest. Rather, it should impose a heightened burden on the government to demonstrate that it turned square corners in applying for the warrant and was fully candid about its other sources of information. Based upon the desperation with which the government cries out for the District Court to keep secret the underlying affidavits in support of the search warrants, it is incredibly unlikely, if not patent, that the government did neither.

**V.     Conclusion**

The casualness and hypocrisy with which the government seeks to invade protected First Amendment rights of a non-profit news organization and its journalists shocks the conscience. The First Amendment recognizes no exception for media companies and journalists that the politically powerful and law enforcement do not "like." The government cannot simply ignore constitutional rights and journalistic privileges to demand private communications from those who strive to hold that very same government and its powerful supporters accountable for their bad behavior.  It is well past time to apply ordinary and well-established constitutional standards to such bullying. Under such standards, and under even the lax standards proposed by the government itself, the materials at issue are privileged and the government has not met the burden of breaching that privilege.

> Respectfully Submitted,
>
> CALLI LAW, LLC
>
>           /s/
> By: _____
>           Paul A. Calli
>           Charles P. Short
> 14 NE 1st Avenue
> Suite 1100
> Miami, FL 33132
> T. 786-504-0911
> F. 786-504-0912
> pcalli@calli-law.com
> cshort@calli-law.com
>
> *Admitted Pro Hac Vice*
>
> Harlan Protass
> PROTASS LAW PLLC
> 260 Madison Avenue
> 22nd Floor
> New York, NY 10016
> T. 212-455-0335

F. 646-607-0760
hprotass@protasslaw.com

Benjamin Barr
BARR & KLEIN PLLC
444 N. Michigan Avenue
Suite 1200
Chicago, IL 60611
T. 202-595-4671
ben@barrklein.com

Stephen R. Klein
BARR & KLEIN PLLC
1629 K. Street, NW
Suite 300
Washington, DC 20006
T. 202-804-6676
steve@barrklein.com

*Counsel for James O'Keefe,
Project Veritas and Project
Veritas Action Fund*